IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS

V.                                    CA NO. 06 - 778 (GMS)

THOMAS L. CARROLL, ET AL.


PETITION FOR WRIT OF MANDAMUS
FOR PRELIMINARY INJUNCTION IN
ACCORDANCE TO FED R. CIV P # 65

FILED

APR - 5 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD

DATE: 4/1/07



Jimmie Lewis
SBI # 506622
DEL. CORR. CENTER
1181 PADDOCK RD
SMYRNA, DEL 19977

IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF DELAWARE


JIMMIE LEWIS


   V.                                    CA. NO 06 - 778(6ms)


THOMAS L. CARROL, DAVID K. HOLMAN,
MR AHMAD, OLUFEMI ADESEMOLU, D. PIERCE,
DR. CANNOLLI, DR. BOLANDA, DR. ROGERS,
DR. DURST, LT LARRY SAVAGE, C/O JELLIFFE,
LT RALPH HEVERIN, SGT GWENDOLYN EVERETTE,
SGT CAIN, C/O BUCKLE, MARY. SNIDER,
CHARLES BENTON, C/O PAUL ROSALIE VARGAS,
ELIZEBETH BURRIS, DEBRA SCOTT,


DATE: 4/1/07                        Jimmie Lewis
                                    SBI# 506622
                                    DEL. CORR. CENTER
                                    1181 PADDOCK RD
                                    SMYRNA, DEL 19977

COMES NOW, THE PETITIONER, JIMMIE LEWIS, TO MOVE THIS HONORABLE COURT FOR RELIEF FROM OPPRESSIVE ACTION BY THE NAMED RESPONDENT, ACTION THAT HAS DEPRIVED THIS PETITIONER OF WELL ESTABLISHED CONSTITUTIONAL RIGHTS.

JURISDICTION:

JURISDICTION IS VESTED IN THIS COURT BY VIRTUE OF 28 U.S.C SECTION 1343; 1361; 1391 (e); 1651; 1654 - 2201; 2241; 2243. 42 U.S.C SECTION 1983 AND 1985. RULE 8 (a)(1), 3.

P.L.R.A, PRISON LITIGATION REFORM ACT, 42 U.S.C 1997(e).

ACCORDING TO D.O.C S.O.P 4.4, INMATE GRIEVANCE PROCEDURE, DISCIPLINARY ACTION AND OR CLASSIFICATION ACTION IS NON-GRIEVABLE. (FORM #584).

MILLER V. NORRIS, 247 F.3d - 736, 740. - (8TH CIR 2001). A REMEDY THAT A PRISON OFFICIAL PREVENTS A PRISONER FROM UTILIZING IS NOT AN AVAILABLE REMEDY UNDER P.L.R.A.

BRIEF DISCRIPTION OF FACTS

BETWEEN THE DATES OF 5/1/05 TO 4/1/05,
THE RESPONDENTS, NAMED IN CAPTION, DISPLAYED VARIOUS
FORMS OF RETALITORY ACTIONS AGAINST ME IN ARBITRARY
AND CAPRICIOUS MANNERS UNDER THE COLOR OF STATE LAW;
DUE TO THE PETITIONER SEEKING RESOLUTION FROM THE
CONDITION OF ITS CONFINEMENT VIA GRIEVANCE, AND
THEREAFTER FROM THE COURTS.

SEE CA.NO. 04-1350 (GMS), CANO. 05-013 (GMS)
AND CA.NO. 06-778 (GMS), WHICH ARE ALL INSTITUTIONS
OF THE STATE OF DELAWARE. THE AFOREMENTIONED CIVIL
COMPLAINTS DISCRIBE THE THE MOODUSOPERANDI OF THE
DEFENDANT IS TO TOTALLY DISREGARD MY WELL ESTABLISHED
CONSTITUTIONAL RIGHTS. I HEREBY PETITION TO THIS HONORABLE
COURT FOR IMMEDIATE RELIEF, BECAUSE UNDER THE CARE OF
MY CUSTODIANS I WILL MOST DEFINETLY SUFFER NUMERIOUS
TYPES OF IRREPARABLE HARM. I AM BEING SUBJECTED TO
1ST, 8TH AND 14TH U.S.CA RIGHT VIOLATIONS HERE AT THE
D.C.C, I HAVE BEEN SUBJECTED TO 1ST, 8TH AND 14TH U.S.C A
RIGHT VIOLATION AT THE H.R.Y.C.I, AND IF IT IS DEEM THAT
MY BEING TRANSFERED TO ANOTHER INST IS INURDER, I ASSERT
THAT I WILL SURELY BE SUBJECT TO 1ST, 8TH AND 14TH U.S.CA
RIGHT VIOLATIONS AT THE ONLY OTHER PRISON IN DELAWARE; S.C.I,
SUSSEX CORR. INST.         DISCLOSURE OF MY CLASSIFICATION,
DISCIPLINARY, INCIDENT, GRIEVANCE, HOUSING, MEDICAL RECORDS,
AND BLD 23'S LOG BOOK WILL FACTUALLY VARIFY THAT
MY CLAIMS ARE INDEED CORRECT.

STATEMENT

OF

CLAIMS

#, I

I, A) On or about the 6TH of Sept 2006, while I, Jimmie Lewis was prescribed to be on psychological close observation level III status, at about 9:30 AM I was told by psychiatrist Dr. Cannolly that I was being discharged. At or about 12:00 PM the inmate patients who had actually been discharged were being transfered to their assigned housing areas, but not me. In response, I asked C/O Jellife why I was on the transfere list, only to receive a belligerent response full of profanity for which resulted in a heated verbal confrontation. Soon thereafter I covered the surveilance camera with tissue, so C/O Jellife wrote me up for a disciplinary code violation, (8TH U.S.C A RIGHT VIOLATION SEE ESTELLE V. GAMBLE, 97 S. CT 285, 50, L.Ed 2d 251.)

I, B) Thereafter Dr. Cannolly wrote a order that I be involuntarily injected with (2) seperate cocktails of psychotropic drugs, even though there weren't any evidence of psychosis.

Officer Jellife and several other officers opened the flap in the door, and ordered me to being handcuffed, and I complied. I was transfered from cell #191, to a cell 4 to 6 cells down the cell block. Upon entering said cell, officer Jellife and several officers tackled me to the floor, at which time officer Jelliffe abruptly and aggressively twisted my arm maliciously, shouted out numerous profanities while standing on my arm pit and back simutaneously while the other officers simply held me

(I P. 2)

down for nurse mary Snider, to inject me
with the (2) different hyperdermic needles of
psychotropic drugs. Before nurse mary injected
me with said hyperdermic needles of psychotropic drugs
I informed her that I didn't need nor do I want
her to inject me, and that she was injecting me
against my will; my plea was ultimately ignored
and I was injected against my will. No alternative
such as (4) point restraint was considered and or
utilized prior to the involuntary administration of
the psychotropic drugs, see Washington V. Harper,
494 U.S 210, 221-22 (1990).
I, c) the injuries I received were as such:
    swelling and bruising to my right arm's
shoulder blade and swelling and bruising to my
right wrist, swelling and bruising to the (2)
different areas, were the hyperdermic needles broke
my skin and entered my flesh, causing said areas
to bleed, persisting and re-occuring migraine
headaches, bouts of amnesia, tremors, persisting
ear ringing, audio and visual hallucinations,
nausea and brain damage due to brain cells
being killed by said psychotropic drugs.

    8TH AND 14TH U.S.C.A RIGHT VIOLATIONS,
CIVIL ASSUALT AND BATTERY.

#. II

While I was prescribed to be in the infurmary at the D.C.C, on psychological close observation, level I and or II, during the following dates: June 2005 for 1 week, July 2005 for 1 week, Nov 02, 2005 thru Nov 06, 2005, Nov 06, 2005 Thru Nov 10, 2005, April 03, 2006 thru May 14, 2006, May 25, 2006 thru June 21, 2006, Aug 30, 2006 thru Sept 13, 2006, and Nov 1, 2006, The D.C.C warden Thomas L. Carrol, Mental health Supervisor Mr Ahmad, Mental health counselor for the D.C.C infurmary Charles Benton, and Psychiatriot Dr Cannolly Denied me the following privilages that the other inmate patients admitted into the D.C.C infurmary were given:
1.) access to law library, 2.) grievance procedure, 3.) legal counsel, 4.) daily access to hygiene products, 5.) Daily recreation, 6.) mental health Therapy or counseling during 4 to 12 and 12 to 8 shifts like inmate patients whom had nurses available to them 24 hours a day., 6.) no suicide blanket, 7.) no suicide footwear, 8.) my mattress was take from me daily at 6:00 Am and returned at 10:00 Am - while other patients were allowed to keep their assigned mattress. I filed grievance, but to no avail.

Said actions define violations of my
1ST, AND 8TH U.S.CA RIGHTS

# III

**III, A)**
On or about 8/22/2006 at the D.C.C,
my left hand was x-rayed, for which revealed that
my pinky finger was severely broken. The x-ray
tech Mary Blades informed Dr. Durst who reviewed
my hand as well as the x-ray and confirmed
that my pinky finger was indeed broken.
Dr. Durst then abruptly left the area
without providing any medical treatment for
the broken finger and or for pain, even though
Dr. Durst was the physician assigned to the
D.C.C. infirmary at that time.
Said injury persisted until 11/30/2006
See Estelle v. Gamble, 97.5.CT 285, 50, L Ed 2d 251.
8TH U.S.CA RIGHT VIOLATION.

**III, B)**
Shortly thereafter, on or about 8/22/06,
at the D.C.C, Dr. Rogers was notified,
but did not provide any medical treatment for
the broken finger and or for pain.
See grievance # 76249, attached as exhibit
Said injury persisted until 11/30/2006.
See Estelle v. Gamble, 97.5.CT 285, 50, L Ed 2d 251.
8TH U.S.CA RIGHT VIOLATION.

**III, C)**
During the dates of 8/26-29/2006 I
repeatedly informed the mental health counselor
to the SNU, (special needs Unit), Mr. Femi, that
I was experiencing psychological dilemmas that
prevented me from getting sleep due to the
pain from my broken pinky finger, but to no avail.

III, P.2

III, D)
On 8/30/2006 I urgently informed
Sgt Cain that I needed emergency medical
treatment, but in response, Sgt Cain instructed
me to lock in my assigned cell, but my
urgent emergency medical request was viewed
by Sgt Cain as a violation of disciplinary code
1.e; "to lock in". Failing to obey, even
though I did lock into my assigned cell.

I wrote grievance, but to no avail.
See, Estelle V. Gamble, 97 S.ct 285,50, L.Ed 2d 251.
8TH U.S.C A RIGHT VIOLATION.

III, E) I was thereafter taken from my
assigned cell BLD 23, D-U-2, To BLD 24,
but while waiting I began experiencing extreme
depression for which were followed by
suicidal thoughts, LT Welcome was informed
who inturn informed staff LT Profaci, who
inturn informed my mental health counselor
Mr Femi. Upon Mr. Femi's arrival, I explained
my psychotic dilemma's, but Mr. Femi ignored
my medical needs, and I was thereafter taken
to the disciplinary unit BLD 18, CL-4.
While I was on the disciplinary unit, depression
and suicidal thoughts got to me, and I hung
myself with a sheet. I woke up in the D.C.C
infirmary prescribed to be on psychological
close observation status level (1).

III, P.3

CONT # III, E)

I wrote grievance, but to no avail.
See, Estelle V. Gamble, 97. S. CT 285, 50, L. Ed 2d 251.
See, Farmer V. Brennan, 511 US 825, 114 S. CT 1970.)
8TH U.S.CA RIGHT VIOLATIONS.

III, F) During my admission in the D.CC infirmary
dating from 8/30/2006 thru 9/13/06
I alerted C/o Rosalie Vargas, who was the
"O/C" (officer in charge), by knocking on
the cell door, that I both needed
to speak with the nurse and that I needed
toilet Tissue, but C/o R. Vargas approached
my assigned cell and informed me that the
only thing I would be receiving was
a major write up. C/o R. Vargas and I
began a heated argument, that resulted in
my being deemed unstable enough to be
discharged from level I to level II and or
discharged from the infirmary altogether.

I wrote grievance, but to no avail.
See Estelle V. Gamble, 97. S. CT 285, 50, L.Ed 2d 251.
8TH U.S.CA RIGHT VIOLATION.

III., P. 4.

III, G)

During the course of my admissions in The D.C.C infirmary, dating from 8/30/2006 thru 9/13/2006 D.C.C warden Thomas L. Carrol, Psychiatrist Dr. Bolanda, Mental Health Supervisor Mr Ahmad, Security Supervisor Major Holman conducted a classification meeting that determined that I was to be sent back to the disciplinary housing unit BLD 18 The place that was in part responsible for my attempted suicide, even though they knew said place didn't address my mental health needs like the SNU could, due in part to the constant confinement and lack of mental health counseling in BLD 18, and on or about 9/13/2006 I was transfered to the disciplinary housing unit never The less, and not back to BLD 23 The mental health unit. I was forced to stay in BLD 18 C-U-2 experiencing extreme depression and suicidal thoughts until Oct 4, 06. On Oct 4, 2006 I was transfered to BLD 17, c-u-1 disciplinary housing unit were the extreme depression and suicidal thought continued, and were etasperated by the constant noise of pipes banging on the walls 24 hours a day for 7 days a week until 11/01/2006. I was sent to BLD 18 AND BLD 17 on Oct 4, 06 as retaliation to the complaint I filed against defendant Raghel Williams, et al 05-013 (GMS), for which includes the D.C.C warden Thomas L. Carrol as a defendant

# III, P.5

cont # III, 6)

d wrote grievance, but to no avail.
See, Estelle V. Gamble, 97.5.CT 285, 50, L.Ed 2d 251
See, Farmer V. Brennan, 511 U.S 825, 114 S.CT 1970.)
8TH U.S.CA RIGHT VIOLATION.

III 4) On 11/01/2006 at or about 2:30 AM
d was transfered to the infirmary from
BLD 17, C-U-1, and prescribed to be on psychological
close observation level II, until about 2:50 pm
at which time l was transfered back to -
BLD 23, D-U-2 SNU UNIT (SPECIAL NEEDS UNIT),
but subsequently, my personal property remained
in building 17, c-U-1 until 11/06/2006 when
c/o Buckle packed the personal property
l received on 9/21/2006 (See attached property
in receipts as exhibit), but c/o Buckley did not
pack and inventory my General Electric radio
cereal number 313794 valued at $48.00.
Said radio was taken from me and or
not packed and or invetoried and returned to me
as an act of retaliation regarding my foling
Civil complaint against Raphel Williams, et al 05-013 GMS
(GMS) for which included numerous D.O.c officers.
Note, c/o Buckle questions me about the number
of officers on the complaint stating l quote.
Lewis you should just drop the suit, because
this is there house, and something may mysteriously
happen to you. unquote. Note, l biewed c/o Buckle's
comment as a threat.
l wrote grievance, but to no avail
1ST U.S.CA RIGHT VIOLATION.

III, P.6

III, I) After being transferred back to the SNU
( SPECIAL NEEDS UNIT ) BLD 23 D-U-2, & subsequently
received sanctions from Disciplinary Hearings
conducted by Disciplinary Hearing officers
LT Larry Savage and LT Ralph Heverin,
Disciplinary report numbers 1027195, 1027222,
1027146 for disciplinary code violation write up
wrote by Sgt cain on 8/30/2006 and C/o -
Rosalie Vargas between 8/30/2006 and 9/13/2006
Disciplinary reports 1027195, 1027222,
and 1027146 were never served to the plaintiff,
1.) the plaintiff never received written notice
of said disciplinary code violations, 2.) The plaintiff
never received notice of fact finding, 3.),
The plaintiff was never allowed to present evidence
in his own behalf, 4.) The plaintiff was never
allowed to appeal, 5.) said disciplinary hearing was
conducted more than (7) days after the disciplinary violation.
I write grievance but to no avail.
See, Avant v. Clifford 67 NJ 496, 341. A.2d 629.
14TH U.S.CA RIGHT VIOLATION

III, J) said sanctions of 5 days, 5 days, and
30 days confined to quarters BLD 23 D-U2
dating from 11/20/2006 thru 12/19/2006
interfered with the mental health treatment
that is provided for SNU inmates.

III, P. 7

cont III, J.)
1.) I wasnt allowed to order
commissary like other SNU inmates, 2.) I wasnt
allowed to participate in activity workshop
on mondays, 3) Music Therapy on mondays,
4.) Overcoming Thinking errors on mondays,
5.) activity workshop on tuesday, 6.)
psychopharmacology on Tuesdays, 7) mutilation
support group on Tuesdays, 8.) Bibliotherapy
on Wednesday, 9.) arts and crafts on wednesday,
10.) Depression support group on thursday,
11.) Activity workshop on thursday,
12.) Open activities on fridays, 13) mourning
group meetings monday thru Fridays,
See SNU activity and group therapy schedule,
attached as exhibit

I wrote grievance, but to no avail.
~~new, content is crossed out~~
~~crossed out text~~
8TH ~~crossed out~~ U.S.CA RIGHTS VIOLATIONS.
See, Estelle V. Gamble, 97 S.CT 285, 50, L.Ed 2d 251

# IV

At the D.C.C dating from 4-7-05 to date, the D.C.C warden Thomas L. Carrol and the D.C.C Deputy Warden D. Pierce have allowed funds to be withdrawn from my inmate account for legal postal fee's, to the sum of more than $1000.00 even though the D.C.C inmate handbook states on page 11, that the state will pay legal postal fee's, (see attached inmate handbook page 11). When ever I receive a money order, the entire sum of the money order is taken, for which leaves me indigent, without funds to purchase hygiene products such as fluride toothpaste, toothbrush, shampoo, deodorant, soap, lotion, after shave, or commissary products like other inmates.

I am unable to for months practice hygiene, for which alinates, segregates and has degraded me as a human being. No deodorant causes me to present as musky, preceived to not be clean, no lotion causes me to present as itchy and asty, preceived to not be clean, no fluride toothpaste causes me to present with halitosis, preceived to not be clean, no commissary causes me to go hungry after daily exercise, for which caused me to loose weight to the sum of 25 lbs due to the insufficient portions served at meal time.

#IV P.2

cont #IV

attached Grievance #'s, 19547 and 80265
I filed grievance, but to no avail.
8TH ~~amendment~~ U.S.CA RIGHT VIOLATIONS

I have been allowed to obtain
indigent mailing supplies to the sum of
$3.74 a month, but I am prohibited
from purchasing hygiene products and/or
commissary products like other inmates
even though I am required to reimberse
said funds, and family members and/
or friends are not allowed to send
me food or hygiene products.

# # V

At The D.C.C since 4-7-2005 to date, the D.C.C warden Thomas L. Carrol has only permitted me to obtain legal supplies to the sum of $3.74 a month. i.e, (4) first class stamps, (4) 12×9 manila envelopes, (16) LG envelopes, (4) small envelopes, (1) writing pad, (1) pen., for which is due to my indigent status.

Said indigent legal supplies are allowed to be obtained, but 12×15.5 manila envelope that other inmate are allowed to purchase have been denied because of my indigent status, even though said funds are withdrew from my inmate account once someone sends me a money orders.

Being denied 12×15.5 manila envelopes have prejudiced me, due to my postconviction appeal which is to volumous to fit into a 12×9 manila delayed my being able to send out said postconviction appeal before the 9/29/2006 deadline. See attached exhibit.

I wrote grievance, but to no avail Said actions have violated my 6TH AND 1ST, ~~government and federal~~ U.S.CA RIGHTS.

# VI

Since 4-7-05 I have filed numerous sick calls for the D.C.C physician Dr Rogers to provide me with medical treatment for toe nail fungas, only to be told by Dr Rogers that there was nothing that she could prescribe me, because it was cosmetic.

On 10/17/2006 I filed grievance grievance number 76246 for fungus that has spread to a total of seven of my toes (3) more than I initially was seeking treatment for. My toe nails are literally rotten, the hurt, bleed, present with a foul odor and actually crumble when I clip them. Dr Rogers was made aware of these conditions, but still refused to provide me with medical treatment.

I filed grievance, but to no avail the grievance procedure is futile. See Estelle v. Gamble, 97 SCT. 285, 50, LEd 2d 251 8TH AMMENDMENT U.S.CA RIGHT VIOLATIONS.

# VII

At the D.C.C. BLD 19, A.U-6 on 11/01/05 at about 1:30 pm I Jimmie Lewis asked Sgt M. Everette to call the support service office to check my account in order to determine exactly why the commissary officer didn't process my commissary order when (2) days prior I had received a money order for ~~$~~ $50. Sgt M. Everette agreed to call the support service office, to check into what appeared to be an error on the behalf of the commissary officer, due to my presenting a photocopy of my inmate account statement printed out and delivered to me just (3) days prior on Oct 27, 2005 along with a money order receipt I had just received just (2) days prior on Oct 28, 2005, but Sgt M. Everette, didn't do as she had informed me on 11/01/2005 due to her leaving the building at about 3:30 pm and not returning until 11/02/2005.

On 11/02/05 at about 10:00 am, I asked Sgt M. Everette is she had done as she said she would, for which her response was "no !! you have to write the support service office". It was then that I requested for Sgt M. Everette to give me my inmate account printout and my money order receipt, but Sgt M. Everette ignored my request and walked away, off of the unit.

# VII P.2

Cont # VII

At about 11:20 Am Sgt Y. Everette and CPL L. Ross began serving lunch (hot dogs and beans), at which time I presented Sgt Y. Everette with a request to speak with the area Lt, Lt Simon; Sgt Everette responded no! and proceeded to serve lunch. At about 11:35 Sgt Everette and CPL L. Ross returned to pick up food trays, Sgt Y. Everette requested for me to give her my food tray, I responded with a request to speak with Lt Simon. In response, Sgt Y. Everette stated fuck it, keep the tray. Sgt Y. Everette left the unit, only to return (5) minute later.

A pon Sgt Y Everette's arriving at my assigned cell Bed 19, A-U-6, Sgt Y everette opened the flap and called me, when I arrived to the flap, Sgt Y. Everette gestured for me to come closer, I thought Sgt Y. Everette was returning my printout of my account statement and my money order receipt, but to my surprise Sgt Y. Everette began spraying cap stun into my face without warning or reason.

Sgt Y. Everette keep spraying cap stun into my assigned cell for a duration of at least 60 seconds, until her cap stun can was empty.

# VII, P.3

Cont # VII

For at least 10 minutes, I was trapped in my assigned cell blinded, eyes burning, skin burning and unable to grasp oxygen.
10 minutes later Sgt G. Everette returned to my assigned cell with Lt Simon, CPL Manns, and CPL L. Ross. I was removed from my assigned cell without incident, and taken to (A) units interview room.
Injuries were as follows, 1.) burning eyes for 48 hours, 2.) Burning skin for 48 hours, 3.) Sore throat and coughing that lasted for (7) days. 4.) Said injuries caused me to become depressed and suicidal causing me to be prescribed to psychological close observation level II for 4 days 11/02/05 thru 11/06/05.

See disciplinary report # 1021432
I filed grievance, but to no avail.
grievance # 20618 but said grievance was dismissed due to it involving alleged disciplinary actions.

8TH U.S C A RIGHT VIOLATION, AS WELL AS CIVIL ASSUALT AND BATTERY.

# VIII

Under color of state law, at the D.C.C on 8/22/2006, disciplinary hearing officer LT Ralph Heverin conducted a disciplinary hearing and found me guilty for the disciplinary code violation % R. Vargas wrote (DR# 1026789), and caused me to serve a (5) day confined to quarters sanction 1.) without providing me with a written notice of the alleged disciplinary write up. 2.) without allowing me to present evidence in my own behalf, 3.) without providing me with written notice of fact finding, 4.) without allowing me to appeal 5.) said disciplinary hearing was conducted more than (7) days after the alleged code violation was said to have occured.

I wrote grievance, but to no avail. See, Avant v. Clifford, 67 NJ 496, 341 A.2d 629

14 TH U.S. CA RIGHT VIOLATIONS

Note, said disciplinary write up are said to have occured in the infirmary while I was on psych close observation level I and or II, for which prohibits the possession of pen or paper on said status, per D.O.C policy and or doctors orders; i.e infirmary.

#IX

Under color of state law at the D.C.C
on 5/08/2006 at or about 00:01 Am
C/o Rosalie Vargas wrote a disciplinary code
violation against me DR# 1024850, while I was
prescribed to be on psychological close observation
level II status, (due to being deemed psychotic),
without first consulting with the psychiatrist whom
prescribed me to be on psych close observation
status, in order to determine my mental health
status, and or to determine before hand if said
disciplinary sanction would be appropriate and or
interfere with my mental health treatment while
housed in the infirmary and or my over all
rehabilitative therapy. Note, due to C/o R. Vargas
continuously arguing with me, my psychotic
condition was exaggerated, for which caused
my mental health condition to be deemed
un stable and prolonged my admissions in the infirmary

I wrote grievance but to no avail.
See, Estelle V. Gamble, 975.CT 285, 50, L.Ed 2d 251.
8TH U.S.CA RIGHT VIOLATION.

#-X

under color of state law, at the D.C.C
on 3/16/2006 disciplinary hearing officer
LT. Ralph Hevesin conducted a disciplinary
hearing and found me guilty for the
disciplinary infraction % Rosalie Vargas
wrote (OR# 1024850), and caused me to
serve (5) day confined to quarters sanction
without 1.) allowing me to present evidence
in my own behalf, 2.) without providing me
with written notice of fact finding, 3.) without
allowing me to appeal. 4.) said disciplinary
hearing was conducted more than (7) days
after the alleged disciplinary violation is said
to have occured.

I filed grievance but to no avail.
See, Avant V. Clifford, 67 NJ 496, 341 A.2d 629

14TH U.S.CA RIGHT VIOLATIONS.

# XI

Under color of state law, at the D.C.C on
5/07/2006 at or about 00:15 Am C/o Rosalie Vargas
wrote a disciplinary code violation against me,
(DR# 1024832) while I was prescribed to be on
psychological close observation level II status,
(due to being deemed psychotic), without first
consulting with the psychiatrist whom prescribed
me to be on psych close observation status,
in order to determine my mental health status,
and or to determine before hand if said
disciplinary sanction would be appropriate and or
interfere with my mental health treatment while
housed in the infirmary and or my over-all
rehabilitative therapy. Note, due to C/o R. Vargas
continuously arguing with me, my psychotic
condition was exasperated, for which caused
my mental health condition to be deemed
unstable and prolonged my admission in the
infirmary.

        I wrote grievance, but to no avail
See, Estelle V. Gamble, 975.CT 285, 50 L.Ed 2d 251
        8TH U.S.CA RIGHT VIOLATION.

# XII

Under color of state law, at the D.C.C
on 6/20/2006 disciplinary hearing officer
Lt Ralph Hevesin conducted a disciplinary hearing
and found me guilty for the disciplinary
running infraction c/o R. Vargas wrote,
(DR # 1024832), and caused me to serve a
(5) day confined to quarters sanction without
1.) allowing me to present evidence in my
own behalf, 2.) without providing me with
written notice of fact finding 3.) without
allowing me to appeal 4) said disciplinary
hearing was conducted more than (7) days
after the alleged disciplinary violation is said
to have occured.

I filed grievance but to no avail
See, Avant V. Clifford, 67 NJ 496, 341 A. 2d 629

14 TH U.S.CA RIGHT VIOLATIONS

# XIII

under color of state law, at the D.C.C on 5/02/2006 at or about 07:36 Am % Rosalie Vargas wrote a disciplinary code violation against me, (DR# 1024743), while I was prescribed to be on psychological close observation level II status, (due to being deemed psychotic), without first consulting with the psychiatrist whom prescribed me to be on psych close observation status, in order to determine my mental health status, and or to determine ~~my~~ before hand if said disciplinary sanction would be appropriate and or interfere with my mental health treatment while housed in the infirmary and or my over all rehabilitative therapy. Note, due to % R. Vargas continuously arguing with me my psychotic condition was exaggerated, for which caused my mental health condition to be deemed unstable and prolonged my admission in the infirmary.

I wrote grievance, but to no avail
See, Estelle V. Gamble, 97 S.CT 285, 50, L.Ed 2d 251
8TH U.S.C.A RIGHT VIOLATION.

# XIV

Under color of state law, at the D.C.C on 5/16/2006 disciplinary hearing officer CT Ralph Hevesin conducted a disciplinary hearing and found me guilty for the disciplinary code violation % R. Vargas wrote, — (DR # 1024743), and caused me to serve a (5) day confined to quarters sanction without 1.) allowing me to present evidence in my own behalf, 2.) without providing me with written notice of fact finding, 3.) without allowing me to appeal 4.) said disciplinary hearing was conducted more than (7) days after the alleged disciplinary violation is said to have occurred.

I filed grievance, but to no avail. See, Avant V. Clifford, 67 NJ 496, 341 A.2d 629

14TH U.S.CA RIGHT VIOLATIONS

# XV

Under color of state law, at the D.C.C on 5/02/2006 at or about 07:00 AM C/o Rosalee Vargas wrote me a disciplinary code violation against me, (DR# 1024742), while I was prescribed to be on psychological close observation level II status, (due to being deemed psychotic), without first consulting with the psychiatrist whom prescribed me to be on psych close observation status, in order to determine my mental health status, and or to determine before hand if said disciplinary sanction would be appropriate and or interfere with my mental health treatment while housed in the infirmary and or my over all rehabilitative therapy. Note, due to C/o R. Vargas continuously arguing with me my psychotic condition was exaggerated for which caused my mental health condition to be deemed unstable and prolonged my admission in the infirmary.

I wrote grievance, but to no avail. See, Estelle V. Gamble, 97 S.CT 285, 50, L.Ed 2d 251 8TH U.S.CA RIGHT VIOLATION

# XVI

under color of state law, at the O.CC
on 5/16/2006 disciplinary hearing officer
Lt Ralph Hevesin conducted a disciplinary
hearing and found me guilty for the disciplinary
code violation c/o R. Vargas wrote,
(DR # 1024742), and caused me to serve a
(5) day confined to quarters sanction without
   1.) allowing me to present evidence in my
own behalf. 2.) without providing me with
written notice of fact finding 3.) without
allowing me to appeal 4.) said disciplinary
hearing was conducted more than (7) days
after the alleged disciplinary violation is
said to have occured.

        I filed grievance, but to no avail.
See; Avant V. Clifford, 67 NJ 496, 341 A.2d 629
    14TH U.S CA RIGHT VIOLATIONS.

#XVII

Under color of state law, at the D.CC on 5/16/2006 disciplinary hearing officer LT Ralph Heverin conducted a disciplinary hearing and found me guilty for the disciplinary code violation C/o R. Vargas wrote (DR.# 1024784), and caused me to serve a (5) day confined to quarters sanction 1.) without providing me with a written notice of the alleged disciplinary write up. 2.) without allowing me to present evidence in my own behalf., 3.) without providing with a written notice of the fact finding, 4.) without allowing me to appeal, 5.) Said disciplinary hearing was conducted more than (7) days after the alleged code violation was said to have occured.

d filed grievance, but to no avail. See, Avant V. Clifford, 67 NJ 496, 341, A. 2d 629 14TH U.S. CA RIGHT VIOLATION.

Note, said disciplinary write up is said to have occured while I was prescribed to be on psych close observation level I and or II, in the infirmary for which prohibits the possession of pen or paper on said status, per D.O.C policy and or doctors orders.

# XVIII

Under color of state law, at the D.CC on 5/16/2006 disciplinary hearing officer LT Ralph Heverin conducted a disciplinary hearing and found me guilty for the disciplinary code violation C/o R. Vargas wrote, (DR# 1324743), and caused me to serve a (5) day confined to quarters sanction 1.) without providing me with a written notice of the alleged disciplinary write up., 2.) without allowing me to present evidence in my own behalf; 3.) without providing me with a written notice of the fact finding, 4.) without allowing me to appeal, 5.) said disciplinary hearing was conducted more then (7) days after the alleged code violation was said to have occured.

I filed grievance, but to no avail see Avant v. Clifford, 67 NJ 496, 341 A. 2d 629 14 TH U.S.CA RIGHT VIOLATION.

Note, said disciplinary write up is said to have occured while I was preascribed to be on psych close observation level I and or II, in the infirmary, for which prohibitg the possession of pen or paper on said status, per D.O.C policy and or doctors orders

# XIX

under color of state law, at the D.CC
on 5/16/2006 disciplinary hearing officer
LT Ralph Heverin conducted a disciplinary
hearing and found me guilty for the disciplinary
code violation 4/o R. Vargas wrote, (DR#1028850),
and caused me to serve a (5) day confined
to quarters sanction 1.) without providing
me with a written notice of the alleged
disciplinary write up. 2.) without allowing me
to present evidence in my own behalf,
3.) without providing me with a written notice
of the fact finding 4.) without allowing me
to appeal, 5.) said disciplinary hearing was
conducted more than (7) days after the alleged
code violation was said to have occured.

See; I filed grievance, but to no avail.
Avant v. Clifford, 67 NT 496, 341, A. 2d 629
14 AMTTH U.S. CA RIGHT VIOLATION.

Note, said disciplinary write up is said
to have occured while I was prescribed
to be on psych close observation level I
and or II in the infirmary, for which
prohibits the possession of pen or paper
on said status, per D.O.C policy and
or doctors orders, i.e infirmary.

# XX

under color of state law, at the D.C.C
on 5/16/2006 disciplinary hearing officer
LT Ralph Heverin conducted a disciplinary
hearing and found me guilty for the disciplinary
code violation % R. Vargas wrote, (OR # 1024836),
and caused me to serve a *(5) day confined
to quarters sanction 1.) without providing me
with a written notice of the alleged
disciplinary write up 2.) without allowing me
to present evidence in my own behalf,
3.) without providing me with a written notice
of fact finding 4.) without allowing me to
appeal, 5.) said disciplinary hearing was
conducted more (7) days after the alleged
code violation was said to have occured.

I filed grievance, but to no avail
See, Avant V. Clifford, 67 NJ 496, 341 A.2d 629
14 ØTH U.S. CA RIGHT VIOLATION

Note, said disciplinary write up is said
to have occured while I was prescribed
to be on psych close observation level I
and or II, for which prohibits the possession
of pen or paper on said status, per D.O.C
policy and or doctors orders; i.e infirmary

# XXI

Under color of state law, at the D.CC on 5/20/2006 disciplinary hearing officer Ct Ralph Heverin conducted a disciplinary hearing and found me guilty for the disciplinary code violation C/o R. Vargas wrote (DR# 1024762), and caused me to serve a (5) day loss of all privileges sanction 1.) without providing me with a written notice of the alleged disciplinary write up, 2.) without allowing me to present evidence in my own behalf, 3.) without providing me with a written notice of fact finding, 4.) without allowing me to appeal 5.) Said disciplinary hearing was conducted more than (7) days after the alleged code violation was said to have occured.

I wrote grievance but to no avail.
See, Avant V. Clifford, 67 NJ 496, 341 A.2d 629 ☐ 14 TH U.S CA RIGHT VIOLATIONS.

Note said disciplinary write up is said to have occured while I was prescribed to be on Psych close observation level I and or II, for which prohibits the possession of pen or paper on said status, per D.O.C policy and or doctors orders, i.e, infirmary

# XXII

under color of state law, at the D.C.C on
9/07/2006 disciplinary hearing officer
Lt. Larry Savage conducted a disciplinary
hearing and found me guilty for the disciplinary
code violation % R. Vargas wrote,(DR# 1027063),
and caused me to serve a 5day loss of all
privileges sanction 1.) without providing me
with a written notice of the alleged disciplinary
write up, 2.) without allowing me to present
evidence in my own behalf, 3.) without providing
me with a written notice of fact finding.
4.) without allowing me to appeal.
5.) Said disciplinary hearing was conducted
more than (7) days after the alleged code
violation was said to have occured.

   I wrote grievance, but to no avail
See, Avant V. Clifford, 67 NJ, 496, 341 A. 2d 629
        14TH U.S.C.A. RIGHT VIOLATIONS

   note, said disciplinary write up is said
to have occured while I was prescribed
to be on Psych close observation level I
and or II, for which prohibits the possession
of pen or paper on said status, per D.O.C
policy and or doctors orders, i.e Infirmary

# XXIII

under color of state law, at the D.C.C on 9/07/2006 disciplinary hearing officer Lt. Larry Savage conducted a disciplinary hearing and found me guilty for the disciplinary code violation C/o R. Vargas wrote, (DR# 1027067), and caused me to serve a 15 day confined to quarters sanction 1.) without providing me with a written notice of the alleged disciplinary write up. 2.) without allowing me to present evidence in my own behalf., 3.) without providing me with a written notice of fact finding. 4.) without allowing me to appeal. 5.) Said disciplinary hearing was conducted more than (7) days after the alleged code violation was said to have occured

I wrote grievance, but to no avail. See, Avant V. Clifford 67 NJ 496, 341, A.2d 629 14TH U.S.C.A RIGHT VIOLATIONS.

Note, Said disciplinary write up is said to have occured while I was prescribed to be on Psych close observation level I and or II, for which prohibits the possessors of pen or pazer on said status, per D.O.C policy and or doctors orders; i.e infirmary

XXIV P(A)

A.1) AUG 28, 06 AT THE D.C.C, I JIMMIE LEWIS WAS TRANSFERED FROM MHU BUILDING 23 D U 2 S.N.U - SPECIAL NEEDS UNIT AT OR ABOUT 3:00 PM TO DISCIPLINARY SEGREGATION FOR A DISCIPLINARY CODE VIOLATION, WHEN I SHOULD HAVE BEEN TRANSFERED TO THE D.CC INFIRMARY AND PRESCRIBED TO BE ON PSYCHIATRIC CLOSE WATCH, DUE TO THE CLINICIAN FOR THE S.N.U OLUFEMI ADESEMOLI BEING FULLY INFORMED BY MYSELF, LT WELCOME AND STAFF LT PROFACI THAT I WAS EXPERIENCING SUICIDAL IDEATIONS.    THERE AFTER AT OR ABOUT 10:30 PM, I WAS TRANSERED TO THE D.C.C INFIRMARY AND PRESCRIBED TO BE ON PSYCIHATRIC CLOSE WATCH LEVEL (1) DUE TO WHAT WAS DEEMED MY ATTEMPTING SUICIDE. 14th 8th U.S.CA VIOLATION.

A.2) BEING FULLY AWARE OF THE FACT THAT THE ISOLATED CONFINEMENT IN A CELL WITH ONLY A MATTRESS ON THE FLOOR AND MY ONLY BEING PROVIDE WITH MY BOXER SHORTS AND MY T-SHIRT GAVE IN PARTIALITY REASON FOR MY ATTEMPTED SUICIDE ATTEMPT, ON OR ABOUT 9/14/06 THOMAS L. CARROL, ELIZEBETH BURRIS, D. PIERCE DR BOLANDA AND CLINICIAN OLUFEME ADESEMOLI ALL ALLOWED ME TO BE TRANSFERED BACK TO DISCIPLINARY SEGREGATION ISOLATION S.H.U BUILDING 18

        8th + 14th U.S C A RIGHT VIOLATION
        SEE ALSO, CA NO. 06 - 778 (GMS)

XXV   P. B)

B.1)   ON OR ABOUT 10/4/06, I WAS TRANSFED
       TO DISCIPLINARY SEGRAGATION BLD 17, CU1.

B.2.)  ON OR ABOUT 10/10/06, I RECEIVED ABOUT
       50 U.S.M 285 PROCESS RECEIPT FROM THE
DEPT OF JUSTICE INFORMING ME THAT SAID AMOUT OF
D.D.O.C ADMINISTRATORS AND EMPLOYEE'S HAD BEEN
SERVED WITH THE CIVIL COMPLAINTS (CA NO. 05-013 GMS),
FOR ~~WITH~~ WHICH GIVES ~~REASON~~ REASON FOR MY
BEING TRANSFERED TO DISCIPLINARY SEGREGATION
~~AND NOT~~ AND NOT BACK TO MHU 23,
D. UNIT S.N.U, ON 10/4/06, BECAUSE MANY OF
THE DELAWARE ADMINISTRATOR'S AND D.D.O.C
EMPLOYEE'S WERE SERVED WITH CIVIL COMPLAINTS
ON THE EXACT SAME DATE 10/4/06 BETWEEN THE
HOURS OF ~~BETWEEN~~ 8:00 AM TO 4:00 PM, HOURS
BEFORE I WAS TRANSFERED TO DISCIPLINARY SEGREGATION
DURING THE 4:00 PM TO 12:00 AM SHIFT.
THIS WAS DONE BY THOMAS L. CARROL.
       1ST U.S.C-A RIGHT VIOLATION.

XXVI — P. C)

C.1) ON NOV 1, 06 AT OR ABOUT 3:00 A.M
I BECAME PSYCHOTIC, AND WAS THEREAFTER
TRANSFERED TO THE D.C.C. INFIRMARY AND PRESCRIBED
TO BE ON PSYCHIATRIC CLOSE OBSERVATION, DUE TO
NOT RECEIVING PROPER MENTAL HEALTH TREATMENT.
IT WAS THEREAFTER DEEMED THAT I WAS TO BE
TRANSFERED BACK TO MHU BUILDING 23, S.N.U,
SPECIAL NEEDS UNIT. ON NOV 1, 06 AT OR ABOUT
2:30 PM I WAS TRANSFERED BACK TO MHU 23,
S.N.U, AND UNIT DUZ.

C.2) ON NOV 8, 06 I FILED GRIEVANCE FOR
LAW LIBRARY CLERK BRIAN ENGRAM DENYING
ME LAW LIBRAY ACCESS, (BRIAN ENGRAM WAS
SUBSTITUTING FOR MARIA LYONNS), AND IN RESPONSE
THE LAW LIBRARY SUPERVISOR MIKE LITTLE IMMEDIATELY
POSTED A MEMO STOPPING ALL INMATE PRISONERS FROM
PERSONALLY GOING TO THE LAW LIBRARY IN BUILDING 24
TO DUE LEGAL RESEARCH, FOR WHICH HAS NEVER BEEN
DONE DURING THE 6 OR 7 YEARS SINCE IT OPENED.
I ASSERT THAT THIS WAS DONE SPECIFICLY TO LIMIT MY
ABILITY TO SHEPPARDIZE CASE LAW, DUE TO SCOPE AND
MAGNITUTE AGAINST SEVERAL INSTITUTIONS OF THE
STATE OF DELAWARE, CA NO. 04-1350 (GMS), CA NO 06-778 (GMS)
CA NO. 05-013 (GMS), AT THIS POINT THE CLAIMS
STATED HEREIN IS JUST CIRCUMSTANCIAL EVIDENCE, DUE TO
MY BEING ABLE TO OBTAIN LEGAL MATERIAL VIA WRITTEN
REQUEST THROUGH THE MAIL

XXVII P. D )

D.1.) AT THE D.C.C DATING FROM 11/1/06 TO 4/1/06, THE FOLLOWING CORRECTIONAL OFFICERS WHO HAVE WORKED MHU 23, S.N.U, D UNIT, ARE D.O.C STAFF MEMBERS WHO I CLAIM ARE RESPONSIBLE FOR AUTHORING FABRICATED CLAIMS AGAINST ME: C/O DAMBY, C/O E. BARNHART, C/O D. SCOTT, C/O GLICK, C/O SWING, C/O L. LAMDEN, C/O WATSON, C/O SKINNER, C/O GILES, C/O TURNER, C/O N. BORDLEY, C/O CONRAD, C/O A. EVANS, C/O VILAREAL, C/O JOHNSON. THIS IS SO, BECAUSE I WAS TOLD BY C/O R. WHITE DURING IDLE CONVERSATION 3/23/07, THAT WAS STRUCTURED AROUND MY STATING TO C/O R. WHITE, I QUOTE, "ARE YOU A PART OF THE CONSPIRACY ALSO" UNQUOTE. IN RESPONSE C/O R. WHITE STATED, I QUOTE. "INCIDENT AND DISCIPLINARY REPORTS ARE BEING DOCUMENTED ABOUT YOU REGARDING YOUR "PAST" BEHAVIOR." UNQUOTE. I INTERPRET THIS TO MEAN THE CIVIL COMPLAINTS I FILED IN THE "PAST" AGAINST PERSONS EMPLOYED BY AND OR AT INSTITUTIONS OF THE STATE OF DELAWARE, CA NO, 04-1350 (GMS), CA. NO 05-013 (GMS) AND 06-778 (GMS). THIS IN CONJUNCTION WITH WHAT D.A GREGORY E. SMITH STATED ON DEC 18, 06 REGARDING MATTERS OF ALLEGED ASSAULTS, AND ALLEGED SEXUAL INAPPROPRIATE MATTERS AT THE H.R.Y.C I AND AT THE D.P.C, ALONG WITH HIS STATING HE COULD REQUEST FOR MY GOOD TIME CREDITS TO BE TAKEN AWAY. FOR WHICH IS AND OR HAS MANIFESTED INTO MORE THAN A METAPHYSICAL CLAIM. SEE DEC 18, 06 DEPOSITION PAGES 85-88 AND 90-91

XXVIII  P.E)

E.1)  FOR INSTANCE, ON 1/15/07 AT 1:55 AM MHU 23,
S.N.U, D.U.2, C/O E. BARNHART HAD MY ASSIGNED
CELL DOOR OPENED AND FOR NO PARTICULAR REASON ASKED AND OR
ORDERED ME TO GIVE HERE MY "RED HORNS". IN RESPONSE I
REQUESTED THE SGT.? BECAUSE I FOUND C/O BARNHARTS
REQUEST HIGHLY UNUSUAL AND INAPPROPRIATE. SUBSEQUENTLY, I
THEREAFTER RECEIVED A MAJOR DISCIPLINARY WRITE UP FOR:
SEXUAL MISCONDUCT, CREATING A HEALTH - SAFETY AND FIRE
HAZARD, FAILING TO OBEY AN ORDER, AND ABUSE OF PRESCRITION
MEDICATION - LAXATIVE. I WAS THEREAFTER FOUND TO BE NOT
GUILTY OF THE SEXUAL MISCONDUCT OFFENSE, FOR WHICH WAS
UTILIZED AS THE PRINCIPAL INCIDENT THAT GAVE REASON FOR
THE MAJOR WRITEUP. I ENDED UP SERVING A 5 DAY L.O.A.P
SANCTION, DATING 2/26/07 THRU 3/02/07.
FURTHERMORE, I FOUND IT TO BE ODD THAT TWO SEPERATE
REPORTS WERE AUTHORED #'S 1029883 AND 1029884.
( SEE ATTACHED HEREIN AS EXHIBIT. )


E.2)  AS A RESULT OF THE DISCIPLINARY REPORT(S), S.N.U
CLINICIAN OLUFEMI ADESEMOLI PLACED ME ON LEVEL 1
SANCTION FROM 1/16/07 THRU 1/19/07 WITHOUT PROVIDING ME
WITH A WRITTEN NOTICE, WITHOUT ALLOWING ME TO PRESENT
EVIDENCE, WITHOUT ALLOWING ME TO CONFRONT MY ACCUSER,
WITHOUT GIVING ME WRITTEN NOTICE OF FACT FINDING.
SAID SANCTION PREVENTED ME FROM PARTISCIPATING IN
THERAPY THAT OTHER PATIENTS IN THE S.N.U PARTISCIPATED IN.

XXVIII  P. E 2 )

E. 3 )

AT THE O.CC, THE S.N.U CLINICIAN OLUFEMI ADESEMOLI WAS NOTIFIED BY ME VERBALLY IN AUG 2006 THAT INMATE PATIENT BERNARD DROZDOWSKI ASSUALTED ME BY PUSHING ME WITH ALL HIS MIGHT, AND ON ANOTHER OCCASSION IN JAN 2007 BERNARD DROZDOWSKI PUNCHED ME WITH HIS FIST . SUBSEQUENTLY ON JAN 29, 07 BERNARD DROZDOWSKI THREATENED TO TO DO ME PHYSICAL HARM, IN FRONT OF C/o SWING, C/o L. LAMDEN AND RECREATIONAL AID DANA SHINNET, FOR WHICH LEAD TO BERNARD DROZDOWSKI RECEIVING A MAJOR WRITE, NOT FOR THREATENING ME, BUT FOR THREATENING C/o SWING, BUT INSTEAD OF PROPERLY DEALING WITH MR. DROZDOWSKI, MR ADESEMOLI THREATENED TO MOVE ME TO THE SHU

AT THE O.CC M/HU 23, D UNIT FEB 2007, BERNARD DROZDOWSKI ATTACKED ME AGAIN, BY SHUTTING ME INTO THE SHOWER, SNACHED MY CLOTHING, I. e TOWEL, SHEET, T-SHIRT AND UNDER OFF OF THE SHOWER DOOR, AND THREW THEM INTO THE TRASH CAN, THEN BERNARD ~~DROZODO~~ DROZDOWSKI BEGAN SPITING SALIVA ON ME. I WAS THEREAFTER GIVEN A TETANUS SHOT, AND BERNARD DROZDOWSKI WAS TRANSFERED TO ANOTHER UNIT; M/HU 23 C UNIT, S.NU. S.N.U CLINICIAN OLUFEMI ADESEMOLI FAILED TO PROTECT ME, EVEN THOUGH THE HAD BE FULLY NOTIFIED VIA, VERBALLY, AS WELL AS GRIEVANCE # 99264 (ATTACHED HEREIN.)

8TH U.S.CA RIGHT VIOLATION.

XXVIIII $p.F$ )

F.1 )  ALSO, ON 2/16/07 AT 15:00 PM, C/O D. SCOTT
WROTE ME A 24 HOUR SANCTION AT THE D.C.C.,
MHU 23 D UNIT. C/O D. SCOTT STATED THAT I CAME
OUT OF THE SHOWER WITH A SHEET WRAPPED AROUN MY
WAIST, AND A T-SHIRT ON, STATING I REFUSED TO
OBEY HER ORDER OF GOING BACK INTO THE SHOWER TO
PUT ON PANTS, EVEN THOUGH I HAD ON MY GYM SHORTS
UNDER THE SHEET I UTILIZE TO BLOCK THE VIEW AND
A T-SHIRT ON. THE ISSUE OF MY BEING PROPERLY DRESS
WASNT THE MATTER, IT WAS THE ISSUE OF MY GENDER
BEING ATTACKED. AS AN RESULT, C/O D. SCOTT WROTE ME UP
FOR A 24 HOUR L.O.A.P, LOSS OF ALL PRIVILEGES SANCTION
FOR WHICH WAS DONE WITHOUT GIVING ME A HEARING,
WITHOUT ALLOWING ME TO PRESENT EVIDENCE IN MY OWN
BEHALF, WITHOUT PROVIDING ME WITH WRITTEN NOTICE OF
FACT FINDING., WITHOUT CONTACTING THE MENTAL HEALTH
STAFF TO INSURE THAT SAID DISCIPLINARY REPORT DIDN'T
INTERFER WITH THE THERAPY THAT THE OTHER S.N.U
INMATE PATIENTS WERE ABLE TO PARTISCIPATE IN, FOR
WHICH IT DID INTERFER WITH ME PARTISCIPATING IN GROUP
RECREATION. C/O D. SCOTT'S ACTIONS DEFINE DELIBERATE
INDIFFERENCE, DUE TO HER BEING FULLY AWARE THAT
I AM A INMATE PATIENT HOUSED ON THE S.N.U,
SPECIAL NEEDS UNIT.

8TH AND 14TH U.S.CA RIGHT VIOLATION.

XXX P. G)

G.1)       THE FACT THAT THESE GENDER BIAS MATTERS
OCCURING AFTER THE CIVIL COMPLAINT HAVE BEEN
SERVED, ARE NOT OF COINCEDENCE TO ME IN LITE OF THE
CIRCUMSTANTIAL FACT THAT D.A GREGORY E. SMITH INQUIRED
ABOUT ME WEARING "RED HORNS", AND MY ALLEGEDLY BEING
INVOLVED IN SEXUALLY INAPPROPRIATE MATTERS.
( SEE DEC 18, 06 DEPOSITION PAGES 85-88 AND 90-91.).
       THIS, ALONG WITH THE FACT THAT C/O R. WHITE
STATED TO ME THAT I AM PILING UP ALOT OF INCIDENT
AND DISCIPLINARY REPORT, BUT TO MY KNOWLEDGE THIS IS
NOT TRUE NOR THE FACT OF THE MATTER.
       THE DILEMMA IS THAT, IF THIS IS INDEED TRUE,
I HAVE NOT BEEN PROVIDED WITH ANY SORT OF WRITTEN
NOTICES REGARDING ANY SORT OF VIOLATIONS IN A
REASONABLE AMOUNT OF TIME, (72 HOURS TO 7 DAYS),
FOR WHICH WOULD GRANT ME THE ABILITY TO DEFEND
MYSELF AGAINST ANY CLAIM, WITH REGARDS TO THE
PRACTICALITIES AND PERCULIARITIES, i.e (MY MENTAL-
DEFECTS AS WELL AS THE RESIDUAL EFFECTS OF THE
PSYCHOTROPIC MEDICATIONS im PRESCRIBED.), THAT WOULD
AFFORD ME THE DUE PROCESS OPPOTUNITY TO PRESENT MY
OBJECTION(S), AND OR TO MARSHALL THE FACTS IN MY
DEFENSE.   THE INFERENCE DRAW, IS IF THE FACTS OF THESE
MATTERS ARE INDEED BEING INACTED UPON IN ORDER TO
GRANT THE RESPONDENTS THE TYPE OF JUDICIAL STRATEGY
THAT WILL DESTROY MY CREDIBILITY, AND FURTHERMORE
UTILIZED AS A BARGINING TOOL, THEN I WILL HAVE
SUFFERED IRREPARABLE HARM

$\overline{XXX}$ P.62)

ACTUALLY, I MADE MENTION OF THIS SCENERIO
IN MY CA NO. 05-013 (GMS) PLEADINGS.
( SEE ATTACHED AS EXHIBIT. )

I JUST WANT THIS HONORABLE COURT TO
ACKNOWLEDGE THAT THE (SEXUAL ASSUALT), THAT INMATE
SCOTT MILLER COMMITTED AGAINST THE COUNSELOR HERE
AT MHU BUILDING 24 IN 2005, IS STILL IN THE VIVID FOCUS
OF MY CUSTODIAN'S THOUGHTS, ALONG WITH THE FACTUAL
MAGNITUTE AND LEGAL MERIT OF CLAIMS NOTED IN MY
CIVIL COMPLAINTS, THE GOVENERS RESPONSE TO THE
SCOTT MILLER INCIDENT, WOULD AND OR HAS PUT ME IN
DEFINETE DANGER OF IRREPARABLE HARM.

ALSO, INCONJUNCTION WITH THE AFOREMENTIONED,
THEREAFTER DEC 18, 06, A DIFFERENT WOMAN OFFICER DAILY,
WOULD COME ONTO S.N.U. D UNIT, WALK UP TO MY ASSIGNED
CELL, PEER INTO MY ASSIGNED CELL, TURN AROUND AND GO
BACK DOWN THE STAIRS, EXIT THE UNIT NEVER TO BE
SEEN AGAIN. AS FAR AS THE STATUS OF THESE WOMAN
OFFICER, INMATES WHO HAVE BEEN HERE AT THE D.CC
FOR YEARS, SAY THAT THESE WOMAN OFFICERS ARE NOT
ROOKIES. IT'S AS IF IM BEING SHOW CASE, TO BE FRAMED
THE SETUP AND FRAMED.

1ST, 8TH AND 14TH U.S.CA RIGHT VIOLATIONS.

XXXI    p. H )

H.1) HERE AT THE D.CC, SUNDAY 3/25/07,
C/O GAVIN REQUESTED THAT I STAY IN THE DINNING
HALL AFTER EVERY ONE ELSE HAS LEFT, SO HE COULD TELL
ME SOMETING IMPORTANT? I REQUESTED FOR HIM TO
SAY WHAT IT WAS THAT HE WAS TALKING ABOUT, RIGHT
THEN AND THERE, HE REPLIED JUST WAIT! I DECIDED IT
WAS BEST TO EXIT THE DINNING HALL WITH EVERYONE
ELSE. C/O GAVIN WORKED D UNIT S.NU MHU 23 THAT DAY,
AND HE DID NOT CONFRONT ME ABOUT ANY THING IMPORTANT.
       THE NEXT DAY, MON 3/26/07
STAFF LT ALISA PROFACI CAME ONTO D UNIT SNU,
AND I MADE HER AWARE OF THE AFOREMENTED INCIDENT
IN ORDER FOR HER TO OBTAIN THE FACTS, BUT WHEN
C/O GAVIN CAME ONTO THE UNIT, LT PROFACI EVADED
CONFRONTING C/O GAVIN, FOR WHICH SERVED ME
NO BENEFICIAL RESOLUTION.
       I HAVN'T REQUESTED PROTECTIVE CUSTODY
BECAUSE YOU CAN'T BE PUT IN PROTECTIVE CUSTODY BECAUSE
OF AN OFFICER OR OFFICERS, ALSO DUE TO MY BELIEF
THAT MY FOOD WHICH IS HAND DELIVERED BY THE
CORRECTIONAL OFFICERS, WAS BEING ADULTERATED WHILE
I WAS IN THE SHU FOR SEGREGATED DISCIPLINE, ALONG
WITH THE FACT THAT I AM MORE THAN $500.00
IN DEPT AND CAN NOT PURCHASE THE NECESSARY PRODUCTS
SUCH AS HYGIENE, FOOD, AND CLOTHING LIKE OTHER
INMATE PRISONERS.

XXXII
P. I

H.1) AT THE D.C.C DATING FROM 5/1/05 THRU
4/1/05, I AM PRESENTLY EXPERIENCING
NUMEROUS MEDICAL AND PSYCHOLOGICAL DILEMMAS
THAT DR. ROGERS, DR. BOLANDA, DR. DURST, AND
THOMAS L. CARROL HAVE PREVENTED FROM RECEIVING,
SUCH AS: REOCCURING INFECTION TO MY LIVER,
TOE NAIL FUNGUS, HALLUCINATIONS BOTH AUDIO AND
VISUAL, PERSISTANT REOCCURING PAIN IN MY TESTICALS,
TREMORS, INSOMNIA, HEADACHES, AMNESIA, EAR RINGING,
VERTIGO, CONSTIPATION, EXCESSIVE DRY SKIN,
HIGH BLOOD PRESSURE, FAILING EYE SIGHT, PERSISTANT
PAIN IN MY LEFT HAND PINKY FINGER.
I HAVE COMPLIED WITH THE GRIEVANCE PROCEDURE,
BUT MOST OF THE GRIEVANCES I FILE 85% ARE
MORE THAN 18 MONTHS OLD, 10% ARE DEEMED
NON-GRIEVABLE, ~~XXXXXXXXXXXXXXX~~ 4% ARE SIMPLY
DENIED, AND THE REMAINING 1%, I NEVER RECEIVE
THE RESOLUTION THAT IS REACHED.

BECAUSE OF THE RESPONDENTS FAILURE TO PROVIDE
ME WITH THE MEDICAL AND OR PSYCHOLOGICAL
HELP I NEED, I HAVE AND WILL SUFFER
IRREPARABLE HARM.

1ST AND 8TH U.S.C.A RIGHT VIOLATIONS.

XXXIII  P.J )

J.1)    FEB 2007, AT THE D.C.C, VIA WRITTEN
        NOTATION(S) TO WARDEN THOMAS L. CARROLL,
AND DEPUTY WARDEN ELIZBETH BURRIS REQUEST
PHOTO COPIES OF THE FOLLOWING DOCUMENTATION
IN THEIR POSSESSION : INCIDENT REPORTS,
DISCIPLINARY REPORTS, MEDICAL RECORDS,
AND GRIEVANCES, BUT TO NO AVAIL, MY REQUEST
HAVE SIMPLY BEEN IGNORED.


J2.)    FEB 2007, AT THE D.CC, VIA WRITTEN
        NOTATION TO WARDEN THOMAS L. CARROLL,
I HAVE REQUESTED A DISCRIPTION OF ANY
TYPE OF TREATMENT I SHOULD SEEK AND OR
OBTAIN, BUT TO NO AVAIL, MY REQUEST
WAS SIMPLY IGNORED.
        SUBSEQUENTLY, THE S.N.U CLINICIAN
OLUKEMI ADESEMOLU ON 3/13/07 PROVIDED ME
WITH A MENTAL HEALTH TREATMENT PLAN
   (SEE ATTACHED AS EXHIBIT)
        BUT THE MEDICAL GRIEVANCE I SUBMITTED
ON OR ABOUT 3/10/07 REGARDING A DISCRIPTION
OF ANY TYPE OF TREATMENT I SHOULD SEEK
AND OR OBTAIN HAS BEEN IGNORED.

XXXIII   P.J 2)

J.3) MAY 2005 AND FEB 2007, AT THE D.C.C, VIA WRITTEN NOTATION(S), TO WARDEN THOMAS L. CARROLL, AND DEPUTY WARDEN ELIZBETH BURRIS REQUESTING AN INTERSTATE TRANSFER TO NEW JERSEY, BUT TO NO AVAIL.

J.4) FEB 2007, AT THE D.C.C, VIA WRITTEN NOTATION(S), TO WARDEN THOMAS L. CARROLL, AND DEPUTY WARDEN ELIBETH BURRIS REQUESTING A FULL AND COMPLETE PHYSICAL, BUT TO NO AVAIL.

J.5) FEB 2007, AT THE D.C.C, VIA WRITTEN NOTATION(S), TO WARDEN THOMAS L. CARROLL, AND DEPUTY WARDEN ELIZBETH BURRIS REQUESTING PSYCHOTHERAPY FROM A PSYCHOLOGIST, BUT TO NO AVAIL.

J.6) FEB 2007, AT THE D.C.C, VIA WRITTEN NOTATION(S), TO WARDEN THOMAS L. CARROLL, AND DEPUTY WARDEN ELIZBETH BURRIS REQUESTING A CAT SCAN AND OR AN MRI, IN ORDER TO DETERMINE IF I AM EXPERIENCING THE NUMEROUS PSYCH AND PHYSICAL DILEMMA'S DISCRIBED IN GRIEVANCE # 15243, BUT TO NO AVAIL.

XXXIII P.J3 )

J.7 )   Oct 2006 , At THE D.CC , VIA WRITTEN
         NOTATION(S) , TO WARDEN THOMAS L. CARROL,
     DEPUTY WARDEN(S) D. PIERCE AND ELIZBETH BURRIS
     REQUEST TO HAVE MY POSTAGE DEBT WAIVED ,
     BUT TO NO AVAIL.

$\overline{XXXIV}$ P.K)

FOR THE AFOREMENTIONED REASONS,
THE PETITIONER JIMMIE LEWIS, HEREBY
REQUEST FOR THIS HONORABLE COURT TO
ISSUE AN ORDER TO SHOW CAUSE, WITY THE
RELIEF SOUGHT SHOULD NOT BE GRANTED.
IN FULL AND OR IN PART.

: RELIEF SOUGHT :

K.1) A FULL AND COMPLETE PHYSICAL BY A
DISINTRESTED PHYSICIAN, NOT PRESENTLY
AFFILIATED WITH THE D.O.C.

K.2) A C.A.T AND OR MR1 SCAN

K.3) A INTERSTATE TRANSFER TO NJ,
N.C OR P.A.

K.4) EXPUNGMENT OF INCIDENT AND OR
DISCIPLINARY REPORTS OBTAINED IN VIOLATION
OF THE PETITIONER U.S.C.A RIGHTS.

K.5) TO PROVIDE THIS HONORABLE COURT AND
THE PETITIONER WITH A COPY OF HIS
MEDICAL RECORDS, IN ORDER TO BE ABLE
TO POINT OUT THE ALLEGED U.S.C.A RIGHT
VIOLATIONS.

P. K 2 )

K.6 ) FOR THE RESPONDENTS, ( THE DEFENDANTS ),
THEIR OFFICERS, SERVANTS, EMPLOYEE'S,
AND ALL PERSONS ACTING IN CONCERT OR
PARTISCIPATING WITH THEM, TO BE RESTRAINED
FROM THREATENING PETITIONER WITH PUNISHMENT,
PENALTY OR OTHER REPRISALS OR RETALIATIONS,
HARASSING THE PETITIONER OR IMPOSING PUNISHMENT
BECAUSE OF THE EXERCISE OF HIS RIGHTS UNDER
THE FIRST AMENDMENT OR BECAUSE OF HIS
PURSUIT OF LEGAL REMEDIES.

K.7.) TO PROVIDE THIS HONORABLE COURT AND
THE PETITIONER WITH A COPY ~~ORIGINAL~~
OF ANY AUDIO OR VIDEO RECORDINGS
OF THE PETITIONER.

K.8.) PSYCHOTHERAPY FROM A DISINTRESTED
PSYCHOLOGIST, NOT PRESENTLY AFFILIATED
WITH THE D.O.C

K.9) FOR MY POSTAL DEBT TO BE WAIVED, AND OR
FOR 20% OF THE FUNDS THE PETITIONER
RECEIVES, BE WITHDRAWN FOR POSTAL DEBT.

K.10) 3 PLY GRIEVANCE # 584 FORMS FOR ACCOUNTABILITY.

P. K 3)

K.11)  3 PLY PAY TO'S FORM # 34,
       FOR ACCOUNTABILITY.

K.12)  3 PLY MEDICAL SICK CALL SLIPS, FORM #263,
       FOR ACCOUNTABILITY.

K.13)  COMPLETE DISCLOSURE ~~WOULDN~~
       OF GRIEVANCE THE PETITIONER FILED,
       TO BE PROVIDED TO THIS HONORABLE COURT
       AND THE PETITIONER, IN ORDER TO
       VARIFY THAT THE PETITIONER EXHAUSTED
       ALL HIS ADMINISTRATIVE REMEDIES PER P.L.R.A.

K 14)  COMPLETE DISCLOSURE OF INCIDENT
       AND OR DISCIPLINARY REPORTS FILED REGARDING
       THE PETITIONER, TO BE PROVIDED TO THIS
       HONORABLE COURT AND PETITIONER, IN ORDER
       TO VARIFY AND OR POINT OUT THE FACTS
       OF THE PETITIONERS CLAIM AS WELL AS TO
       POINT OUT THE ALLEGED U.S.C.A RIGHT
       VIOLATIONS.

K.15.)  A GENERAL ELECTRIC RADIO WITH SPEAKER.

P. K 4)

K.16) ) NO RESTRICTIONS ON INDIGENT SUPPLIES.
FOR WHICH MEANS AN INDIGENT INMATE
CAN ORDER HYGIENE, FOOD, OR LEGAL SUPPLIES.
UP TO $ 8.00 A MONTH. $ 2.00 A WEEK.
TO BE REPAID AT A 20% RATE UPON RECEIVING
FUNDS.

K.17) MENTAL HEALTH CLINICIANS ON DUTY
AT THE D.OC INSTITUTIONS, D.CC, S.C.1,
AND THE H.R.Y.C.I AND THE WOMANS INST
OF DELAWARE 24 HOURS A DAY. SO MENTAL
HEALTH PATIENTS CAN RECIEVE TREATMENT
LIKE ANY OTHER MEDICAL PATIENT WHO'S SICK.

K.18) SUICIDE FOOTWEAR, SUICIDE BLANKETS,
DAILY ACCESS TO HYGIENE PRODUCTS,
DAILY RECREATION, EMERGENCY PHONE CALLS
TO ATTORNEY AND OR FAMILY., FOR INMATES
PRESCRIBED TO BE ON PSYCH CLOSE OBSERVATION
WATCH IN THE INFIRMARY, D.CC, H.R.Y.CI, OR S.CT.

19.) PUNITIVE, EXEMPLATORY AND NOMINAL DAMAGES
FOR PAIN AND SUFFERING (MONETARY).

20.) ~~DONNATORY~~ DECLARATORY JUDGEMENT.

# **Certificate of Service**

I, _JIMMIE LEWIS_, hereby certify that I have served a true

and correct cop(ies) of the attached: _PETITION FOR WRIT OF MANDAMUS_

_FOR PRELIMINARY INJUNCTION, FED R. CIV P⁺ 65_ upon the following

parties/person (s):


TO: _____        TO: _____

_CLERK OF THE COURT (GMS)_                 _____

_U.S. DISTRICT COURT_                            _____

_844 N. KING ST, LOCKBOX 18_            _____

_WILMINGTON, DELAWARE 19801_        _____


TO: _____        TO: _____

_____                _____

_____                _____

_____                _____

_____                _____


**BY PLACING SAME IN A SEALED ENVELOPE** and depositing same in the United
States Mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, DE
19977.

On this __1ˢᵗ__ day of ___APRIL___ , 2007

Jimmie Lewis

Paragraph #

under color of state law, at the H.R.Y.C.I, Rachel Williams, Stanley Taylor, Major Dave Williams have failed to correct, act or respond to my written notations and or grievances regarding violations of my rights established under 11 DEL C§ 6504, 6517, 6535, 6530, 6531, 6523, 6525, 6536, in violation of my 1ST, 8TH and 14TH U.S.C.A rights.

From 5/2003 to 5/2005, the defendants failed to correct, act or respond to staff members fabricating disciplinary and or incident reports against me, (covering a wide variety of institutional disciplinary violations and or psychologically related incidents.), in retaliation for my filing numerous grievances seeking resolutions in order to obtain relief from the conditions of my confinement; for which phantom witnesses have stated that I committed a disciplinary violation. This is done with a surety that no one will be repremanded due to my being denied full disclosure and or discovery. This certifies that simply being wrote up for a disciplinary infraction, defines that I will be adjudicated guilty before the hearing officer and or disciplinary committee has the opportunity to review the evidence that I present. This renders me unable to defend myself against a wide variety of allegations that may affect my conditions of confinement. I percieve that this has been done and or is being done to cover the deliberate violations of my rights, as well as to establish a judicial strategy that will grant the defendants leverage by destroying the validity of my credibility.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )  Civil Action No. 06-778 GMS
                                       )
THOMAS L. CARROLL,                     )
MAJOR DAVID K. HOLMAN,                 )
D. PIERCE,                             )
DR. CANNOLLY,                          )
DR. BOLANDA,                           )
DR. ROGERS,                            )
DR. DURST,                             )
LT. LARRY SAVAGE,                      )
LT. RALPH HEVERIN,                     )
SGT. GWENDOLYN EVERETTE,               )
C/O TELLIFFE,                          )
SGT. CAIN,                             )
MARY SNIDER,                           )
CHARLES BENTON,                        )
C/O ROSALIE VARGAS,                    )
IMAD JARWAN,                           )
C/O BUCKLE,                            )
OLUFEMI ADESEMOLU,                     )
                                       )
                Defendants.            )

## ORDER

1.   The plaintiff Jimmie Lewis, SBI #506622, a pro se litigant who is presently incarcerated, has filed this action pursuant to 42 U.S.C. § 1983 and has requested leave to proceed in forma pauperis pursuant to 28 U.S.C. § 1915.

2.   Based on the plaintiff's submissions, his request to proceed in forma pauperis is granted. Pursuant to 28 U.S.C. § 1915(b), the plaintiff shall be assessed the filing fee of $350.00. The Court has determined that the **plaintiff has no**

**assets and no means to pay the initial partial filing fee, nevertheless, any money the plaintiff later receives will be collected in the manner described below.**

3.   The plaintiff shall, within thirty days from the date this order is sent, complete and return to the Clerk of Court, the attached authorization form allowing the agency having custody of him to forward all payments required by 28 U.S.C. § 1915(b)(2) to the Clerk of the Court. **FAILURE OF THE PLAINTIFF TO RETURN THE AUTHORIZATION FORM TO THE CLERK OF COURT WITHIN THIRTY DAYS FROM THE DATE THIS ORDER IS SENT SHALL RESULT IN DISMISSAL OF THIS ACTION.**

4.   The plaintiff shall be required to make monthly payments of 20 percent (20%) of the preceding month's income credited to the plaintiff's prison trust account and absent further order of the Court, the Warden or other appropriate official at Delaware Correctional Center, or at any prison at which the plaintiff is or may be incarcerated, shall forward payments from his account to the Clerk of the Court each time the amount in the account exceeds $10.00 until the filing fee is paid. **NOTWITHSTANDING ANY PAYMENT MADE OR REQUIRED, THE COURT SHALL DISMISS THE CASE IF THE COURT DETERMINES THAT THE ACTION IS FRIVOLOUS OR MALICIOUS, FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED, OR SEEKS MONETARY RELIEF AGAINST A DEFENDANT WHO**

2

**IS IMMUNE FROM SUCH RELIEF.**

5.    Pursuant to 28 U.S.C. § 1915(g), if plaintiff has had three or more actions dismissed by the Court on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief may be granted, the Court shall deny plaintiff leave to proceed in forma pauperis all future suits filed without prepayment of the filing fee, unless the Court determines that plaintiff is under imminent danger of serious physical injury.

DATED: ᒍ~ ᖷ, ᒿoo �try

_____
United States District Judge

```
┌─────────────────────────────┐
│         F I L E D           │
│                             │
│        JAN - 4 2007         │
│                             │
│     U.S. DISTRICT COURT     │
│    DISTRICT OF DELAWARE     │
└─────────────────────────────┘
```

3



## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                                )
                                             )
              Plaintiff,                     )
                                             )
       v.                                    )    Civil Action No. 05-013-GMS
                                             )
WARDEN RAFAEL WILLIAMS,                       )
DEPARTMENT OF CORRECTION                     )
COMMISSIONER STANLEY                         )
TAYLOR, JR. and STAFF, FIRST                 )
CORRECTIONAL MEDICAL and                     )
STAFF, CAPT. D. BAMFORD,                     )
CAPT. EMIG, CAPT. P. PARKER,                 )
MAJOR DAVE WILLIAMS,                         )
CAPT. JEFFERSON, INTERNAL                    )
AFFAIRS, LT. JOSEPH SABATO,                  )
LT. SHEETS, LT. S. FARMER,                   )
LT. MITCHEL, LT. CHUDZIG,                    )
SGT. M. MOODY, SGT. FRED WAY,                )
SGT. C. RICHARDS, SGT. MEDFORD,              )
SGT. LEWIS, SGT. KENNEDY,                    )
CORPORAL A. GOINS, CORPORAL                  )
A. DAVIS, CORPORAL HARRIFORD,                )
CORPORAL CHAPEL, CORPORAL                    )
CUMBERBACK, C/O PRESLEY,                     )
C/O C. JOHNSON, C/O TALENTI,                 )
C/O MARK BLUE, C/O MS. NEWMAN,               )
C/O D. CARLOCK, C/O B. APA,                  )
C/O V. WILLIAMS, C/O CANON,                  )
C/O G. INCE, C/O SOUL, C/O A.                )
ARMSTRONG, C/O GASSNER,                      )
C/O D. YOUNG, C/O MACK RENOLDS,              )
C/O NANNETT BORDLEY,                         )
C/O WAYMAN, C/O MASE,                        )
C/O TAMIKO CHAFFER,                          )
C/O RODRIGUEZ, C/O HARDGRAVE,                )
LT. POLK, and MICHAEL KNIGHT,                )
                                             )
              Defendants.                    )

JIMMIE LEWIS,                                    )
                                                 )
          Plaintiff,                             )
                                                 )
                v.                               )    Civil Action No. 05-051-GMS
                                                 )
DEPARTMENT OF CORRECTION                         )
COMMISSIONER STANLEY                             )
TAYLOR, JR., WARDEN RAFAEL                       )
WILLIAMS and STAFF, FIRST                        )
CORRECTIONAL MEDICAL and STAFF, )
INTERNAL AFFAIRS SUPERVISOR,                     )
MAJOR DAVE WILLIAMS,                             )
DR. BOSTON, THOMAS CARROLL,                      )
BETTY BURRIS, and                                )
EVELYN STEVEN,                                   )
                                                 )
          Defendants.                            )

---

JIMMIE LEWIS,                                    )
                                                 )
          Plaintiff,                             )
                                                 )
                v.                               )    Civil Action No. 05-052-GMS
                                                 )
FIRST CORRECTIONAL MEDICAL                       )
and STAFF, GEORGIA SUTTON,                       )
DEPARTMENT OF CORRECTION                         )
COMMISSIONER STANLEY                             )
TAYLOR, JR. and STAFF, WARDEN                    )
RAFAEL WILLIAMS and STAFF,                       )
DR. ALI, DR. BOSTON, DR. JOSHI,                  )
MR. FISH, DEBRA MUSKARELI,                       )
NURSE INNA, DIANNE HERNANDEZ,                    )
NURSE K. JOHNSON, and                            )
COLLEN BELL ,                                    )
                                                 )
          Defendants.                            )

---

**FORM #584**

## GRIEVANCE FORM

FACILITY:_____    DATE:_____

GRIEVANT'S NAME:_____    SBI#:_____

CASE#:_____    TIME OF INCIDENT:_____

HOUSING UNIT:_____

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED IN THE INCIDENT OR ANY WITNESSES.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

ACTION REQUESTED BY GRIEVANT:_____

_____

_____

_____

_____

GRIEVANT'S SIGNATURE:_____    DATE:_____

WAS AN INFORMAL RESOLUTION ACCEPTED?    _____(YES)    _____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____    DATE:_____

**IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.**

cc: INSTITUTION FILE
    GRIEVANT

April '97 REV



**CMS**
DEDICATED PEOPLE
MAKING A DIFFERENCE
Correctional Medical Services

## Mental Health Treatment Plan

**I. Problems (check all that apply):**

- [ ] Depressive Ideation
- [ ] Suicidal Ideation
- [x] Agitation
- [x] Racing thoughts
- [x] Delusions
- [x] Hallucinations

- [x] Sleep disturbance
- [ ] Anger management
- [ ] Limited cognitive abilities
- [ ] Limited coping skills
- [ ] Substance abuse/dependence

- [ ] Lack of support
- [ ] Obsessions/compulsions
- [x] Excessive worry
- [ ] Other: *Needed to Know he belongs as part of Community*

**Current Diagnosis (include substance disorders in Axis I):**

Axis I: _Schizophrenia_
Axis II: _Deferred_
Axis III: _HBP_
Axis IV: _Unoriented_
Axis V: _65_

**II. Strengths (check all that apply):**

- [ ] Able to communicate effectively
- [ ] Strong support system
- [ ] Adequate educational background
- [ ] Adequate vocational skills

- [ ] Good insight
- [ ] Good judgment
- [ ] Willingness to participate in treatment
- [ ] Other:

**III. Long Term Goal:** Reduce or eliminate problems noted above so that they do not impair inmate's daily functioning.

**IV. Short Term Treatment Objectives:**

- [x] Participate in psycho education regarding mental illness, signs, symptoms, and treatment
- [ ] Develop coping techniques for managing:
  - [x] Depressive Ideation
  - [ ] Cognitive Limitations
  - [x] Anxiety
  - [x] Situational Stress
  - [x] Anger/Frustration
  - [x] Fluctuating Feelings

- [ ] Refer to/Participate in substance abuse treatment
- [ ] Report adequate sleeping/ eating patterns
- [x] Report the reduction/absence of AH/VH
- [ ] Participate in at least one productive activity daily
- [ ] Participate in interactive journaling/engage in journaling
- [ ] Other _____

- [ ] Participate in sex offender issues group
- [x] Take psychotropic medications as prescribed
- [x] Demonstrate organized thinking/ reality test
- [x] Participate in transition/discharge planning
- [x] Participate in bibliotherapy

**V. Treatment Modalities:**

- [ ] Individual treatment by clinician at least every thirty days
- [ ] Evaluation and treatment by psychiatrist at least every 90 days
- [ ] Medication monitoring by nursing daily

- [ ] Group treatment at least once every thirty days
- [ ] Independent interactive journalin
- [x] Other _Needed to Know he belongs in the Community_

| | | | |
|---|---|---|---|
| Clinician Signature: | *(signature)* MPS | Date: | 3/13/07 |
| Title: | Clinician | Time: | 1513 |
| Inmate Signature: | *(signature)* | Date: | 3/13/07 |
| Inmate Number: | 506622 | Institution: | DCC |

CORRECTIONAL MEDICAL SERVICES
Mental Health Office, Bldg. #24
1181 Paddock, Rd.
Smyrna, DE. 19977
PH:    302-653-9261 ex.2863
FAX:  302-653-4670

# Memo

To:  Sgt. Mapps

From:  Olufemi Adesemolu, Mental Health Therapist

Cc:  Imad Jarwan, Director of Mental Health

Date: December 1, 2006

Re: I/M Lamar Trower  (305593)

I/M Lamar Trower  23D U 12 is currently serving 15 days CTQ starting 11/28/2006 till 12/10/2006.
It should be noted that the sanction was imposed following a meeting of DOC/ Mental Health
on Wednesday, November 22, 2006.

It is very important this I/M adhere to all the terms of this sanction.


Olufemi Adesemolu
Mental Health Therapist.



STATE OF DELAWARE
DEPARTMENT OF CORRECTION

## OFFICE OF THE MHU/SHU UNIT MANAGER

DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977
TELEPHONE: (302) 653-9261
FAX: (302) 653-2855

## MEMORANDUM

**TO:** MHU 23 SNU Staff
**FROM:** S/Lt. Alisa Profaci
**SUBJECT:** SNU
**DATE:** 16 July 2006

Attached is a schedule for SNU inmates. The only changes are that inmates are not out during count time or "chow" time.

The tiermen on SNU are not paid positions therefore they are given extra time out as compensation.

Due to the size of the tier, count wise, the SNU tier will not be separated when going to chow. Both uppers and lowers will run together.

The SNU program has built in ways of dealing with the behaviors of SNU inmates, such as the different Phases. SNU inmates can still be written up through the disciplinary process but at the same time we need to inform mental health so that they may be dealt with according to the program.

Mental health inmates present their own unique challenges to security staff. When experiencing problems with SNU tier inmates and mental health staff are on duty, have them come in to assist in calming the situation. We should make every attempt to allow the program to work keeping in mind security will not be compromised.

In the near future staff will be receiving training to assist them in handling special needs inmates.

## SNU Schedule and Processes Breakdown

5:30 am        Wake up call for breakfast. Staffs go to each door to get acknowledgement
               that I/M is awake. Some I/M are on heavy medication and thus do not
               wake easily. They do not have to physically get up, just acknowledge you.

6:00 am        Breakfast – not mandatory. I/M can stay in cell if they choose.

6:30 am        Medication Pass by staff Nurse. I/M are encouraged / told to take meds.
               If they refuse, a 404 for information purpose is filled out and processed
               as usual. Refusal should also be noted in the logbook so that all staffs are
               aware. It needs to be clarified if I/M is refusing just one specific med but
               is complying with taking others, or just meds for a standard medical issue
               versus their psychotropic meds.

9: 00am        Cell doors are opened for I/Ms to come out for Community Meeting,
               except anyone on lockdown (Phase one or new arrival to the program).
               Community meeting usually last for about 45 minutes or till it's time for
               count. Packets of coffee are given to the environmental leader who
               distributes them to I/M on level 3 and level 4. I/M on level 3 gets one
               packet while those on level 4 receive 2 while the community meeting is
               going on, security does a quick. Assessment of each cell to make sure that
               beds are made and cell is neat. If cell is not clean and neat, a point is lost
               for lack of cleanliness. **If an inmate does not come out for Community
               Meeting, he does not get his 1 hr. & 15 min. Rec. time later that
               afternoon.** (Unless there is a medical or mental health issue excusing the
               absence.) On a daily basis, 2 inmates, 1 from the lower the lower level and
               another from the upper level are assigned for cleanup duties along with the
               environmental leader. They should be allowed to stay out to clean ~~as soon~~
               ~~as they return from lunch~~ and they get to stay out throughout the rec.
               period. One of the reasons we ask for this is that they cannot begin to
               clean the ~~bathroom~~ when everyone is out. Also all our workers do this for
               the community. They are all volunteers. This is their only incentive.
               No one is paid for this work assignment. Everyone works for the upkeep
               of the SNU community..

               Likewise, the environmental leader and the cleaning crew for the day
               Stays out during the recreational period 6:30 to 9:45.

9:45–10:30     Morning environmental cleanup.

11:00–11:30    Lunch

1:00–2:00      First afternoon Rec.

2:00–3:00      Second afternoon Rec.



PUBLICATIONS

PORTUGUÊS FRANÇAIS РУССКИЙ DEUTSCH
ESPAÑOL 中文 العربية OTHER

<<previous | index | next>>

# IV. WHO ARE THE MENTALLY ILL IN PRISON?

· Africa
· Americas
· Asia
· Europe/Central Asia
· Middle East/N. Africa
· United States

GLOBAL ISSUES
· Arms
· Children's Rights
· HIV/AIDS
· International Justice
· Prisons
· Refugees
· Women's Rights
· United Nations
· More...





*"I am a commander of Star Wars SS. We have been practicing nuclear allimators stronger than the Russians. If I'm killed it's going to burn stars and the world at the same time. If we don't watch it, people will burn and I will go into a different dimension. So I'd like to keep my single cell as long as possible. I write to Berlin, to Red China, they don't send me no package."*[71]

- D.O.T., California State Prison, Corcoran.

The mentally ill in prison, as in the world outside prison, suffer from a wide array of mental disorders serious enough to require psychiatric treatment. The symptoms of some prisoners with serious mental illness are subtle, discernable only by clinicians. This is particularly true for prisoners suffering serious depression, who may just appear withdrawn and unsociable to other prisoners and staff. But the serious mental illness of some prisoners is easily identified even by the layman: they rub feces on themselves, stick pencils in their penises, bite chunks of flesh from their bodies, slash themselves, hallucinate, rant and rave, mumble incoherently, stare fixedly at the walls. While many of the mentally ill in prison do not suffer major impairments in their ability to function, some, like the above-quoted prisoner, are so sick they live in a world entirely constructed around their delusions.

Not only is the number of prisoners with mental illness growing, but more persons are being incarcerated whose illnesses fall at the most severe end of the mental illness spectrum. According to Dave Munson, lead psychologist at Washington State's McNeil Island Correctional Center, "the severity of the mental illness of those coming in is increasing. People are no longer going to state hospitals. The prisoners often have no idea how they ended up here."[72] In Oregon, the administrator for counseling and treatment services reported that in the last five years the prison system has begun receiving prisoners who have been in mental health group homes since childhood.[73] Gloria Henry, warden of Valley State Prison for Women, California's largest prison for female prisoners, also points to the severity of the mental conditions of incarcerated women:

> I don't know how [some of these women] were sentenced to prison. They have no understanding of why they are in prison. I don't know what purpose it serves. To some degree the services will be limited, because this is a prison, not a state hospital. We're having to adjust and make changes to accommodate mental health — and it's difficult.[74]

## Overview of Mental Illness

Mental disorders include a broad range of impairments of thought, mood, and behavior. The degree of impairment can vary dramatically from individual to individual. Also, some individuals with mental illness have periods of relative stability during which symptoms are minimal, interspersed with incidents of psychiatric crisis. Other individuals are acutely ill and dramatically symptomatic for prolonged periods.

In this report, we use the term serious mental illness to refer to diagnosable mental, behavioral, or emotional disorders of sufficient duration to meet diagnostic criteria specified in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association, (generally referred to as DSM-IV)[75] and that result in substantial interference with or limitations on one or more major life activities.[76] The DSM-IV defines a mental disorder as:

> a clinically significant behavioral or psychological syndrome or pattern that occurs in an individual and that is associated with present distress (e.g. a painful symptom) or disability (i.e., impairment in one or more important areas of functioning) or with a significant increased risk of suffering death, pain, disability, or an important loss of freedom.[77]

The DSM-IV classification for mental disorders includes serious mental illness (Axis 1) and serious personality disorders (Axis 2). In prisons, the category of serious mental illness is typically limited to such conditions as schizophrenia, serious depression, and bipolar disorder. Schizophrenia is a frightening, complex, difficult, and debilitating disease which may include disordered thinking or speech, delusions (fixed, rigid beliefs that have no basis in reality), hallucinations (hearing or seeing things that are not real), inappropriate emotions, confusion, withdrawal, and inattention to any personal grooming. Among the subtypes of schizophrenia is "paranoid schizophrenia" with characteristics of delusions of persecution and extreme suspiciousness. Even if a person with schizophrenia is described as recovered or in remission, quite likely he or she is neither ill nor well, but will usually have a great deal of difficulty adjusting to life situations, and can be driven over the edge by overwhelming demands.[78] Serious or clinical depression, which can be experienced episodically or chronically, usually includes, among other symptoms, profound feelings of sadness, helplessness, and hopelessness. It can also be accompanied by psychotic features, including hallucinations and/or delusions. Clinical depression, which is far more common among women than men, is a significant suicide risk factor. Bipolar disorder (previously called manic-depressive disorder) is characterized by frequently dramatic mood swings from depressions to mania. During manic phases some people may be psychotic and may experience delusions or hallucinations.

Wholly apart from ensuring adequate mental health treatment, the incarceration of thousands of persons with these illnesses poses extremely difficult management challenges for correctional staff trying to ensure prison safety and security. For example, serious depression puts people at risk of suicide. Persons with schizophrenia may experience prison as a peculiarly frightening, threatening environment that can result in inappropriate behavior including self-harm or violence directed toward staff or other prisoners. Persons with bipolar disorder in a manic phase can be disruptive, quick to anger, provocative, and dangerous.[79] Prisoners with serious mental illness, particularly if the illness has psychotic features, may find it next-to-impossible to abide by, or, in more extreme cases, even to understand, prison regulations. According to correctional mental health expert and clinical professor of psychiatry at the University of Colorado's Health Sciences Center Dr. Jeffrey Metzner, "A small percentage [of prisoners] don't understand the rules. They're the ones who are psychotic. More common is that prison rules don't mean much to someone hearing voices — that's the least of their problems." A person with paranoid schizophrenia, said Metzner, may, on a literal level, understand a rule but nevertheless view a request to abide by that rule as being part of a conspiracy directed against him. "It's less of not understanding and more of acting on distortions."[80]

It is not uncommon for persons who end up in jail or prison to have Axis 2 personality disorders which result in serious problems in thinking, feeling, interpersonal relations, and

impulse control. When these disorders are associated with significant functional impairments they constitute serious mental illnesses. According to the DSM-IV, personality disorders are "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment."[81]

Perhaps the most prevalent personality disorders among jail and prison inmates are anti-social personality disorder (ASPD) and borderline personality disorder. The essential feature of the former is "a pervasive pattern of disregard for, and violation of, the rights of others."[82] Persons with antisocial personality disorder, typically men, can be particularly difficult to manage in a correctional setting. They can often be manipulative, volatile, disruptive, and likely to engage in aggressive, impulsive "acting out" behavior which can include assaults on others, self-mutilation and/or suicide attempts. Epidemiological research shows that only 15 percent to 20 percent of prisoners have bona fide ASPD, if the diagnosis is made using the criteria in the DSM-IV. Yet, according to psychiatrist Dr. Terry Kupers, who has examined mental health services in many prisons, correctional mental health staff have a tendency to over-diagnose the presence of ASPD, essentially using it as a default diagnosis for anyone who seems to have mental problems of some sort but does not have an obvious Axis I illness. A diagnosis of ASPD becomes, in fact, a moral rather than clinical judgment; prisoners with APSD are "bad" not "mad."[83]

According to the DSM-IV, borderline personality disorder is marked by "patterns of instability in interpersonal relationships, self-image and affects, and marked impulsivity that begins in early adulthood." People with borderline personality disorder often have volatile and extreme emotions, are prone to depression, and can be difficult and manipulative. Many resort to self-mutilation at some point. Borderline personality disorder can also include episodes of psychotic decompensation. Research suggests that childhood trauma — particularly sexual and physical abuse — is one of the causal factors for the disorder. About 70 to 77 percent of people diagnosed with this disorder are women.[84] Some psychiatrists, such as Harvard University's Dr. Judith Herman, believe that many, if not most, women diagnosed as borderline are in fact suffering from what Herman calls, "complex posttraumatic stress disorder." The multiple traumas cause psychological disorganization and emotional dyscontrol that look very much like borderline personality disorder. If the diagnosis, however, is of borderline personality disorder, the complex posttraumatic stress disorder is ignored and, all too often, the women are considered just plain difficult and not amenable to or in need of treatment.[85]

Although people with personality disorders may appear "normal" — just obnoxious or difficult — these mental disorders are very real and drive those who have them to behave the way they do. Unlike Axis 1 mental illnesses, personality disorders are not believed to be caused by abnormality of brain chemistry or other organic problems, but are rooted in life histories, such as childhood traumas and neglect, and perhaps genetics. For that reason, they do not generally respond to medications and are thus harder to treat and contain. Personality disorders can and often do co-exist with Axis-1 mental illnesses, further complicating the diagnosis and treatment of both.

It is a convention in correctional psychiatry to identify as serious mental illnesses only certain serious Axis I disorders such as bipolar disorder, major depression, and schizophrenia, and to limit mental health treatment to prisoners with those disorders. It is a convention in part created by the shortage of mental health staff: absent sufficient numbers to treat everyone, the determination of who warrants treatment is restricted to the most deeply troubled individuals and also those who are more likely to respond to the primary treatment modality offered in prison — medication. Correctional mental health staff are particularly reluctant to expend treatment time on prisoners with personality disorders. The judgment of correctional mental health staff about the seriousness of a non-psychotic mental condition may also be colored by their concerns that prisoners may be malingering or seeking secondary gains. It is also a convention that survives under constitutional jurisprudence that has failed to clarify the boundaries of the "serious mental illness" for which mental health services are required.

Nevertheless, individuals who suffer from other illnesses not on the short list of Axis I disorders can be equally distressed and disabled. Some personality disorders can include episodes of psychotic decompensation and several of the personality disorders can result in severe disability. For example, an individual suffering from a severe generalized anxiety disorder with panic attacks might spend all of her time terrified, incapable of acting productively, and cringing in her cell. Someone with severe obsessive-compulsive disorder might spend all his time cleaning his cell or counting cracks in the wall and be completely incapable of undertaking other activities. A person with a dysthymic disorder (a less severe form of depression than a major depressive disorder) might successfully commit suicide.

Failure to diagnose and properly attend to prisoners' personality disorders can lead to inappropriate responses by correctional staff that aggravate the prisoners' conduct and heighten the incidence of self-mutilation and suicide attempts. The clinical diagnosis of personality disorders should be followed with useful therapeutic interventions, such as individual and group talk therapy and cognitive skills and anger management training. Medication cannot address the fundamentals of personality disorders but can alleviate frequently concomitant symptoms, such as depression and anxiety. Mental health interventions can not only make life in prison more tolerable both for the prisoners and the staff who have to deal with them; they also can provide the prisoners with life-skills — such as personal hygiene, education, anger management, and an ability to recognize the signs of an approaching mental health crisis — that will serve them well when they are released from prison.

# Examples of Mentally Ill Prisoners

To provide a sense of the nature and degree of serious mental illness from which some prisoners suffer, we note below some descriptions, many of which were made by mental health experts and courts who had access to complete mental health records:

- "Prisoner 1 is a 25-year-old who was transferred to [Wisconsin's] Supermax in February 2001. He has a history of serious mental illness beginning at age 11. According to a [1995] entry in his clinical file...he was diagnosed with Paranoid Schizophrenia. Prisoner 1 experiences command hallucinations, which are voices that tell him to do bad things. Prisoner 1's charts list medication orders dating back to 1995 that include the antipsychotic medications Thorazine, Haldol, Quetiapine, Seroquel, Loxitane, Risperdal and Olanzopoine. On the Mental Illness Screening Tool in his file, Prisoner 1 was assigned a diagnosis of "Chronic paranoid Schizophrenia vs. Major Depression with Psychotic Features." Prisoner 1 told Dr. Kupers [plaintiffs' expert] that he hears voices constantly that command him to kill himself or hurt others....Prisoner 1 told Kupers that he cannot sleep because he "sees things," including "demons moving around the floor and climbing on my bed" all night. Prisoner 1 told Kupers that he has paranoid thoughts that the guards are out to get him. He paces in his cell. Prisoner 1 continues to experience auditory hallucinations and massive anxiety despite his strong psychotropic medications...[86]

- Psychologist Craig Haney painted a harrowing picture of some of the prisoners with mental illness he encountered in Texas prisons:

- I'm talking about forms of behavior that are easily recognizable and that are stark in nature when you see them, when you look at them, when you're exposed to them. In a number of instances, there were people who had smeared themselves with feces. In other instances, there were people who had urinated in their cells, and the urine was on the floor.... There were many people who were incoherent when I attempted to talk to them, babbling, sometimes shrieking, other people who appeared to be full of fury and anger and rage and were, in some instances, banging their hands on the side of the wall and yelling and screaming, other people who appeared to be simply

disheveled, withdrawn and out of contact with the circumstances or surroundings. Some of them would be huddled in the back corner of the cell and appeared incommunicative when I attempted to speak with them. Again, these were not subtle diagnostic issues. These were people who appeared to be in profound states of distress and pain.[87]

- [A Texas prisoner was]...a 45 year old man with chronic paranoid schizophrenia found in a decompensated psychotic state. His thinking was grossly disorganized and his speech was irrelevant. He appeared confused, agitated, and paranoid. The medical record indicated that his antipsychotic medication had been discontinued... due to refusals. There could be no question that his decompensation was long and tortured.... A 28 year old man with schizoaffective disorder and mental retardation... he appeared floridly psychotic and deteriorating. His left arm was severely mutilated from multiple self-inflicted lacerations.[88]

- "John Doe #117 was charged with 'being untidy' because he smeared feces on his cell door...[A] psychological report found that John Doe #117 was 'mentally limited and often psychotic...not able to control his behavior and...not in good touch with reality'...[A subsequent psychological evaluation] determined that John Doe #117 was 'cognitively limited,' 'schizophrenic' and 'not completely in control of his behavior.'"[89]

- "Inmate [V.Y.A.] is a 40-year-old Black male with a history of chronic, Paranoid Schizophrenia with a positive response to anti-psychotic drug therapy. Inmate [V.Y.A.] initially reported auditory hallucinations, lack of sleep, and concerns about possible effects of blood pressure medication. His mental status deteriorated and regressed considerably while in the infirmary, including alternatively claiming to be Jesus and denying he was Jesus. His affect was often intense, agitated and paranoid threatening. Thought process was disorganized, grandiose, and delusional, with auditory hallucinations at times reported but at other times denied. Decompensation continued until Inmate [V.Y.A.] became compliant with medication regime... Assessment Diagnosis: Axis I: Schizophrenia, Paranoid, Chronic with acute exacerbation."[90]

- "[V.R.] is delusional and thought disordered; his speech is disorganized and tangential, with loose associations. He believes that he is 'attached to an alien affiliation' and that he has been forced to commit treason against the Untied States. He also claims that he is a woman, but 'they haven't found his vagina yet.' He said that he shot his mother when he was three years old, but does not know if she died or not. He also reported that he believes that there is a radio in his nerves that is broadcasting. He often picks at his ear to see if the receiver is in there but can't find it. He still believes it is there. He also gets messages through 'federal codes' in his cell."[91]

- "D.R. has been on psychiatric medication since the age of ten years old for hearing voices and what he calls 'psychological illusions.' He has had several previous psychiatric hospitalizations. He describes visual hallucinations of seeing ghosts, animals, people and things move. Auditory hallucinations are outside of his head, they are sometimes about Jesus, they take up to 500 different forms and talk to each other. They sometimes command him to kill himself although he has not made any previous suicide attempts. He is obviously severely mentally retarded and appeared to be blithely indifferent to his conditions.[92]

- "Mr. BF is a forty year old black man who has been incarcerated since July 1994. [He] has a history of severe mental illness. During the period of incarceration preceding his arrival at Attica, he was psychiatrically hospitalized at CNYPC [Central New York Psychiatric Center] a total of seven times and was in and out of MHUs in the facilities where he was housed. On each occasion that he was transferred to

CNYPC, he presented with symptoms of a highly agitated, confusional psychosis with some suicidal features. His clinical presentation has also included a great deal of agitated, bizarre and inappropriate behavior, including sexual preoccupations, grandiose ideation of being a rock star, and a fixation with princess Diana of Britain. At times he experienced visual and auditory hallucinations, and sometimes carried on loud conversations with the voices he heard. He was observed to be hearing voices and seeing strange people who were not there, and became preoccupied with spacecraft, aliens, voodoo, and the singer Mariah Carey. At times, he was observed to be overtly confused and disoriented, mumbling incoherently.... At times he was quite floridly ill, while at other times, he appeared to be reasonably coherent. His behavior was often grossly bizarre and inappropriate...[H]e was observed to have inserted a lighter, cigarettes, and pictures into his anus. On at least one occasion, he inflicted multiple lacerations on both sides of his face....He smeared feces on his cell wall — even using his excrement as a paint to write words on the walls. At times he was suicidal.[93]

- "[A prisoner in Illinois] reports he hears voices of dead people: his brother...his own victim(s); voices usually happen at night. No visual, olfactory, gustatory or tactile hallucinations.... States that cutting his arms and legs helps him to relax. Sometimes it is intended to be lethal. Has no recollection of trying to eat his own flesh except as told to him by correctional staff...diagnostic formulation: Long-standing history of psychiatric treatment/psychiatric hospitalization(s) for depression and SSDI for physical and mental disorder. [While in prison] diagnoses of depression, dysthymic disorder, cyclothymia, adjustment disorder, adult attention deficit disorder, PTSD, impulse control disorders, atypical psychosis and personality disorders...Differential diagnosis includes: Major depressive disorder, recurrent, with psychotic features; Schizophrenia, undifferentiated type; Borderline personality disorder; Schizotypal personality disorder.[94]

- Y.R. is an prisoner on Virginia's death row. He was convicted of a triple-murder carried out when he was eighteen years old. Although he underwent a psychiatric evaluation conducted by a state expert, he was never given a mental health competency hearing, despite his lawyers believing him to be incompetent to stand trial.[95] Y.R., who three psychiatric experts believe developed schizophrenia aged about sixteen, sometimes believes himself to be an incarnation of famous rap stars. At other times, he declares that he is God and that the Bible was written about him. He believes that when he is executed he will immediately return to earth, bringing with him all his dead relatives. When he acts out, bangs on the walls, or floods his cell, guards have, at least twice, placed him into four point restraints; because he is so ill, he cannot write to his attorney. She only finds out about these events when other prisoners on death row contact her and tell her what has been happening to her client.[96]

- During our research, Human Rights Watch interviewed numerous other prisoners also identified by mental health staff, family members, or correctional staff as seriously mentally ill and whose illness was patent. For example, we interviewed a prisoner, V.P., at Corcoran State Prison, California who was incarcerated for murdering his wife because she had cheated on him. He told Human Rights Watch that he'd been playing a game called "no murder." "I hear my wife. She talks about game playing. No Murder. She says she's sorry she fooled around..... I think about game 'no murder.' I want to go home." V.P. also said that his wife and her father had also killed him several times, but that he hadn't died; and that the whole family had been playing this game for two thousand years.[97]

[71] Human Rights Watch interview with O.O.T., California State Prison, Corcoran, Enhanced Outpatient Program, California, July 11, 2002.



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
HOWARD R. YOUNG CORRECTIONAL INSTITUTION
1301 EAST 12TH STREET
WILMINGTON, DELAWARE 19801
Telephone: (302) 429-7719
Fax: (302) 429-7708

Dave Williams
Security Superintendent

## *MEMORANDUM*

*TO:*      *Jimmy Lewis # 506622*
            *1E*

*FROM:*    *Major Dave Williams*

*DATE:*    *February 22, 2005*

*SUBJ:*    **YOUR RECENT CORRESPONDENCE**

        *This office is in receipt of your recent correspondence. Your request for all disciplinary and incident reports pertaining to you during your incarceration here at HRYCI is denied. The information you request is confidential and released by subpoena only.*

*DW:sm*

**DISTRIBUTION**

*File*



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
HOWARD R. YOUNG CORRECTIONAL INSTITUTION
1301 EAST 12TH STREET
WILMINGTON, DELAWARE 19809
Telephone: (302) 429-7747
Fax: (302) 429-7716

Raphael Williams
Warden IV

## *MEMORANDUM*

*TO:*      *Jimmie Lewis, 506602*
           *1E Pod*

*FROM:*    *Warden Raphael Williams*

*DATE:*    *February 15, 2005*

*SUBJ:*    **YOUR RECENT CORRESPONDENCE**

   *Delaware law prohibits you from receiving a copy of your medical records absent of a court order.*

*RW:adc*

**DISTRIBUTION**

*File*





STATE OF DELAWARE
DEPARTMENT OF CORRECTION
HOWARD R. YOUNG CORRECTIONAL INSTITUTION
1301 EAST 12TH STREET
WILMINGTON, DELAWARE 19809
Telephone: (302) 429-7747
Fax: (302) 429-7716

Raphael Williams
Warden IV

### *MEMORANDUM*

*TO:*        *Jimmie Lewis, 506622*
             *1E Pod*

*FROM:*      *Raphael Williams*
             *Warden IV*

*DATE:*      *January 24, 2005*

*SUBJ:*      ***YOUR RECENT CORRESPONDENCE***

    *You currently have 47 active grievances on file. At this time, your request to receive copies of those grievances is denied, as it is too cumbersome to copy and costly.*

*RW:adc*

***DISTRIBUTION***

*File*



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
MULTI-PURPOSE CRIMINAL JUSTICE FACILITY
1301 EAST 12TH STREET
WILMINGTON, DELAWARE 19809
Telephone: (302) 429-7747
Fax: (302) 429-7716

Raphael Williams
Warden IV


## *MEMORANDUM*


*TO:*        *Jimmie Lewis, 506622*
            *2A Pod*

*FROM:*      *Warden Raphael Williams*

*DATE:*      *November 12, 2003*

*SUBJ:*      **YOUR RECENT CORRESPONDENCE**

        *You must work with the classification/treatment unit to obtain the necessary paperwork for out-of-state transfer through Interstate Compact.*

*RW:adc*


**DISTRIBUTION**

*Pam Minor, Treatment Administrator*
*File*

# OCTOBER 2006

<>SNU 23-C & 23-D
ACTIVITIES & GROUPS

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| **1** | **2 (two classrooms)** 23C Activity Workshop 1300-1400 Music Therapy & 23D Group 1300-1500 Overcoming Thinking Errors | **3 (one classroom)** 23C Activity Workshop 1300-1400 Psychopharmacology | **4 (one classroom)** 23C Activity Workshop 1300-1400 Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | **5 (one classroom)** 23C Activity Workshop 1300-1400 Depression Support Group | **6 (no classrooms)** 23C & 23D 1300-1500 Open Activity (on unit) | **7** |
| **8** | **9 (two classrooms)** 23C Activity Workshop 1300-1400 AA/NA Substance Abuse Awareness & 23D Group 1300-1500 Overcoming Thinking Errors | **10 (one classroom)** 23C Activity Workshop 1300-1400 Self-Mutilation Support Group | **11 (one classroom)** 23C Activity Workshop 1300-1400 Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | **12 (one classroom)** 23C Activity Workshop 1300-1400 Art Therapy | **13 (no classrooms)** 23C & 23D 1300-1500 Open Activity (on unit) | **14** |
| **15** | **16 (two classrooms)** 23C Activity Workshop 1300-1400 Music Therapy & 23D Group 1300-1500 Overcoming Thinking Errors | **17 (one classroom)** 23C Activity Workshop 1300-1400 Psychopharmacology | **18 (one classroom)** 23C Activity Workshop 1300-1400 Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | **19 (one classroom)** 23C Activity Workshop 1300-1400 Depression Support Group | **20 (no classrooms)** 23C & 23D 1300-1500 Open Activity (on unit) | **21** |
| **22** | **23 (two classrooms)** 23C Activity Workshop 1300-1400 AA/NA Substance Abuse Awareness & 23D Group 1300-1500 Overcoming Thinking Errors | **24 (one classroom)** 23C Activity Workshop 1300-1400 Self-Mutilation Support Group | **25 (one classroom)** 23C Activity Workshop 1300-1400 Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | **26 (one classroom)** 23C Activity Workshop 1300-1400 Art Therapy | **27 (no classrooms)** 23C & 23D 1300-1500 Open Activity (on unit) | **28** |
| **29** | **30 (two classrooms)** 23C Activity Workshop 1300-1400 Music Therapy & 23D Group 1300-1500 Overcoming Thinking Errors | **31 (one classroom)** 23C Activity Workshop 1300-1400 Psychopharmacology | | | | |

# NOVEMBER 2006

## ◇SNU 23-C & 23-D ACTIVITIES & GROUPS

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | 1 (one classroom)<br>23C Activity Workshop 1300-1400<br>Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | 2 (one classroom)<br>23C Activity Workshop 1300-1400 Depression Support Group | 3 (no classrooms)<br>23C & 23D 1300-1500 Open Activity (on unit) | 4 |
| 5 | 6 (two classrooms) | 7 (one classroom)<br>23C Activity Workshop 1300-1400 Self-Mutilation Support Group | 8 (one classroom)<br>23C Activity Workshop 1300-1400<br>Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | 9 (one classroom)<br>23C Activity Workshop 1300-1400 | 10 (no classrooms)<br>23C & 23D 1300-1500 Open Activity (on unit) | 11 |
| 13 (two classrooms)<br>DACS @ 9:00<br>23C Activity Workshop 1300-1400 Music Therapy & 23D Group 1300-1500 Overcoming Thinking Errors | 14 (one classroom)<br>23C Activity Workshop 1300-1400 Psychopharmacology | 15 (one classroom)<br>23C Activity Workshop 1300-1400<br>Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | 16 (one classroom)<br>23C Activity Workshop 1300-1400 Depression Support Group | 17 (no classrooms)<br>23C & 23D 1300-1500 Open Activity (on unit) | 18 |
| 20 (two classrooms)<br>23C Activity Workshop 1300-1400 AA/NA Substance Abuse Awareness & 23D Group 1300-1500 Overcoming Thinking Errors | 21 (one classroom)<br>23C Activity Workshop 1300-1400 Self-Mutilation Support Group | 22 (one classroom)<br>23C Activity Workshop 1300-1400<br>Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | 23 (one classroom)<br>23C Activity Workshop 1300-1400 Art Therapy | 24 (no classrooms)<br>23C & 23D 1300-1500 Open Activity (on unit) | 25 | |
| 27 (two classrooms)<br>23C Activity Workshop 1300-1400 Music Therapy & 23D Group 1300-1500 Overcoming Thinking Errors | 28 (one classroom)<br>23C Activity Workshop 1300-1400 Psychopharmacology | 29 (one classroom)<br>23C Activity Workshop 1300-1400<br>Bibliotherapy & 23D Group (on unit) 1300-1500 Arts & Crafts | 30 (one classroom)<br>23C Activity Workshop 1300-1400 Depression Support Group | | | |

CORRECTIONAL MEDICAL SERVICES
Mental Health Office, Bldg. #24
1181 Paddock, Rd.
Smyrna, DE. 19977
PH:    302-653-9261 ex.2863
FAX:  302-653-4670



To: Lt. Welcome
_____

From: Olufemi Adesemolu SNU Coordinator
_____

Cc: Imad Jarwan, Director of Mental Health DCC
_____

Date: August 7, 2006
_____

Re:  Scheduled Activity for the Special Needs Unit  23D
_____

The Special Needs Unit at 23 D would like to engage in Arts and Craft and Spades Tournament Beginning the week of 8/7/06.  Each activity will last for about a month. While we realize the need to abide by the split recreation time, it may sometimes be necessary to have inmates from top and bottom level to interact during these activities. Not only is this therapeutic for these inmates, it also provide avenue for positive social interaction and for those with social anxiety the opportunity to address their issues.

This month's Activity Leader Inmate **Jimmie Lewis** would coordinate these activities.
The following events would be tentatively held during the recreation period.

### ARTS & CRAFTS

| Leonard Baylis | L3 |
| Billy Glaze | L7 |
| William Murray | U8 |
| Roy Campbell | L2 |
| Willie Williams | L1 |

### SPADES TOURNAMENT

| Hector Quirico | U6 | Michael Dolan | U3 |
| Willis Mathews | U11 | Fred Brown | U7 |
| Norris Durham | L5 | Bryan Selhorst | L9 |
| Kevin Dixon | U1 | Chris Dennis | L8 |

August 9, 2006

| Tyrone Miller | U1 | Tremaine Chapman | L8 |
| William Novello | U4 | Chris Forester | U6 |
| John Sheats | U4 | Fred Brown | U7 |
| Chris Forester | U6 | Lamar Trower | L12 |
| Darren Brooks | U7 | David Crosby | L9 |

## PINOCHLE TORNAMENT

| Floyd Wright | LHC |
| Jerel Flamer | U12 |
| Ronald Scott | L11 |

Thanking you for your understanding and support for the SNU programs.

Olufemi Adesemolu, MPS

SNU Coordinator.

| Name | Phase | SNU Phase Report 7/31/06-8/6/06 |
|---|---|---|
| Lamar Trower | 2 | Day Rec Only, No Evening Rec |
| Bryant Waples | 2 | Day Rec Only, No Evening Rec |
| Martin, Micheal | 2 | Day Rec Only, No Evening Rec |
| Bryan Selhorst | 2 | Day Rec Only, No Evening Rec |
| David Crosby | 2 | Day Rec Only, No Evening Rec |
| Norman Banks | 2 | Day Rec Only, No Evening Rec |
| Brooks, Darren | 4 | |
| Brown, Fred | 4 | |
| Chapman, Tremaine | 4 | |
| Darius Johnson | 4 | |
| Dennis, Chris. | 4 | |
| Dixon, Kevin | 4 | |
| **Dolan, Michael** | 4 | **Community Leader** News |
| Drozdowski, Benard | 4 | |
| Flamer, Jerel | 4 | |
| Forrester, Chris | 4 | |
| Frank, Richard | 4 | |
| Glaze, Billy | 4 | |
| Godfrey, Clarence | 4 | |
| Hull, Robert | 4 | |
| **Jimmy Lewis** | 4 | **Activity Leader** |
| Leonard Baylis | 4 | |
| Mathews, Willis | 4 | |
| Michael Chicosky | 4 | |
| Miller, Tyrone | 4 | |
| Minor, Samuel | 4 | |
| Murray, William | 4 | |
| Norris Durham | 4 | |
| Novello, William | 4 | |
| Quirico, Hector | 4 | |
| Roy Campbell | 4 | |
| Scott, Ronald | 4 | |
| Sheats, John | 4 | |
| **Ternahan, John** | 4 | **Community Leader/E** Environmental |
| Williams, Willie | 4 | |
| Wright, Floyd | 4 | |
| Zickgraf, Steven | 4 | |
| | | |



STATE OF DELAWARE
DEPARTMENT OF CORRECTION
**OFFICE OF THE DEPUTY WARDEN**
DELAWARE CORRECTIONAL CENTER
1181 Paddock Road
SMYRNA, DELAWARE 19977
Telephone: (302) 653-9261
Fax: (302) 659-6668

## MEMORANDUM

TO:         IM Jimmie Lewis SBI# 506677 MHU 23 DU2B

FROM:       Deputy Warden Pierce

DATE:       November 27, 2006

RE:         Inmate Account and Indigent Supplies
_____

I received your letter October 12, 2006, regarding your inmate account and supplies. In regards to your inmate account the fees will not be waived since you incurred them while being incarcerated. In regards to the indigent supplies your concerns have been forwarded to Treatment Administrator Hosterman for his investigation and action.

DP/dc
Attachment
cc:     Treatment Administrator Hosterman
        File

DU242

RECEIVED

OCT 1 2 2006

DEPUTY WARDEN I

To: Deputy Warden Pierce

From: Jimmie Lewis, SBI #506622
SHU BLD 17, C-U-1

Mr Pierce, im writing because I owe
more than $250.00 for postage fees !!
The dilemma is that I have recently
run out of cosmetics, soap, deodarant,
powder, tooth paste, lotion. & wrote to
the Dismas Catholic Community, but I was informed
that they are not allowed to send or bring me
the cosmetics I need. What am I to do?
My parents can send me money, but they
are retired and can't afford to shell out more than
$250.00 for my postage and legal supply fees, bill.
Because theis retired and on a fixed income.
Can you have the postage fees waived?
Will you contact the St. Dismas Catholic Community
to give them the okay about getting me cosmetics?

Please get back to me as soon as possible.

Jimmie Lewis

DATE: 10/9/06.

**INDIGENT INMATES'**

**MONTHLY MAILING SUPPLIES**

/ 9

| Date | Bldg. | Last Name | First Name | SBI No. | Amt. | Signature |
|------|-------|-----------|------------|---------|------|-----------|
| 10-31-05 | ALS | Rodriguez | Juan | 332476 | .41 | |
| | AUS | Lohman | Quintin | 382566 | 3.57 | |
| | AU8 | Harmon | Vector | 323674 | 2-69 | x Victor Harmon |
| | AU | Johnson | Myron | 446737 | 1.72 | |
| | CL9 | Williams | David | 159089 | 3.57 | |
| | CU2 | Robinson | Gregory | 263082 | 2-93 | property of Robinson |
| | DU2 | Collinswood | Larry | 193980 | 269 | Larry Collinswood Jr. |
| | DU1 | Thomas | Wayne | 191611 | 273 | |
| | DU10 | Whiteman | Benjamin | 167669 | 3.94 | |
| | AU7 | Lewis | Tommie | 504622 | 1.20 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

TO: _Jimmy Lewis_    SBI: _00526622_

DATE: _4-7-05_

**From:**    **CLASSIFICATION OFFICE**

**RE:**    **INITIAL CLASSIFICATION**

This is to inform you that the Multi-Disciplinary Team (MDT) has classified you to **MAXIMUM** security. You will be required to complete your treatment plan and follow Institutional rules. Negative behavior, excessive write-ups, or failure to complete your treatment plan may lengthen your stay in a higher security level. You will be assigned a Quality of Life Level (QLL) and an individual treatment plan by your assigned building counselor, who will monitor your progress. Direct questions to your counselor.

**NOTE:   This classification is subject to a higher review.**

Inmate Signature: _____

Date: _4-7-05_

Next Review: _6/05_
RA Score: _(w.6/05, 12pt.)_

**Three Part Form**
**Original: Records**
**Pink: File**
**Yellow: Inmate**
FORM# 960 (3 pt)

Appendix E

## DELAWARE CORRECTIONAL CENTER — MEMORANDUM

TO:    Inmate J̲i̲m̲m̲y̲ ̲L̲o̲u̲i̲s̲ , SBI# 5̲0̲6̲6̲0̲2̲ , Housing Unit S̲H̲U̲
VIA:    Counselor ̲Z̲e̲n̲o̲l̲o̲
FROM:  I.B.C.C. ̲
DATE:    ̲8̲/̲1̲6̲/̲0̲5̲
RE:    Classification Results

Your M.D.T. has recommended you for the following: ̲M̲e̲d̲ ̲H̲C̲,̲ ̲M̲H̲,̲ ̲P̲R̲,̲ ̲T̲F̲C̲

The I.B.C.C.'s decision is to:

✓ Approve ̲C̲o̲n̲t̲ ̲M̲a̲x̲ ̲ ̲ ̲M̲a̲x̲ ̲P̲r̲o̲g̲r̲a̲m̲s̲

✓ Not Approve ̲M̲e̲d̲ ̲H̲i̲g̲h̲,̲ ̲ ̲M̲H̲,̲ ̲P̲R̲,̲ ̲T̲F̲C̲

_____ Defer ̲

_____ Recommend ̲

_____ Not Recommend ̲

## BECAUSE:

_____ Lack of program participation          _____ Time remaining on sentence
_____ Pending disciplinary action            _____ Prior failure under supervision
_____ Gradual phasing indicated              _____ Poor institutional adjustment
_____ Open charges                           _____ Serious nature of offense
_____ Prior criminal history
_____ Failure to follow your treatment plan in that you ̲

_____ You present a current and continuous danger to the safety of staff, other inmates, or the good
      order of the Institution.  Explanation: ̲

**OTHER:**  ̲R̲e̲v̲:̲ ̲0̲8̲/̲0̲6̲

## ADDITIONAL COMMENTS:

_____ Develop/continue treatment plan with counselor

You will be expected to address the following: ̲

Copy to:  Classification
          Inmate                                          Form #456
          Institution File                                Revised 11/97

## Special Order Items Requested for Purchase from Commissary

Inmate Name: _Jimmie Lewis_                    SBI# _506622_
Inmate Signature: _Jimmie Lewis_            Date _2/5/06_
Bldg: _19_   Tier: _A_   Cell: _U-7_
Please allow 7-10 days for Delivery of items **In Stock**.
Note: Not all items on this list are approved for all areas.
Circle your choice for any item that has one. i.e. Chess/ Checkers/Dominos

| Qty Requested | Qty Approved | Item | Cost $ |
|---|---|---|---|
| | | Bristle Pads | |
| | | Brushes ( low/high quality) | |
| | | Chess/Checkers/Dominoes | |
| | | Crayons | |
| | | Fan | |
| | | Handkerchief | |
| | | Headphones - Sony | |
| | | Lockerbox | |
| | | Pastels | |
| | | Pencil Sharpener | |
| | | Photo Album | |
| | | Protractor | |
| 1 | 1 | Radio - NO SPEAKER | $ 48.00 |
| | | Remote Control (universal) | 313 794 |
| | | Ruler | |
| | | Television, clear, NO SPEAKER | |
| | | Watch Battery (Comm watch only) | |
| | | Watercolor markers | |
| | | Watercolor paints | |
| | | Watercolor pencils | |
| | | Wrist Watch | |

Reviewed by Commissary Officer: _HU_          Date: _2-16-4_

Received by Inmate: _Jimmie Lewis_              Date: _2/2/06_

FORM #: 661A ( Rev. 01/05) (3 pt NCR)

| Distribute: | White - Property Officer |
|---|---|
| | Pink - Commissary |
| | Yellow - Inmate |

**Please Note: This form must be submitted on your scheduled commissary day,
along with any other purchases you may have.
At that time the amount will be deducted from your account.**

## Special Order Items Requested for Purchase from Commissary

Inmate Name: _JIMMIE LEWIS_  SBI# _506622_

Inmate Signature: _Jimmie Lewis_  Date _1/08/06_

Bldg: _19_ Tier: _A_ Cell: _U-7_

Please allow 7-10 days for Delivery of items **In Stock**.

Note: Not all items on this list are approved for all areas.

Circle your choice for any item that has one. i.e. Chess/ Checkers/Dominos

| Qty Requested | Qty Approved | Item | Cost $ |
|---|---|---|---|
| | | Bristle Pads | |
| | | Brushes ( low/high quality) | |
| | | Chess/Checkers/Dominoes | |
| | | Crayons | |
| | | Fan | |
| | | Handkerchief | |
| 1 | 1 | Headphones – Sony | $34.19 |
| | | Lockerbox | |
| | | Pastels | |
| | | Pencil Sharpener | |
| | | Photo Album | |
| | | Protractor | |
| | | Radio – NO SPEAKER | |
| | | Remote Control (universal) | |
| | | Ruler | |
| | | Television, clear, NO SPEAKER | |
| | | Watch Battery (Comm watch only) | |
| | | Watercolor markers | |
| | | Watercolor paints | |
| | | Watercolor pencils | |
| | | Wrist Watch | |

Reviewed by Commissary Officer: _JLu_  Date: _1-11-6_

Received by Inmate: _Jimmie Lewis_  Date: _1/24/06_

FORM #: 661A ( Rev: 01/05) (3 pt NCR)

| Distribute: | White – Property Officer |
|---|---|
| | Pink – Commissary |
| | Yellow – Inmate |

**Please Note: This form must be submitted on your scheduled commissary day, along with any other purchases you may have. At that time the amount will be deducted from your account.**

...REQUIRED OR CONFISCATED PROPERTY

INMATE NAME: _____    SBI# _____
HOUSING UNIT: LEWIS   JIMMY    DATE _____    TIME: _____
          23   A 12                    7 - 33 - 36          15 35

| ITEM | DESCRIPTION/BRAND NAME | S/P** | QUANTITY | CONDITION (Poor/Fair/Good) |
|---|---|---|---|---|
| 1 | (Sny) ear phones | P | 1 | poor |
| 2 | G-E Radio Sunup | P | 1 | poor serial no: 0315794 |
| 3 | plastic bowl w/ lid | P | 1 | poor |
| 4 | Lubriskin lotion | P | 1 | poor |
| 5 | Nex T 1 | P- | 1 | poor |
| 6 | Ramen soup | P | 1 | poor |
| 7 | tooth brush | P | 1 | poor |
| 8 | pen | P | 1 | poor |
| 9 | eye glasses | P | 1 | poor |
| 10 | eye glass case | P | 1 | poor |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Officer's Name (Print Clearly) A/C 2          Shift 1630          Officer's Signature Who Inventoried Property

Supervisor's Name (Print Clearly)          Shift          Supervisor's Signature Reviewing Inventory

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:

_____, on ___/___/___, at _____, by _____, within _____
(Person Transferring Property)    (Date)    (Time)    (Person Receiving Property)    Unit

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:

_____, on ___/___/___, at _____, by _____, within _____
(Person Transferring Property)    (Date)    (Time)    (Person Receiving Property)    Unit

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:

_____, on ___/___/___, at _____, by _____, within _____
(Person Transferring Property)    (Date)    (Time)    (Person Receiving Property)    Unit

Revised: 4/01/03    ** S- State Property    P- Personal Property    FORM# 537-A

## INMATE ACQUIRED OR CONFISCATED PROPERTY

INMATE NAME: _Lewis, J. Hary_      SBI# _506622_

HOUSING UNIT: _23_    DATE _30 Aug 06_    TIME: _1520_

| ITEM | DESCRIPTION/BRAND NAME | S/P** | QUANTITY | CONDITION (Poor/Fair/Good) |
|---|---|---|---|---|
| 1 | Envelope's legal | P | 3 | ✓ Poor |
| Envelopes | white (lg. & sm.) | P | 24 | ✓ FAIR |
| Booklet | The power of positive Thinking | P | 1 | ✓ FAIR |
| Pictures | Various | P | 12 | ✓ FAIR |
| Pens | Bic | P | 1 | ✓ FAIR |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

_VICTOR GONZALEZ_      _0800-1600_      _Co Victor Gonzalez_

**Officer's Name (Print Clearly)**    **Shift**    **Officer's Signature Who Inventoried Property**

_____     _____     _____

**Supervisor's Name (Print Clearly)**    **Shift**    **Supervisor's Signature Reviewing Inventory**

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:

_____, on __/__/__, at _____, by _____, within _____

(Person Transferring Property)  (Date)  (Time)  (Person Receiving Property)  Unit

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:

_____, on __/__/__, at _____, by _____, within _____

(Person Transferring Property)  (Date)  (Time)  (Person Receiving Property)  Unit

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:

_____, on __/__/__, at _____, by _____, within _____

(Person Transferring Property)  (Date)  (Time)  (Person Receiving Property)  Unit

Revised: 4/01/03    ** S- State Property    P- Personal Property     FORM# 537-A



𝔖t. 𝔇ismas 𝔆onference
# SOCIETY OF ST. VINCENT DePAUL
Delaware Correctional Center
1181 Paddock Road
Smyrna, Delaware 19977



Date    12-1-05

Dear M. lewis          ,

Thank you for your recent request for cosmetic assistance. The Society of St. Vincent DePaul would consider it a privilege to serve you; however, security concerns do not allow us to send cosmetics to the SHU. Please write again when you get to the MHU.

Thank you again, and God bless.

Wishing you peace, prosperity, and happiness,

Louis Renai
_____
Louis Renai, Vice President                Glenn E. MacDonald, President

| Defendant Name: | | | | | Date: | 02-11-05 |
| AKA: | Lewis Jimmy | | | | Judge: | PLA |
| ID Number: | 03D5D16966 | | | | DOB: | 12-25-66 |

| Criminal Action Number: | | Charge: |
| Prefix IN   Number 03-06-0175   Suffix | | Carjacking 2nd |

**FINANCIAL**

| ☐ Pay Costs | ☐ Costs Suspended | ☐ Pay Fine $ | ☐ 15%  ☐ 18% | ☐ Fine Suspended: |

**IMPRISONMENT/PROBATION**

| ☐ In Violation of Probation/Contempt | ☐ Revoked | ☐ Continued | ☐ Modified | ☐ Discharged |

Effective:

Be imprisoned for __5__ years _____ months _____ days   At Level __5__

Level 5 Treatment: _____

Beginning: _____

Ending: _____

Eff Date: 5/26/03

| ☐ Min. Mandatory Time: _____   Title/Sec: _____ | ☐ Credit for | ☐ Time Served |

☐ Suspended Immediately

☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting

☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting

☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting

Followed By: _____ at Level _____ Balance at Level _____

| Probation for | at Level | Suspended after | for | at Level |

| ☐ Consecutive to: | ☒ Concurrent with: |

| ☐ Level 4 Sentence, Hold at:<br>(circle one)    3    5 | ☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent. |

| RESTITUTION | TO: | | Amount: |
| ☐<br>Determined by<br>Presentence Memo | Address: | | |

| CONDITIONS | ☐ Pay costs, fines, restitution during _____ | ☐ Probationary period  ☐ Previously Ordered |

| ☐ Work Referral<br>☐ Pay Costs of Supervision<br>☐ Community Service: _____ Hours<br>☒ No Contact with Patrick Greer<br>☒ No Driving for _____<br>☒ Subst Abuse Eval<br>☐ Residential Drug/Alc<br>☐ Outpatient Drug/Alc<br>☐ 4177 DUI Program | ☐ TASC Supervision/Evaluation<br>☐ One Time Fee<br><br>☐ Alcohol Treatment<br>☐ Job Training<br>☐ Fully Employed<br>☐ Zero Tolerance | ☐ Determined by Probation<br><br>☐ Victim   ☐ Codefendant<br><br>☒ Mental Health<br>☐ Obtain GED<br>☐ Random Urinalysis | ☐ SEX OFFENDER:<br>Registration/Com-<br>munity Notification<br>Required. Level 1-4<br>Sentence: Super Ct<br>to provide notice<br>and register deft.<br>Level 5 Sentence:<br>Dept of Correction<br>to provide notice<br>and register deft. | (circle one)<br>COMMITMENT<br><br>RELEASE<br><br>DEFERRED<br>COMMITMENT |
| ☐ Follow Original Conditions of Probation  X Anger Management | | | | |

| ☒ Nolle Prosses entered on remaining charges<br>☒ Nolle Prosses entered on Criminal Action Number(s): | PR $ |
| | SH $ |
| | TOTAL $ |

| DEF ATTY: | DAG: | CLERK: | CT. REP: |
| Edinger | Robertson | Ferry | Coale |

# SENTENCING WORKSHEET

Time:    Sent to Judge:

| | |
|---|---|
| Defendant Name: | Date: 02-11-05 |
| AKA: Lewis, Jimmy | Judge: PLA |
| ID Number: 03056 966 | DOB: 12-25-66 |

| Criminal Action Number: | | Charge: |
|---|---|---|
| Prefix N  Number 03-06-0176  Suffix | | Theft 1000 or > |

**FINANCIAL**

| ☐ Pay Costs | ☐ Costs Suspended | ☐ Pay Fine $ | ☐ 15%  ☐ 18% | ☐ Fine Suspended: |
|---|---|---|---|---|

**IMPRISONMENT/PROBATION**

| ☐ In Violation of Probation/Contempt | ☐ Revoked | ☐ Continued | ☐ Modified | ☐ Discharged |
|---|---|---|---|---|

Effective: _____

Beginning: _____

Be imprisoned for ⊘ years _____ months _____ days  At Level 5

Ending: _____

Level 5 Treatment: _____

Eff Date: _____

☐ Min. Mandatory Time: _____  Title/Sec: _____  ☐ Credit for  ☐ Time Served

☐ Suspended Immediately

☒ Susp After ___1V___ ☐ time served for ___1V___ at Level __4__ ☒ Plummer/Home Conf/Day Reporting

☒ Susp After ___6m___ ☐ time served for ___6m___ at Level __3__ ☐ Plummer/Home Conf/Day Reporting

☐ Susp After _____ ☐ time served for _____ at Level _____ ☐ Plummer/Home Conf/Day Reporting

Followed By: _____ at Level _____  Balance at Level _____

| Probation for | at Level | Suspended after | for | at Level |
|---|---|---|---|---|

| ☐ Consecutive to: | ☒ Concurrent with: |
|---|---|

| ☐ Level 4 Sentence, Hold at:  (circle one)    3    5 | ☐ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State Hospital) until competent. |
|---|---|

| RESTITUTION | TO: | | Amount: |
|---|---|---|---|
| ☐ Determined by Presentence Memo | Address: | | |

| CONDITIONS | ☐ Pay costs, fines, restitution during_____ | ☐ Probationary period  ☐ Previously Ordered |
|---|---|---|

☐ Work Referral

☐ Pay Costs of Supervision  ☐ One Time Fee

☐ Community Service: _____ Hours

☐ No Contact with _____

☐ TASC Supervision/Evaluation

☐ Determined by Probation

☐ Victim  ☐ Codefendant

☐ No Driving for _____

☐ Subst Abuse Eval

☐ Residential Drug/Alc

☐ Outpatient Drug/Alc

☐ 4177 DUI Program

☐ Follow Original Conditions of Probation

☐ Alcohol Treatment

☐ Job Training

☐ Fully Employed

☐ Zero Tolerance

☐ Mental Health

☐ Obtain GED

☐ Random Urinalysis

☐ SEX OFFENDER: Registration/Community Notification Required. Level 1-4 Sentence: Super Ct to provide notice and register deft. Level 5 Sentence: Dept of Correction to provide notice and register deft.

(circle one)

COMMITMENT

RELEASE

DEFERRED:
COMMITMENT

☒ Nolle Prosses entered on remaining charges

☒ Nolle Prosses entered on Criminal Action Number(s):

| PR $ |
|---|
| SH $ |
| TOTAL $ |

| DEF ATTY: | DAG: | CLERK: | CT. REP: |
|---|---|---|---|
| Edinger | Robertson | Ferry | Coale |

Document Control No.: 02-03-10-9B-09-02

| Defendant Name: | | | | Date: | 0 2 - 11 - 05 |
|---|---|---|---|---|---|
| AKA: | Lewis, Jimmy | | | Judge: | PLA |
| ID Number: | 5305016966 | | | DOB: | 12 - 25 - 66 |

| Criminal Action Number: | | | Charge: |
|---|---|---|---|
| Prefix N   Number 03 - 06 - 0177   Suffix | | | Resist Arrest |

FINANCIAL

| □ Pay Costs | □ Costs Suspended | □ Pay Fine $ | □ 15%<br>□ 18% | □ Fine Suspended: |
|---|---|---|---|---|

IMPRISONMENT/PROBATION

| □ In Violation of Probation/Contempt | □ Revoked | □ Continued | □ Modified | □ Discharged |
|---|---|---|---|---|

Effective:

Beginning: _____

Be imprisoned for_____ years_____ months_____ days  At Level __5__

Ending: _____

Level 5 Treatment:_____

Eff Date:_____

| □ Min. Mandatory Time:_____ Title/Sec:_____ | □ Credit for | □ Time Served |
|---|---|---|

☒ Suspended Immediately

□ Susp After_____ □ time served for__1 Y__ at Level __2__ □ Plummer/Home Conf/Day Reporting

□ Susp After_____ □ time served for_____ at Level_____ □ Plummer/Home Conf/Day Reporting

□ Susp After_____ □ time served for_____ at Level_____ □ Plummer/Home Conf/Day Reporting

Followed By:_____ at Level_____ Balance at Level_____

| Probation for | at Level | Suspended after | | for | at Level |
|---|---|---|---|---|---|

| □ Consecutive to: | ☒ Concurrent with: |
|---|---|

| □ Level 4 Sentence, Hold at;<br>(circle one)     3     5 | □ Guilty but Mentally Ill, to be confined at Delaware Psychiatric Center (Delaware State<br>Hospital) until competent. |
|---|---|

| RESTITUTION | TO: | Amount: |
|---|---|---|
| □<br>Determined by<br>Presentence Memo | Address: | |

| CONDITIONS | □ Pay costs, fines, restitution during_____ | □ Probationary period  □ Previously Ordered |
|---|---|---|

| □ Work Referral            □ TASC Supervision/Evaluation<br>□ Pay Costs of Supervision    □ One Time Fee        □ Determined by Probation<br>□ Community Service:_____ Hours<br>□ No Contact with_____ □ Victim  □ Codefendant<br><br>□ No Driving for _____<br>□ Subst Abuse Eval        □ Alcohol Treatment    □ Mental Health<br>□ Residential Drug/Alc    □ Job Training        □ Obtain GED<br>□ Outpatient Drug/Alc    □ Fully Employed      □ Random Urinalysis<br>□ 4177 DUI Program        □ Zero Tolerance<br>□ Follow Original Conditions of Probation | □ SEX OFFENDER:<br>Registration/Com-<br>munity Notification<br>Required. Level 1-4<br>Sentence: Super Ct<br>to provide notice<br>and register deft.<br>Level 5 Sentence:<br>Dept of Correction<br>to provide notice<br>and register deft. | (circle one)<br>COMMITMENT<br><br>RELEASE<br><br>DEFERRED;<br>COMMITMENT |
|---|---|---|

| ☒ Nolle Prosses entered on remaining charges<br>☒ Nolle Prosses entered on Criminal Action Number(s): | | PR  $ |
|---|---|---|
| | | SH  $ |
| | | TOTAL $ |

| DEP ATTY: | DAG: | CLERK: | CT. REP: |
|---|---|---|---|
| Ellinger | Robertson | Ferry | Coale |

Document Control No.: 02-03-10-98-09-02

Smyrna Landing Road
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC | |
| **Grievance #** : 16149 | **Grievance Date** : 07/31/2005 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : | |
| **Grievance Type:** Law Library | **Incident Date** : 07/31/2005 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 19, Upper, Tier D, Cell 12, Single | | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims he has bee requesting legal assistance from the LL for the last two weeks but to no avail. He states none of his correspondences are acknowledged.

**Remedy Requested** : Inmate requests to be told why he is being denied LL access.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** NO | **Date Received by Medical Unit :** |
| **Investigation Sent :** | **Investigation Sent To** : Little, Michael |
| **Grievance Amount :** | |

R. Young Correctional Institution
**1301 E. 12th Street**
**WILMINGTON DE; 19809**
**Phone No. 302-429-7700**

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : HRYCI | |
| **Grievance #** : 9686 | **Grievance Date** : 12/14/2004 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 12/14/2004 | **Incident Time :** | |
| **IGC** : Moody, Mary | **Housing Location :** Building 1, West, Floor 1, Pod 1E, Cell 15, Bed A | | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** What do I have to do in order to receive medical treatment when I'm on PCO II status?

**Remedy Requested     :**

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 12/17/2004 |
| **Investigation Sent :** 12/17/2004 | **Investigation Sent To** : Sutton, Georgia |
| **Grievance Amount :** | |

HRYCI Howard R.Young Correctional Institution
1301 E. 12th Street
WILMINGTON DE, 19809
Phone No. 302-429-7700

Date: 01/21/2005

# GRIEVANCE INFORMATION - Appeal

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name** : LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : HRYCI |
| **Grievance #** : 9686 | **Grievance Date** : 12/14/2004 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 12/14/2004 | **Incident Time :** |
| **IGC** : Moody, Mary | **Housing Location :** Building 1, West, Floor 1, Pod 1E, Cell 15, Bed A | |

### APPEAL REQUEST

Appeal submitted by Jimmy Lewis, 506622-dated 1-18-05 Ms. Georgia Sutton explained to me that First Correctional Medical and staff are not responsible for cleaning the Psych Close Observation rooms #196 and #197, but F.C.M. is responsible for providing medical treatment when I am prescribed to be on PCO II status. On many occasions in the past, I have tried to obtain medical treatment while I was prescribed to be on PCO II status, only to be told during morning med pass to fill out a sick call slip and submit it? When PCO II status does not permit me to have and or utilize paper, pencils or pens. Due to my chronic mental illness, it is highly probable that I will be prescribed PCO II status again. I have therefore refused to sign the informal resolution on 1/18/05, because I don't want my mental health status to jeopardize my medical needs. Jimmy Lewis

### REMEDY REQUEST

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 15114 | **Grievance Date** : 07/04/2005 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/04/2005 | **Incident Time :** |
| **IGC** : Vargas, Rosalie | **Housing Location :** Bldg 19, Upper, Tier D, Cell 12, Single | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate states experiencing complications in groin, pain in testicles and pain during urination. Was taken to urologist and was scheduled to return for follow up but have not received it.

**Remedy Requested** : I want to be rescheduled to visit my urologist in order to obtain treatment for problems in my groin

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 07/08/2005 |
| **Investigation Sent :** 07/08/2005 | **Investigation Sent To** : Breton, Monique |
| **Grievance Amount :** | |

Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# GRIEVANCE REPORT

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 15533 | **Grievance Date** : 07/24/2005 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 07/22/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 19, Upper, Tier D, Ceil 12, Single | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims he experiences numerous psychiatric dilemma's on a daily basis. For more then a year he has complied with the psychotropic medicine that's prescribed to him but numerous requests to receive mental health treatment from a psychologist have been ignored.

**Remedy Requested** : psychotherapy from a psychologist.

| INDIVIDUALS INVOLVED | | |
|---|---|---|
| **Type** | **SBI #** | **Name** |

| ADDITIONAL GRIEVANCE INFORMATION | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 07/27/2005 |
| **Investigation Sent :** 07/27/2005 | **Investigation Sent To** : Dunn, Lee Anne |
| **Grievance Amount :** | |

Inmate Copy

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | |
|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI# :** 00506622    **Institution :** DCC |
| **Grievance #** : 15243 | **Grievance Date :** 07/09/2005    **Category :** Individual |
| **Status** : Unresolved | **Resolution Status :**    **Resol. Date :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 06/25/2005    **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 19, Upper, Tier D, Cell 12, Single |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** inmate claims after being transferred back to DOC on 6-25-2005 from DE Psychiatric Center he reported illnesses Insomnia, headaches, delusions, hallucinations, ear ringing, dizziness, vertigo tremors a nd s peech problems. D r. A drumburo a greed w ith i nmate could b e t he s ide e ffects of psychotropic medicines inmate received at DPC. Inmate claims Dr. Adrumburo explained that the symptoms are side effects of Geoson, Haldol, Seroquel, ativan and Benadryl, in which could also very well be signs of brain damage.

**Remedy Requested** : Inmate requests an MRI and or CAT scan in order to determine if he has brain damage as well as to determine if his psychological dilemma's are in relation to brain damage.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 07/12/2005 |
| **Investigation Sent** : 07/12/2005 | **Investigation Sent To** : Breton, Monique |
| **Grievance Amount :** | |

Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 09/07/2006

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| Offender Name : LEWIS, JIMMY | SBI# : 00506622 | Institution : DCC | |
| Grievance # : 19547 | Grievance Date : 10/19/2005 | Category : Individual | |
| Status : Unresolved | Resolution Status : | Resol. Date : | |
| Grievance Type: Mail | Incident Date : 04/06/2005 | Incident Time : | |
| IGC : Merson, Lise M | Housing Location : Bldg D/Infirmary, Tier D, Cell 188, Single | | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: On April 6, 2005, Jenny Havel, support service secretary posted memorandums on the units stating that the inmate population would not be charged for postal fee's in accordance to the newly adapted policy, but yet and still I have been charged more than $80.00 for legal mail postal fee's.

**Remedy Requested** : I want the legal mail postal fee's that total $80.00 withdrawn from my account, credited back into my account, dating from April 2005 up until Sept. 2005.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| Medical Grievance : NO | Date Received by Medical Unit : |
| Investigation Sent : | Investigation Sent To : Havel, Jenny |
| Grievance Amount : | |

Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : LEWIS, JIMMY | SBI# : 00506622 | Institution : DCC |
| Grievance # : 19547 | Grievance Date : 10/19/2005 | Category : Individual |
| Status : Unresolved | Resolution Status: | Inmate Status : |
| Grievance Type: Mail | Incident Date : 04/06/2005 | Incident Time : |
| IGC : Merson, Lise M | Housing Location :Bldg D/Infirmary, Tier D, Cell 188, Single | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name** : Havel, Jenny          **Date of Report** 11/01/2005

**Investigation Report :**

**Reason for Referring:**

---

**Investigator Name** : Smith, Tonya          **Date of Report** 04/04/2006

**Investigation Report :**

**Reason for Referring:** Ms. Smith,
              This grievance has reached the 150 warning. Thank You,
              Cpl Merson.

**Investigator Name** : Smith, Tonya          **Date of Report** 08/09/2006

**Investigation Report :** Attached are Inmate Lewis' account statements from April 2005- through June 2006. Postage is still paid for by the inmates. If funds are available on the inmate's account, the account is charged immediately. If funds are not availalbe, a hold is placed on the account and the fees are taken as funds become available.

**Reason for Referring:** Ms Smith this grievance is 10 months old and there has never been an investigation done one needs to be completed ASAP in order for a hearing to be held thank you Cpl Merson

---

**Offender's Signature:**_____

**Date** :_____

**Witness (Officer)** :_____

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 12/07/2006

## GRIEVANCE REPORT

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 85884 | **Grievance Date** : 11/29/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : |
| **Grievance Type:** Treatment | **Incident Date** : 11/22/2006 | **Incident Time :** |
| **IGC** : McCreanor, Michael | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| OFFENDER GRIEVANCE DETAILS | | |
|---|---|---|

**Description of Complaint:** I am an inmate who is classified to the Special Needs Unit (SNU) for mental illnesses and behavioral issues. I've been informed that I cannot attend group activities, group therapy, or group community meetings. I am entitled to receive treatment and/or therapy like other inmates calssified to the SNU regarding active rehabilitation.

**Remedy Requested** : for this matter to be investigated.

| INDIVIDUALS INVOLVED | | |
|---|---|---|
| **Type** | **SBI #** | **Name** |

| ADDITIONAL GRIEVANCE INFORMATION | |
|---|---|

| | |
|---|---|
| **Medical Grievance :** NO | **Date Received by Medical Unit :** |
| **Investigation Sent :** | **Investigation Sent To** : Hosterman, Ron |
| **Grievance Amount :** | |

**DCC Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76247 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : |
| **Grievance Type:** Medical Staff | **Incident Date** : 08/21/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 17, Upper, Tier C, Cell 1, Single | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: On 8/22/06 my left hand was x-rayed for which revealed my pinky finger was fractured. the x-ray tech Mary Blades informed the male doctor who was working in the infirmary that day and subsequently Dr. Rogers was notified but nothing was done. Two weeks thereafter I was sent out to a hand doctor, who scheduled me to return, unbeknowest to me, two week thereafter for surgery, but the fracture had already begun to heal.

**Remedy Requested** : I want to know exactly who is responsible for it taking so long for me to receive medical treatment, due to it being undoubtedly known that I was in pain because my left pinky finger was broken.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES          **Date Received by Medical Unit :** 10/24/2006

**Investigation Sent :** 10/24/2006          **Investigation Sent To** : Rodweller, Deborah

**Grievance Amount :**

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

**Date:** 10/24/2006

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

**Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC
**Grievance #** : 76246 | **Grievance Date** : 10/17/2006 | **Category** : Individual
**Status** : Unresolved | **Resolution Status :** | **Resol. Date** :
**Grievance Type:** Health Issue (Medical) | **Incident Date** : 10/17/2006 | **Incident Time :**
**IGC** : Merson, Lise M | **Housing Location :** Bldg 17, Upper, Tier C, Cell 1, Single

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: I have toe nail fungus, that has cause my toe nails to rot. When I clip my toe nails, it hurts and bleeds because the fungus is at the root of my toe nails. This fungus is so bad that my toe nail crumbles when I clip them. Initially this wasn't the case, but the more time that passes, the worse it becomes. I have filed numerous sick call slips, PA Ott and Dr. Rogers both told me that nothing could be prescribed to help clear up the toe nail fungus because it's cosmetic.

**Remedy Requested** : I request to receive the medical treatment I have been denied.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|------|-------|------|

## ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES  **Date Received by Medical Unit :** 10/24/2006

**Investigation Sent :** 10/24/2006  **Investigation Sent To** : Rodweller, Deborah

**Grievance Amount :**


DCC **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 12/07/2006

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | | | |
|---|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | | **SBI#** : 00506622 | **Institution** : DCC | |
| **Grievance #** : 85884 | | **Grievance Date** : 11/29/2006 | **Category** : Individual | |
| **Status** : Unresolved | | **Resolution Status :** | **Resol. Date** : | |
| **Grievance Type:** Treatment | | **Incident Date** : 11/22/2006 | **Incident Time :** | |
| **IGC** : McCreanor, Michael | | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** I am an inmate who is classified to the Special Needs Unit (SNU) for mental illnesses and behavioral issues. I've been informed that I cannot attend group activities, group therapy, or group community meetings. I am entitled to receive treatment and/or therapy like other inmates calssified to the SNU regarding active rehabilitation.

**Remedy Requested** : for this matter to be investigated.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** NO | **Date Received by Medical Unit :** |
| **Investigation Sent :** | **Investigation Sent To** : Hosterman, Ron |
| **Grievance Amount :** | |

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 11/30/2006

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

**Offender Name :** LEWIS, JIMMY

**Grievance # :** 83927

**Status :** Unresolved

**Grievance Type:** Medical Staff

**IGC :** Merson, Lise M

**SBI#** : 00506622

**Grievance Date :** 11/08/2006

**Resolution Status :**

**Incident Date :** 11/03/2006

**Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom

**Institution :** DCC

**Category :** Individual

**Resol. Date :**

**Incident Time :**

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: In retaliation to my filing a complaint against Dr. Rogers, my every sick call request for constipation, athletes feet ; excessive dry skin has been ignored, while I am forced to watch other inmates called for medical treatment per their sick call request slip.

**Remedy Requested** : to have this matter investigated in order to factually determine why I am being denied medical treatment.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|------|-------|------|

## ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES

**Investigation Sent :** 11/30/2006

**Grievance Amount :**

**Date Received by Medical Unit :** 11/30/2006

**Investigation Sent To** : Rodweller, Deborah

**DCC Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 11/28/2005

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 20618 | **Grievance Date** : 11/12/2005 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : |
| **Grievance Type:** Staff Issues | **Incident Date** : 11/12/2005 | **Incident Time :** 10:45 |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 19, Upper, Tier A, Cell 7, Single | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** I was sprayed with capstun by Sgt. G. Everett while secured in Building 19, AU 7 because of my numerous request to speak to a Lieutenant. As a result I was transferred to the Infirmary for physical and psychiatric treatment. Today, Sgt. Everett approached my cell and made mention of making things worse by threatening to spray me again with capstun. She fabricated an allegation that I assaulted her.

**Remedy Requested** : An investigation by Internal Affairs to ensure that my U.S.C.A are unjustifiably violated.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** NO | **Date Received by Medical Unit :** |
| **Investigation Sent :** | **Investigation Sent To** : Taylor, Ramon |
| **Grievance Amount :** | |

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 12/11/2006

## GRIEVANCE INFORMATION - Appeal

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76246 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 10/17/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| APPEAL REQUEST | | |
|---|---|---|

Appeal received 8 December 2006.

Inmate states: During the level (2) medical grievance hearing, there wasn't a disinterested representative present in my behalf, for which allowed the facts as I presented them to the medical grievance committee to either be ignored and or misinterpreted. Due to the denial of said medical treatment as stated in the medical grievance.

I hereby request a copy of my medical records, in order to be given the opportunity to point out the facts.

Also I seek monetary relief for nominal, punitive and exemplatory damages for pain and suffering we been subjected to due to Dr. Rogers deliberate indifference towards my medical needs, for which define a violation of my 8th U.S. C. A. rights.

| REMEDY REQUEST | | |
|---|---|---|

## GRIEVANCE INFORMATION - Appeal

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76247 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Medical Staff | **Incident Date** : 08/21/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| APPEAL REQUEST | |
|---|---|

Appeal received 8 December 2006.

Inmate states: During the level (2) grievance hearing, there wasn't a disinterested representative present in my behalf, for
which allowed the facts as I presented them to the medical grievance committee to either be ignored and or misinterpreted.
Due to the denial of said medical treatment as stated in the medical grievance.
I hereby request a copy of my medical records, in order to be given the opportunity to point out the facts.
Also, I seek monetary relief for nominal , punitive and exemplary damages for pain and suffering I've been subjected to, due
to Dr. Rogers deliberate indifference towards my medical need, for which define a violation of my 8th U.S.C.A. rights.

| REMEDY REQUEST | |
|---|---|

**DEPARTMENT OF CORRECTION**
Bureau of Prisons
245 McKee Road
Dover, Delaware 19904

March 27, 2007

Inmate LEWIS JIMMY
SBI # 00506622
DCC  Delaware Correctional Center
SMYRNA DE, 19977

Dear JIMMY LEWIS:

We have reviewed your Grievance Case # 21065 dated 11/21/2005.

Based upon the documentation presented for our review, we deny your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

Richard Kearney
Bureau Chief

DCC  Delaware Correctional Center                    Date: 03/27/2007
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

**Offender Name :** LEWIS, JIMMY        **SBI#**        : 00506622      **Institution**    : DCC
**Grievance #**   : 21065              **Grievance Date** : 11/21/2005   **Category**     : Individual
**Status**     : Resolved             **Resolution Status :** Level 3   **Resol. Date** : 03/27/2007
**Grievance Type:** Mail              **Incident Date**     : 11/21/2005  **Incident Time :**
**IGC**       : Merson, Lise M        **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** The Mail Room is holding my legal mail that I am sending to the courts for 2 weeks before it is sent out. The dilemma is that the courts often order a rapid response (within 10 days) of receiving said order to respond. The 2 week delay for my response(s) can ultimately result in my case(s) being denied or procedurally barred due to my failure to respond with said court order.

**Remedy Requested** : I want my legal mail to be sent out to their destinations within 24 hours of being delivered to the Mail Room.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|------|-------|------|
|      |       |      |

## ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** NO                **Date Received by Medical Unit :**

**Investigation Sent :**                  **Investigation Sent To**    : Smith, Tonya

**Grievance Amount :**

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 03/27/2007

# INFORMAL RESOLUTION

## OFFENDER GRIEVANCE INFORMATION

**Offender Name :** LEWIS, JIMMY          **SBI#** : 00506622          **Institution** : DCC
**Grievance #** : 21065          **Grievance Date** : 11/21/2005          **Category** : Individual
**Status** : Resolved          **Resolution Status:** Level 3          **Inmate Status :**
**Grievance Type:** Mail          **Incident Date** : 11/21/2005          **Incident Time :**
**IGC** : Merson, Lise M          **Housing Location** :Bldg 23, Upper, Tier D, Cell 2, Bottom

## INFORMAL RESOLUTION

**Investigator Name** : Smith, Tonya          **Date of Report** 12/09/2005

**Investigation Report :**

**Reason for Referring:**

**Investigator Name** : Smith, Tonya          **Date of Report** 04/28/2006

**Investigation Report :**

**Reason for Referring:** Ms. Smith,
This grievance has reached the 150 warning. Please have someone meet with the inmate for a level 1 and resolve if possible. Thank You,
Cpl. Merson

**Investigator Name** : Smith, Tonya          **Date of Report** 08/09/2006

**Investigation Report :** The DCC Mail Room is to process outgoing legal mail within 48 hours of their receipt of such mail.

**Reason for Referring:** Ms Smith this grievance is 9 months old and there has never been an investigation done one needs to be completed ASAP in order for a hearing to be held thank you Cpl Merson

**Investigator Name** : Profaci, Alisa          **Date of Report** 08/18/2006

**Investigation Report :**

**Reason for Referring:** Please review with Inmate.

**Investigator Name** : Burris, Betty          **Date of Report** 10/26/2006

**Investigation Report :**

**Reason for Referring:** As per your instructions.

**Investigator Name** : Smith, Tonya          **Date of Report** 11/30/2006

**Investigation Report :**

**Reason for Referring:** fy action.

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/27/2007

# GRIEVANCE INFORMATION - RGC

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name** : LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC | |
| **Grievance #** : 21065 | **Grievance Date** : 11/21/2005 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status** : Level 3 | **Inmate Status** : | |
| **Grievance Type:** Mail | **Incident Date** : 11/21/2005 | **Incident Time** : | |
| **IGC** : Merson, Lise M | **Housing Location** : Bldg 23, Upper, Tier D, Cell 2, Bottom | | |

### RGC

**Date Received** : 12/26/2006        **Date of Recommendation:** 01/05/2007

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Inmate | 00370464 | NELSON, CRAIG C | Uphold |
| Inmate | 00367132 | STEVENS, RANDY W | Uphold |
| Staff | | Schrader, Sarah | Uphold |
| Staff | | Merson, Lise M | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| | | |
|---|---|---|
| **Uphold : 4** | **Deny : 0** | **Abstain : 1** |

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| | | | |

### RECOMMENDATION

Hearing held 3 January 2007.

Uphold: Sent out 9-23-06. Arrived 10-5-06. Still happening. Mail addressed to Supreme court, Dover, Delaware. Court letter states appeal was 4 days late. There is no proof I/m sent letter on 9-23-06. I/m did not address grievance dated 11-2005. I/m stated 48 hrs deadline was acceptable. I/m would not sign.

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/27/2007

## GRIEVANCE INFORMATION - WARDEN

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 21065 | **Grievance Date** : 11/21/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Mail | **Incident Date** : 11/21/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

### REFERRED TO

**Due Date :**          **Referred to:**          **Name:**

**Type of Information Requested :**

### DECISION

**Date Received** : 01/05/2007

**Decision Date** : 03/16/2007          **Vote :** Deny

**Comments** : Denied. All outgoing legal mail is processed within 48 hours of the Mail Room receiving such.

cc IGC
Inmate

---

**WARDEN / WARDEN'S DESIGNEE SIGNATURE**                    **DATE**

**I WISH TO APPEAL THIS TO THE BUREAU GRIEVANCE OFFICER (B.G.O.)**    **YES:_____**    **NO:_____**

**GRIEVANT'S SIGNATURE**                    **DATE**

**I.G.C. SIGNATURE**                    **DATE**

## GRIEVANCE INFORMATION - Appeal

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 21065 | **Grievance Date** : 11/21/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Mail | **Incident Date** : 11/21/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

### APPEAL REQUEST

Appeal returned 27 March 2007.
Inmate states: As an inmate prisoner, I am allowed to utilize the pay to form #34 to cover the cost for legal mail postage; for which I must do without first knowing how much the cost of the legal mail postage will be, or exactly when the legal mail actually leaves this facility. My inmate individual account statement shows withdrawls for pay to's submitted two and three months prior, nor am I able to identify exactly who is responsible for withdrawing funds from my account. Also, I need to be able to factualy varify that I have meet deadlines imposed by the courts.

### REMEDY REQUEST

**DEPARTMENT OF CORRECTION**
**Bureau of Prisons**
**245 McKee Road**
**Dover, Delaware 19904**

March 27, 2007

$23, DU-2$

Inmate LEWIS JIMMY
SBI # 00506622
DCC  Delaware Correctional Center
SMYRNA DE, 19977

Dear JIMMY LEWIS:

We have reviewed your Grievance Case # 19547 dated 10/19/2005.

Based upon the documentation presented for our review, we deny your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by
BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

**Richard Kearney**
**Bureau Chief**

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/27/2007

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC | |
| **Grievance #** : 19547 | **Grievance Date** : 10/19/2005 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status** : Level 3 | **Resol. Date** : 03/27/2007 | |
| **Grievance Type:** Mail | **Incident Date** : 04/06/2005 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: On April 6, 2005, Jenny Havel, support service secretary posted memorandums on the units stating that the inmate population would not be charged for postal fee's in accordance to the newly adapted policy, but yet and still I have been charged more than $80.00 for legal mail postal fee's.

**Remedy Requested** : I want the legal mail postal fee's that total $80.00 withdrawn from my account, credited back into my account. dating from April 2005 up until Sept. 2005.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| **Medical Grievance :** NO | **Date Received by Medical Unit :** |
| **Investigation Sent :** | **Investigation Sent To** : Havel, Jenny |
| **Grievance Amount :** | |

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 03/27/2007

# INFORMAL RESOLUTION

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 19547 | **Grievance Date** : 10/19/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status:** Level 3 | **Inmate Status :** |
| **Grievance Type:** Mail | **Incident Date** : 04/06/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | | |

**Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom

### INFORMAL RESOLUTION

**Investigator Name** : Havel, Jenny                    **Date of Report** 11/01/2005

**Investigation Report :**

**Reason for Referring:**

---

**Investigator Name** : Smith, Tonya                    **Date of Report** 04/04/2006

**Investigation Report :**

**Reason for Referring:** Ms. Smith,
This grievance has reached the 150 warning. Thank You,
Cpl Merson.

---

**Investigator Name** : Smith, Tonya                    **Date of Report** 08/09/2006

**Investigation Report :** Attached are Inmate Lewis' account statements from April 2005- through June 2006. Postage is still paid for by the inmates. If funds are available on the inmate's account, the account is charged immediately. If funds are not availalbe, a hold is placed on the account and the fees are taken as funds become available.

**Reason for Referring:** Ms Smith this grievance is 10 months old and there has never been an investigation done one needs to be completed ASAP in order for a hearing to be held thank you Cpl Merson

Offender's Signature:_____

Date :_____

Witness (Officer) :_____

DCC  **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/27/2007

# GRIEVANCE INFORMATION - RGC

## OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 19547 | | **Grievance Date** : 10/19/2005 | **Category** : Individual |
| **Status** : Resolved | | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Mail | | **Incident Date** : 04/06/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

## RGC

**Date Received** : 10/23/2006                 **Date of Recommendation:** 12/11/2006

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Inmate | 00333101 | BROKENBROUGH, RORY L | Uphold |
| Inmate | 00367132 | STEVENS, RANDY W | Uphold |
| Staff | | Kramer, William | Deny |
| Staff | | Merson, Lise M | Deny |

### VOTE COUNT

| Uphold : 2 | Deny : 3 | Abstain : 0 |
|---|---|---|

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Staff | | McCreanor, Michael | Deny |

### RECOMMENDATION

Hearing held 4 December 2006.

Deny: Postage is paid by inmates. I/M brought 1 page of old housing rule stating "state shall pay legal mail". I/M feels all money should not be paid when he receives money orders. Feels 20 - 30 % should be taken.

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/27/2007

# GRIEVANCE INFORMATION - WARDEN

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 19547 | **Grievance Date** : 10/19/2005 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Mail | **Incident Date** : 04/06/2005 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

## REFERRED TO

**Due Date :**                     **Referred to:**                     **Name:**

**Type of Information Requested :**

## DECISION

| | |
|---|---|
| **Date Received** | : 12/11/2006 |
| **Decision Date** | : 03/16/2007     **Vote :** Deny |

**Comments**      : Denied.  Since January 2004, inmates are required to pay all general and legal mail postage fees. There are no provisions for only percentages of the funds due to the state of Delaware for postage to be taken from the inmate's account.  If funds are due to the state, all funds are deducted from the inmate's account as the funds are received until the debt is satisfied.

cc  IGC
      Inmate

---

**WARDEN / WARDEN'S DESIGNEE SIGNATURE**                          **DATE**

**I WISH TO APPEAL THIS TO THE BUREAU GRIEVANCE OFFICER (B.G.O.)**      **YES:_____**          **NO:_____**

---

**GRIEVANT'S SIGNATURE**                          **DATE**

---

**I.G.C. SIGNATURE**                          **DATE**

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 03/27/2007

## GRIEVANCE INFORMATION - Appeal

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#**            : 00506622 | **Institution**      : DCC |
| **Grievance #**    : 19547 | **Grievance Date**   : 10/19/2005 | **Category**      : Individual |
| **Status**          : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Mail | **Incident Date**    : 04/06/2005 | **Incident Time :** |
| **IGC**           : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

### APPEAL REQUEST

Appeal returned 27 March 2007.
Inmate states: It is cruel and unusual for me not to be able to utilize a percentage of the fund I receive in order to purchase commissary items such as hygiene  products, food, lock, sneakers, Long Johns etc like other inmate prisoners! To deny my request for relief in this matter, is synonymous to my having to choose either petitioning to the courts or living as an indigent vegabond.

### REMEDY REQUEST

**DEPARTMENT OF CORRECTION**
**Bureau of Prisons**
**245 McKee Road**
**Dover, Delaware 19904**

December 26, 2007

$23, DU-2$

Inmate LEWIS JIMMY
SBI # 00506622
DCC  Delaware Correctional Center
SMYRNA DE, 19977

Dear JIMMY LEWIS:

We have reviewed your Grievance Case # 76247 dated 10/17/2006.

Based upon the documentation presented for our review, we deny your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by
BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

Richard Kearney
Bureau Chief

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 02/16/2007

# GRIEVANCE REPORT

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC | |
| **Grievance #** : 76247 | **Grievance Date** : 10/17/2006 | **Category** : Individual | |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Resol. Date** : 02/16/2007 | |
| **Grievance Type:** Medical Staff | **Incident Date** : 08/21/2006 | **Incident Time :** | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | | |

| OFFENDER GRIEVANCE DETAILS | | | |
|---|---|---|---|

**Description of Complaint:** Inmate claims: On 8/22/06 my left hand was x-rayed for which revealed my pinky finger was fractured. the x-ray tech Mary Blades informed the male doctor who was working in the infirmary that day and subsequently Dr. Rogers was notified but nothing was done. Two weeks thereafter I was sent out to a hand doctor, who scheduled me to return, unbeknowest to me, two week thereafter for surgery, but the fracture had already begun to heal.

**Remedy Requested** : I want to know exactly who is responsible for it taking so long for me to receive medical treatment, due to it being undoubtedly known that I was in pain because my left pinky finger was broken.

| INDIVIDUALS INVOLVED | | |
|---|---|---|
| **Type** | **SBI #** | **Name** |

| ADDITIONAL GRIEVANCE INFORMATION | |
|---|---|

| | |
|---|---|
| **Medical Grievance :** YES | **Date Received by Medical Unit :** 10/24/2006 |
| **Investigation Sent** : 10/24/2006 | **Investigation Sent To** : Rodweller, Deborah |
| **Grievance Amount :** | |

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 02/16/2007

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76247 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status:** Level 3 | **Inmate Status :** |
| **Grievance Type:** Medical Staff | **Incident Date** : 08/21/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| INFORMAL RESOLUTION | |
|---|---|

**Investigator Name** : Rodweller, Deborah                **Date of Report** 10/24/2006

**Investigation Report :** -PER DR RODGER'S PROGRESS NOTE, I/M HAS A DISPLACED AVULSION FRACTURE OF THE 5TH FINGER. I/M WAS APPROVED TO HAVE SURGERY BY ORTHO, HOWEVER I/M REFUSED APPT FOR SURG ON 10-4-06

**Reason for Referring:**


**Investigator Name** : Eller, Gail                **Date of Report** 12/12/2006

**Investigation Report :** 10/4/06 inmate refused surgery to fix finger.

**Reason for Referring:**


**Offender's Signature:** _____

**Date** : _____

**Witness (Officer)** : _____

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 02/16/2007

## GRIEVANCE INFORMATION - IGC

### OFFENDER GRIEVANCE INFORMATION

**Offender Name :** LEWIS, JIMMY

**Grievance #** : 76247

**Status** : Resolved

**Grievance Type:** Medical Staff

**IGC** : Merson, Lise M

**SBI#** : 00506622

**Grievance Date** : 10/17/2006

**Resolution Status :** Level 3

**Incident Date** : 08/21/2006

**Institution** : DCC

**Category** : Individual

**Inmate Status :**

**Incident Time :**

**Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom

### IGC

**Medical Provider:**                                  **Date Assigned**

**Comments:**

[x] **Forward to MGC**          [ ]  **Forward to Medical Provider**          [ ]  **Warden Notified**

[ ] **Forward to RGC**          **Date Forwarded to MGC :**          11/13/2006

[ ] **Offender Signature Captured**          **Date Offender Signed**          :

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 02/16/2007

## GRIEVANCE INFORMATION - Appeal

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#**        : 00506622 | **Institution**      : DCC |
| **Grievance #**      : 76247 | **Grievance Date**   : 10/17/2006 | **Category**      : Individual |
| **Status**        : Resolved | **Resolution Status** : Level 3 | **Inmate Status :** |
| **Grievance Type:** Medical Staff | **Incident Date**      : 08/21/2006 | **Incident Time :** |
| **IGC**          : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

### APPEAL REQUEST

Appeal received 8 December 2006.

Inmate states: During the level (2) grievance hearing, there wasn't a disinterested representative present in my behalf, for which allowed the facts as I presented them to the medical grievance committee to either be ignored and or misinterpreted. Due to the denial of said medical treatment as stated in the medical grievance.

I hereby request a copy of my medical records, in order to be given the opportunity to point out the facts.

Also, I seek monetary relief for nominal , punitive and exemplary damages for pain and suffering I've been subjected to, due to Dr. Rogers deliberate indifference towards my medical need, for which define a violation of my 8th U.S.C.A. rights.

### REMEDY REQUEST

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 02/16/2007

# GRIEVANCE INFORMATION - BGO

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76247 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Medical Staff | **Incident Date** : 08/21/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| REFERRED TO | | |
|---|---|---|

**Due Date :** 12/26/2006          **Referred to:** Person          **Name:** Welch, James

**Type of Information Requested :**
Grievant takes issue with timeliness of Treatment for broken finger.

| DECISION | | |
|---|---|---|

**Date Received :** 12/11/2006

**Decision Date** : 12/29/2006          **Vote :** Deny

**Comments** :

Inmate refused treatment. The grievance process is not the appropriate mechanism to seek financial damages. Inmate should follow procedures and submitt a sick call requesting to review medical record.

**DEPARTMENT OF CORRECTION**
**Bureau of Prisons**
**245 McKee Road**
**Dover, Delaware 19904**

December 29, 2006 7

Inmate LEWIS JIMMY
SBI # 00506622
DCC  Delaware Correctional Center
SMYRNA DE, 19977

Dear JIMMY LEWIS:

We have reviewed your Grievance Case # 76246 dated 10/17/2006.

Based upon the documentation presented for our review, we uphold your appeal request.

Accordingly, there is no further issue to mediate nor Outside Review necessary as provided by BOP Procedure 4.4 entitled "Inmate Grievance Procedure", Level III appeals.

Sincerely,

Richard Kearney
Bureau Chief

**DCC Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 02/16/2007

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

**Offender Name :** LEWIS, JIMMY

**Grievance #**   : 76246

**Status**   : Resolved

**Grievance Type:** Health Issue (Medical)

**IGC**   : Merson, Lise M

**SBI#**   : 00506622

**Grievance Date**   : 10/17/2006

**Resolution Status :** Level 3

**Incident Date**   : 10/17/2006

**Institution**   : DCC

**Category**   : Individual

**Resol. Date**   : 02/16/2007

**Incident Time :**

**Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: I have toe nail fungus, that has cause my toe nails to rot. When I clip my toe nails, it hurts and bleeds because the fungus is at the root of my toe nails. This fungus is so bad that my toe nail crumbles when I clip them. Initially this wasn't the case, but the more time that passes, the worse it becomes. I have filed numerous sick call slips, PA Ott and Dr. Rogers both told me that nothing could be prescribed to help clear up the toe nail fungus because it's cosmetic.

**Remedy Requested**   : I request to receive the medical treatment I have been denied.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
| --- | --- | --- |

## ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES

**Investigation Sent :** 10/24/2006

**Grievance Amount :**

**Date Received by Medical Unit :** 10/24/2006

**Investigation Sent To**   : Rodweller, Deborah

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

**Date:** 02/16/2007

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION |
|---|

| | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76246 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status:** Level 3 | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 10/17/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| INFORMAL RESOLUTION |
|---|

**Investigator Name** : Rodweller, Deborah                    **Date of Report** 10/24/2006

**Investigation Report :** -NO SICK CALL SLIPS FOUND IN CHART RE:NAIL FUNGUS

**Reason for Referring:**


**Investigator Name** : Eller, Gail                    **Date of Report** 12/12/2006

**Investigation Report :** Inmate to put in request to see MD for possible fungus of toes, schedule to see MD or NP about possible fungus as inmate states.

**Reason for Referring:**


**Offender's Signature:**_____

**Date**                 :_____

**Witness (Officer)**    :_____

DCC  **Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 02/16/2007

## GRIEVANCE INFORMATION - IGC

### OFFENDER GRIEVANCE INFORMATION

**Offender Name** : LEWIS, JIMMY

**Grievance #** : 76246

**Status** : Resolved

**Grievance Type:** Health Issue (Medical)

**IGC** : Merson, Lise M

**SBI#** : 00506622

**Grievance Date** : 10/17/2006

**Resolution Status** : Level 3

**Incident Date** : 10/17/2006

**Institution** : DCC

**Category** : Individual

**Inmate Status** :

**Incident Time** :

**Housing Location** : Bldg 23, Upper, Tier D, Cell 2, Bottom

### IGC

**Medical Provider:**

**Date Assigned**

**Comments:**

[x] **Forward to MGC**

[ ] **Forward to RGC**

[ ] **Offender Signature Captured**

[ ] **Forward to Medical Provider**

**Date Forwarded to MGC :**    11/13/2006

**Date Offender Signed**    :

[ ] **Warden Notified**

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 02/16/2007

## GRIEVANCE INFORMATION - Appeal

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76246 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 10/17/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| APPEAL REQUEST |
|---|

Appeal received 8 December 2006.

Inmate states: During the level (2) medical grievance hearing, there wasn't a disinterested representative present in my behalf, for which allowed the facts as I presented them to the medical grievance committee to either be ignored and or misinterpreted. Due to the denial of said medical treatment as stated in the medical grievance.

I hereby request a copy of my medical records, in order to be given the opportunity to point out the facts.

Also I seek monetary relief for nominal, punitive and exemplatory damages for pain and suffering we been subjected to due to Dr. Rogers deliberate indifference towards my medical needs, for which define a violation of my 8th U.S. C. A. rights.

| REMEDY REQUEST |
|---|

DCC Delaware Correctional Center                          Date: 02/16/2007
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## GRIEVANCE INFORMATION - BGO

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC |
| **Grievance #** : 76246 | **Grievance Date** : 10/17/2006 | **Category** : Individual |
| **Status** : Resolved | **Resolution Status :** Level 3 | **Inmate Status :** |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 10/17/2006 | **Incident Time :** |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 23, Upper, Tier D, Cell 2, Bottom | |

| REFERRED TO | | |
|---|---|---|
| **Due Date :** | **Referred to:** | **Name:** |

**Type of Information Requested :**

| DECISION | | |
|---|---|---|

**Date Received :** 12/11/2006

**Decision Date** : 12/29/2006          **Vote :** Uphold

**Comments** :

Medical to evaluate need for treatment of fungus. I/M should follow procedure and submit a sick call requesting to review medical record. Grievance process is not the mechanism to request financial damages.

10.5.05

**FORM #584**

**GRIEVANCE FORM**

FACILITY: D.C.C                          DATE: 7/4/05

GRIEVANT'S NAME: JIMMIE LEWIS      SBI#: 506602

CASE#: 18243                              TIME OF INCIDENT: 7/4/05

HOUSING UNIT: BUILD 19, D-12-U

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

I AM CLASSIFIED TO LEVEL 2, FOR WHICH
INTITLES FOR ME TO BE ASSIGNED A TELEVISON.
I HAVE BEEN HERE IN THE S.H.U FOR 3 MONTHS
AND I STILL HAVE NOT BE ASSIGNED A TELEVISION.
I HAVE VERBALLY REQUEST ON NUMEROUS
DIFFERENT OCCASSIONS, AS WELL AS SUBMITTED
WRITTEN REQUEST TO LT. SEACORD, SGT THOMAS,
WARDEN THOMAS CARROLL, DEPUTY WARDEN
BETTY BURRIS, AS WELL AS TO COUNSELOR
TOM ZANDA, BUT TO NO AVAIL.

ACTION REQUESTED BY GRIEVANT: I REQUEST TO BE ASSIGNED
A TELEVISION, A.S.A.P. OR BE ALLOWED
TO PURCHASE MY OWN

GRIEVANT'S SIGNATURE: Jimmie Lewis      DATE: 7/4/05

WAS AN INFORMAL RESOLUTION ACCEPTED?        _____(YES)    _____(NO)

**RECEIVED**

JUL 0 5 2005

Inmate Grievance Office

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____        DATE:_____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
    GRIEVANT

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. _____ Disciplinary Action _____ Parole Decision _____ Classification Action

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance #_____ .

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

RECEIVED

Inmate Grievance Office

R Uangao
_____
Inmate Grievance Chairperson

JUL 0 6 200

_____
Date

Form#: 584 (F&B)
(Reverse Revised July '99)

UnV

**FORM #584**

**GRIEVANCE FORM**

FACILITY: D. C C

DATE: 10/24/06

GRIEVANT'S NAME: JIMMIE LEWIS

SBI#: 506622

CASE#: 80265

TIME OF INCIDENT: 10/24/06

HOUSING UNIT: BLD 17, C - U - 1

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

BECAUSE I OWE D. C. C #275.00 FOR POSTAL
FEE'S I HAVE NOT BEEN ABLE TO PURCHASE
HYGIENE PRODUCTS SUCH AS DEODARANT LOTION
AFTER SHAVE , TOOTHPASTE, SHAMPOO , SOAP .
MY REQUEST TO THOMAS CARROL, BETTY BURRIS,
AND DEPUTY WARDEN PIERCE HAVE ALL GONE UNANSWERED
I HAVE ALSO REQUESTED SAID HYGIENE PRODUCTS
FROM THE COMMISSARY OFFICER ANDREWS, BUT TO NO AVAIL.
BEING DENIED SAID HYGIENE PRODUCTS VIOLATES MY 8TH
U.S.CA RIGHTS.

ACTION REQUESTED BY GRIEVANT: I WANT THIS MATTER TO BE
INVESTIGATED , SO THAT I CAN LIVE IN ACCORDANCE TO
DECENT HUMANE STANDARD

GRIEVANT'S SIGNATURE: Jimmie Lewis  DATE: 10/24/06

WAS AN INFORMAL RESOLUTION ACCEPTED?          (YES)          (NO)

RECEIVED

OCT 26 2006

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____          DATE:_____

Inmate Grievance ____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
    GRIEVANT

April '97 REV

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. _____ Disciplinary Action _____ Parole Decision _____ Classification Action

___✓___ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance # _____.

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

*BASIC HYGIENE, SOAP, TOOTHPASTE, TOOTHBRUSH, ARE AVAILABLE AS FREE ISSUE.*

_____
Inmate Grievance Chairperson

*11-9-06*
_____
Date

Form#: 584 (F&B)
(Reverse Revised July '99)

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: D.C.C

INMATE'S NAME: Jimmie Lewis

HOUSING UNIT: BU 17, C-U-1

DATE SUBMITTED: 10/24/06

SBI#: 506622

CASE #: 80283

////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: 10/24/06

TYPE OF MEDICAL PROBLEM:

ON AUG 30, 06 I WAS TRANSFERED FROM THE MENTAL
HEALTH UNIT BUILDING 23, D-U-2, TO THE WHOLE FOR
A DISCIPLINARY INFRACTION, ON THE SAME DAY I ATTEMPTED
to COMMIT SUICIDE BUT WAS UNSUCCESSFUL, AND WAN WAS
TRANSFERED TO THE INFIRMARY. AFTER BEING DISCHARGED FROM
THE INFIRMARY I WAS TRANSFERED TO THE SITU THINKMAKE
THE D.C.C MENTAL HEALTH STAFF AND OFFICIALS KNOW
THAT MY ATTEMPTING SUICIDE WAS DUE TO MATTER RELATED
TO MY BEING PLACED INTO THE SITU.

GRIEVANT'S SIGNATURE: Jimmie Lewis          DATE: 10/24/06

ACTION REQUESTED BY GRIEVANT: I WANT TO KNOW WHO IS RESPONSIBLE
FOR MY NOT RECEIVING PROPER MENTAL HEALTH TREATMENT
REGARDING SAID ISSUES, AND I WORKED ALSO REQUEST TO
BE TRANSFERED BACK TO BUD 23, THE MENTAL HEALTH UNIT.

DATE RECEIVED BY MEDICAL UNIT: _____

RECEIV...

OCT 26 2006

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL
GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. _____ Disciplinary Action _____ Parole Decision _____ Classification Action

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance #_____.

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

___✓___ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

INMATES WHO ATTEMPT SUICIDE ARE SEEN BY MENTAL HEALTH. No INMATE IS REMOVED FROM SUICIDE WATCH UNTIL CLEARED BY MENTAL HEALTH. YOU WERE MOVED TO B/08 18 ON 9-13-06

Inmate Grievance Chairperson

Date 11-9-06

Form#: 584 (F&B)
(Reverse Revised July '99)

FACILITY: D.C.C

DATE SUBMITTED: 8/29/06

INMATE'S NAME: JIMMIE LEWIS

SBI#: 506622

HOUSING UNIT: BLD 23, D-4-2    NOT 23

CASE #: 68839

////////////////////////////////////////////////////////////////////////////////////////////////////////////////

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: 8/29/06

TYPE OF MEDICAL PROBLEM:

WHILE IVE BEEN PRESCRIBED TO BE IN THE INFIRMARY ON PCOII STATUS, AND OR ON D-UNIT BLD 23, THE MENTAL HEALTH UNIT. D.C.C CORRECTIONAL OFFICERS TOOMEY, R. VARGAS, C/o WHITE, GONZALEZ AND SGT CAIN HAVE EITHER REPEATEDLY INTERFERED AND OR WROTE ME UP FOR DISCIPLINARY VIOLATION WHEN MY MENTAL ILLNESSES WERE DIRECTLY RESPONSIBLE, WITHOUT CONSULTING WITH THE MENTAL HEALTH STAFF FOR THE APPROPRIATE MENTAL HEALTH TREATMEN FOR WHICH DEFINES DELIBERATE INDIFFERENCE, VIOLATIONS OF 11 DEL C8, 6525, 6523, 6531, 6536, WITH VIOLATIONS OF MY 8TH & 14TH U.S.CA RIGHTS. FOR WHICH RESULTED IN THE PAIN AND SUFFERING OF RELAPSING AS WELL AS ATYPICAL AND SIGNIFICANT HARDSHIP.

GRIEVANT'S SIGNATURE: Jimmie Lewis    DATE: 8/29/06

ACTION REQUESTED BY GRIEVANT: TO HAVE CORRECTIONAL OFFICER PLACED ON D-UNIT WHO ARE TRAINED IN MENTAL HEALTH CARE, WHO DONT INTERFERE WITH MY MENTAL HEALTH TREATMENT.

DATE RECEIVED BY MEDICAL UNIT:

NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.

RECEIVED

SEP 05 2006

Inmate Grievance Office

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language**. The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable**. This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. _____ Disciplinary Action _____ Parole Decision _____ Classification Action

_____ **Request**. Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s)**. This issue has been addressed previously in Grievance # _____ .

_____ **Original Grievances** must be submitted to the Inmate Grievance Chairperson. Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates**. Inmates cannot submit grievances for other inmates.

_____ **Expired filing period**. Grievance exceeds seven(7) days from date of occurrence.

*MENTAL/ HEALTH ISSUES DO NOT ABSOLVE YOU FROM ABIDING WITH THE HOUSING RULES*

_____
Inmate Grievance Chairperson

9-19-06
Date

Form#: 584 (F&B)
(Reverse Revised July '99)

## Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision. This form is to be returned via the Grievance Box.
This form is to be used Only in the event of a decision appeal. Please specify the reason for the appeal in the space below.

Grievant: JIMMIE LEWIS          SBI#: 506622

Housing Unit: BLD 23, D-U-2          Case#: 76246

Date: 12-7-06          Due Date: 12-14-06

DURING THE LEVEL (2) MEDICAL GRIEVANCE HEARING, THERE
WASN'T A DISINTRESTED REPRESENTITIVE PRESENT IN MY
BEHALF, FOR WHICH ALLOWED THE FACTS AS I PRESENTED THEM
TO THE MEDICAL GRIEVANCE COMMITTEE TO EITHER BE IGNORED
AND OR MISINTERPRETED. DUE TO THE DENIAL OF SAID MEDICAL
TREATMENT AS STATED IN THE MEDICAL GRIEVANCE.
    I HEREBY REQUEST A COPY OF MY MEDICAL RECORDS,
IN ORDER TO BE GIVEN THE OPPORTUNITY TO POINT OUT
THE FACTS.
    ALSO, I SEEK MONETARY RELIEF FOR NOMINAL,
PUNITIVE AND EXEMPLATORY DAMAGES FOR PAIN AND
SUFFERING WE BEEN SUBJECTED TO DUE TO DR. ROGERS
DELIBERATE INDIFFERENCE TOWARDS MY MEDICAL NEEDS,
FOR WHICH DEFINE A VIOLATION OF MY 8TH U.S.C.A
RIGHTS.

Jimmie Lewis
INMATE SIGNATURE

If you need additional space, attach 8.5" X 11" size sheets of paper.

## Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision. This form is to be returned via the Grievance Box.
This form is to be used Only in the event of a decision appeal. Please specify the reason for the appeal in the space below.

**Grievant:** Jimmie Lewis    **SBI#:** 506622

**Housing Unit:** BLD 23, D-U-2    **Case#:** 96247

**Date:** 12-7-06    **Due Date:** 12-14-06

DURING THE LEVEL (2) GRIEVANCE HEARING, THERE WASN'T
A DISINTRESTED REPRESENTITIVE PRESENT IN MY BEHALF,
FOR WHICH ALLOWED THE FACTS AS I PRESENTED THEM TO THE
MEDICAL GRIEVANCE COMMITTEE TO EITHER BE IGNORED AND OR
MISINTERPRETED. DUE TO THE DENIAL OF SAID MEDICAL
TREATMENT AS STATED IN THE MEDICAL GRIEVANCE.
     I HEREBY REQUEST A COPY OF MY MEDICAL
RECORDS, IN ORDER TO BE GIVEN THE OPPORTUNITY TO POINT
OUT THE FACTS.
     ALSO, I SEEK MONETARY RELIEF FOR NOMINAL,
PUNITIVE AND EXEMPLATORY DAMAGES FOR PAIN AND
SUFFERING IVE BEEN SUBJECTED TO, DUE TO DR. ROGERS
DELIBERATE INDIFFERENCE TOWARDS MY MEDICAL NEED,
FOR WHICH DEFINE A VIOLATION OF MY 8TH U.S.CA
RIGHTS.

Jimmie Lewis
INMATE SIGNATURE

If you need additional space, attach 8.5" X 11" size sheets of paper.

Case 1:06-cv-00778-GMS    Document 14    Filed 04/05/2007    Page 34 of 55

DCC  Delaware Correctional Center
SMYRNA Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

# GRIEVANCE REPORT

| OFFENDER GRIEVANCE INFORMATION |
|---|

| | | | |
|---|---|---|---|
| **Offender Name :** LEWIS, JIMMY | **SBI#** : 00506622 | **Institution** : DCC | |
| **Grievance #** : 20618 | **Grievance Date** : 11/12/2005 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : | |
| **Grievance Type:** Staff Issues | **Incident Date** : 11/12/2005 | **Incident Time :** 10:45 | |
| **IGC** : Merson, Lise M | **Housing Location :** Bldg 19, Upper, Tier A, Cell 7, Single | | |

| OFFENDER GRIEVANCE DETAILS |
|---|

**Description of Complaint:** I was sprayed with capstun by Sgt. G. Everett while secured in Building 19, AU 7 because of my numerous request to speak to a Lieutenant. As a result I was transferred to the Infirmary for physical and psychiatric treatment. Today, Sgt. Everett approached my cell and made mention of making things worse by threatening to spray me again with capstun. She fabricated an allegation that I assaulted her.

**Remedy Requested** : An investigation by Internal Affairs to ensure that my U.S.C.A are unjustifiably violated.

| INDIVIDUALS INVOLVED | | |
|---|---|---|
| **Type** | **SBI #** | **Name** |

| ADDITIONAL GRIEVANCE INFORMATION |
|---|

| | |
|---|---|
| **Medical Grievance :** NO | **Date Received by Medical Unit :** |
| **Investigation Sent :** | **Investigation Sent To** : Taylor, Ramon |
| **Grievance Amount :** | |

**FORM  #584**

**GRIEVANCE FORM**

FACILITY: ___D. C - C___          DATE: __1/05/07__

GRIEVANT'S NAME: __Jimmie Lewis__  SBI#: __506622__

CASE#: __97908__          TIME OF INCIDENT:_____

HOUSING UNIT: __MHU23, 0-U-2__

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

BRIAN ENGRAM HAS REPEATEDLY DENIED
ME LAW LIBRARY AND OR LEGAL MATERIAL
ACCESS ON NUMEROUS OCCASSIONS FOR WHICH
HAS CAUSED ME NUMEROUS DILEMMAS
WITH THE SUPERIOR COURT SUPREME COURT
AS WELL AS WITH THE UNITED STATES
DISTRICT COURT. BRIAN ENGRAMS ACTIONS
DEFINE A VIOLATION OF MY 1ST UNITED STATES
CONSTITUTIONAL RIGHTS 4th , SEE GRIEVANCE # 16149
DATED 7/31/05.

ACTION REQUESTED BY GRIEVANT: __FOR THIS MATTER TO BE__
__INVESTIGATED.__

GRIEVANT'S SIGNATURE: _Jimmie Lewis_     DATE: _1/05/07_

WAS AN INFORMAL RESOLUTION ACCEPTED?          ____(YES)    ____(NO)

(COMPLETE  ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____          DATE:_____

**IF UNRESOLVED, YOU ARE  ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.**

cc: **INSTITUTION FILE**
    **GRIEVANT**

RECEIVED

JAN 1 7 2007

Inmate Grievance Office

April '97 REV

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. _____ Disciplinary Action _____ Parole Decision _____ Classification Action

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance # _____.

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

*LAW LIBRARY REQUEST ARE HANDLED IN THE ORDER THEY ARE RECEIVED, THERE IS NO SPECIAL CONSIDERATION WITHOUT DOCUMENTATE FROM THE COURT,*

_____          2-2-07
Inmate Grievance Chairperson                Date

Form#: 584 (F&B)
(Reverse Revised July '99)

**FORM #585**

**MEDICAL GRIEVANCE**

FACILITY: _D. C. C_

INMATE'S NAME: _Jimmie Lewis_

HOUSING UNIT: _BU 17, C-U-1_

DATE SUBMITTED: _10/24/06_

SBI#: _506622_

CASE #: _80283_

//////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: _10/24/06_

TYPE OF MEDICAL PROBLEM:

ON AUG 30, 06 I WAS TRANSFERED FROM THE MENTAL
HEALTH UNIT BUILDING 23, D-U-2, TO THE WHOLE FOR
A DISCIPLINARY INFRACTION, ON THE SAME DAY I ATTEMPTED
to COMMIT SUICIDE BUT WAS UNSUCCESSFUL., AND WAM WAS
TRANSFERED TO THE INFIRMARY. AFTER BEING DISCHARGED FROM
THE INFIRMARY I WAS TRANSFERED TO THE SITU TOWERWAFE
THE D.C.C MENTAL HEALTH STAFF AND OFFICIALS KNOW
THAT MY ATTEMPTING SUICIDE WAS DUE TO MATTER RELATED
TO MY BEING PLACED INTO THE SITU.

GRIEVANT'S SIGNATURE: _Jimmie Lewis_   DATE: _10/24/06_

ACTION REQUESTED BY GRIEVANT: _I WANT TO KNOW WHO IS RESPONSIBLE_
FOR MY NOT RECEIVING PROPER MENTAL HEALTH TREATMENT
REGARDING SAID ISSUES, AND I WOULD ALSO REQUEST TO
BE TRANSFERED BACK TO BUD 23, THE MENTAL HEALTH UNIT.

DATE RECEIVED BY MEDICAL UNIT: _____

RECEIVED

OCT 26 2006

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING**

### Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. _____ Disciplinary Action _____ Parole Decision _____ Classification Action

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance # _____.

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

__✓__ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

*INMATES WHO ATTEMPT SUICIDE ARE SEEN BY MENTAL HEALTH. NO INMATE IS REMOVED FROM SUICIDE WATCH UNTIL CLEARED BY MENTAL HEALTH. YOU WERE MOVED TO B/OG 18 ON 9-13-06*

_____
Inmate Grievance Chairperson

_11-9-06_
Date

Form#: 584 (F&B)
(Reverse Revised July '99)

FORM #585

## MEDICAL GRIEVANCE

FACILITY: D.C.C

INMATE'S NAME: Jimmie Lewis

HOUSING UNIT: BLD 23, D-U-2

DATE SUBMITTED: 1/30/07

SBI#: 506622

CASE #: 99264

//////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

SECTION #1

DATE & TIME OF MEDICAL INCIDENT: 1/29/07

TYPE OF MEDICAL PROBLEM:

THE MENTAL HEALTH STAFF'S ACTING SUPERVISOR
MR. OLUFEMI HAS BEEN NOTIFIED THAT INMATE
BERNARD DROZDOWSKI HAS ASSULTED ME
AND SEAN SISSON ON TWO SEPERATE OCCASSIONS
DURING THE MONTH OF JAN 2007, NOW ON
JAN 29, 2007 BERNARD DROZDOWSKI HAS THREATENED
TO DO PHYSICAL HARM TO ME, BUT INSTEAD OF
PROPERLY DEALING WITH MR. DROZDOWSKI MR FEMI HAS
THREATENED TO MOVE ME OFF OF THE SNU

GRIEVANT'S SIGNATURE: Jimmie Lewis          DATE: 1/30/07

ACTION REQUESTED BY GRIEVANT: THAT THIS MATTER BE PROPERLY
INVESTIGATED, AND THAT MY TREATMENT THERAPY
NOT BE PUT IN JEOPARDY DUE TO THE ACTIONS
OF BERNARD DROZDOWSKI

RECEIVED

JAN 3 1 2007

DATE RECEIVED BY MEDICAL UNIT: _____

Inmate Grievance Office

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

**FORM  #585**

**MEDICAL GRIEVANCE**

FACILITY: _D . CC_

INMATE'S NAME: _JIMMIE LEWIS_

HOUSING UNIT: _MHU 23  D-U-2_

DATE SUBMITTED: _1/05/07_

SBI#: _506622_

CASE #: _97563_

//////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////////

**SECTION #1**

DATE & TIME OF MEDICAL INCIDENT: ~~XXXXXX~~  _9:45 pm_
  _1/04/07_

TYPE OF MEDICAL PROBLEM:

DURING MEDICATION PASS C/O WHITE OBSTRUCTS THE ENTRANCE OF MY ASSIGNED CELL DOOR, IN A MANNER THAT I HAVE TO REACH PASS HIS BODY IN ORDER TO RECEIVE MY MEDICATION, FOR WHICH I AM CONCERNED THAT I MAY RECEIVE A DISCIPLINARY CODE VIOLATION FOR INADVERTENTLY TOUCHING HIM, ALSO, C/O WHITE INTERFERS WITH MY TREATMENT PRESCRIBED IN ACCORDANCE WITH THE SNU MENTAL HEALTH PROGRAM, DUE TO HIS INSTRUCTING ME TO DISREGARD WHAT THE ENVIORMENTAL LEADER ASKS ME TO DO, THEN THREATENS TO WRITE ME UP FOR DISCIPLINARY CODE VIOLATIONS ~~THEN~~ WHEN NO DISCIPLINARY CODE VIOLATION HAS ACCURED. (NUMEROUS WITNESSES CAN VALIDATE MY CLAIMS).

GRIEVANT'S SIGNATURE: _Jimmie Lewis_    DATE: _1/05/07_

ACTION REQUESTED BY GRIEVANT: _FOR THIS MATTER TO BE INVESTIGATED, C/O WHITES ACTIONS DEFINE DELIBERATE INDIFFERENCE TOWARDS MY MENTAL HEALTH TREATMENT, A VIOLATION OF MY 8TH U.S.CA RIGHTS. FOR C/O WHITE TO RECEIVE TRAINING REGARDING THE MAINTENCE AND CUSTOMS OF MENTAL HEALTH INMATES HOUSED IN THE SNU._

**RECEIVED**

DATE RECEIVED BY MEDICAL UNIT: _____

**JAN 17 2007**

Inmate Grievance Office

**NOTE: EMERGENCY MEDICAL CONDITIONS WILL TAKE PRIORITY. OTHERWISE, MEDICAL GRIEVANCES WILL BE ADDRESSED AT THE WEEKLY MEDICAL COMMITTEE MEETING.**

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

_____ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed.   _____ Disciplinary Action   _____ Parole Decision
_____ Classification Action

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance #_____.

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.
SECURITY PROCEDURES TRUMP PROGRAM PROCEDURES.

_____
Inmate Grievance Chairperson

1-31-07
_____
Date

Form#: 584 (F&B)
(Reverse Revised July '99)

Disciplinary#
**1029883**

Date: **01/15/2007**

**DCC** Delaware Correctional Center
Smyrna Landing Road
**SMYRNA DE, 19977**
Phone No. 302-653-9261

## DISCIPLINARY REPORT

| Disciplinary Type: Class1 | | Housing Unit Bldg 23 | | IR#: 1038889 | | |
|---|---|---|---|---|---|---|
| SBI# | Inmate Name | Inst. Name | Location Of Incident | | Date | Time |
| 00506622 | Lewis, Jimmy | DCC | Bldg.23 D Tier | | 01/15/2007 | 01:55 |

Violations: 1.25/200.202 Sexual Misconduct, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order, /200.112 Abuse of Prescribed Medication

| Witnesses:1. Glick, Lisa | 2. Behney, Jeffrey | 3. N/A |
|---|---|---|

### Description of Alleged Violation(s)

On Above Date And Time I C/O Elizabeth Barnhart While Doing A Routine Area Check I/M Jimmy Lewis In Du2 Was Standing In His Cell Window Masturbating With Horns On Head. When I Asked The Inmate To Stop He Replied " You Know How I Do". I C/O Elizabeth Barnhart Called For Back Up C/O Jeff Beheney And Sgt. Lisa Glick Responded The Lights Were Turned On And The Door Cracked. The Inmate Was Asked To Turn Around And Cuff-Up I/M Lewis Refused Three Times He Said He Had To Get Dressed First.    Once The Inmate Was Cuffed C/O Beheney And C/O Barnhart  Proceeded To Shake Down His Room. The Following Items Were Found: 1 Wire Stuck In Cable Port, 4 Soap Balls On The Desk, 8 Laxative Pills And 1 Asprin In Medcine Cup On Desk, Sbi# Of Inmate Kevin Dixon In Trash, 2 Red Horns Contructed Of Red Cardboard And Toothpaste. Cell Search Was Completed With Out Further Incident,The Inmate Was Un Cuffed, And The Cell Door Secured.The Evidence Was Forwarded,With This Report,For A Major Adjustment Board Referal. Area Lt Was Notified Of Situation And Reports Followed.
**Reporting Officer:** Barnhart, Elizabeth A (Correctional Officer)

### Immediate Action Taken

**Immediate action taken by:** Barnhart, Elizabeth A -Correctional Officer

Inmate Cuffed And Cell Search

### Offender Disposition Details

**Disposition:** N/A    **Date:** N/A    **Time:** N/A    **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** Turned Over To Area Lt.Forwarded To The Hearing Office.

### Approval Information

**Approved: [x]**    Disapproved: [ ]    **Approved By:** Rodden, Timothy (Shift Commander - Large Inst.)

**Comments:** The Evidence Was Forwarded,With This Report,For A Major Adjustment Board Referal.Note To Mental Health To Place Inmate Lewis Back On Phase One In The Snu For Now.

### Shift Supervisor Details

**Date Received:** 01-15-07    **Time:** 0316    **Received From:** Rodden, Timothy

**Shift Supervisor Determination:**

[ ]    Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[x]    Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

Rodden, Timothy (Shift Commander - Large Inst.)

I have received a copy of this notice on DATE: 01-15-07  TIME: 0    and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

**Preliminary Hearing Officer:**

**Offender:** X

Lewis, Jimmy

01/15/2007
1029883

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**

Date: **01/15/2007**

## NOTICE OF DISCIPLINARY HEARING - FOR MINOR/MAJOR OFFENSE

TO: Inmate:Lewis,Jimmy    SBI#: 00506622    Housing Unit:Bldg 23

1.  You will be scheduled to appear before the Hearing Office to answer charges pending against you. (Staff are to explain the charges as listed on the 122.)

2.  At that time, a hearing will be held to determine whether you violated Institutional Rule(s) as alleged in the attached Disciplinary Report.
    How do you plead ? [  ] Guilty    [ X ] Not Guilty

3.  A "Minor Offense"  is a rule violation in which the extent of the sanction to be imposed shall be restricted to:
    a.  Written Reprimand.
    b.  Loss of one or more privileges for a period of time **of more than 24 hours but not to exceed 15 days.**

4.  A "Major Offense" is a rule violation in which the extent of the sanction to be imposed shall be restricted to:
    a.  Loss of one or more privileges for a period of time not to exceed 90 days.
    b.  Confinement to assigned quarters for a period of time not to exceed 90 days.
    c.  Isolation confinement for a period of time not to exceed 90 days.
    d.  Loss of good time for a period of time not to exceed 90 days.
    (Forfeiture of accumulated good time shall be subject to the approval of the Commissioner or his designee.)

5.  You have the right in the disciplinary process as stated on the lower and back of this page. These have been fully explained to you at the time of this notification.

6.  Counsel requested    **Yes**    Name of Counsel: Lyons, Maria

7.  Confront accuser?    **Yes**

8.  Witness requested?    **Yes**    Name of Witness: ,

I certify that on **01/15/2007**    at **03:13**    , I
served upon the above inmate this notice of
Disciplinary Hearing for Minor/Major Offense and
the Disciplinary Report is attached hereto.

**(Employee's Signature & Title)**
Rodden, Timothy

I have received copies of 122 & 127 and
understand my rights as Form # 127 has
been read to me

**(Inmate's Signature)**
Lewis,Jimmy

01/15/2007
1029883

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**

**Date: 01/15/2007**

## NOTICE OF DISCIPLINARY HEARING - FOR MINOR/MAJOR OFFENSE

### INMATE RIGHTS IN THE DISCIPLINARY PROCESS

**MINOR OFFENSE :**

**Right to Remain Silent:** If you are charged criminally based upon the same facts giving rise to the disciplinary process, you have the right to remain silent at the Disciplinary Hearing. If you choose to remain silent, your silence will not be considered against you at the Disciplinary Hearing. In all other circumstances, silence at the Disciplinary Hearing may be considered against you.

**Presence:** You have the right to be present at all phases of the hearing, except that you may be excluded during the Hearing Officer's deliberations and at any time your behavior becomes disruptive to the proceedings. Reason for such exclusions shall be stated in writing.

Disciplinary# .
1029884
1029883    SAME—

**DCC  Delaware Correctional Center**
Smyrna Landing Road
**SMYRNA DE, 19977**
Phone No. 302-653-9261

Date: **01/15/2007**

## DISCIPLINARY REPORT

| Disciplinary Type: Class1 | | Housing Unit Bldg 23 | | IR#: 1038890 | | |
|---|---|---|---|---|---|---|
| **SBI#** | **Inmate Name** | **Inst. Name** | **Location Of Incident** | | **Date** | **Time** |
| 00506622 | Lewis, Jimmy | DCC | Bldg.23 D Tier | | 01/15/2007 | 01:55 |

**Violations:** 1.25/200.202 Sexual Misconduct, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order, /200.112 Abuse of Prescribed Medication

| Witnesses:1. N/A | 2. N/A | 3. N/A |
|---|---|---|

**Description of Alleged Violation(s)**

On The Above Date And Approximate Time, I Sgt. Glick, Lisa Responded To D-Tier Du2 At The Request Of C/O Barnhardt, Elizabeth. C/O Barnhardt Advised Me That Inmate Lewis, Jimmy Sbi# 00506622 Had Engaged In Sexual Misconduct By Means Of Masterbating At His Cell Window As C/O Barnhardt Was Conducting A Tier Check. I Was Also Advised By C/O Barnhardt That Lewis Had Affixed A Pair Of "Horns" To His Head. The "Horns" Were Apparently Inmate Constructed. Upon My Response To Du2, Lewis Was In His Assigned Cell And Had Refused To Exit The Cell And Submit To Handcuff Restraint. Lewis Stated " I Had To Get Dressed. What Do You Want Me To Come Out Butt Naked?" I Advised Lewis That He Had To Exit The Cell And Cuff Up When He Was Ordered To Do Such And Not On His Terms.  It Should Be Noted That Lewis Was Initially Clothed Only In A Pair Of Boxer Shorts. Lewis Then Submitted To Hand Cuff Restraint. A Cell Search Was Conducted  By C/O Barnhardt And C/O Behney, Joe With The Following Contraband Discovered:

(1) Pair "Horns" Apparently Inmate Constucted From Toothpaste And Some Sort Of Red Paper Covering.
(1) Paper Clip Bent And Inserted Into The Cable Connection.
(8) Laxative Pills. Confirmed By Medical Staff
(1) Aspirin Tablet. Confirmed By Medical Staff
(4) Soap Balls
(1) Slip Of Paper With The Sbi # 00154239 Of Inmate Dixon, Kevin, An Inmate Housed In Mhu 23 Du1

The Above Contraband Was Confiscated And Retained As Evidence, Inventoried On A 537-A And Surrendered To The Area Lieutenant: Lt Rodden, Timothy.

At The Conclusion Of The The Cell Search, Lewis Was Secured In His Assigned Cell Du2 Without Further Incident. - End Of Report.

**Reporting Officer:** Glick, Lisa L (CO Corporal/Sgt. - Large Inst.)

**Immediate Action Taken**

**Immediate action taken by:** Glick, Lisa L -CO Corporal/Sgt. - Large Inst.

Du2 Searched. Inmate Secured. Incident Reports Completed.

**Offender Disposition Details**

**Disposition:** N/A                    **Date:** N/A        **Time:** N/A        **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** Contraband Surrendered To Lt. Rodden. 537-A Completed.

**Approval Information**

**Approved: [x]    Disapproved: [ ]  Approved By:** Rodden, Timothy  (Shift Commander - Large Inst.)

**Comments:** N/A

**Shift Supervisor Details**

Date Received: 01-15-07    Time: 0343  Received From: Rodden, Timothy

**Shift Supervisor Determination:**

[ ]  Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[x]  Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

## INMATE ACQUIRED OR CONFISCATED PROPERTY

INMATE NAME: _Lewis, Jimmy_                                SBI# _00 506 622_
HOUSING UNIT: _MHU-23_         DATE _1/15/07_      TIME: _0155_

| ITEM | DESCRIPTION/BRAND NAME | S/P** | QUANTITY | CONDITION (Poor/Fair/Good) |
|---|---|---|---|---|
| Horns" | Inmate constructed - Red | N/A | 1 set | N/A |
| Medication | Laxative Pills - orange | P | 8 | N/A |
| medication | Asprin (Enteric) Orange | P | 1 | N/A |
| Soap Balls | Soap Balls - Yellow | S | 4 | (3) unused (1) Broken |
| paperclip | Paperclip - Bent | S | 1 | Poor / Bent |
| paper | Paper w/ IM SBI #154239 | N/A | 1 | Poor |

12:00 To 8:00 AM
C/O'S ON DUTY 1/15/07
WATSON
BONWELL
THOMAS
GLICK
BARNHART
BEHNEY

_S.G.T. Glick, L.154_
Officer's Name (Print Clearly)

_Timothy Kordden CT_
Supervisor's Name (Print Clearly)

Shift _12x8_

Shift _12x8_

Officer's Signature Who Inventoried Property

Supervisor's Signature Reviewing Inventory

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:
_____, on _01/15/07_ at _0730_, by _HO_____, within _Bld-13_
Person Transferring Property   (Date)      (Time)      (Person Receiving Property)      Unit

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:
_____, on __/__/__, at _____, by _____, within _____
Person Transferring Property   (Date)      (Time)      (Person Receiving Property)      Unit

### Record of Transfer of Property

The acquired/confiscated property, with exceptions noted, as listed above was received from:
_____, on __/__/__, at _____, by _____, within _____
Person Transferring Property   (Date)      (Time)      (Person Receiving Property)      Unit

Revised: 4/01/03    ** S- State Property     P- Personal Property            FORM# 537-A

01/15/2007
1029884

DCC Delaware Correctional Center
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**
Date: 01/15/2007

## NOTICE OF DISCIPLINARY HEARING - FOR MINOR/MAJOR OFFENSE

TO: Inmate:Lewis,Jimmy                    SBI#: 00506622    Housing Unit:Bldg 23

1. You will be scheduled to appear before the Hearing Office to answer charges pending against you. (Staff are to explain the charges as listed on the 122.)

2. At that time, a hearing will be held to determine whether you violated Institutional Rule(s) as alleged in the attached Disciplinary Report.
   How do you plead ? **[ ] Guilty      [ X ] Not Guilty**

3. A "Minor Offense" is a rule violation in which the extent of the sanction to be imposed shall be restricted to:
   a. Written Reprimand
   b. Loss of one or more privileges for a period of time **of more than 24 hours but not to exceed 15 days.**

4. A "Major Offense" is a rule violation in which the extent of the sanction to be imposed shall be restricted to:
   a. Loss of one or more privileges for a period of time not to exceed 90 days.
   b. Confinement to assigned quarters for a period of time not to exceed 90 days.
   c. Isolation confinement for a period of time not to exceed 90 days.
   d. Loss of good time for a period of time not to exceed 90 days.
   (Forfeiture of accumulated good time shall be subject to the approval of the Commissioner or his designee.)

5. You have the right in the disciplinary process as stated on the lower and back of this page. These have been fully explained to you at the time of this notification.

6. Counsel requested      **Yes**            Name of Counsel: Lyons, Maria

7. Confront accuser?      **Yes**

8. Witness requested?      **No**            Name of Witness: ,

I certify that on **01/15/2007** at **03:39** , I
served upon the above inmate this notice of
Disciplinary Hearing for Minor/Major Offense and
the Disciplinary Report is attached hereto.

**(Employee's Signature & Title)**
Rodden, Timothy

I have received copies of 122 & 127 and
understand my rights as Form # 127 has
been read to me

**(Inmate's Signature)**
Lewis,Jimmy

**Page 1 of 2**

01/15/2007.
1029884

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**
Date: 01/15/2007

## NOTICE OF DISCIPLINARY HEARING - FOR MINOR/MAJOR OFFENSE

### INMATE RIGHTS IN THE DISCIPLINARY PROCESS

**MINOR OFFENSE :**

**Right to Remain Silent:** If you are charged criminally based upon the same facts giving rise to the disciplinary process, you have the right to remain silent at the Disciplinary Hearing. If you choose to remain silent, your silence will not be considered against you at the Disciplinary Hearing. In all other circumstances, silence at the Disciplinary Hearing may be considered against you.

**Presence:** You have the right to be present at all phases of the hearing, except that you may be excluded during the Hearing Officer's deliberations and at any time your behavior becomes disruptive to the proceedings. Reason for such exclusions shall be stated in writing.

Disciplinary#
1029884

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## DISCIPLINARY REPORT

Disciplinary Type: Class1                    Housing Unit Bldg 23                    IR#: 1038890

Rodden, Timothy  (Shift Commander - Large Inst.)

I have received a copy of this notice on DATE: $1-15-07$  TIME: $\emptyset$        and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

Preliminary Hearing
Officer:                                              Offender: ✕

Lewis, Jimmy

DR#
1029884

## DISCIPLINARY HEARING DECISION

**Inmate** : Lewis, Jimmy                                                SBI#:00506622    **Type:**Class 1

**Institution:**DCC  Delaware Correctional Center                       **Hearing Date:** 01/29/2007    **Time:** 07:24

**Inmate Present:** Yes          **Reason(If No):** N/A

**Violation:** /200.112 Abuse of Prescribed Medication, 1.25/200.202 Sexual Misconduct, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Guilty**

**Inmate Statement:** N/A

**Decision :Guilty**

**Rational :**Per rept. the officer wrote him up is not the officer who witness. She didn't see him comitt the SM charge. I'am dropping the SM charge but find I/M Guilty of all other charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [ ]    DO    [X]    DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

| [X]    Inmate does not wish to appeal | [ ]  Appeal has been denied by Commissioner or Designate |
|---|---|
| [ ]    Sanctions have been modified | [ ]  Time Limit(72 Hours since hearing) for appeal has expired |

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Loss of All Privileges | 02/26/2007 | 5 | 03/02/2007 |

| Disciplinary# |
| 1030448 |

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: **02/16/2007**

# DISCIPLINARY REPORT

| Disciplinary Type: Summary | | | Housing Unit Bldg 23 | | IR#: 1039723 | | |
|---|---|---|---|---|---|---|---|

| SBI# | Inmate Name | | Inst. Name | Location Of Incident | Date | Time |
|---|---|---|---|---|---|---|
| 00506622 | Lewis, Jimmy | | DCC | Bldg.23 D Tier | 02/16/2007 | 15:00 |

Violations: 2.06/200.108 Failing to Obey an Order

| Witnesses:1.N/A | 2. N/A | 3. N/A |
|---|---|---|

### Description of Alleged Violation(s)

On Friday 2-16-07 At @ 1500 Hrs I/M Jimmy 00506622 Came Out Of The Shower With A Sheet Wrapped Around His Waist  And A T-Shirt On. I/M Lewis Would Not Go Intot He Shower And Put On Any Pants Because He Said  " It Was Against His Gender And He Isn'T Exposing Himself". I/M Was Finally Secured In His Cell And Notified He Would Be Gettinga 24 Loap
Reporting Officer: Scott, Deborah  (CO Corporal/Sgt. - Large Inst.)

### Immediate Action Taken

Immediate action taken by: Scott, Deborah  -CO Corporal/Sgt. - Large Inst.

Inmate Recieved A 24 Loap

### Offender Disposition Details

Disposition: N/A                    Date:N/A          Time: N/A          Cell secured?  No

Reason: N/A

Disposition Of Evidence: N/A

### Approval Information

Approved: [✓]    Disapproved: [ ]   Approved By: _____

Comments: N/A

### Shift Supervisor Details

Date Received:              Time:              Received From: ___

Shift Supervisor Determination:

[ ]    Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[ ]    Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

_____
, ()

I have received a copy of this notice on DATE: 02/16/07    TIME: 1500    and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

Preliminary Hearing
Officer: _____              Offender: _____
                                                      Lewis, Jimmy

| Disciplinary# | | | | | | | Date: 07/09/2005 |
|---|---|---|---|---|---|---|---|
| 1019020 | | | | | | | |

**DCC   Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

# DISCIPLINARY REPORT

| Disciplinary Type: Class2 | | Housing Unit: Bldg 19 | | | IR#: 1024147 | | |
|---|---|---|---|---|---|---|---|
| **SBI#** | **Inmate Name** | | **Inst. Name** | **Location Of Incident** | | **Date** | **Time** |
| 00506622 | Lewis, Jimmy | | DCC | Bldg.19 D Tier | | 07/09/2005 | 16:15 |

**Violations:** 2.06/200.108 Failing to Obey an Order

**Witnesses:** 1. N/A          2. N/A                    3. N/A

### Description of Alleged Violation(s)

On The Above Date And Aprox. Time I C/O Phelps Was Conducting A Tier Check And Found Du12 Cell Door Window Covered. I/M Lewis Jimmy Sbi#00506622 Is Housed In Du12. I/M Lewis Has Been Told Several Times That He Can Not Have His Window Covered At All. I/M Lewis Still Continues To Cover His Window. The Paper Was Removed From His Cell (Du12) And Thrown Away. I/M Lewis Was Advised Of The Disciplinary Write Up.

**Reporting Officer:** Phelps, Casey J (Correctional Officer)

### Immediate Action Taken

**Immediate action taken by:** Phelps, Casey J -Correctional Officer

Disciplinary Write Up

### Offender Disposition Details

**Disposition:** N/A                    **Date:** N/A          **Time:** N/A          **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** N/A

### Approval Information

**Approved:** ☑     **Disapproved:** ☐     **Approved By:** Welcome, Michael  (Staff Lt./Lt)

**Comments:** N/A

### Shift Supervisor Details

**Date Received:** 07/09/2005          **Time:** 20:07          **Received From:** __

**Shift Supervisor Determination:**

[ ]   Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[X]   Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing

_____
Welcome, Michael  (Staff Lt./Lt)

I have received a copy of this notice on **DATE:**_____ **TIME:** _____ and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

**Preliminary Hearing**
**Officer:** _____          **Offender:** _____
              Welcome, Michael                                    Lewis, Jimmy

| Disciplinary# | | | | | | |
|---|---|---|---|---|---|---|
| 1021432 | | | | | | |

**DCC  Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## DISCIPLINARY REPORT

| Disciplinary Type: Class1 | | Housing Unit: Bldg 19 | | IR#: 1027274 | | |
|---|---|---|---|---|---|---|
| **SBI#** | **Inmate Name** | **Inst. Name** | **Location Of Incident** | | **Date** | **Time** |
| 00506622 | Lewis, Jimmy | DCC | Bldg.19 A Tier | | 11/02/2005 | 11:45 |

**Violations:** 1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

| Witnesses:1. N/A | 2. N/A | 3. N/A |
|---|---|---|

### Description of Alleged Violation(s)

While Picking Up Trays After All Inmates Were Finished Eating, I/M Jimmy Lewis #506622 Refused To Give Up His Tray Apparently Mad About The Fact That The Law Library Took Money Out Of His Account For Some Legal Work He Had Done. Asking To Speak To A Lt.I Sgt. Everette Did Not Think That Him Having To Pay For Work He Had Done On His Behalf Warranted The Attention Of The Lt. I Went On The Wing Giving Him Two Direct Orders To Give Me His Tray And He Refused.He Then Stated That He Was Going To Take The Tray And Break The Glass With It. I Opened His Flap To Give Him One Last Order To Return The Tray And He Thrust His Arm Through The Flap Trying To Grab Me And Yelling "I'M Gonna Choke You And Kick Your Ass" And I Sgt. Everette Sprayed A Burst Of Capstun Into His Face Because Of His Threatening Actions And Immediately Notified Lt. Simon Making Him Aware Of The Situation. He Was Removed From His Cell And Secured In The Interview Room. He Was Then Seen By Nurse Qwanni Neal.

**Reporting Officer:** Everette, Gwendolyn  (CO Corporal/Sgt. - Large Inst.)

### Immediate Action Taken

Immediate action taken by: Everette, Gwendolyn  -CO Corporal/Sgt - Large Inst.

Inmate Capstunned, Secured And Seen By Medical. Area Lt Notified.

### Offender Disposition Details

**Disposition:** N/A                    **Date:** N/A        **Time:** N/A        **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** N/A

### Approval Information

**Approved:** ☑        **Disapproved:** ☐        Approved By: Simon, Joseph S (Staff Lt./Lt)

**Comments:** N/A

### Shift Supervisor Details

**Date Received:** 11/02/2005        **Time:** 12:53        Received From: Simon, Joseph S

**Shift Supervisor Determination:**

[ ]  Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[X]  Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing

Simon, Joseph S (Staff Lt./Lt)

I have received a copy of this notice on **DATE:** _11-2-05_ **TIME:** _1330_ and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

**Preliminary Hearing Officer:** _Simon, Joseph S_        **Offender:** _____
                                                                    Lewis, Jimmy

**Page 1 of 1**

| DR# |
|-----|
| 1021432 |

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**

# NOTICE OF DISCIPLINARY HEARING - FOR MINOR/MAJOR OFFENSE

TO: Inmate: Lewis, Jimmy                    SBI#: 00506622    Housing Unit: Bldg 19

1. You will be scheduled to appear before the Hearing Office to answer charges pending against you. (Staff are to explain the charges as listed on the 122.)

2. At that time, a hearing will be held to determine whether you violated Institutional Rule(s) as alleged in the attached Disciplinary Report.
   How do you plead ? [  ] Guilty    [ X  ] Not Guilty

3. A "Minor Offense" is a rule violation in which the extent of the sanction to be imposed shall be restricted to:
   a. Written Reprimand
   b. Loss of one or more privileges for a period of time **of more than 24 hours but not to exceed 15 days.**

4. A "Major Offense" is a rule violation in which the extent of the sanction to be imposed shall be restricted to:
   a. Loss of one or more privileges for a period of time not to exceed 90 days.
   b. Confinement to assigned quarters for a period of time not to exceed 90 days.
   c. Isolation confinement for a period of time not to exceed 90 days.
   d. Loss of good time for a period of time not to exceed 90 days.
      (Forfeiture of accumulated good time shall be subject to the approval of the Commissioner or his designee.)

5. You have the right in the disciplinary process as stated on the lower and back of this page. These have been fully explained to you at the time of this notification.

6. Counsel requested ?  ~~No~~ YES            Name of Counsel: PARALEGAL

7. Confront accuser?    Yes

8. Witness requested?   No            Name of Witness: __ I/m  VICTOR  HARMON
                                              CPL  MICHAEL  MAANS
                                              CPL  LEMUEL  ROSS

I certify that on **11/02/2005**  at **12:54** , I
served upon the above inmate this notice of
Disciplinary Hearing for Minor/Major Offense and
the Disciplinary Report is attached hereto.

(Employee's Signature & Title)
Simon, Joseph S

I have received copies of 122 & 127 and
understand my rights as Form # 127 has
been read to me.

_____
(Inmate's Signature)
Lewis, Jimmy

| DR# | |
|---|---|
| 1021432 | |

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 12/20/2005

## DISCIPLINARY HEARING DECISION

Inmate : Lewis, Jimmy                                      SBI#:00506622    Type: Class 1

Institution:DCC  Delaware Correctional Center            Hearing Date: 11/16/2005    Time: 10:43

Inmate Present: Yes    Reason(If No): N/A

Violation:  1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

### Inmate PLEA: Not Guilty

Inmate Statement:  I spoke with the c/o the day before about my accound. I said I need to speak with Lt. I said I need my receipt back. I held my tray because I need to speak with Lt. I said I was going to bust tray and break window. Never said what she said I did

Witness Name: Maan, Lewis Cpl

Testimony : Inmate Lewis wasn't given up tray. Inmate reached in Sgts direction she sprayed him.

Witness Name: Fox, Michael i/m

Testimony : Inmate held tray because he wanted to see Lt. Sgt sprayed mace in flap.

### Decision :Guilty

Rational : During confrontation Sgt Everette said inmate refused to give up tray, threatened her, and tried to grap her. Per report and confrontation inmate refused to give up tray,reached for officer and threatened her. Found guilty of all charges.

Sanctions: N/A

#### HEARING OFFICER'S SIGNATURE

Savage, Larry

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X]    DO    [ ]    **DO NOT INTEND TO APPEAL**

INMATE's SIGNATURE

#### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal                [X]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified                  [ ]    Time Limit(72 Hours since hearing) for appeal has expired

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 01/16/2006 | 15 | 01/30/2006 |

DR # *102143*

Date: _11/16/05_

DCC Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

## DISCIPLINARY HEARING DECISION

[X] Class I (Major)    [ ] Class II (Minor)    [ ] Summary (24 Hour LOAP)

**Inmate:** _Lewis Jimmy_    **SBI#: 00** _506622_
**Institution:** Delaware Correctional Center   **Hearing Date:** _11/16/05_   **Time:** _1043_

**Inmate Present:** [X] Yes   [ ] No

**Reason (If No):** _____

**Violation:** _200.203  200.108_
**Inmate Plea:** _not guilty_
**Inmate Statement:** _I spoke with Cp. Day before about my account. I said I need to speak with Lt. I said I need her receipt back. I told my thing because I needed the paper work_
**Witness Name:** _Lt.___
**Testimony:** _break window. Never said what she said did._

**Witness Name:** _Cpl Magan___
**Testimony:** _Lewis was giving up true, James reached with Sgt direction she sprayed him._

**Witness Name:** _Lt. Michael Fox___
**Testimony:** _Inmate held true because he wanted to see Lt. Sgt Springle made it so._

**Decision:** [X] Guilty   [ ] Not Guilty   [ ] Further Investigation.
**Rational:** _During confrontation Sgt Greathe said inmate refuse to give up true, threaten her, an tried to grabher. Per report _n_ confrontation inmate refused to cave anything ore reached for phone and threaten Sgt. Faune guilty on all charges._

**Sanctions:** _15 days CTO 1 on all charges_

_____
**Hearing Officer's Signature**

I understand that I may appeal the decision of the Hearing Officer (or Shift Supervisor in the case of a Summary Sanction) to the Commissioner of Correction or his designee. I must complete a Disciplinary Appeal Form within 72 hours immediately following the hearing and mail it to the DCC Hearing Office.

[X] I do intend to appeal.
[ ] I do not intend to appeal.

_inmate not present for final disposition_
**Inmate's Signature**

## ORDER TO IMPLEMENT SANCTIONS

[ ] Inmate does not wish to appeal.
[ ] Sanctions have been modified

[ ] Appeal has been denied by Commissioner or Designee
[ ] Time Limit (72 hours since hearing) for appeal has expired

**Modifications:** _____
It is hereby ordered to implement the sanctions or modified sanctions on **Date:** _____ **Time:** _____

Form 121 – May 30, 2003 – 2 pt. NCR  DACS

| Disciplinary#<br>1024832 | | DCC  Delaware Correctional Center<br>Smyrna Landing Road<br>SMYRNA DE, 19977<br>Phone No. 302-653-9261 | | | Date:  05/07/2006 | |

# DISCIPLINARY REPORT

| Disciplinary Type: Class1 | | Housing Unit Bldg D/Infirmary | | IR#: 1032204 | | |
|---|---|---|---|---|---|---|
| **SBI#** | **Inmate Name** | **Inst. Name** | **Location Of Incident** | | **Date** | **Time** |
| 00506622 | Lewis, Jimmy | DCC | D/INFIRMARY | | 05/07/2006 | 00:15 |

Violations: 1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

| Witnesses:1. N/A | 2. N/A | 3. N/A |
|---|---|---|

### Description of Alleged Violation(s)

On Sunday May 7, 2006 Co Rosalie Vargas Was Completing Paperwork At The Nurses Station When I Heard Banging. I Approached Cell 191 And Observed Im Jimmy Lewis # 00506622 Banging On The Door. I Had Ordered Im Lewis Not To Bang On The Door. I Had Just Completed An Area Check And Was By The Room At 0009. Im Lewis Loudly Stated He Needed To See A Nurse. I Notified Med Staff Who Were In The Med Room. Im Lewis Then Began To Bang On The Door Again. I Notified Him He Had A Mab As I Had Previously Ordered Him Not To Bang On The Door. Im Lewis Became Loud And Disorderly "I Don'T Give A Fuck About No Write Up Bitch! Write That Up! I Don'T Give A Fuck!". Med Staff Paul Responded And Asked Im Lewis What He Needed. Im Lewis Stated He Was Banging On The Door As He Needed Something For Gas Pains. Im Lewis Received Mab And Was Notified Of Write Up.

Reporting Officer: Vargas, Rosalie  (CO Corporal/Sgt. - Large Inst.)

### Immediate Action Taken

Immediate action taken by: Vargas, Rosalie  -CO Corporal/Sgt. - Large Inst.

Im Lewis Received Mab And Was Notified

### Offender Disposition Details

**Disposition:** N/A           **Date:** N/A          **Time:** N/A          **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** N/A

### Approval Information

**Approved:** [x]    **Disapproved:** [ ]  **Approved By:** Burman, Barry M (Staff Lt./Lt)

**Comments:** N/A

### Shift Supervisor Details

**Date Received:**            **Time:**          **Received From:** Burman, Barry M

**Shift Supervisor Determination:**

[ ]    Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[x]    Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

*LT Barry Burns*

Burman, Barry M (Staff Lt./Lt)

I have received a copy of this notice on DATE: 05/07/06 TIME: 0145 and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

**Preliminary Hearing Officer:**  *LT Barry Burns*              **Offender:** _____

Lewis, Jimmy   1633 88445

WILL SSE FEDEL CASTRO

C/O Rosalie Vargas

| DR#<br>1024832 | | **DCC Delaware Correctional Center**<br>**Smyrna Landing Road**<br>**SMYRNA DE, 19977**<br>**Phone No. 302-653-9261** | Date: 06/27/2006 |
|---|---|---|---|

## DISCIPLINARY HEARING DECISION

Inmate : Lewis, Jimmy                                           SBI#:00506622    Type:Class 1

Institution:DCC Delaware Correctional Center                    Hearing Date: 06/20/2006    Time: 09:41

Inmate Present: No        Reason(If No): I/M Refuse to come to hearing

Violation:  1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

Inmate Statement:  N/A

Decision :Guilty

Rational : Per Rept. found I/M Guilty of all charges

Sanctions: N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [X]   DO   [ ]   DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[ ]   Inmate does not wish to appeal           [ ]   Appeal has been denied by Commissioner or Designate

[ ]   Sanctions have been modified             [X]   Time Limit(72 Hours since hearing) for appeal has expired

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 07/17/2006 | 5 | 07/21/2006 |

1024850

# DISCIPLINARY REPORT

| Disciplinary Type: Class1 | | Housing Unit Bldg D/Infirmary | | IR#: 1032237 | | |
|---|---|---|---|---|---|---|
| SBI# | Inmate Name | Inst. Name | Location Of Incident | | Date | Time |
| 00506622 | Lewis, Jimmy | DCC | D/INFIRMARY | | 05/08/2006 | 00:01 |

**Violations:** 1.06/200.203 Disorderly or Threatening Behavior, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Witnesses:**1. N/A          **2.** N/A          **3.** N/A

## Description of Alleged Violation(s)

On Monday May 8, 2006 Co Rosalie Vargas Was Conducting An Area Check Of D/Infirmary. I Observed Im Jimmy Lewis On His Knees On His Mattress Banging On The Cell Door. I Asked Im Lewis Why He Was Banging On The Door. Im Lewis Started To Smile, Lay Halfway Down On His Mattress And Loudly And Disorderly Stated "Turn The Fucking Fan Off Bitch!". I Notified Im Lewis He Had A Mab. Im Lewis Continued His Behavior Yelling "What You Go Home And Think About This Shit! Turn Off The Fucking Fan Bitch!". Im Lewis Has Received Mab For This Behavior From This Officer The Last Two Weeks. Im Was Notified By Medical Staff And Myself That He Would Injure Himself If He Continued Banging On The Door. Im Lewis Received Mab, Was Notified Of Write Up And Continued His Behavior.

**Reporting Officer:** Vargas, Rosalie (CO Corporal/Sgt. - Large Inst.)

## Immediate Action Taken

**Immediate action taken by:** Vargas, Rosalie -CO Corporal/Sgt. - Large Inst.

Im Lewis Received Mab, Was Notified Of Write Up And Continued His Behavior

## Offender Disposition Details

**Disposition:** N/A          **Date:** N/A          **Time:** N/A          **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** N/A

## Approval Information

**Approved:** [x]     **Disapproved:** [ ]     **Approved By:** Brzezicki, Ronald A (Staff Lt./Lt)

**Comments:** N/A

## Shift Supervisor Details

**Date Received:** 05/08/2006          **Time:** 07:11          **Received From:** Brzezicki, Ronald A

**Shift Supervisor Determination:**

[ ]     Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[X]     Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

Brzezicki, Ronald A (Staff Lt./Lt)

I have received a copy of this notice on **DATE:** 5/10/06     **TIME:** 0700 and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

**Preliminary Hearing Officer:**          Brzezicki, Ronald A

**Offender:** S/m unable to sign     Lewis, Jimmy

CO Rosalie Vargas

**DR#**
**1024850**

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: **06/06/2006**

## DISCIPLINARY HEARING DECISION

| | |
|---|---|
| Inmate : Lewis, Jimmy | SBI#:00506622    Type:Class 1 |
| Institution:DCC  Delaware Correctional Center | Hearing Date: 05/16/2006    Time: 09:43 |

**Inmate Present:** No       **Reason(If No):** I/M Refused to come to hearing. Witness by CPL. Andrews

**Violation:**   1.06/200.203 Disorderly or Threatening Behavior, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA:** **Not Guilty**

**Inmate Statement:** N/A

**Decision :Guilty**

**Rational :** Per Rept found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X]  DO     [ ]   DO NOT INTEND TO APPEAL

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

| | | | |
|---|---|---|---|
| [ ] | Inmate does not wish to appeal | [X] | Appeal has been denied by Commissioner or Designate |
| [ ] | Sanctions have been modified | [ ] | Time Limit(72 Hours since hearing) for appeal has expired |

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 07/24/2006 | 5 | 07/28/2006 |

1024743

# DISCIPLINARY REPORT

| Disciplinary Type: Class1 | | | Housing Unit Bldg D/Infirmary | | IR#: 1032095 | | |
|---|---|---|---|---|---|---|---|
| **SBI#** | | **Inmate Name** | **Inst. Name** | **Location Of Incident** | | **Date** | **Time** |
| 00506622 | Lewis, Jimmy | | DCC | D/INFIRMARY | | 05/02/2006 | 07:36 |

**Violations:** 1.06/200.203 Disorderly or Threatening Behavior, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

| Witnesses:1. N/A | 2. N/A | 3. N/A |
|---|---|---|

### Description of Alleged Violation(s)

On Tuesday May 2, 2006 Co Rosalie Vargas Was At The Nurses Station In The Infirmary. Im Jimmy Lewis #00506622 Started To Bang On His Door Loudly. I Went To His Cell 191 And Observed Him Banging On The Door. Im Lewis Saw Me And Started To Yell "What The Fuck Are You Doing Here! What The Fuck Do You Want Now Bitch!". I Ordered Im Lewis To Stop Banging, Yelling And Acting Disorderly. Im Lewis Started To Bang The Door So Hard You Could See The Door Jumping From The Top Of The Frame. Im Lewis Was Also Yelling At The Same Time In A Disorderly Manner "Fuck You Motherfucking Bitch! You Don'T Know What I'M Going Through! Who The Fuck Do You Think You Are! Write Me Up! I Don'T Give A Fuck! I Don'T Give A Fuck About No Write Up! Fuck You!". Im Lewis Received A Mab, Was Notified Of Write Up And Continued His Disorderly Behavior Of Banging On The Door And Yelling. Im Lewis Was Ordered By Medical Staff To Stop Banging On The Door Or He Would Injure Himself. Im Lewis Continued To Bang And Yell.

Reporting Officer: Vargas, Rosalie (CO Corporal/Sgt. - Large Inst.)

### Immediate Action Taken

Immediate action taken by: Vargas, Rosalie -CO Corporal/Sgt. - Large Inst.

Im Lewis Received Mab, Was Notified Of Write Up And Continued His Disorderly Behavior

### Offender Disposition Details

Disposition: N/A

Date: N/A     Time: N/A     Cell secured? No

Reason: N/A

Disposition Of Evidence: N/A

### Approval Information

Approved: [x]     Disapproved: [ ]   Approved By: Godwin, Derrick R (Staff Lt./Lt)

Comments: N/A

### Shift Supervisor Details

Date Received: 05/02/2006     Time: 09:23     Received From: Godwin, Derrick R

Shift Supervisor Determination:

[ ]   Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[X]   Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

Godwin, Derrick R (Staff Lt./Lt)

I have received a copy of this notice on **DATE:**_____ **TIME:** _____ and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

Preliminary Hearing
Officer:

Godwin, Derrick R

Offender:

Lewis, Jimmy

DR#
·1024743·

**DOC   Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Dlinb

## DISCIPLINARY HEARING DECISION

| Inmate : Lewis, Jimmy | SBI#:00506622 | Type:Class 1 |
|---|---|---|

| Institution:DCC  Delaware Correctional Center | Hearing Date: 05/16/2006 | Time: 09:28 |
|---|---|---|

**Inmate Present:** No        **Reason(If No):** I/M Refused to come to Hearing . Witness by CPL. Andrews

**Violation:**   1.06/200.203 Disorderly or Threatening Behavior, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:** N/A

**Decision :Guilty**

**Rational :** Per Rept. found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [X]   DO      [ ]   DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

| [] | Inmate does not wish to appeal | [X] | Appeal has been denied by Commissioner or Designate |
|---|---|---|---|
| [ ] | Sanctions have been modified | [ ] | Time Limit(72 Hours since hearing) for appeal has expired |

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 06/26/2006 | 5 | 06/30/2006 |

| Disciplinary# | | |
| --- | --- | --- |
| 1024742 | | |

Smyrna Landing Road
**SMYRNA DE, 19977**
Phone No. 302-653-9261

# DISCIPLINARY REPORT

| Disciplinary T... Class1 | | Housing Unit Bldg D/Infirmary | | IR#: 1032094 | | |
| --- | --- | --- | --- | --- | --- | --- |
| SBI# | Inmate Name | | Inst. Name | Location Of Incident | Date | Time |
| 00506622 | Lewis, Jimmy | | DCC | D/INFIRMARY | 05/02/2006 | 07:00 |

**Violations:** 1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

| Witnesses:1.N/A | 2. N/A | 3. N/A |
| --- | --- | --- |

### Description of Alleged Violation(s)

On Tuesday May 2, 2006 Co Rosalie Vargas Was Conducting An Area Check Of The D-Infirmary. Im Jimmy Lewis #00506622 Was Standing w... his Cell Door ( 191 ). Im Lewis Became Disorderly And Threatening Yelling Loudly "Fuck You! Who Do You Think You Are! I Know Who You Are And What You Do! I Don'T Give A Fuck! Bitch! Write That Up! Fuck You!". Mental Health Staff Charles Benton E...tered The Infirmary To Interview With An Inmate In Cell 190. Im Lewis Then Began To Yell Louder "You Pussy Faggot Ran Wh... They Opened My Flap To Get My Tray! You Aren'T Doing Your Job! I Don'T Give A Fuck About Nothing!" I Ordered Im Lewis To Stop His Disorderly Behavior And Notified Him He Would Be Receiving A Mab. Im Lewis Yelled "Write Me Up Bitch! I Don'T Gi... A Fuck About No Write Up! Fuck You! Write That Up!". I Completed My Area Check And Started To Write The Mab. Im Lewis C...ntinued His Behavior Yelling "Charlie Benton! Who The Fuck Ordained You! You Aren¿T' No Minister! I'M Trying To Get A Coun...lor Over Here To Get Me A Phone Call To Let Them Know What I'Ve Been Going Through! To Let Them Know I'M Fucking Over Here! Fuck You!" Im Lewis Received A Mab, Was Notified Of The Write Up And Continued His Disorderly And Threatening Behavior Continuing His Yelling.

Reporting Officer: Vargas, Rosalie  (CO Corporal/Sgt. - Large Inst.)

### Inmediate Action Taken

Immediate action taken by: Vargas, Rosalie -CO Corporal/Sgt. - Large Inst.

Im Lewis Received Mab, Was Notified Of Write Up And Continued His Disorderly Behavior

### Offender Disposition Details

**Disposition:**N/A

| | Date:N/A | Time: N/A | Cell secured? No |
| --- | --- | --- | --- |

Reason: N/A

Disposition E... idence: N/A

### Approval Information

**Approved:** [x]   **Disapproved:** [ ]   Approved By:Godwin, Derrick R (Staff Lt./Lt)

Comment :N...

### Shift Supervisor Details

Date Received: /02/2006    Time: 09:35    Received From: Godwin, Derrick R

Shift Supervisor Determination:

[ ] Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[X] Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

Godwin, Derrick R (Staff Lt./Lt)

I have received a copy of this notice on DATE:_____ TIME: _____ and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the rules of conduct.

Preliminary Hearing Officer:

Godwin, Derrick R

Offender:

Lewis, Jimmy

Page 1 of 1

| DR#<br>1024742 | DCC **Delaware Correctional Center**<br>**Smyrna Landing Road**<br>**SMYRNA DE, 19977**<br>**Phone No. 302-653-9261** | Date: <u>06/06/2006</u> |

## DISCIPLINARY HEARING DECISION

| Inmate : Lewis, Jimmy | SBI#:00506622 | Type:Class 1 |
| Institution:DCC  Delaware Correctional Center | Hearing Date: 05/16/2006 | Time: 09:25 |

**Inmate Present:** No        **Reason(If No):** I/M Refused to come to Hearing. Witness By CPL. Andrews

**Violation:**  1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA:** <u>Not Guilty</u>
**Inmate Statement:** N/A

**Decision :**Guilty
**Rational :**Per Rept. found I/M Guilty of all charges
**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE _____

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [X]    DO    [ ]    DO NOT INTEND TO APPEAL**  _____

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

| [] | Inmate does not wish to appeal | [X] | Appeal has been denied by Commissioner or Designate |
| [ ] | Sanctions have been modified | [ ] | Time Limit(72 Hours since hearing) for appeal has expired |

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 07/31/2006 | 5 | 08/04/2006 |

DR#
1027146

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## DISCIPLINARY HEARING DECISION

**Inmate :** Lewis, Jimmy                                   **SBI#:** 00506622      **Type:** Class 2

**Institution:** DCC  Delaware Correctional Center                     **Hearing Date:** 09/11/2006    **Time:** 11:47

**Inmate Present:** Yes      **Reason(If No):** N/A

**Violation:**  1.06/200.203 Disorderly or Threatening Behavior, 2.05 Disrespect, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:**  I don't remember this incidence

**Decision :Guilty**

**Rational :** Per Rept. found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X]    DO    [ ]    **DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal          [ ]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified          [X]    Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 11/30/2006 | 5 | 12/04/2006 |

DR#
1027222

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## DISCIPLINARY HEARING DECISION

| | | |
|---|---|---|
| **Inmate** : Lewis, Jimmy | **SBI#:**00506622 | **Type:**Class 1 |

| | | |
|---|---|---|
| **Institution:**DCC  Delaware Correctional Center | **Hearing Date:** 09/11/2006 | **Time:** 11:50 |

**Inmate Present:** Yes      **Reason(If No):**N/A

**Violation:**   1.06/200.203  Disorderly  or  Threatening  Behavior,  2.03/200.106  Creating  a  Health,  Safety  or  Fire  Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:**   Because I don't remember any of this

**Decision** :Guilty

**Rational** :Per Rept. found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X]   DO   [ ]   **DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[X]   Inmate does not wish to appeal         [ ]   Appeal has been denied by Commissioner or Designate

[ ]   Sanctions have been modified         [ ]   Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 11/25/2006 | 5 | 11/29/2006 |

DR# 1027195

Date: 10/25/2006

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## DISCIPLINARY HEARING DECISION

Inmate : Lewis, Jimmy

SBI#: 00506622    Type: Class 1

Institution: DCC Delaware Correctional Center

Hearing Date: 09/28/2006    Time: 09:17

Inmate Present: Yes    Reason(If No): N/A

Violation: 1.06/200.203 Disorderly or Threatening Behavior, 2.05 Disrespect, 2.06/200.108 Failing to Obey an Order

Inmate PLEA: Not Guilty

Inmate Statement: Wasn't in right state of mind. When I was in hospital I was a mental health patient. Didn't inform mental health so they could tell her about my status.

Decision : Guilty

Rational : Inmate didn't ask to confront accuser at hearing. Per report inmate found guilty of all charges.

Sanctions: N/A

**HEARING OFFICER'S SIGNATURE**

Savage, Larry

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X] DO    [ ] DO NOT INTEND TO APPEAL

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal

[ ]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified

[X]    Time Limit(72 Hours since hearing) for appeal has expired

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 11/20/2006 | 30 | 12/19/2006 |

**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## DISCIPLINARY HEARING DECISION

Inmate : Lewis, Jimmy                                   SBI#:00506622    Type:Class 1

Institution:DCC  Delaware Correctional Center          Hearing Date: 05/16/2006   Time: 09:33

**Inmate Present:** No        **Reason(If No):** I/M Refused to come to Hearing. Witness by CPL. Andrews

**Violation:** 1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:** N/A

**Decision :Guilty**

**Rational :** Per Rept. found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer. I may appeal the decision of a Class I Hearing to the facility administrator. I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [X]    DO    [ ]    DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal              [X]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified              [ ]    Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 07/06/2006 | 5 | 07/10/2006 |

DR# 1024743

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## DISCIPLINARY HEARING DECISION

| | | |
|---|---|---|
| Inmate : Lewis, Jimmy | SBI#:00506622 | Type: Class 1 |
| Institution:DCC  Delaware Correctional Center | Hearing Date: 05/16/2006 | Time: 09:28 |

**Inmate Present: No**      **Reason(If No):** I/M Refused to come to Hearing . Witness by CPL. Andrews

**Violation:**   1.06/200.203 Disorderly or Threatening Behavior, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:**   N/A

**Decision :Guilty**

**Rational** : Per Rept. found I/M Guilty of all charges

**Sanctions: N/A**

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [X]   DO      [ ]   DO NOT INTEND TO APPEAL**

INMATE's SIGNATURE

### ORDER TO IMPLEMENT SANCTIONS

[ ]   Inmate does not wish to appeal

[X]   Appeal has been denied by Commissioner or Designate

[ ]   Sanctions have been modified

[ ]   Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 06/26/2006 | 5 | 06/30/2006 |

| DR#<br>1024850 | **DCC  Delaware Correctional Center**<br>**Smyrna Landing Road**<br>**SMYRNA DE, 19977**<br>**Phone No. 302-653-9261** | Date: <u>06/06/2006</u> |
|---|---|---|

## DISCIPLINARY HEARING DECISION

Inmate  :  Lewis, Jimmy                                         SBI#:00506622    Type:Class 1

Institution:DCC  Delaware Correctional Center         Hearing Date: 05/16/2006    Time: 09:43

**Inmate Present: No**        Reason(If No): <u>I/M Refused to come to hearing. Witness by CPL. Andrews</u>

**Violation:**    1.06/200.203 Disorderly or Threatening Behavior, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:** N/A

Decision :<u>Guilty</u>

**Rational** : Per Rept found I/M Guilty of all charges

**Sanctions:** N/A

**HEARING OFFICER'S SIGNATURE** _____

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer. I may appeal the decision of a Class I Hearing  to the facility administrator. I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X]  DO    [ ]   **DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

## ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal          [X]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified          [ ]    Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 07/24/2006 | 5 | 07/28/2006 |

| DR# | |
|---|---|
| 1024836 | |

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

## DISCIPLINARY HEARING DECISION

| Inmate : Lewis, Jimmy | | SBI#:00506622 | Type:Class 1 |
|---|---|---|---|
| Institution:DCC Delaware Correctional Center | | Hearing Date: 05/16/2006 | Time: 09:40 |

**Inmate Present:** No        **Reason(If No):** I/M Refused to come to hearing. Witness by CPL> Andrews

**Violation:** /200.224 Indecent Exposure, 1.06/200.203 Disorderly or Threatening Behavior, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:** N/A

**Decision :Guilty**

**Rational :** Per Rept. found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I [X]    DO    [ ]    DO NOT INTEND TO APPEAL

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal        [X]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified        [ ]    Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 06/26/2006 | 10 | 07/05/2006 |

| DR# | DCC Delaware Correctional Center |
|---|---|
| 102476? | Smyrna Landing Road |

**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

$23$

## DISCIPLINARY HEARING DECISION

| Inmate : Lewis, Jimmy | | SBI#:00506622 | Type:Class 2 |
|---|---|---|---|
| Institution:DCC  Delaware Correctional Center | | Hearing Date: 06/20/2006 | Time: 09:42 |

**Inmate Present:** No   **Reason(If No):** I/M Refuse to come to hearing

**Violation:**  /200.112 Abuse of Prescribed Medication

**Inmate PLEA: Not Guilty**

**Inmate Statement:**  N/A

**Decision** :Guilty

**Rational** :Per Rept. found I/M Guilty of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE
Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I  [X]   DO    [ ]    DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

| [ ]   Inmate does not wish to appeal | [ ]   Appeal has been denied by Commissioner or Designate |
|---|---|
| [ ]   Sanctions have been modified | [X]   Time Limit(72 Hours since hearing) for appeal has expired |

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Loss of All Privileges | 07/17/2006 | 5 | 07/21/2006 |

| DR#<br>1026789 | **DCC  Delaware Correctional Center**<br>**Smyrna Landing Road**<br>**SMYRNA DE, 19977**<br>Phone No. 302-653-9261 | Date: 09/14/2006 |

## DISCIPLINARY HEARING DECISION

Inmate : Lewis, Jimmy                                    SBI#:00506622    Type:Class 1

Institution:DCC  Delaware Correctional Center          Hearing Date: 08/22/2006   Time: 19:34

Inmate Present: No        Reason(If No): I/M Refused to come to hearing. Witness by Sgt. Lancaster

Violation:  1.06/200.203 Disorderly or Threatening Behavior, 2.05 Disrespect, 2.06/200.108 Failing to Obey an Order

Inmate PLEA: Guilty
Inmate Statement:  N/A

Decision :Guilty
Rational  : Per Rept. found I/M Guilty of all charges
Sanctions: N/A

### HEARING OFFICER'S SIGNATURE

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

I  [X]    DO    [ ]    DO NOT INTEND TO APPEAL

INMATE's SIGNATURE

### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal              [ ]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified               [X]    Time Limit(72 Hours since hearing) for appeal has expired

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 10/17/2006 | 10 | 10/26/2006 |

DR# 1027063

DCC Delaware Correctional Center
**Smyrna Landing Road**
**SMYRNA DE, 19977**
Phone No. 302-653-9261

## DISCIPLINARY HEARING DECISION

**Inmate :** Lewis, Jimmy                                   **SBI#:**00506622          **Type:**Class 1

**Institution:**DCC  Delaware Correctional Center                    **Hearing Date:** 09/07/2006    **Time:** 09:46

**Inmate Present:** Yes        **Reason(If No):** N/A

**Violation:**  1.06/200.203 Disorderly or Threatening Behavior, 2.05 Disrespect, 2.06/200.108 Failing to Obey an Order, 2.11/200.102 Off Limits

**Inmate PLEA: Not Guilty**

**Inmate Statement:**  Don't remember.

**Decision** :**Guilty**

**Rational :** Per report inmate found guilty of 2.06/200;108 FTO.  All other charges dropped.

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Savage, Larry

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [ ]    DO    [X]    DO NOT INTEND TO APPEAL**

                                                                          **INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

**[X]**    Inmate does not wish to appeal              **[ ]**    Appeal has been denied by Commissioner or Designate

**[ ]**    Sanctions have been modified               **[ ]**    Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Loss of All Privileges | 09/25/2006 | 5 | 09/29/2006 |

DR# 1027067

**DCC Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: **09/07/2006**

## DISCIPLINARY HEARING DECISION

**Inmate :** Lewis, Jimmy                                                                 **SBI#:** 00506622          **Type:** Class 1

**Institution:** DCC  Delaware Correctional Center                                **Hearing Date:** 09/07/2006   **Time:** 09:45

**Inmate Present:** Yes          **Reason(If No):** N/A

**Violation:** 1.04/200.209 Damage or Destruction of Property (Over $10), 1.06/200.203 Disorderly or Threatening Behavior, 2.01/200.105 Abuse of Privileges, 2.03/200.106 Creating a Health, Safety or Fire Hazard, 2.06/200.108 Failing to Obey an Order

**Inmate PLEA: Not Guilty**

**Inmate Statement:** Don't remember incident.

**Witness Name:** Mcclain, Stephen

**Testimony :** N/A

**Decision :** Guilty

**Rational :** Per report inmate found guilty of all charges.

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE

Savage, Larry

I understand that I may appeal the decision of a Class II Hearing to the Class I Hearing Officer.I may appeal the decision of a Class I Hearing to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [ ]    DO        [X]    DO NOT INTEND TO APPEAL**

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[X]    Inmate does not wish to appeal                    [ ]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified                      [ ]    Time Limit(72 Hours since hearing) for appeal has expired

**It is here by ordered to implement the sanctions:**

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 10/02/2006 | 15 | 10/16/2006 |

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                      )
                                   )
          Plaintiffs,              )   C.A. No. 04-1350
                                   )
v.                                 )
                                   )
SYLVIA FOSTER, M.D., et al.,       )
                                   )
          Defendants.              )

          Deposition of JIMMIE LEWIS taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the Delaware Correctional
Center, 1181 Paddock Road, Smyrna, Delaware, on Monday,
December 18, 2006, beginning at approximately 10:05 a.m.,
there being present:

APPEARANCES:

          JIMMIE LEWIS, Pro Se

          REGER, RIZZO, KAVULICH & DARNALL, LLP
          RONALD W. HARTNETT, JR., ESQ.
            1001 Jefferson Plaza, Suite 202
            Wilmington, Delaware  19801
            for Sylvia Foster, M.D.,

          DEPARTMENT OF JUSTICE
          GREGORY E. SMITH, ESQ.
           ILONA M. KIRSHON, ESQ.
            Carvel State Office Building, 7th Floor
            820 North French Street
            Wilmington, Delaware  19801
            for Defendant.

                CORBETT & WILCOX
          Registered Professional Reporters
230 North Market Street      Wilmington, DE 19899
                (302) 571-0510
             www.corbettreporting.com
        Corbett & Wilcox is not affiliated
      with Wilcox & Fetzer, Court Reporters

Jimmie Lewis

2   (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 | JIMMIE LEWIS, |
| 2 | the witness herein, having first been |
| 3 | duly sworn on oath, was examined and |
| 4 | testified as follows: |
| 5 | BY MR. SMITH: |
| 6 | Q.  Mr. Lewis, before we get started, I just want |
| 7 | to -- you mentioned that you wanted to -- you had an |
| 8 | objection you wanted to make before we started, so I will |
| 9 | let you state that first and then I will have a few |
| 10 | ground rules that I just want to talk about with you, but |
| 11 | I will let you begin with that, if you would like. |
| 12 | A.  According to the motion I received, a copy of |
| 13 | the motion, it says Dr. Foster, Johnson, Gray and Moffett |
| 14 | and Sagers, but it only has you as the representing |
| 15 | counsel.  It doesn't have anybody else that was going to |
| 16 | represent Mr. -- Dr. Foster on the motion to depose -- or |
| 17 | the deposition, as to say, so I object to anybody else, |
| 18 | you know, being present in regards to representing |
| 19 | Dr. Foster when she didn't put this in a motion, herself, |
| 20 | to depose me for a deposition. |
| 21 | Q.  Okay.  Let me see if I can just -- if we can |
| 22 | clarify just a couple things.  I just want to make sure, |
| 23 | are you saying that you don't feel like anyone else is |
| 24 | allowed to even be here or anyone else is allowed to ask |

|  | Page 3 |
|---|---|
| 1 | you questions? |
| 2 | A.  Ask me questions in regards to Dr. Foster's |
| 3 | position. |
| 4 | Q.  You don't have an objection to Dr. Foster's |
| 5 | attorney being here; you have an objection to him asking |
| 6 | you questions as part of the deposition? |
| 7 | A.  At this point, I am going to say I object to |
| 8 | him being here as well. |
| 9 | Q.  Just so you know, part of the ground rules, |
| 10 | actually, if the parties wanted to be here, they could |
| 11 | be, too, but, obviously, they are not.  But any party |
| 12 | that's represented by counsel is allowed to have, you |
| 13 | know, their counsel here.  So, hopefully, you are not |
| 14 | going to, you know, that's not going to be a real issue |
| 15 | for you, but I certainly -- you know, you have made your |
| 16 | objection for the record. |
| 17 | A.  It's on the record. |
| 18 | Q.  And that, that way, if you want to bring that |
| 19 | up with Judge Sleet afterwards, I am certainly not |
| 20 | telling you that you can't.  I am going to let |
| 21 | Dr. Foster's attorney respond to, I guess, your objection |
| 22 | to having him ask any questions since that's not really |
| 23 | directed to me. |
| 24 | A.  Yeah.  I received no order for -- to be |

|  | Page 4 |
|---|---|
| 1 | deposed by Dr. Foster, only received the order that |
| 2 | granted you the ability to depose me for deposition at |
| 3 | this point.  So -- |
| 4 | MR. HARTNETT:  Well, I mean, the |
| 5 | position of Dr. Foster would be that, obviously, as a |
| 6 | party to this matter, if a deposition has been scheduled |
| 7 | by another party in the matter, then, obviously, |
| 8 | Dr. Foster has an opportunity and a right to be present |
| 9 | and to ask questions to ensure that judicial economy is |
| 10 | maintained, so, that way, we wouldn't have to come back |
| 11 | at a separate time and do a separate deposition, and, |
| 12 | therefore, that's the purpose for us to be here today so |
| 13 | we take care of everything all at once. |
| 14 | In addition, you know, I would note that |
| 15 | I am here on behalf of the attorney of record, Carol |
| 16 | Antoff, covering this deposition.  I am a member of her |
| 17 | firm, and I have been asked, due to a scheduling |
| 18 | conflict, to attend this deposition on her behalf.  And, |
| 19 | you know, in light of the fact that Dr. Foster is a party |
| 20 | to this matter and we are the attorneys of record for |
| 21 | Dr. Foster, then we, obviously, have a right and an |
| 22 | opportunity to come to this deposition.  Despite the fact |
| 23 | that it was not our party that called the deposition, we |
| 24 | have a right to be here and ask questions of the |

|  | Page 5 |
|---|---|
| 1 | plaintiff to ensure everything is dealt with at one time |
| 2 | rather than have to come back for a second opportunity. |
| 3 | THE WITNESS:  With all that being said, |
| 4 | I still object to -- what's your name? |
| 5 | MR. HARTNETT:  Ron Hartnett. |
| 6 | THE WITNESS:  -- to Mr. Ron Hartnett |
| 7 | asking me any questions in regards to the deposition |
| 8 | that's been ordered by Judge Sleet today. |
| 9 | BY MR. SMITH: |
| 10 | Q.  I am going to be starting off, Mr. Lewis.  I |
| 11 | just want to give you some of the basics for a |
| 12 | deposition.  I have a chance to ask you some questions, |
| 13 | and then, obviously, you are the one who is giving the |
| 14 | answers.  This is all being recorded by the court |
| 15 | reporter, so we have to make sure that, you know, we |
| 16 | respect one another's, you know, chance as we are talking |
| 17 | and not talk over one another since she can only record |
| 18 | one person at a time. |
| 19 | If you don't understand a question that |
| 20 | I am asking you, you know, please don't -- don't answer |
| 21 | something if you don't understand it.  Please say, "I |
| 22 | don't understand," and I will do my best to refine the |
| 23 | question; otherwise, we have to assume that if you have |
| 24 | answered the question, that you understood what it was. |

Page 6

1  Hopefully, that sounds fair to you.
2     A.  I understand that. I agree.
3     Q.  And if it comes a point in time -- I don't
4  know how long this deposition will run, if it comes a
5  point in time you need a break to use the rest room, you
6  know, please just, you know, say, "Can I have a break for
7  that purpose"?, and we will certainly accommodate that.
8     A.  I am an adult.
9     Q.  Okay.
10         My name is Greg Smith. I am a Deputy
11 Attorney General. I am representing the four state
12 employees whom you have sued in this matter, Ryan
13 Johnson, David Moffett, Lance Sagers, and Robert Gray.
14         This is my co-counsel, Ilona Kirshon,
15 who is also a Deputy Attorney General and she also
16 represents those defendants. She is not going to be
17 asking you any questions today. She is just here to
18 observe.
19         So, with that, I guess we will get
20 started.
21         I am going to focus mainly on what I am
22 going to refer to as the second amended complaint that
23 you signed on March 17 of 2006.
24     A.  Yes sir, roughly.

Page 7

1     Q.  Are you familiar with that document?
2     A.  Yes.
3     Q.  Who wrote that complaint?
4     A.  I did.
5     Q.  Did anyone assist you in writing the
6  complaint?
7     A.  No one at all.
8     Q.  And where were you when you wrote the
9  complaint?
10     A.  I was here in the Delaware Correctional Center
11 in my cell, in my assigned cell.
12     Q.  Now, the defendants that you listed in the
13 complaint were Dr. Foster, Lance -- and the way you
14 spelled it in the complaint was Sapiers, S-a-p-i-e-r-s,
15 David Moffett, Mr. Johnson one, Mr. Johnson two, and
16 Robert Gray; is that correct?
17     A.  Yes, initially. But I modified -- I amended
18 it. It was amended -- are you talking about the amended
19 complaint or the original complaint?
20     Q.  The second amended complaint.
21     A.  Is that how it's spelled?
22     Q.  Let me check. That's correct. That's how it
23 was spelled? DPC, do you know what that stands for?
24     A.  Delaware Psychiatric Center.

Page 8

1     Q.  How long were you at DPC?
2     A.  Close to -- close to five weeks, from May 21st
3  of 2004 to June 25th, 2004.
4     Q.  Do you know why you were at the DPC?
5     A.  To be evaluated for competency -- for
6  competency evaluation to determine my ability to assist
7  counsel and for treatment for my very well own being.
8     Q.  Where were you before you came to the DPC?
9     A.  I was at the Howard R. Young Correctional
10 Institution, formerly known as the -- I was at the Howard
11 Young Correctional Institution.
12     Q.  Gander Hill?
13     A.  Gander Hill, yes.
14     Q.  And you can certainly refer to it that way and
15 I will know what that is.
16     A.  Okay.
17     Q.  And why were you at Gander Hill?
18     A.  For criminal offenses.
19     Q.  And the transfer from Gander Hill to DPC, that
20 was related to your criminal offenses?
21     A.  Yes. It was -- it was related to me -- my
22 issues regarding competency at the time.
23     Q.  Were you -- if you don't know what that phrase
24 is, please tell me -- were you a pretrial detaince at the

Page 9

1  time you were transferred from Gander Hill to DPC?
2     A.  No. I had already been adjudicated guilty.
3     Q.  You were then a sentenced inmate at that time?
4     A.  No. I don't understand if I am still -- at
5  this point, I don't understand if I was -- if I am a
6  pretrial -- if I am pretrial before I get sentenced,
7  then, yes, I was still pretrial because I wasn't yet
8  sentenced but I was already adjudicated guilty. That's
9  the gray area for me.
10     Q.  Thank you. I apologize for that. You had
11 already had your trial at that time?
12     A.  Yes, October 21st to October 23rd of 2003.
13     Q.  But you had not yet been sentenced as a result
14 of that trial?
15     A.  Correct.
16     Q.  I apologize for that. I did not mean that as
17 a trick question.
18         Did you do anything while you were at
19 Gander Hill that resulted in your transfer to DPC?
20     A.  I -- that's irrelevant. I find that to be
21 irrelevant towards the conditions -- the situation that's
22 regarding the plaintiffs -- the defendants, I am saying.
23 I object to that line of questioning, I should say.
24     Q.  And you have a right to register an objection.

| Page 10 | Page 12 |
|---|---|
| 1     A. Yes. | 1     A. Yes. |
| 2     Q. Generally speaking, the way this works is your | 2     Q. Are you familiar with Mr. Sagers? |
| 3  objection is then noted for the record so that you have | 3     A. Yes. |
| 4  preserved that right. | 4     Q. Do you know what he looks like? |
| 5     A. I reserved that right. | 5     A. Yes. |
| 6     Q. Yes. | 6     Q. Would you be willing to describe him for me? |
| 7     A. Okay. | 7     A. About 5'10", medium build, 175 to 190 pounds, |
| 8     Q. I would ask you to still go ahead and answer | 8  Caucasian male, maybe 30 years old, fair complexion, |
| 9  that with your objection preserved. | 9  like, sandy blonde hair. I don't know if he has -- he is |
| 10    A. I am still going to object. I don't want to | 10  a brunette or a blonde. I don't remember the color of |
| 11  answer that question. | 11  his hair. I would know him if I seen him. |
| 12    Q. Were you involved in any attempt to commit | 12    Q. David Moffett? |
| 13  suicide while you were at Gander Hill? | 13    A. Yes. |
| 14    A. Is this relevant towards the conditions of the | 14    Q. Are you familiar with Mr. Moffett? |
| 15  situation that I am being deposed? What's the relevancy | 15    A. Yes. |
| 16  towards the line of questioning on that? Why is that | 16    Q. And what does Mr. Moffett look like? |
| 17  relevant towards, you know, what happened at the Delaware | 17    A. Mr. Moffett is about 6'2" in height, |
| 18  Psychiatric Center is what I am asking? | 18  African-American male, brown-skinned. That's about it. |
| 19    Q. Why you got to DPC is certainly relevant to | 19  I would recognize him if I seen him. |
| 20  why you were there, especially in the light of the | 20    Q. Brian Johnson, what's Mr. Johnson look like? |
| 21  allegations, and, particularly -- | 21    A. Brian Johnson is about 5'11", 190 pounds, |
| 22    A. I reserve that right. I think that's an issue | 22  Caucasian male, and I would recognize him if I seen him |
| 23  that should be reserved for trial. | 23  as well. |
| 24    Q. Now, Mr. Lewis, just so you understand, this | 24    Q. Robert Gray, are you familiar with Mr. Gray? |

| Page 11 | Page 13 |
|---|---|
| 1  is our chance to ask you questions in advance of trial. | 1     A. Yes. |
| 2     A. I understand that. I am fully aware of that. | 2     Q. What does Mr. Gray look like? |
| 3     Q. And you understand that if you refuse to | 3     A. Mr. Gray is about 5'6", 5'7", about 190 |
| 4  answer something at the deposition, then -- | 4  pounds, African-American male. At the time I remember |
| 5     A. You can put a motion to the judge to have him | 5  him, he had dreadlocks, you know, in his -- for a |
| 6  to force me to answer the question. | 6  hairstyle, brown-skinned. I would recognize him if I |
| 7     Q. Yes. | 7  seen him as well. |
| 8     A. If it's relevant towards, you know, the | 8     Q. And may I just ask you to describe yourself, |
| 9  deposition. | 9  height, weight. |
| 10    Q. Yes. And one sanction of a refusal to answer | 10    A. 6'1", dark brown skin, bald-headed, mustache, |
| 11  would be that you would not be able to bring up | 11  goatee, about 210 pounds. |
| 12  information at trial if you refuse to answer questions | 12    Q. In the second amended complaint that I |
| 13  about it during the deposition. I just want to make sure | 13  referred to earlier, you provided a statement of facts in |
| 14  you understand that. | 14  there that was broken down into eight different parts. |
| 15    A. Let me think. What's the question again? | 15    A. Yes. |
| 16    Q. I asked whether you had attempted to commit | 16    Q. What I am going to be doing, just so you have |
| 17  suicide at any time while you were at Gander Hill before | 17  some idea of where we are going, I am going to talk to |
| 18  you were transferred to DPC? | 18  you about each one of those different parts and how they |
| 19    A. I am going to reserve the right on that | 19  relate to the individuals whom I represent. |
| 20  question. | 20       Do you have a copy of that complaint in |
| 21    Q. Let's talk some about the individuals whom I | 21  front of you right now? |
| 22  represent in this ease. Lance Sagers. | 22    A. Yes, I do. |
| 23    A. Yes. | 23    Q. If you want to have it available to look at, |
| 24    Q. Are you familiar with Mr. Sagers? | 24  please do at this time. |

Page 14

1    A. Okay.
2    Q. Certainly, you know, don't hesitate, since I
3    will be asking you some questions about it.
4    A. Okay. I wrote it, so I pretty much know what
5    it is.
6    Q. Let me turn your attention to the first part
7    of the complaint.
8        Would you disagree that that first, what
9    you have labeled as No. 1, nothing in that first part of
10   your complaint alleges any misconduct on the part of
11   Lance Sagers, David Moffett, Brian Johnson, or Robert
12   Gray?
13   A. I reserve the right on that question.
14   Q. Now, Mr. Lewis, this is very much -- there is
15   no question that this is relevant to the complaint. This
16   is your complaint.
17   A. My question -- I am -- if it's something
18   that's dealing with what Mr. Gray and Mr. Sagers done to
19   me, do you understand what I am saying, if you can
20   specifically identify something specific instead of in
21   general, I will answer -- I will be glad to answer your
22   question. You are asking me am in general question that
23   causes me to speculate and I am not going to do that.
24   Q. Mr. Lewis, I am not asking you to speculate.

Page 15

1    That's why I thought you might want to have the complaint
2    open in front of you.
3    A. Yes.
4    Q. Do you want me to hand you a copy of it?
5    A. No. I need you to be more specific in your
6    question, your line of questioning, sir.
7    Q. I would like you to look at the first part of
8    your complaint, what you have labeled as No. 1 within
9    your statement of facts; okay.
10   A. I heard your question. I heard what you said
11   initially. What I am telling you is that your question
12   was too general and too broad for me to give you a
13   specific answer to an in general question.
14   Q. Is there anything in that paragraph that
15   relates to the four individuals whom I represent?
16   A. I reserve the right on that question because
17   it's too in general and it's not -- it's -- for me to
18   give you a specific question -- a specific answer.
19   Q. So, you are refusing to answer that question?
20   A. I reserve the right to answer. I reserve my
21   right on that. It's too in general. You have to be more
22   specific, sir.
23   Q. I will be a little more specific, then.
24   A. Yes.

Page 16

1    Q. Mr. Lewis, from my reading of that complaint,
2    none of those defendants are mentioned by name in part
3    one of your complaint.
4    A. Mm-hmm.
5    Q. Do you agree with that statement?
6    A. At this point, discovery has -- may reveal
7    that those individuals were involved in situations that
8    occurred throughout the course of that complaint, so,
9    therefore, you know what I am saying, I am not going to
10   say that they weren't involved in situations where I was
11   unconstitutionally violated.
12   Q. Mr. Lewis, I am not trying to get you to talk
13   about the whole complaint, just that first part.
14   A. You spoke earlier -- you mentioned
15   specifically that it was broken down into eight points
16   and that you was going to question me on each point.
17   Q. Right.
18   A. So I would -- in the focus of my thoughts, I
19   will answer your questions.
20   Q. Mr. Lewis, I certainly acknowledge that you
21   have their names written in many parts of the complaint,
22   but right now, I am just trying to get you to focus on
23   that first part; okay, so that we can deal with, in an
24   orderly fashion, who you have alleged to have been

Page 17

1    involved in conduct; okay?
2    A. Yes.
3    Q. With that in mind, are you willing to answer
4    the question that I have asked you?
5    A. You have to pose the question in a manner that
6    is not so in general that I would have to speculate on
7    facts that have not been forthcoming throughout the
8    course of this discovery process.
9    Q. Mr. Lewis, I am not asking you to speculate.
10   A. Okay.
11   Q. I am just talking about what you put in
12   writing in that first part of your complaint. All I am
13   asking you is that in that first part of the --
14   A. They may very well have been involved in
15   situations throughout -- that I have depicted in each
16   eight sections as you have depicted it in the complaint.
17   Q. In each of the eight sections, you are saying?
18   A. That's what you said initially, and I am
19   answering in that -- in that format. They may very
20   well be individuals that were involved in violating my
21   constitutional rights throughout the course of, as you
22   say, the eight parts that constitute all or construct the
23   complaint itself.
24   Q. Since you said you have a copy of it in front

Jimmie Lewis

6 (Pages 18 to 21)

Page 18

1  of you, I am going to ask you to turn to that first, what
2  I have been referring to here as the first portion of
3  your complaint. Can you look at that for me, please?
4      A. Yes. Okay. I have it.
5      Q. You have it in front of you?
6      A. Yes.
7      Q. Can I ask you to read that, please, beginning
8  with, "I arrived at the Delaware Psychiatric"?
9      A. I am willing to answer questions. If you have
10  a question that you want to ask me, then I will answer a
11  question.
12      Q. Yes, I do. My question is: Will you please
13  read this paragraph for me?
14      A. I reserve the right -- I reserve that. I
15  am --
16      Q. You are refusing to even read your own
17  complaint?
18      A. Yes, at this point. The first page, yes.
19      Q. Mr. Lewis, let me refer you now to the second
20  part of your complaint.
21      A. Is that the second page?
22      Q. Yes. It has a pound sign two?
23      A. Yes.
24      Q. Is it fair to say that this paragraph is

Page 19

1  talking about allegations that you have raised on June
2  6th of 2004, regarding an individual by the name of James
3  Floyd?
4      A. That issue seems to be directed for
5  Dr. Foster, and I refuse to answer that question. I
6  retain the right to answer that. That just seems to be
7  directed for Dr. Foster, so I am, you know, I don't see
8  the relevancy in answering the questions regarding
9  Dr. Foster when the motion to depose has been for other
10  defendants other than Dr. Foster at this point.
11      Q. So, the second portion is about Dr. Foster?
12      A. I am saying that you are -- you are asking me
13  about situations that aren't specifically identifying the
14  defendants who you are saying that you are here to
15  represent at this point.
16      Q. So, paragraph two doesn't deal with any of my
17  defendants?
18      A. I am not saying that. What I am saying is
19  that you are not specifying what it is that you -- or why
20  you are asking me this in regards to the defendants that
21  you are here to depose me on. Do you understand what I
22  am saying? They may very well be involved with this
23  situation that took place on 6/6, 2004, but discovery
24  hasn't, you know, made that forthcoming at this time.

Page 20

1  So, you know what I am saying -- but, at this time, you
2  know, I reserve the right because, you know, we are still
3  in the discovery process.
4      If you can't specify anything more
5  specific than what -- than, you know, just the general
6  reading of -- because that's like fact-finding process,
7  it's fact-finding process that we must, you know, that
8  must be completed and we are still in the fact-finding
9  process, so I don't want, you know, to say something
10  that's binding and say that the individuals were not
11  involved in the situation that took place on 6/6, 2004,
12  when, in fact, they may very well have been.
13      Do you understand what I am saying?
14      Q. I do.
15      A. Yes.
16      Q. Mr. Lewis, who is James Floyd?
17      A. James Floyd is a person that was a patient
18  that was at the Delaware Psychiatric Center while I was
19  there.
20      Q. What happened with James Floyd on June 6th of
21  2004?
22      A. I reserve the right to answer that question.
23      Q. Mr. Lewis, you understand you are refusing to
24  answer any basic facts about your own complaint? You are

Page 21

1  stating for the record that you will not talk about what
2  happened between you and James Floyd on June 6th of 2004?
3      A. What I am saying is: If you can't
4  specifically point out to me the relevancy to why it's
5  relevant towards the defendants who you are here to
6  depose me -- to why you put the motion to depose me on, I
7  am going to reserve the right for the fact-finding
8  process.
9      Q. Mr. Lewis, you have made allegations against
10  individuals whom I represent. I am trying to find out
11  what it is that you have alleged they have done wrong to
12  you. You have to answer these questions. This is very
13  much relevant to the case.
14      A. In what manner?
15      Q. Mr. Lewis, you have said that they have
16  violated your constitutional rights. I am trying to find
17  out how, as a result of something that happened between
18  you and James Floyd, how my clients allegedly violated
19  your constitutional rights? That's the relevance of this
20  question.
21      Now, with that said, do you still refuse
22  to answer the question?
23      A. What I am saying, if you can't specifically
24  point --

Page 22

1    Q. I just specifically pointed out.
2    A. I am going to say that I reserve the right to
3 answer that question. I think that's a fact-finding
4 process that need to be determined in, you know,
5 discovery. You know, at this point, we are still in the
6 discovery process, and I can't specify specifically that
7 your clients weren't involved with the situation that
8 took place on 6/6, 2004, regarding, you know,
9 constitutional violations that I alleged on that date.
10    Q. Let's talk about part three of the second
11 amended complaint.
12        Do you have that in front of you?
13    A. Pound three?
14    Q. Yes, please.
15    A. Yes.
16    Q. And just to make sure we are both referring to
17 the same thing, it begins, "At the Delaware Psychiatric
18 Center, Delaware, on or about 6/9, 2004"?
19    A. Yes.
20    Q. Is it fair to say that this portion of your
21 complaint deals with shaving your head, in part?
22    A. As a religious writ, yes.
23    Q. What's your religious affiliation?
24    A. I reserve the right to answer that question at

Page 23

1 this point.
2    Q. Now, Mr. Lewis, in your complaint, you state
3 that you are a Hebrew Israelite; is that correct?
4    A. If that's what's stated, yes.
5    Q. Is that your religious affiliation?
6    A. Yes.
7    Q. What is a Hebrew Israelite?
8    A. I am going to reserve the right to answer that
9 question at this point.
10    Q. As a result of being a Hebrew Israelite, how
11 did that impact on your hair?
12    A. I reserve the right to answer that question.
13    Q. Did Lance Sagers have anything to do with
14 shaving your hair?
15    A. Subsequently, I spoke with several staff
16 members regarding that matter, and, at this point, I am
17 not specifically -- I am not going to say that he wasn't
18 one of the individuals who I spoke with at that time
19 regarding that issue, so I am going to reserve the right
20 to answer that.
21    Q. Did David Moffett have anything to do with
22 shaving your hair?
23    A. The defendants work at the Delaware
24 Psychiatric Center and they were individuals who were

Page 24

1 assigned to passing out razors or assigned to enforcing
2 the rules and regulations that I may add that I never
3 received, the rule books that I never received; do you
4 understand what I am saying? So, at this point, this is
5 why I am saying I am not going to specifically say that
6 they were individuals that did not, you know, prevent me
7 from practicing my religious right.
8    Q. Did Brian Johnson have anything to do with
9 shaving your hair?
10    A. No, not at all.
11    Q. Did Robert Gray have anything to do with
12 shaving your hair?
13    A. I reserve the right, at this point, to answer
14 that question. Brian Johnson had nothing to do with it.
15 Brian Johnson was not affiliated with the situation at
16 that point.
17    Q. Now, a part of your complaint focuses on the
18 psychiatric evaluation of doctor -- conducted by
19 Dr. Foster; correct?
20    A. Yes.
21    Q. Did Lance Sagers have anything to do with
22 Dr. Foster's psychiatric evaluation of you?
23    A. Yes.
24    Q. What did Mr. Sagers have to do with

Page 25

1 Dr. Foster's evaluation of you?
2    A. He made notes inside the doctor's notes,
3 progress notes, and that reflected upon my -- the psych
4 report that was submitted to the Superior Court. And he
5 committed other acts that were also taken into
6 consideration in regards to Dr. Foster, Dr. Foster's
7 evaluation.
8    Q. Where are these notes that you mentioned that
9 Mr. Sagers, you say, were --
10    A. They were sent to me via discovery.
11    Q. And where?
12    A. Pardon me? I don't understand exactly what
13 you are saying.
14    Q. Where did Mr. Sagers write the notes?
15    A. At the Delaware Psychiatric Center.
16    Q. And in what document did he make these notes?
17    A. The progress notes, the doctor's progress
18 notes that -- that's what they -- it's something that the
19 doctor would look at and be able to reflect upon with
20 what has been said about my behavior and what has been
21 said about my psychiatric, psychological, mental health
22 condition during the course of my stay while I was at the
23 Delaware Psychiatric Center.
24    Q. Would that have been part of your medical file

Page 26

1   at DPC?
2       A.  Yes.
3       Q.  And do you have that with you today?
4       A.  Not -- no.  I didn't bring the medical
5   records.  Did you?
6       Q.  I have the medical records that you attached
7   to your complaint.
8       A.  Okay.
9       Q.  I did not bring everything in discovery that's
10  been provided to you.
11      A.  Okay.
12      Q.  Do you recall what Mr. Sagers, you say, wrote
13  in the progress notes that affected Dr. Foster's
14  psychiatric evaluation of you?
15      A.  I would have to -- I would have to reflect
16  upon the doctor's notes to be specific, and I don't want
17  to misquote and say something that Mr. Sagers did not
18  say, so I am going to reserve the right to answer that
19  question at this point.
20      Q.  How many times did Mr. Sagers write something
21  in your progress notes that impacted Dr. Foster's
22  evaluation of you?
23      A.  To my -- to my recollection, at least three to
24  four times, and that's off the top -- and don't, you

Page 27

1   know, don't hold me to that, you know, per se, but, to my
2   recollection, that's about -- about as many times as I
3   can, you know, recall off the top of my head.
4       Q.  And without trying to ask you to quote
5   directly what those statements were, generally speaking,
6   what notes are you saying Mr. Sagers made that impacted
7   on Dr. Foster's evaluation?
8       A.  I was going to ask -- that's going to have to
9   -- I will have to answer that with being -- with
10  specifying what it is that, you know, that I thought that
11  he said.  I am not going to do that, you know what I am
12  saying?  I don't want to violate Mr. Sagers in any way by
13  falsely accusing him of something that he didn't do, so I
14  reserve the right to answer that question.
15      Q.  David Moffett, did Mr. Moffett have anything
16  to do with Dr. Foster's evaluation of you?
17      A.  At this point, I can't say.  I haven't been
18  provided with all the documents and all necessary -- or
19  all affidavits that have -- that was before Dr. Foster,
20  and, at this point, Dr. Foster has failed to answer
21  discovery requests that I presented to her, so I can't --
22  I can't -- I can't specifically say yes or no at this
23  point, so I reserve the right to answer that question.
24      Q.  Robert Gray, was he involved with Dr. Foster's

Page 28

1   evaluation of you?
2       A.  Yes.
3       Q.  How is Mr. Gray involved?
4       A.  He submitted notes regarding my behavior, my
5   psychological condition, my mental health, my physical
6   health upon the progress notes, and, therefore, those
7   notes were reviewed by Dr. Foster in conducting her
8   evaluation.
9       Q.  Finally, Brian Johnson, was Mr. Johnson
10  involved in any way with Dr. Foster's psychiatric
11  evaluation?
12      A.  All the discovery material hasn't been
13  forthcoming at this point, and I can't identify
14  specifically if Mr. Johnson was or was not, you know,
15  offered anything that Dr. Foster took into consideration
16  when she authored the psychiatric evaluation.  So I
17  reserve the right to answer that question at this point.
18      Q.  The third part of your complaint, is it fair
19  to say that it does not list Lance Sagers, David Moffett,
20  Brian Johnson, and Robert Gray by name?
21      A.  Yes.
22      Q.  And let's talk about the fourth part of your
23  second amended complaint.
24          Can I ask you to read that first

Page 29

1   paragraph, please?
2       A.  I don't want to.
3       Q.  Is it a fair statement that the fourth
4   paragraph deals generally with a, what I will call,
5   laundry room incident on June 14th of 2004?
6       A.  Well, that day, it was -- it was particularly
7   the same day that I complained -- that's the latter part
8   of the day in regards to the incident with Moffett,
9   Mr. Gray, Mr. Sagers, and another DPC nurse assistant who
10  I have come to understand his name as being Mr. Evans,
11  which was -- which just was probably a few hours earlier,
12  so, it was -- it's the totality of everything that took
13  place throughout the course of the 14th of June of 2004.
14  But it specifically, you know, deals with, you know, the
15  incident, you know, so I can identify because I had to
16  specify, you know, that, you know, when Mr. Brian Johnson
17  became involved, was kind of like, you know, at the
18  latter part of that day.
19      Q.  The latter part of which day?
20      A.  Of 6/14, 2004.
21      Q.  How did you have any interaction with Brian
22  Johnson that day?
23      A.  Well, he was -- he was called, as he told me
24  on our 20-minute conversation, he was called for

Page 30

1  assistance to come to the Mitchell building because of
2  claims of my extreme agitation.
3     Q. At approximately what time of the day did this
4  20-minute conversation with Mr. Johnson take place?
5     A. At or about -- between 10:30 -- no, about
6  10:45, 11:00, until a quarter after 11. Around that
7  time.
8     Q. And where, at the Mitchell building, did this
9  take place?
10    A. At room 71. I was located -- I was assigned
11 to room 71 on the north side, if I am not mistaken, of
12 the Mitchell building, and I was at the doorway where
13 they -- actually, they woke me up, you know, they woke me
14 up and things of that nature.
15    Q. You said, "They woke you up"; who woke you up?
16    A. Well, the nurse, a male nurse, a male nurse
17 and Mr. Johnson and someone else. I can't recall exactly
18 who that person was. As a matter of fact, I don't even
19 know who the male nurse name is. That's still pending
20 discovery. I am trying to get that forthcoming.
21    Q. Who is Clarence Oates?
22    A. He is a nurse's assistant that works at the
23 Delaware Psychiatric Center, about 6'3", 6'4", 270, 80
24 pounds, African-American male, bald-headed, dark-skinned,

Page 31

1  dark brown skin. I would recognize him if I seen him.
2     Q. What, if any, interaction did you have with
3  Mr. Oates on June 14th of 2004?
4     A. This -- it was -- it was, basically, I was
5  trying to get my clothes out of the laundry room, and
6  Mr. Oates, who had just came on duty, because I had just
7  came out of the room, I was just, you know, I had just
8  came out my room and my clothing were in the laundry room
9  and I went to the laundry room to retrieve my clothes
10 that was in the dryer, and, at that time, I had an
11 encounter with Mr. Oates.
12    Q. Do you have the ability to do your own laundry
13 at the Mitchell building?
14    A. Yes. They allow us to -- that privilege.
15    Q. And, so, what were you doing in the laundry
16 room?
17    A. I hadn't made it to the laundry room. I was
18 attempting to retrieve my clothes out of the dryer.
19    Q. You were on the way -- on your way to the
20 laundry room?
21    A. Yes. From -- from my -- from my room, I
22 walked down the hall -- from room 71, I walked down the
23 hall to -- en route to the laundry room.
24    Q. Had you already started laundry or were you

Page 32

1  just about to start laundry?
2     A. My laundry had been started before I had went
3  to snack, which was around 8:00 that day, but,
4  subsequently, I was -- I had encountered some situations
5  earlier that day, as described in -- as described in No.
6  5, I believe, in pound five of the complaint, which is
7  basically chronologically incorrect according to the --
8  as far as the numbers and how I documented them. And I
9  had put the clothes in the laundry at that time and put
10 them in the dryer -- well, before we went to snack, I had
11 put the clothes in the washing machine -- before we went
12 to snack, I put the clothes in the dryer.
13    So by the time I came out of the
14 isolation room and things of that nature, and, you know,
15 was -- went to my room, I was in my room resting, it
16 dawned on me, My clothes that I needed to wear were still
17 in the dryer. They was dry. They was already dry.
18    Q. What happened as you approached the laundry
19 room to collect your clothing?
20    A. Mr. Oates confronted me in an aggressive
21 manner, directed -- directed me to go into the bathroom
22 because he -- he wanted to get physical, he wanted some
23 kind of physical confrontation, and I kept seeing him
24 looking over my shoulder -- I don't know if it's my right

Page 33

1  or left shoulder -- so I look around and I seen Helen
2  Hanlon, and, at that time, she made some type of gesture,
3  and he told me -- he instructed me to go back to my room.
4     Q. Who is Helen Hanlon?
5     A. Helen Hanlon is a nurse that works at the
6  Delaware Psychiatric Center.
7     Q. What happened after you say Miss Hanlon made
8  some motion to Mr. Oates?
9     A. Well, they -- they basically -- she came on to
10 the unit and -- because I was still trying to say -- I
11 was trying to tell her I need my clothes so I could put
12 them on for the next day and I just wanted to collect
13 them out of the laundry room, and, so, she just -- she
14 said, "Just go to your room," and she instructed me to go
15 to my room, which I did without further incident.
16    Q. And what happened after you went to your room?
17    A. Tucked in -- tucked in the bed and went to
18 sleep. I was still feeling the effects of the
19 psychotropic medications that I had received earlier via
20 injection, inadvertent -- you know, intravenously
21 injected with psychotropic medications earlier that day
22 which wasn't even a half hour after I came out the
23 isolation room, after I was let out the isolation room, I
24 should say.

Page 34

1    Q. Now, you mentioned earlier that you had some
2 20-minute conversation with Mr. Johnson.
3    A. Well --
4    Q. When did that take place?
5    A. That was after the situation that, you know,
6 me being instructed to go back to the room.
7    Q. Because you said you tucked in.
8    A. Listen. After I was instructed to go back to
9 my room, I tucked in, and about shortly thereafter, you
10 know, I was resting 15 minutes, then that's when
11 Mr. Johnson, male nurse, and someone else came to my
12 assigned room, room 71, and awoke me and was explaining
13 to me that they were -- they were here because there were
14 reports of -- that I was extremely agitated.
15    Q. Was anyone else in the room with you?
16    A. I was assigned a room by myself.
17    Q. Did this conversation with Mr. Johnson and the
18 two other individuals take place with the door open or
19 with the door closed?
20    A. The door was open.
21    Q. What was the tone of the conversation?
22    A. It was very civil, in the manner that we are
23 speaking here today.
24    Q. And what was the result of this conversation?

Page 35

1    A. They informed me that it was an order to give
2 me psychotropic medications. I informed Mr. Johnson, who
3 was actually the more civil of, you know, of the other
4 individuals, you know, because he was the one that was
5 really talking to me, and I was telling him, I was
6 telling him, "I don't need any medication. I just came
7 out of the isolation room. Is there some kind of
8 mistake. I just came out of there." I kept asking him.
9        He was like, "No, the doctor ordered you
10 to have an injection." I said, "This can't be so," so I
11 didn't know -- I said, "Maybe you have to call the doctor
12 back and see, you know, if this is some kind of error or
13 mistake because I was just -- I am" -- and he knew that I
14 was, he had woke me up out of the bed, so, you know, he
15 kind of figured that something was incorrect.
16        I believe he was assessing me to be
17 agitated, to see if I was agitated, and I don't believe
18 that he thought I was. And we spoke for -- for the most
19 part, the 20 minutes, and, you know, where, you know,
20 there was no yelling, there was no cursing, there was no,
21 you know, inappropriate behavior at that time.
22    Q. What happened next?
23    A. The male nurse who was there left, so he was
24 -- he was, you know, he was basically standing idly by as

Page 36

1 me and Mr. Johnson was talking, so I believed that he was
2 going to call the nurse -- I mean call the doctor, pardon
3 me. I believe he was going to call the doctor, you know,
4 to -- to see if, in fact, I did -- you know, if, you
5 know, if I still should be given any psychotropic
6 medications. And -- but about, like I said, throughout
7 the course of that, he was gone for like ten minutes, you
8 know, he left in the course of about ten minutes of me
9 and Mr. Johnson talking, he was gone ten minutes. When
10 he returned, he returned with five or six other people.
11    Q. Do you know who these five or six other people
12 were?
13    A. I understand that they were staff members of
14 the psychiatric center, the Delaware Psychiatric Center.
15    Q. Was Lanee Sagers one of those five or six
16 other people?
17    A. No.
18    Q. Was David Moffett one of those five or six
19 other people?
20    A. No.
21    Q. Was Robert Gray one of those five or six other
22 people?
23    A. No.
24    Q. After this group arrived, what happened next?

Page 37

1    A. They informed me that it was a standing order
2 to give me an injection of psychotropic medications, and
3 I informed them that I did not want to be given any
4 psychotropic medications, and I, you know, that if they
5 was going to take me to give me psychotropic medications
6 it would be against my will, but that's what happened
7 anyway.
8        They all laid hands on me, Mr. Johnson,
9 Mr. Brian Johnson, the male nurse, and three or four
10 other staff members, you know, took hold of me, and it
11 wasn't much force needed to be used, but it was force
12 because it was against my will, and I let them know that.
13 They took me down there and held me down.
14    Q. You said, "Took me down there."
15    A. To the isolation room.
16    Q. The isolation room?
17    A. Yes.
18    Q. How far is the isolation room from room 71
19 where you were housed?
20    A. Thirty feet, 40 feet.
21    Q. Did you walk under your own willpower?
22    A. It wasn't -- it was against my will.
23    Q. I will rephrase that.
24    A. I was walking. I was on my feet but I was

Page 38

1   being forcibly moved along against my will by the hands
2   of the individuals who had took -- who had grabbed hold
3   of me.
4       Q.   You were at least walking?  You were not dead
5   weight being dragged?
6       A.   No.  I was being pulled along.
7       Q.   What happened once you reached the isolation
8   room?
9       A.   They held me down, the male nurse injected me
10  with psychotropic mediations, and then he pulled my
11  pants down, things of that nature, and injected me with
12  psychotropic medications.
13          Immediately thereafter, I was taken back
14  to my room, and, I mean, if it was a situation where I
15  was extremely agitated, it would seem as though I would
16  have -- I wouldn't have been taken immediately back to
17  the room if I was extremely agitated, but that's what
18  happened.
19      Q.   Where were you injected?
20      A.   In my buttocks.
21      Q.   And that was, you said that your pants were
22  pulled down?
23      A.   Yes.
24      Q.   You said it was the male nurse who did the

Page 39

1   injection?
2       A.   Yes.
3       Q.   Was Brian Johnson in the room when this took
4   place?
5       A.   Yes.  He had hands on holding me down when the
6   male nurse committed this act against me.
7       Q.   Did you have to be carried back to room 71
8   after that?
9       A.   No.  They escorted me, though, with their
10  presence, no hands on, just presence.
11      Q.   What injuries did you suffer as a result of
12  this injection?
13      A.   Can I refer to the complaint?
14      Q.   Sure.
15      A.   I was bleeding as a result from the needle
16  breaking and bruising my skin.  My skin was bruised.  My
17  butt cheeks -- I was bruised on my buttocks.  I had
18  swollen wrists and ankles.  Pardon me.
19      Q.   May I just ask you: From what part of the
20  complaint are you reading?
21      A.   Pound four.
22      Q.   And is that at pound four P3?
23      A.   Yes.  Swollen wrists and ankles due to the
24  tight four point restraints, persisting and reoccurring

Page 40

1   migraine headaches, burst of amnesia, insomnia, swollen
2   tongue at the time, body tremors, ear ringing, audio and
3   video hallucinations, nerve and brain damage resulting
4   from brain cells being killed, loss of cognitive and
5   volitional functions that caused me to not be as
6   forthcoming with my hygiene, matters of hygiene.  My
7   social conduct was affected.  I say etiquette, history,
8   and culture issues were also affected as a result of me
9   not being in the same state of mind that I initially was
10  during the time when I was hallucinating and having
11  visual and audio hallucinations.
12      Q.   Now, when were you placed in four point
13  restraints as a result of this incident?
14      A.   I believe at the time I was taken to the
15  isolation room.
16      Q.   So, when you were taken to the isolation room,
17  you were placed in four point restraints?
18      A.   Maybe.  Maybe not.
19      Q.   You are not sure whether you were placed in
20  four point restraints?
21      A.   Absolutely not sure.  That was something that
22  I reflected upon the discovery information, and I believe
23  that I was four point restrained.  Like I said, I was
24  still -- I was still under -- I was still, you know,

Page 41

1   subjected to the effects of the psychotropic medications
2   that I had -- that had been -- that I had been subject to
3   earlier that day, so I could be misquoted on a point that
4   I was four point restrained.  I could be misquoting that,
5   and I admit that.
6       Q.   You talked about audio hallucinations.
7           Can you explain what an audio
8   hallucination is?
9       A.   Hearing things that I can't recognize where
10  the sound is actually coming from.
11      Q.   And a visual hallucination?
12      A.   Seeing things that I can't factually identify
13  as actually there.
14      Q.   How long did you --
15      A.   Or someone else can't factually identify as
16  there as well.  I am only experiencing that visual sight;
17  no one else is.
18      Q.   Can you give me an example of when you had one
19  of these visual hallucinations?
20      A.   I am going to reserve the right to answer that
21  question.
22      Q.   You said that you had numerous brain cells
23  that were killed; is that a fair statement of how you
24  just testified?

Page 42

1    A.  Yes.
2    Q.  How do you know you had brain cells that were
3  killed?
4    A.  Because of the effects that occurred to me
5  after I received the psychotropic drugs and the way that
6  they affected me.
7    Q.  Have you been seen by another doctor who has
8  informed you that you had loss of brain cells?
9    A.  No.
10    Q.  And you mentioned, I guess, your personal
11  hygiene was affected.
12        Can you explain a little bit more what
13  you mean by that?
14    A.  Basically, you know, I was like lethargic.
15  When it was time for me -- I knew the time to get up to
16  go to take care of hygiene, I felt as though, you know,
17  that wasn't an issue and matter that I needed to address
18  at that time and I knew that it was an effect -- that was
19  an effect that wasn't my normal, you know -- it wasn't
20  normal for me, and I only become that way after I
21  received those drugs, psychotropic drugs intravenously.
22    Q.  When I think of personal hygiene, I think of
23  things like brushing one's teeth, taking a shower,
24  combing hair, dressing.

Page 43

1    A.  All the above, yes.
2    Q.  So, that's your understanding of that as well?
3    A.  Correct.
4    Q.  Did you stop doing any of those things as a
5  result?
6    A.  Yes.
7    Q.  Which of those things did you stop doing?
8    A.  Well, I don't have it here.
9    Q.  Yes. That's why I started off by way of
10  example.
11    A.  But as far as bathing, showering, and, you
12  know, brushing teeth and stuff like that during the
13  course when everybody else, my peers, you know, would do
14  it, like, in the morning, you know, before we would take
15  vitals and stuff like that, I would just want to just lay
16  in the bed and just, you know, I didn't feel like, you
17  know, nothing else mattered. I just felt like
18  hopelessness and things of that nature. And I was
19  experiencing hallucinations and things.
20        It was just -- I was withdrawing and I
21  felt, you know -- I felt unlike myself. And as a result,
22  my hygiene -- my hygiene suffered.
23    Q.  Let me turn your attention to part five of the
24  second amended complaint. Do you want me to give you a

Page 44

1  moment to familiarize yourself again with that part?
2    A.  I wrote it. I am familiar.
3    Q.  I just meant to refresh your memory of what
4  you had written. That's all.
5    A.  Okay.
6    Q.  Now, the first sentence there, "At the
7  Delaware Psychiatric Center on or about June 14, 2004,
8  during the 8:00 p.m. snack break in the dining hall, I
9  was eating a bag of M&M chocolate candy"; is that timing
10  correct?
11    A.  About, yes. At or about 8:00.
12    Q.  8:00 in the evening on June 14?
13    A.  Yes.
14    Q.  Now, when we just talked about part four of
15  the complaint, you said that the incident with the --
16  being intercepted on the way to the laundry room took
17  place the morning after this incident?
18    A.  Yes.
19    Q.  Am I misunderstanding something, or I thought
20  part four mentioned that that took place the morning of
21  June 14th?
22    A.  In my interpretation, I said -- I said the
23  morning of the 14th, but I should have basically been
24  saying the morning of the 15th.

Page 45

1    Q.  Okay.
2    A.  The early a.m. hours. Sometimes I always get
3  them confused when I was coming up. I never was able to
4  differentiate between the morning and, you know, the
5  evening, and still sometimes even the evening, right now,
6  I am still -- I don't know -- what is the evening? Is it
7  4:00 or 6:00? You know, like that. So I was confused in
8  regards to my depiction of interpreting what the morning
9  was.
10    Q.  So, the laundry room incident, you meant
11  actually June 15th? I am not trying to put words in your
12  mouth.
13    A.  No. I was actually seen -- Mr. Johnson -- I
14  actually seen Mr. Johnson on the evening, 11 p.m., at or
15  about 11 p.m. on 6/14, 2004, but it carried on until the
16  morning of June 15th, 2004, after this incident depicted
17  in pound five of the amended complaint.
18    Q.  Now, my understanding was you testified that
19  Mr. Johnson came to your door the morning after this
20  other incident that we are about to get to.
21    A.  Yes.
22    Q.  And spoke with you for about 20 minutes.
23    A.  Yes.
24    Q.  Now, are you saying he also came and spoke

Page 46

1  with you at some time previous to that 20-minute
2  conversation?
3    A. No. No.
4    Q. But you are saying that did take place in the
5  morning?
6    A. I am saying that took place in the latter part
7  of June 14th, before -- before June 15th. 11 p.m., 12
8  p.m., that would be the morning, at 1 p.m., like that. I
9  seen him at around 11 or something, at or about 11 p.m.
10  of June 14th. When I say "the morning," I am meaning
11  that to mean after -- at 12:00 would be June 15th.
12    Q. Yes. So, when you wrote, in paragraph four,
13  "On or about June 14, 2004, at about 10:45 a.m."
14    A. Yes. Did I say a.m.?
15    Q. "Staff member Oates came in"; is the "a.m."
16  incorrect?
17    A. Yes, it is.
18    Q. By that, did you mean p.m.?
19    A. Yes. That's a -- that's a typo, as they would
20  say. That is an error.
21    Q. Thank you for clearing that up.
22    A. Yes.
23    Q. Let's go back to the -- what you have here as
24  eight p.m. June 14, 2004, from the dining hall.

Page 47

1      Where is the dining hall?
2    A. The dining hall is in the corridor outside of
3  the north wing on the Mitchell building. It's in the
4  corridor.
5    Q. What's the basic setup of the room?
6    A. Pardon me?
7    Q. How is the room set up?
8    A. Chairs and tables, juice machine, coffee
9  machine.
10    Q. Can you give me any approximate dimensions?
11  And I am not trying to hold you to specific numbers, but
12  compared to this room, and I am not going to -- I know we
13  don't have the dimensions of this room -- bigger,
14  smaller, or about the same size as the room we are in
15  now?
16    A. Smaller. You didn't depict how big this room
17  is.
18    Q. Right. And I am not -- Mr. Lewis, this is not
19  meant to be a trick question. I am just trying to get a
20  visual.
21    A. Fifteen by -- 15 by 15 feet.
22    Q. And, again, I promise I am not trying to hold
23  you to those dimensions; okay?
24      Approximately how many tables in the

Page 48

1  room?
2    A. Seven, maybe. More.
3    Q. With tables around each of the -- with chairs
4  around each of the tables?
5    A. Yes.
6    Q. Is it fair to say there is not a whole lot of
7  open space in the room?
8    A. It's pretty spacious.
9    Q. Even though --
10    A. Not a whole lot of open space. It's designed
11  for a dining hall.
12    Q. You stated that you were eating a bag of M&M
13  chocolate candy?
14    A. Yes.
15    Q. And you say, "I gave a fellow inmate patient,
16  named James Smith, one dollar to purchase for me."
17      Who is James Smith?
18    A. He was a fellow inmate patient who was there
19  with me during the course of my stay at Delaware
20  Psychiatric Center.
21    Q. How well did you know him?
22    A. I was acquainted -- I was just an associate --
23  associated with him from being -- from -- during my stay,
24  from my stay at Delaware Psychiatric Center.

Page 49

1    Q. Just somebody you met while you were at DPC?
2    A. Correct.
3    Q. You didn't know him from the outside?
4    A. No.
5    Q. What does Mr. Smith look like?
6    A. Brown-skinned, African-American male, maybe
7  5'7", 5'8". He was young, so he was probably still
8  growing, about 140 pounds, slim guy. I would recognize
9  him if I seen him.
10    Q. Why did you give him a dollar to purchase M&Ms
11  for you?
12    A. I was unconstitutionally placed on vending
13  machine restriction, and I wanted to eat some M&Ms. I
14  wanted snacks like everybody else. I didn't feel as
15  though it was fair for me to be, you know, denied the
16  privilege of snacks and watch everyone else eat snacks
17  and be denied snacks. So --
18    Q. At the DPC, you had access to their vending
19  machines within the building?
20    A. Yes.
21    Q. And these vending machines sold candy and
22  snacks?
23    A. Yes.
24    Q. And you were allowed to have money on your

Page 50

1   person under normal circumstances?
2      A.  Yes.
3      Q.  Is that something that's different from being
4   in prison?
5      A.  Yes.
6      Q.  Do you know why you were placed on vending
7   machine restriction?
8      A.  Without reflecting on the records -- I believe
9   it was an incident with Mr. Floyd attacked me because he
10  wanted a chef salad like mines.  He, at the time, only
11  had a regular salad, a tossed salad, and the chef salad
12  that was prescribed for me was -- was -- it was his envy,
13  and throughout the course of him trying to be prescribed
14  a chef salad, you know, he was -- he was angry, upset, or
15  whatever it may have been, but, yet, those facts were
16  never, you know, you know, examined by Dr. Foster or
17  anyone else, you know what I mean, in regards to, you
18  know, why I was placed on vending machine restriction.
19  He lunged at me and attacked at me because he didn't have
20  a salad.  That's the only thing I can interpret.
21          But to specifically identify exactly
22  why, he would have to tell you.  This is -- I am telling
23  you what I think, you know, but not what I can say
24  factually according to what he may say.

Page 51

1      Q.  Help me out.  What is a chef's salad?
2      A.  A chef salad contains chunks of cheese, chunks
3   of turkey, chunks of tomatoes.  It had lettuce.  It had
4   boiled egg, sliced boiled egg in it.
5      Q.  And the other kind of salad you mentioned was
6   a tossed salad?
7      A.  Which was basically just lettuce, unions,
8   cucumbers, and tomatoes.
9      Q.  And were these served to you in the dining
10  hall?
11     A.  Yes, during meal times and snack times if it
12  was prescribed, which mine was prescribed because I have
13  a certain diet, that I don't -- a lot of foods, I don't
14  eat, you know, so the dietitian prescribed me the chef
15  salad because I don't eat a lot of different foods like
16  everybody else, pork and yeast and stuff of that nature,
17  things of that nature, according to my religious
18  affiliation.  So she -- you know, she -- plus I had -- I
19  got irritable bowels, so it was -- it was all -- and
20  hypertension as well, I have.
21          So, the chef salad was, you know, it
22  helped me.  It helped me fulfill my religious obligations
23  as well as my physical and psychological because once my
24  -- I have recognized my blood pressure goes up, you know,

Page 52

1   I tend to be, you know, a little bit more mental in
2   regards to my psychological conditions.
3      Q.  After you had been placed on vending machine
4   restriction, what did that prohibit you from doing?
5      A.  From obtaining personally, from going into the
6   area where the vending machines were located to purchase
7   vending -- to purchase the products that are available.
8      Q.  So, but you believed that if you gave somebody
9   else money, that you would be -- it was still okay for
10  you to have access to the vending machines that way?
11     A.  Yes.
12     Q.  That was your understanding?
13     A.  Yes.  I don't believe it was, you know,
14  significant enough to be assaulted and things of that
15  nature for being in possession of a product purchased
16  from the vending machine.
17     Q.  So, what happened after Mr. Smith got these
18  M&Ms for you?
19     A.  We sat at the table and we were eating our
20  snacks.
21     Q.  While you were sitting at a table eating the
22  M&Ms, what happened next?
23     A.  Helen Hanlon recognized that I was eating some
24  M&Ms.  She called to me and got my attention and asked me

Page 53

1   to throw the M&Ms in the trash.  And I said --
2      Q.  What happened next?
3      A.  I said, "No.  I just purchased these.  I want
4   them.  I love M&Ms.  I am not going to throw these away.
5   I just used my dollar to purchase these."
6      Q.  And what happened after you did not throw them
7   away?
8      A.  She became irate and very angry, got on the
9   walkie-talkie, and called for emergency assistance.  In
10  came Mr. Moffett, Mr. Sagers, Mr. Evans, and Mr. Gray,
11  bewildered as to what the emergency was because the scene
12  was so serene upon them entering into the dining hall.
13  They was like, What's going on?  What's going on?  They
14  was really amped up like, you know, What's happened?
15  This is supposed to be an emergency.  But it wasn't no
16  emergency.
17     Q.  Would you describe the tone of your
18  conversation with Ms. Hanlon?
19     A.  In the same manner that we are speaking here
20  today.  She asked me to throw away the M&Ms, and I said
21  "No.  I want to eat them.  I love M&Ms.  I want them.  I
22  just paid for them."
23     Q.  So, it was not emotional?  No cursing?
24     A.  Not at all.  I don't -- I very seldom use

Page 54

1    profanity.
2        Q.  And is that -- how long have you seldom used
3    profanity?
4        A.  All my life.  I don't -- I don't use profanity
5    like that, specifically for no reason whatsoever.
6        Q.  After these individuals came into the dining
7    hall, what happened next?
8        A.  They -- they became -- they was bewildered and
9    they was asking, you know, Helen Hanlon, the nurse, you
10   know, What's the problem? What's the issue? You know,
11   they were looking around as if to say, You called us here
12   for nothing.
13           And she identified the situation by
14   telling them, in an angry tone, "Mr. Lewis is on vending
15   machine restriction.  He is not allowed to have them
16   M&Ms." You know? And they like -- then she was like -- I
17   hold up.  Yeah, "He is not allowed to have M&Ms." Then
18   she was like, Get them from him.  As a matter of fact,
19   she said, "Get them." That was her order to them.
20       Q.  After Ms. Hanlon said that, then what
21   happened?
22       A.  They surrounded me.  Mr. Gray -- Mr. Moffett
23   was to my left.  Mr. Gray walked his way around me
24   towards the back of me.  Mr. Moffett was on the left of

Page 55

1    me.  Mr. Evans was on the right of me.  Mr. Sagers was in
2    front of me.  Mr. Gray abruptly grabbed me around my
3    throat with his arms and began choking me.  So I was,
4    like, spread out, because Mr. Evans had grabbed my right
5    arm and Mr. Moffett had grabbed my left arm.  And at that
6    point, I was, you know -- I kind of like stood up in the
7    process of Mr. Gray because he was, like, he was tugging
8    me.  Oh, I can't breathe.  I can't breathe.
9        Q.  You were seated when this started?
10       A.  Yes.  Because he, like, grabbed me.  You know,
11   he grabbed me, and during the course of me getting up and
12   telling him, I can't breathe, I can't breathe, he was
13   tugging and he was choking me because I had just placed a
14   few M&Ms in my mouth.  I was chewing.  He had them, like,
15   in my throat and I was trying to swallow them.  I didn't
16   know he was going to grab me.  He was, like, behind me.
17   I didn't know he was going to grab me or nothing.
18           So, as I was like -- I was almost lifted
19   up to a degree because I felt as though that that would
20   alleviate the pressure for him choking me, and I was, you
21   know, lifted up with one of my arms.  I was basically,
22   you know, I was at their mercy.  And, at that time, by
23   the time I was, like, fully standing up, that's when
24   Sagers grabbed my legs, he was like, like he was tackling

Page 56

1    me -- actually, that's what occurred -- but I felt --
2    when I fell back, I think I fell back more so because
3    Mr. Gray was -- he was like -- he was like -- I don't
4    know if he was, like, tugging at my neck and he was
5    choking me.  And I was telling them I couldn't breathe.
6    I was mumbling, "I can't breathe.  I can't breathe.
7    Stop.  Stop."
8            So, in the process of my falling back, I
9    was, like, on Mr. Gray, and that's when they start
10   hitting me and punching me and kicking me with their fist
11   and hands.
12       Q.  Who punched you?
13       A.  Mr. Moffett, Mr. Sagers, and Mr. Evans is who
14   I identified as being Mr. Johnson, I believe -- I believe
15   -- I didn't know why I thought his name was Mr. Johnson,
16   but it came to me that that's -- it was Mr. Evans, a
17   short guy, about 5'5", brown-skinned, bald-headed.
18       Q.  So Mr. Johnson was not there?
19       A.  Mr. Brian Johnson -- nobody named Mr. Johnson
20   was there.  The person identified as John Doe, a/k/a,
21   Mr. Johnson, I am now identifying as Mr. Evans, 5'5",
22   brown-skinned, bald head, African-American male, and I
23   would recognize him if I seen him.
24       Q.  And who do you say kicked you?

Page 57

1        A.  Mr. Moffett, Mr. Evans, and Sagers was well on
2    the way on me.  He was basically almost on top of me
3    because he was, like, on my knees and on my legs and he
4    was punching upon my chest.  And after about a few
5    minutes, I kind of let the M&Ms go and they stopped.
6    They stopped.
7            I remembered thinking, "Damn, it's like
8    they robbed me for my M&Ms." I really wanted my M&Ms.  I
9    remember thinking that after the incident happened.  And
10   I remember thinking it was like they robbed me from my
11   M&Ms, and I was really upset, at the time, more so than
12   anything else because that's why I, you know, I was
13   holding on.  I was holding on to them.  I said, "Damn, I
14   better let these M&Ms go because they are putting a
15   whipping on me."
16       Q.  So, you said Mr. Sagers tackled you from down
17   below, was then on top of you, and punched you in your
18   chest area?
19       A.  I was facing upward because Mr. Gray was
20   behind me.  I don't know how Mr. Gray was.  I guess he
21   was falling towards me and I was laying on top of him.
22   Mr. Evans was on my right.  Mr. -- Mr. Moffett was on my
23   left.  And Sagers was basically in front of me.  And they
24   all commenced to punch and kick me from those positions.

Jimmie Lewis

16 (Pages 58 to 61)

Page 58

1    Q. Where did Mr. Moffett hit you?
2    A. Kicked me upon my chest, upon my face, and
3 punched me upon my -- in my head, things of that nature.
4    Q. How many times?
5    A. I am looking at him -- I am looking at him
6 because I couldn't do much because one of them had my
7 hands, one was choking me on my neck, the other one had
8 my other hand, so I was just looking at them, you know,
9 just had to basically view everything from that position.
10    Q. Were they punching you with both of their
11 hands?
12    A. No. One hand each for Mr. Johnson and
13 Mr. Evans, but Mr. Sagers was able to use both of his
14 hands and kick me, I believe kicked me in my groin as
15 well. Everybody witnessed that. They was rushing
16 everybody else, Mr. Smith, Mr. Ronald Stevens, Mr. James
17 Smith, a few other individuals who were present at the
18 time of the sneak, they all viewed that. There was a
19 nurse's assistant present, too.
20    Q. So Mr. Moffett was able to hold one of your
21 arms with his arm and punch you with the other; is
22 that --
23    A. Correct.
24    Q. And then you are saying Mr. Evans --

Page 59

1    A. Yes.
2    Q. -- was doing the same on the other side?
3    A. Yes.
4    Q. And Mr. Sagers was on your legs?
5    A. For the most part, he was, like, crouched down
6 by my legs where he had already had tackled me and, you
7 know, so his body weight was, more or less, holding my
8 legs clamped down to the point where he was able to, you
9 know, lift up off me and he was waling with his hands,
10 with both hands.
11    Q. And during this time, Mr. Gray, you say, had
12 one of his arms around your neck?
13    A. He had a choke hold on me and he was
14 clenching, he kept clenching on my neck at the time, so
15 that's what I was focused on more so than anything, was
16 trying to breathe, you know, as far as, you know, what
17 was immediate to him, and you know, but, yeah, they was
18 all -- they all went to work on me.
19    Q. But Mr. Gray, himself, was on the floor and
20 you were on top of him; is that --
21    A. Yes.
22    Q. And then on top of you was Mr. Sagers?
23    A. Yes, on my legs.
24    Q. Just on your legs?

Page 60

1    A. Yes.
2    Q. So, Mr. Sagers' weight would not have been on
3 top of you as well as Mr. Gray?
4    A. I would assume so. Maybe.
5    Q. You think Mr. Sagers was -- his weight was on
6 both of you?
7    A. I couldn't -- I couldn't tell you exactly if
8 Mr. Gray would say that Mr. Sagers was on -- weight was
9 on him, but his weight was on me.
10    Q. And how long do you say that you were held
11 down, punched, and kicked?
12    A. Close to two minutes. It was -- it was an
13 eternity, actually. It was quite a long time because I
14 couldn't -- I couldn't do nothing back. I couldn't
15 defend myself. I was open to all the blows and kicks and
16 stuff. I couldn't do nothing. So it seemed like
17 eternity.
18    Q. What happened at the end of these two minutes?
19    A. I released the M&Ms, and they, like, almost
20 simultaneously stopped punching and kicking me. It was,
21 you know, they was -- when Miss Hanlon told them to get
22 the M&Ms, that was their missions and their duty. That's
23 what they was after, they was after them M&Ms, and I let
24 them go. When I let them go, they dropped to the floor,

Page 61

1 what was remaining in the bag, and all over the floor
2 like marbles and things like that.
3         And, so, Mr. Gray was -- maneuvered his
4 body, I don't know how -- I don't know if I was pulled or
5 whatever, but he was kind of like on top of me now. Now
6 he took me around and he was, like, on top of me and had
7 me up, and they was like, "Ease up. Ease up." They kept
8 telling him, "Ease up." They was like, "Are you all
9 right? Are you all right"? I am like, "I can't breathe.
10 I can't breathe." And he was easing up to a point that
11 they was talking to me at that point.
12    Q. Who was saying, "Ease up"?
13    A. I couldn't tell you. At that point, my face
14 was facing towards the floor now. It was like the
15 maneuver had changed.
16    Q. Someone other than Mr. Gray?
17    A. Mr. Gray was saying -- was saying something
18 into my ear because he was right close to me, he was
19 right up on me and stuff like that, but yes, it was
20 someone other than Mr. Gray, to answer your question.
21    Q. And let me back up. What kind of M&Ms were
22 these?
23    A. M&M candy, chocolate M&Ms.
24    Q. Peanuts, plain, peanut butter?

Page 62

1    A. It didn't matter to me. I love them both.
2    They were M&M candies.
3        Q. Do you remember what kind they were?
4        A. Specifically?
5        Q. Yes.
6        A. I don't know what kind they were. I know they
7    were M&M candies and I was -- and they were mine and I
8    purchased them with the dollar that I gave Mr. James
9    Smith.
10       Q. After you were up on your feet, what happened
11   next?
12       A. That was about five minutes later because they
13   kept me there and they had to wait until everybody else
14   got off the unit and went on to the Mil-U (phonetic), so
15   we stayed there for a while with Mr. -- Mr. Gray on my
16   back and the other nurse's assistant standing around,
17   Miss Helen Hanlon and them, they was just standing there.
18       Q. So Mr. Gray stayed on your back for
19   approximately five minutes?
20       A. I don't know if it was approximately, but it
21   was -- it was at or about that amount of time. And I
22   stayed there on the floor.
23       Q. And he had his weight on you for that period
24   of time?

Page 63

1    A. More so on my back at that time to hold me
2    down.
3        Q. And your understanding was, during that period
4    of time, staff cleared the room of other patients?
5        A. Well, I can see them because -- all right, the
6    way I was, right, I was close to the door and I can see
7    them -- I could see their feet leaving out. I could see
8    people leaving out. I could hear them talking but --
9    plus by me being in a position that I was in, I could
10   almost see people, you know, but I wasn't paying
11   attention to them. I was basically getting blowed in the
12   face but I could still see because my eyes were open.
13       Q. So, now, after this period of time and the
14   room having cleared, what happens next?
15       A. They help me to my feet and they escorted me
16   to the isolation room against my will. I am like, "I
17   don't want to go in the isolation room." They took me
18   anyway.
19       Q. Were you carried or did you walk?
20       A. I was -- I was pulled along. I was on my
21   feet.
22       Q. You were on your feet?
23       A. I was pulled along.
24       Q. Did you --

Page 64

1        A. Forcibly.
2        Q. Okay. Were you being dragged?
3        A. No. I was being directed with -- with -- by
4    hands and things of that nature that was directing me,
5    you know. I wasn't being dragged. I wasn't, you know
6    what I mean, I wasn't like that. I wasn't dead weight or
7    nothing. I wasn't being carried on the stretcher or
8    nothing, but they were pulling me like, you know, you are
9    coming with us regardless if you want to or not, in that
10   manner.
11       Q. During this whole incident, did you say
12   anything?
13       A. I said, "Why are you all -- why are you all
14   doing this to me? Why are you all doing this to me"?
15   Things of that nature. "Why are you all doing this to
16   me"?
17       Q. Were you swearing at all during this?
18       A. No.
19       Q. So, despite being punched and kicked, you did
20   not swear even during this incident?
21       A. The most thing I was concerned about during
22   the course of the time when I was being actually
23   physically assaulted was I couldn't breathe. That was my
24   primary focus at the point as far as, you know, me being

Page 65

1    able to -- if anything I was going to say, it was going
2    to be regarding me trying to breathe. That was first and
3    foremost, me breathing, my being able to breathe.
4        Q. Okay.
5        A. That's what I was saying, "I can't breathe. I
6    can't breathe. Stop. Stop. I can't breathe." I was in
7    fear for my life. I thought I was going to die because I
8    couldn't breathe.
9        Q. How far is the isolation room from the dining
10   hall?
11       A. Again, about 30, 40 feet, about the same
12   distance from room 71 to isolation is about the same
13   distance from the isolation room to the dining hall, give
14   or take a few more feet.
15       Q. Approximately how long did it take to walk
16   from the dining hall to the isolation room?
17       A. Less than a minute.
18       Q. Once you got into isolation room, what
19   happened?
20       A. I was held down. I believe I was four-point
21   -- I was four-point restrained, four-point restrained.
22   Let me reflect on this complaint to see if it -- that's
23   what I said. Yes, I was four-point restrained.
24       Q. Who placed you in the four-point restraints?

Page 66

1      A.  The staff.
2      Q.  Do you know which staff members?
3      A.  Sagers, Moffett, Gray, Helen Hanlon, they all
4   had part in -- and Dr. Foster because she had to be
5   notified.  So, you know, I am going to say Dr. Foster as
6   well.
7      Q.  Was Dr. Foster there?
8      A.  Well, personally, I didn't see her at that
9   time.
10     Q.  Just so we understand what four-point
11  restraints are:  Can you describe the isolation room for
12  me?
13     A.  It's a room, maybe six by eight feet, with a
14  bunk in the middle of the room and a little window for
15  observation and it has a corridor outside of it with
16  adjoining bathroom -- where the bathroom is inside that
17  corridor, toilet, sink, things of that nature.
18     Q.  So, then, you were placed in four-point
19  restraints, is that on the bunk?
20     A.  That's on the bunk with straps, Velcro straps,
21  things of that nature.
22     Q.  And where are those four restraints physically
23  placed on your body?
24     A.  On my -- my ankles, my left ankle, right

Page 67

1   ankle, right wrist, left wrist.
2      Q.  And how long were you placed in four-point
3   restraints on this evening?
4      A.  At least two hours, to my recollection,
5   two-and-a-half hours, maybe.  I believe it was about two
6   hours, two-and-a-half hours.
7      Q.  Was this the first time you had ever been
8   placed in four-point restraints?
9      A.  No, not at the Delaware Psychiatric Center,
10  but throughout the course of my life, me being placed in
11  four-point restraints, it was the first time it ever
12  occurred to me was at the Delaware Psychiatric Center.
13  That's the first time that ever happened to me where
14  somebody placed me in four-point restraints.  It never
15  happened to me before in my life until I got to the
16  Delaware Psychiatric Center, if that's what you mean.
17     Q.  That's fair.
18         So, at the Delaware Psychiatric Center,
19  prior to this -- the M&M incident, you had been placed in
20  four-point restraints?
21     A.  Never.
22     Q.  Never?
23     A.  Never before.
24     Q.  So that day was the first day, both in your

Page 68

1   life and at DPC, that you were placed in four-point
2   restraints?
3      A.  I am not saying that either.  What I am saying
4   is I was placed in four-point restraints prior to that
5   day at the Delaware Psychiatric but not prior in my life
6   to anyone else prior to coming to the Delaware
7   Psychiatric Center.
8      Q.  Sometime earlier that same day?
9      A.  No.  At an earlier date, earlier dates.
10     Q.  Maybe it's my own confusion.
11     A.  Earlier dates at the Delaware Psychiatric
12  Center.
13     Q.  So, sometime between the date you were first
14  admitted at DPC and the date we are talking about with
15  the M&M incident --
16     A.  6/14, 2004, at or about 8:00 to 11:00 was not
17  my first time being placed in four-point restraints while
18  I was at the Delaware Psychiatric Center.
19     Q.  Were you injected with any medications when
20  you were placed in four-point restraints?
21     A.  Cocktails of psychotropic medications,
22  psychotropic drugs for reasons unbeknownst me.  I had no
23  reasons -- there was no reason -- I didn't need no
24  psychotropic drugs.  I wasn't psychotic.  I wasn't, you

Page 69

1   know -- I wasn't homicidal or suicidal, so there was no
2   reason for me to be injected with psychotropic drugs, in
3   my opinion.
4      Q.  So, how were the -- how was this medication
5   administered to you?
6      A.  Through a hyperdermic needle in my buttocks.
7      Q.  Did that take place before or after you were
8   placed in the four-point restraints?
9      A.  It was like -- I was in the four-point
10  restraint first a while, like a little while, and then
11  they came in afterwards.  I don't know if it was a half
12  hour later.  I believe about a half hour later.  Then
13  they came and gave me the needle.
14     Q.  Did you have to be taken out of the four-point
15  restraints to have the needle administered to you?
16     A.  No.  It was given to me in my arm, I believe,
17  maybe in my arm.  Maybe in my buttock.  I believe it was
18  -- let me refer to the complaint.  I want to be specific.
19  I am talking too fast here.  It says my buttocks.  I
20  believe that was the primary area that they used to
21  inject me with the psychotropic medications.
22     Q.  Now, when you are in four-point restraints,
23  that's face up; is that correct?
24     A.  Yes.

Page 70

1    Q.  So, you'd be laying on your back, your
2    buttocks; is that correct?
3         A.  Yes.
4         Q.  When you are in four-point restraints?
5         A.  Mm-hmm.
6         Q.  How, then, were you injected in your buttocks
7    when you were in four-point restraints?
8         A.  With a hyperdermic needle through the side of
9    the -- through the flesh on the inside of my buttocks,
10   it's still obtainable.
11        Q.  The side?
12        A.  I guess, yes.
13        Q.  Were you --
14        A.  The fleshy area of my buttocks, I should say.
15        Q.  Were you clothed or were you naked?
16        A.  They pulled my pants down every time.  Every
17   time, they would pull my pants down before I was
18   injected, rub me with some kind of fluid on a piece of
19   cotton or something, and inject me, inject me with the
20   needle, stick me.
21        Q.  So you wore clothes, then, during the time you
22   were in four-point restraints?
23        A.  Yes, I would be.  They would take my shoes.
24   They would take my watch.  They would take my money.

Page 71

1    That's -- that's what they would take.  They would take
2    those things off of me and have them in another area and
3    I would be able to get them once I came out of isolation.
4         Q.  Who injected you on this occasion with the
5    medication?
6         A.  That's something I believe is forthcoming as
7    far as the discovery.  Specifically -- discovery -- it's
8    -- it's in the discovery, it's in the doctor's notes, and
9    I don't have them with me at this point, but with further
10   response, let me see if I specifically identified who I
11   believe was the individual.  Helen Hanlon, I believe, is
12   the individual, but I want to see specifically if that's
13   what I put down.  I didn't identify Helen Hanlon, but I
14   believe that Helen Hanlon is the person who was
15   identified on the discovery as being the nurse who
16   injected me, actually injected me with the medications,
17   per Dr. Foster's order.
18        Q.  At any time while you were at the DPC, did
19   Lance Sagers ever inject you with medications?
20        A.  Held me down, but, to my knowledge, inject me
21   personally, no.
22        Q.  David Moffett, did he ever, at any time,
23   inject you with medication?
24        A.  He held me down, but personally him injecting

Page 72

1    me with a hyperdermic needle, no.
2         Q.  Robert Gray, did he ever inject you with
3    medications?
4         A.  He held me down, but actually injected me with
5    hypertrophic medications, no.
6         Q.  And, finally, Brian Johnson, did he ever
7    inject you with any medications?
8         A.  Held me down, but actually inject me, no.
9         Q.  Do you understand what their basic job
10   responsibilities of Lance Sagers, David Moffett, and
11   Robert Gray are?
12        A.  No.
13        Q.  Do you know what their job titles were?
14        A.  Yes.
15        Q.  And what was your understanding of their job
16   titles?
17        A.  I just told you, I don't understand -- I don't
18   know what their job titles actually are.
19        Q.  That's fine.
20        A.  Yeah.
21        Q.  You don't believe they were doctors; correct?
22        A.  No.
23        Q.  And you don't believe they were nurses;
24   correct?

Page 73

1         A.  Yeah.  I do.
2         Q.  You believe they were nurses?
3         A.  Yes.
4         Q.  You believe that Lance Sagers is a nurse?
5         A.  Yes.
6         Q.  You believe that David Moffett is a nurse?
7         A.  Yes.
8         Q.  You believe that Robert Gray is a nurse?
9         A.  Yes.  They all took my vitals.  Every last one
10   of those individuals took my vitals during the course of
11   my stay at the Delaware Psychiatric Center except for
12   Mr. Johnson.  Mr. Brian Johnson was the only one who
13   didn't take vitals from me.
14        Q.  Do you believe Mr. Johnson was a nurse?
15        A.  No.
16        Q.  Were you examined by a physician at any time
17   while you were in isolation?
18        A.  No.
19        Q.  Any time after being released from isolation,
20   were you examined by a physician?
21        A.  After complaints, after grievances, after
22   duration of time have elapsed after me -- you have to be
23   more specific.  I can't -- I can't answer that question
24   without you being more specific.

Jimmie Lewis

20 (Pages 74 to 77)

Page 74

1    Q. Let me ask this: While you were in isolation,
2    did any medical staff ever come in to observe how you
3    were doing?
4    A. During the course of my being in isolation and
5    under the influence of the psychotropic medications, a
6    lot of the times is foggy to me. Upon reviewing the
7    discovery, the doctor's notes, I seen that, you know,
8    there were shifts, but to specifically be able to say
9    that I can identify those individuals, you know what I
10   mean, and to point them ont as individuals who came to
11   check on me during the course of my being confined in the
12   isolation room, I wouldn't do that.
13   Q. Without trying to ask you to identify what
14   medical staff member looked in on you during the time you
15   were in four-point restraints, do you believe that any
16   staff, any medical person came in to observe your
17   condition while you were in four-point restraints?
18   A. I reserve the right on that question.
19   Q. While you were in four-point restraints, were
20   you able to speak?
21   A. At times, yes, and at times, no. At times, my
22   tongue wouldn't move and stuff like that. I couldn't
23   control my tongue. I couldn't get words out, I don't
24   believe. I couldn't speak because I know I remember

Page 75

1    thinking I had to use the bathroom and I tried to yell
2    out for somebody to come help me, but the words wouldn't
3    come out of my mouth.
4    Q. After you were -- do you know who took you out
5    of four-point restraints?
6    A. Specifically being able to identify somebody
7    without the assistance of progress notes or things of
8    that nature, I couldn't -- I wouldn't be able to
9    specifically identify.
10   Q. There, obviously, came a point in time when
11   you were released from four-point restraints?
12   A. Correct.
13   Q. After you were taken out of the four-point
14   restraints, did you remain in the isolation room or did
15   you go somewhere else?
16   A. I am going to reserve the right to answer that
17   question.
18   Q. How often would you see any staff member of
19   the Delaware Psychiatric Center in a given day?
20   A. Every 15 minutes according to my recollection.
21   Q. If you saw a staff member, were you allowed to
22   speak to a staff member?
23   A. Yes. I -- I imagine so, yes.
24   Q. And if you had -- if you have some kind of

Page 76

1    ailment, if you have a problem, you know, something is
2    hurting, are you allowed to tell the staff member, I am
3    hurting?
4    A. I imagine so, yes.
5    Q. Did you ever complain to staff members about
6    various ailments you have?
7    A. Yes.
8    Q. Did you ever complain about having
9    indigestion?
10   A. Yes.
11   Q. So, I mean, that's just a basic kind of
12   physical ailment; you agree with me on that?
13   A. Yes.
14   Q. And were you given Milk of Magnesia to help
15   you with that?
16   A. Yes.
17   Q. Now, as a result of the injuries that you say
18   you suffered from the M&M incident, did you tell any
19   members that you were in pain?
20   A. Yes.
21   Q. Who did you tell that you were in pain?
22   A. I reserve the right to answer that question.
23   Q. How many people did you tell that you were in
24   pain?

Page 77

1    A. A few. I even filed grievances, as a matter
2    of fact. I filed a grievance in accordance to that
3    situation. So the team, as they are called, you know,
4    they collaborate together, all of them very well knew
5    that I, you know, received injuries or claimed I received
6    injuries from this situation that occurred.
7    Q. That's your treatment team?
8    A. That's what they call themselves, but I didn't
9    feel like they were mine.
10   Q. But that was the title, the treatment team?
11   A. Yes.
12   Q. Do you know who was on the treatment team?
13   A. The whole staff. They all consider themselves
14   a team.
15   Q. Did you ever sit down with members of the
16   treatment team?
17   A. Once.
18   Q. Once during the entire time you were at PC?
19   A. Maybe twice.
20   Q. What injuries do you say that you have
21   suffered as a result of the allegations that you were
22   punched and kicked during the M&M incident?
23   A. Bleeding as a result from the knee breaking
24   and bruising the skin and flesh of my buttocks, swollen

Page 78

1   wrists and ankles due to the tight four-point restraints,
2   swollen eye, swollen lip from being punched, a sore
3   throat for about a month due to being choked, you know, a
4   sore and bruised ribs, sore and bruised legs and arms for
5   about two months due to being kicked and punched and
6   things of that nature, persisting and reoccurring
7   migraine headaches, bouts of amnesia, I had insomnia, a
8   swollen tongue, body tremors, persistent ear ringing,
9   video and -- video and audio hallucinations, nerve and
10  brain damage that were the result of my brain cells being
11  killed, lost cognitive and volitional functions regarding
12  matters of hygiene, social conduct, etiquette, history,
13  and culture, things of that nature. Those are the basic
14  descriptions of my injuries.
15      Q.  And is it fair to say that you were willing to
16  read that from your complaint just now, part five, P3?
17      A.  Yes.  It's fair to say that.
18      Q.  I am going to ask you to turn your attention
19  now to part six of your complaint. I am going to refer
20  to this as the June 21st, 2004, isolation room incident.
21  I am going to give you a chance to look at this part of
22  the complaint.
23      A.  Yeah. I am familiar.
24      Q.  Where in this part of the complaint do you

Page 79

1   allege that Robert Gray was involved with this incident?
2       A.  In way of further response, I am going to
3   reserve the right to answer that question at this point.
4       Q.  Is it fair to say that Mr. Gray's name does
5   not appear in this part of the complaint?
6       A.  Correct. But I am not saying that he is not
7   -- he wasn't involved.
8       Q.  You are just not willing to tell me how he was
9   involved?
10      A.  At this point, I reserve the right to answer
11  that question.
12      Q.  Which means you are not willing to tell me, at
13  this time, how he was involved?
14      A.  Isn't that repetitive?
15      Q.  Mr. Lewis, please.
16      A.  I mean, I will be answering your questions but
17  you kind of like be asking me the same questions after I
18  answer your question again.
19      Q.  I am not trying to be difficult with you.
20          Mr. Sagers, how was Mr. Sagers involved
21  in the June 21st, 2004, incident you alleged?
22      A.  Pending discovery, things of that nature, I am
23  going to reserve the right to answer the question at this
24  point.

Page 80

1       Q.  Is it fair to say, at this point, that
2   Mr. Sagers' name is not listed in part six of your
3   complaint?
4       A.  Correct.
5       Q.  David Moffett, how was Mr. Moffett involved in
6   this June 21st, 2004, incident?
7       A.  I reserve the right to answer that question
8   pending discovery.
9       Q.  Is it fair to say that Mr. Moffett's name is
10  not listed in part six of this complaint?
11      A.  Correct.
12      Q.  Mr. Johnson, Mr. Brian Johnson, how is he
13  involved in the June 21st, 2004, incident?
14      A.  He is not.
15      Q.  Mr. Johnson was not involved in this incident?
16      A.  Not at all.  For the record, Mr. Johnson was
17  only involved in the incident that occurred on 6/14 at
18  about 11:00.
19      Q.  Are you willing to tell me anything about the
20  allegations in part six, the June 21st, 2006, incident?
21      A.  Yes.
22      Q.  What will you tell me happened?
23      A.  If you present a specific question to me, I
24  can answer it in that format, not in an in general format

Page 81

1   but in a specific format.
2       Q.  Do you know why you were in the isolation room
3   on June 21st, 2004?
4       A.  Per Dr. Foster's order.
5       Q.  Had you engaged in any behavior that placed
6   you in there?
7       A.  No.
8       Q.  So, it's just you are stating that there is an
9   order from Dr. Foster that you be placed in the isolation
10  room on June 21st, 2004?
11      A.  Correct.
12      Q.  For no reason whatsoever?
13      A.  I didn't say -- I didn't state that.
14      Q.  Why --
15      A.  I said there was an order to place me in
16  isolation by Dr. Foster. Dr. Foster has not been
17  forthcoming in via discovery requests, so, at this point,
18  I am going to have to reserve to answer those questions.
19  She hadn't been cooperative in regards to the discovery.
20  So, you know, these questions you are asking me regarding
21  a lot of the situations pertain to situations with
22  Dr. Foster's behavior and actions continue to be a
23  mystery to, you know, continue to be a mystery via
24  discovery.

Page 82

1    Q.  I am going to ask you to turn your attention
2    to part seven of your complaint.
3        A.  Yes.
4        Q.  I am going to refer to this as the June 22nd,
5    2004, isolation room incident.
6            How was Mr. Robert Gray involved in this
7    incident?
8        A.  I reserve the right to answer that question
9    pending further discovery.
10       Q.  Is it fair to say you do not have Mr. Gray's
11   name listed in part seven of your complaint at this time?
12       A.  Correct.
13       Q.  David Moffett, how is Mr. Moffett involved in
14   the June 22nd of 2004 incident?
15       A.  I reserve the right to answer that question
16   pending further discovery response.
17       Q.  Is it fair to say Mr. Moffett's name is not
18   listed in part seven of the complaint at this time?
19       A.  Correct.
20       Q.  And Mr. Lance Sagers, how is Mr. Sagers
21   involved in the June 22nd, 2004, incident?
22       A.  I reserve the right to answer that question,
23   you know, pending further discovery response.
24       Q.  Is it fair to say that, at this time,

Page 83

1    Mr. Sagers is not listed, his name does not appear in
2    part seven of your complaint?
3        A.  Correct.
4        Q.  And I am not trying to be repetitive, but
5    Mr. Johnson, you previously stated he was not involved in
6    any other --
7        A.  Any other incident.
8        Q.  So he is not involved in the June 22nd, 2004?
9        A.  Not at all.
10       Q.  We are getting close to the end. Part eight,
11   I am going to refer to this as the June 24, 2004,
12   incident.
13       A.  Yes.
14       Q.  Mr. Robert Gray, how was he involved in this
15   incident?
16       A.  I reserve the right to answer that question at
17   this point pending further discovery response.
18       Q.  And is it fair to say, as the claim is written
19   at this time, that Mr. Gray's name not mentioned in part
20   eight of the complaint?
21       A.  Correct.
22       Q.  Mr. David Moffett, how is Mr. Moffett involved
23   in the June 24, 2004, incident?
24       A.  I reserve the right to answer the -- to answer

Page 84

1    that question pending further discovery pretrial
2    investigation response and things of that nature.
3        Q.  Is it fair to say that Mr. Moffett's name is
4    not listed in part eight of the complaint at this time?
5        A.  Corrects.
6        Q.  Mr. Sagers, Lance Sagers, how is he involved
7    in the June 24, 2004, incident?
8        A.  I reserve the right to answer that question at
9    this point pending further discovery response.
10       Q.  And is it fair to say that Mr. Sagers' name is
11   not listed in the part eight of your complaint at this
12   time?
13       A.  Yes.
14       Q.  And, again, that's being dually repetitive,
15   but you are not alleging that Mr. Johnson is involved in
16   the June 24th, 2004, incident; correct?
17       A.  Pardon me?
18       Q.  You are not alleging that Mr. Johnson is
19   involved?
20       A.  Not at all. Actually, I would like to make a
21   statement about Mr. Johnson. If anyone acted any way
22   civil towards me, it was him. I think he was reluctant
23   in doing what he done, but he done it anyway. And I
24   think that, you know, if -- I don't understand why he

Page 85

1    still laid hands on me still against my will, but that's
2    what happened. But he talked to me for 20 minutes and he
3    understood. He was the only one that understood that,
4    you know, maybe this guy is not, you know, extremely
5    agitated or agitated at all.
6        Q.  Have you ever been involved in a fight with
7    another inmate or patient at DPC?
8        A.  No. I reserve the right to answer that
9    question. I am -- I am going to check that question. I
10   reserve the right to answer that question is what I am
11   going to say.
12       Q.  Have you ever been involved in a fight with an
13   inmate at Gander Hill?
14       A.  I reserve the right to answer that question.
15       Q.  And while you have been here at the Delaware
16   Correctional Center, have you ever been involved in a
17   fight with an inmate here?
18       A.  I reserve the right to answer that question.
19       Q.  While you have been at DPC, you had a --
20   various health issues for which medication was prescribed
21   for you?
22       A.  That's correct.
23       Q.  Have you always taken the medications that
24   have been prescribed for you while you were --

Page 86

1    A.  I reserve the right to answer that question at
2  this time.
3    Q.  Are you familiar with the drug Effexor?
4    A.  Yes.
5    Q.  Was Effexor ever prescribed for you at DPC?
6    A.  Yes.
7    Q.  Did you ever refuse to take Effexor?
8    A.  Yes, after being prescribed -- after being
9  prescribed to me and me taking it for a course of time
10  and experiencing, you know, side effects or injuries,
11  however you want to term it..
12    Q.  Have you ever heard voices -- and I don't mean
13  by, obviously, you are listening to me right now -- have
14  you ever heard voices where someone is not present?
15    A.  Yes.
16    Q.  And how often did you hear -- have you heard
17  voices?
18    A.  I reserve the right to answer that question at
19  this time.
20    Q.  Are you continuing to hear voices at this
21  time?
22    A.  I reserve the right to answer that question at
23  this time.
24    Q.  I'd like to ask you to focus on some of the

Page 87

1  female staff at the Delaware Psychiatric Center.
2          How would you describe your
3  relationships with the female staff there?
4    A.  I reserve the right to answer that question.
5    Q.  Did you ever discuss sexually inappropriate
6  matters with female staff at the Delaware Psychiatric
7  Center?
8    A.  No.
9    Q.  Let me go back to room 71, the room where you
10  were housed.
11          Were you housed in that room the entire
12  time you were at DPC?
13    A.  No.
14    Q.  How many other rooms were you housed in,
15  approximately?
16    A.  One room prior to that particular room I was
17  assigned to.
18    Q.  While you were in one of the two rooms where
19  you were housed at DPC, did you ever bang on the door?
20    A.  No.
21    Q.  You never banged on the door at DPC?  Did you
22  ever hear any other patient bang on a door at DPC?
23    A.  Yes.
24    Q.  Would you consider a patient banging on the

Page 88

1  door to be inappropriate behavior?
2    A.  Yes, but not warranting assaults or things of
3  that nature, no, I don't think that it warrants, even if
4  it's inappropriate, I don't think someone banging on a
5  door should be assaulted because they banged on a door.
6  I think there is an appropriate remedy for, you know,
7  inappropriate behavior.
8    Q.  Have you ever placed horns on your head?
9    A.  I reserve the right to answer that question.
10    Q.  Mr. Lewis, I just want to make sure you
11  understand all the questions that you have, as you
12  stated, reserved your right to answer.
13    A.  Yes.
14    Q.  Are there any that you want to go back at this
15  point and answer so that we don't have to have the judge
16  involved?
17    A.  I would like to say that I would like a copy
18  of the transcript.
19    Q.  I will provide you a copy of the transcript
20  when it's available.
21    A.  I would like to know each individual's name
22  who was present here today.
23    Q.  I believe you have heard everyone's name who
24  is present today.  Is there someone right now that you

Page 89

1  don't believe you know who they are and what their role
2  was?
3    A.  Well, I don't specifically -- I need to maybe
4  write -- I don't have a pen to write the names down. The
5  names can be provided to me is my further point.
6    Q.  That will be part of the transcript. Remember
7  when I started off --
8    A.  Everybody stated their name.
9    Q.  I went through -- we didn't state the name of
10  the correctional officer who is sitting in the room, but,
11  obviously, he is not involved in the deposition, he is
12  just here because the deposition is taking place at DCC.
13    A.  Okay.
14    Q.  I don't believe we have to have his name --
15    A.  No.  He needs not to be involved.
16    Q.  But otherwise, everyone's name was listed so
17  that you will see that when you get a copy of the
18  transcript.
19    A.  Okay.
20    Q.  We will provide that to you as soon as, you
21  know --
22    A.  You possibly can.
23    Q.  I can't make a promise as to when that will
24  happen, but I certainly will provide it to you.

Page 90

1    A. Do you know when Dr. Foster will answer her --
2    my discovery requests?
3    Q. That's not something I -- I don't have --
4    A. You reserve the right to answer the question?
5    Q. No. I am not reserving the right to answer,
6    Mr. Lewis. I am not involved in that. That's not within
7    my power.
8        One last thing I just want to make you
9    aware of before -- so if you decide you want to answer
10   some of these before I finish today, have you heard of
11   something called the Prison Litigation Reform Act?
12   A. Yes, I have.
13   Q. Are you aware of a portion of the PLRA that
14   says that if you file a lawsuit against someone and you
15   don't have the factual basis for doing it, that, among
16   other sanctions, you can lose your good time?
17   A. If I don't have a what behind it?
18   Q. A factual basis for the allegations.
19   A. I am aware of it now since you brought it to
20   my attention.
21   Q. Those are all the questions that I have of
22   you. And, Mr. Lewis, obviously, since you --
23   A. You won't be the one who determine if I had a
24   factual basis?

Page 91

1    Q. No. I will not be the one who makes that
2    final determination. I will be making a proffer, but no,
3    the judge makes that determination.
4    A. It's more than genuine material grounds enough
5    -- trial grounds for trial here. I guess you and I both
6    know that.
7    Q. Mr. Lewis, you understand just because --
8    A. So that right there is irrelevant, in my eyes,
9    anyway.
10   Q. Can we still -- we have played well with the
11   ground rules and not talked over each other, so please
12   just, if we can continue that because it's gone very
13   smoothly that way. You understand that even though I am
14   finishing the questions that I am going to ask of you
15   today, because there are questions that you have refused
16   to answer at this time, that we may end up having to have
17   another deposition where I ask you more questions.
18   A. I am all right, you know, per a court order,
19   you know, I will adhere to any court order that the
20   Honorable Judge Gregory M. Sleet, you know, issues in
21   regards to questions that I didn't -- that I wasn't
22   forthcoming with, I have no problem with answering those
23   questions per court order.
24   Q. Fair enough. Those are all the questions I

Page 92

1    have of you today, Mr. Lewis.
2    A. I also want to say, a lot of the questions
3    that weren't asked, I feel as though, you know, through
4    the -- the situations regarding the defendants' behaviors
5    or their accountability or their -- their actions could
6    possibly be revealed through pretrial discovery, you
7    know, procedures, you know. So, but, for the most part,
8    that's why I retain the right, you know, just for the
9    record, I retained the right to answer those questions
10   because it may become -- it may become evident, through
11   some kind of -- through some form of evidence that is
12   presented later on specifically more so because
13   Dr. Foster wasn't forthcoming with her -- with her
14   discovery for the discovery request that I present
15   towards her. So, it's like we are in limbo at this point
16   in regards to the defendants that you represent, so I
17   can't really answer the questions because she may have --
18   she may have evidence that contradicts that may have been
19   something -- that may have been something done
20   strategically, so to vindicate those individuals, her not
21   answering at this point, you know what I am saying, to
22   have the deposition, and then I vindicate them at this
23   point, you know, and then come to find out they are the
24   individuals who were, indeed, involved to have documented

Page 93

1    or who have drawn the inference that may have been
2    involved in incidents that have annuity in the complaint.
3        So, for the most part, that's why I
4    reserved the right, you know, for those foregoing reasons
5    because there is still procedures to be had in regards to
6    finding more in depth, you know, in the search for truth
7    in this matter, more fact-finding process that need to
8    be, you know, need to be forthcoming so we can find out,
9    you know, more about what happened.
10       It may be an issue for trial. It may
11   only come out at trial. You know, it may be where we are
12   at trial and that be the only way that, you know, we can
13   find out if they were actually present and involved with,
14   you know, the claims that I, you know, present in my
15   complaint.
16       With that being said, I am -- I am
17   finished.
18       MR. SMITH: At this point, I am going to
19   turn it over to -- if you are ready.
20   BY MR. HARTNETT:
21   Q. Mr. Lewis, once again, my name is Ron Hartnett
22   and I am here on behalf of Dr. Foster. And it's my
23   understanding, from your objection at the beginning of
24   this deposition, that you believe that my presence here

Page 94

1  today is objectionable, and, in addition, my asking you
2  any questions at this deposition, you would object to any
3  questions and would not answer; is that correct?
4      A.  For the fact that you -- Dr. Foster, or
5  whoever represents Dr. Foster, has failed to present or
6  submit a motion to depose me, yes.
7      Q.  So, in essence, just so I understand and so
8  the record is clear, due to the fact that Dr. Foster and
9  her representatives have not filed a motion with the
10  Court to request a deposition of you, you, as we sit here
11  today, on December 18, 2006, are going to refuse to
12  answer any questions from a representative of Dr. Foster?
13     A.  I wouldn't say "refuse." I am going to
14  reserve the right on every question that you present to
15  me.
16     Q.  Are you capable of receiving mail here at the
17  Department of Corrections?
18     A.  Correct.
19     Q.  And are you aware of the address that someone
20  would send mail to you here at the Department of
21  Corrections?
22     A.  Yes.
23     Q.  And would it be to indicate your name and then
24  your SBI number and then the address for the Department

Page 95

1  of Corrections here in Smyrna?
2      A.  What did you say? Repeat that.
3      Q.  If someone were sending you mail of any type,
4  would they put your name and then what is referred to as
5  an SBI number?
6      A.  Then the address for the correctional
7  facility, and I would receive it.
8      Q.  Yes.
9      A.  Yes.
10     Q.  And is your SBI No. 506622?
11     A.  Correct.
12     Q.  And is the address here at the Delaware
13  Correctional Center here in Smyrna 1181 Paddock Road?
14     A.  Yes.
15     Q.  And were you housed here at the Department of
16  Corrections in Smyrna on September 26th of 2006?
17     A.  Yes, I believe so.
18     Q.  Do you recall what date you came to the
19  Department of Corrections here in Smyrna?
20     A.  Yes.
21     Q.  And what date was that, sir?
22     A.  April 7th, 2005.
23     Q.  And is it fair to say that you have been here
24  at the Smyrna Correctional Center from that time until

Page 96

1  the date that we are here today, December 18 of 2006?
2      A.  Correct. What is this in regards to? Why are
3  you questioning me?
4      Q.  Well, sir, I have a copy of the notice of
5  documents that were served on you as well as Mr. Smith,
6  the Deputy Attorney General in this case, that was served
7  on September 26th of 2006, which are stamped --
8      A.  Yeah, I received that.
9      Q.  -- progress notes.
10     A.  Mm-hmm.
11     Q.  So, is it your position today that there is
12  additional material that should be presented on behalf of
13  Dr. Foster in regards to discovery?
14     A.  Yes.  Discovery No. 2, discovery No. 3,
15  discovery No. 4, discovery No. 5, discovery No. 6,
16  discovery No. 7, discovery No. 8 and 9, which I have just
17  recently filed with the Court, but, you know, if it's not
18  on the record, I wouldn't, you know, I wouldn't add that,
19  but yes, those -- those -- those preceding six
20  discoveries, I have not received any response whatsoever
21  from the representatives or Dr. Foster.
22     Q.  And are those interrogatories or are they
23  requests for production of documents?
24     A.  It's interrogatories, request for discoveries,

Page 97

1  and what else do they call it? Yes, along those lines.
2  All of them is not interrogatories, but they were
3  depicted as being all of interrogatories, which is
4  incorrect. And they quoted a statute in point to me
5  being able to only request 50 interrogatories, 26 -- --
6  pardon me. Let me refer to this. I didn't bring it.
7          It quoted, in the motion, I believe it
8  was protective order, it quoted a statute 26 B -- 26.1B
9  or C, something of that nature, and I couldn't find -- I
10  couldn't find where it says I was only entitled to
11  request 50 interrogatories.  So I seen that as being a
12  frivolous motion and it was -- it was meritless in
13  regards to, you know, towards the reasons to not respond
14  to the discoveries that I requested. So I don't see why
15  I should be forthcoming in responding to a representative
16  of Dr. Foster's when a lot of the questions in regards,
17  in retrospect and points -- it's like I will be answering
18  the questions that I asked her, I will be answering the
19  very questions I presented to her, you know, during the
20  deposition.
21         So it seems to be, you know, it seems to
22  be that Dr. Foster needs to adhere to the judge's court
23  order because I put in the motion to depose witnesses and
24  they put in a protective order and I put in a motion to

Page 98

1   -- for discovery and it wasn't adhered to and the judge
2   had already put a motion for -- for the defendant to
3   respond to discovery because it was inappropriate for me
4   to be transferred to the Federal Court Building, you
5   know, pending -- and they stated it was my -- my prison
6   status, you know, it was my indigent status, and all
7   these things were cited as grounds to support the fact
8   that, you know, everything should be, you know, all
9   discovery should be adhered to through -- like through
10  the mail, but Dr. Foster hasn't been adhering to any type
11  of discovery requests I presented to her and is hindering
12  the process.
13      Q. Have you filed a motion with the Court in
14  regards to the outstanding discovery that you intend has
15  not been responded to?
16      A. I filed -- what was it called -- I filed a
17  response -- I filed a response. I didn't file a default,
18  you know, a motion for default or a declaratory judgment
19  or nothing like that at this particular point, none of
20  that has been filed, but that surely will be forthcoming.
21      Q. And this response, do you know what it was in
22  response to?
23      A. It was in response to a motion for protective
24  order.

Page 99

1       Q. And are you aware of --
2       A. Filed by Dr. Foster, I should say.
3       Q. And are you aware if -- whether the Court has
4   taken any action in regards to the request for protective
5   order and your response to that?
6       A. I said I wasn't going to talk to you but I am
7   talking to you anyway. I am going to say this much: I
8   am not aware of a response.
9       Q. So you are not aware of any Court order that's
10  been filed as we sit here today?
11      A. If you have a Court order -- if you have any
12  in your possession, I would like you to make it available
13  to me at this point, but no, at this point, I am not
14  aware of any response by the Court issuing any response
15  to her motion to depose -- I mean her motion for
16  protective order or my response to her motion for
17  protective order.
18      Q. Would you be able to describe for me what
19  Dr. Foster looks like?
20      A. I reserve the right to answer that question at
21  this point.
22      Q. Are there any specific requirements in regards
23  to your diet that you mentioned previously which deals
24  with both your physical well-being and your observe

Page 100

1   answer of your religious beliefs? Are there any specific
2   parameters of a diet --
3       A. For the record, identify yourself.
4       Q. Once again, Mr. Lewis, my name is Ron
5   Hartnett. I am an attorney who represents Dr. Foster and
6   was asked to come here today on behalf of the attorney of
7   record, who is Carol Antoff, who is another attorney in
8   my office. I was asked by her to come here to attend
9   this deposition on behalf of Dr. Foster.
10      A. I retain the right to answer your questions
11  about the diet.
12      Q. The injuries that you have sustained in the
13  June 14, 2004, incident, which involved the M&M candies,
14  did you receive any medical treatment as a result of
15  those injuries?
16      A. I retain the right to answer that question.
17      Q. What is your understanding of the medications
18  that were included in the injections that you received,
19  or let me phrase it differently.
20          What made up the medications that were
21  in the injection that you indicate you received on
22  several occasions in your complaint?
23      A. I retain the right to answer that question.
24      Q. Is it fair to say, Mr. Lewis, that, at this

Page 101

1   point, any question that I am going to ask you, you are
2   going to retain the right and not answer at this time?
3       A. I retain to the right to answer that question.
4       Q. Well, Mr. Lewis, I am asking you, as we sit
5   here today, is it fair to say that any other question
6   that I am going to ask specifically regarding this
7   complaint, you are going to use the terminology, "I
8   reserve the right to answer that question," and not
9   provide any information in regards to the questions that
10  are asked?
11      A. That's the question?
12      Q. Yes, sir.
13      A. I retain the right to answer the question.
14      Q. And I guess I will give you the same
15  instruction that Mr. Smith gave that you understand that
16  the purpose for this deposition is to develop some of the
17  factual underpinnings of the complaint that you have
18  filed against both Dr. Foster and personnel at DPC; is
19  that correct?
20      A. For the defendant or for the plaintiff?
21      Q. For everyone involved in this matter.
22      A. I disagree, but I retain the right to answer
23  that question.
24      Q. And I guess my question is: Why would you

Page 102

1   disagree with the previous question that I posed to you?
2       A.  I retain the right to answer that question.
3       Q.  Would you agree with me, at this point, that
4   this case is presently in the discovery phase, meaning
5   that this is the time for fleshing out the issues and the
6   factual circumstances that surround the incidents that
7   are identified in your complaint?
8       A.  Correct.
9       Q.  And would you also agree that the calling of
10  this deposition by Mr. Smith was not intended due to your
11  inability to testify at trial, it was more a discovery
12  tool that was being used by Mr. Smith to garner
13  additional information from you; is that correct?  Is
14  that your understanding of the purpose of this deposition
15  today?
16      A.  My understanding of the deposition is to
17  answer questions that the defendant, you know, wants to
18  get more understanding of the, to flesh out, through the
19  fact-finding process, to understand, you know, what my
20  perspective, in order to determine, you know, what's
21  factual and what's not factual in regards to the
22  complaints claimed that I have documented or noted in my
23  complaint.
24      Q.  And, once again, just so we are clear, in

Page 103

1   light of the fact that either Dr. Foster, herself, or a
2   representative of Dr. Foster did not file a motion with
3   the Court as Mr. Smith did, then it's your belief that a
4   representative of Dr. Foster is not entitled to ask
5   questions at this time at this deposition today?
6       A.  It's not a belief.  I was actually told that I
7   was not supposed to have any contact -- actually, it's a
8   court order, and I believe you might be in violation of
9   that court order for the simple fact that Judge Sleet put
10  an order for me to not have any contact with the
11  defendants without, you know, without notification from
12  the Court.
13          MR. HARTNETT:  In light of Mr. Lewis'
14  insistence on not answering anymore questions, I don't
15  have any further questions.  Thank you, sir.
16          THE WITNESS:  You are welcome.
17          MR. SMITH:  This concludes, then, the
18  deposition.
19          (The deposition was concluded at 12:25
20  p.m.)
21
22
23
24

Page 104

1       (I HAVE READ THE FOREGOING DEPOSITION,
2   AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
3
4
5
6   _____
7   JIMMIE LEWIS
8   - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 105

1           INDEX TO TESTIMONY
2
    JIMMIE LEWIS                          PAGE
3
    Examination by Mr. Smith                2
4   Examination by Mr. Hartnett            93
5
        - - - - -
6
7           INDEX TO EXHIBITS
8                                   PAGE
9   (There were no exhibits marked for identification.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

28  (Page 106)

Page 106

```
 1              CERTIFICATE
 2     STATE OF DELAWARE:
                   :
 3     NEW CASTLE COUNTY:
 4          I, Renee A. Meyers, a Registered Professional
 5     Reporter and Notary Public, within and for the County and
 6     State aforesaid, do hereby certify that the foregoing
 7     deposition of JIMMIE LEWIS, was taken before me, pursuant
 8     to notice, at the time and place indicated; that said
 9     deponent was by me duly sworn to tell the truth, the
10     whole truth, and nothing but the truth; that the
11     testimony of said deponent was correctly recorded in
12     machine shorthand by me and thereafter transcribed under
13     my supervision with computer-aided transcription; that
14     the deposition is a true record of the testimony given by
15     the witness; and that I am neither of counsel nor kin to
16     any party in said action, nor interested in the outcome
17     thereof.
18          WITNESS my hand this 25th day of December A.D.
19     2006.
20
21          _____
            RENEE A. MEYERS
22            REGISTERED PROFESSIONAL REPORTER
              CERTIFICATION NO. 106-RPR
23            (Expires January 31, 2008)
24
```

IM _Jimmie Lewis_
SBI# _506622_ UNIT _D 42_
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



$ 05.00⁰

CLERK OF THE COURT (GMS)
UNITED STATES DISTRICT COURT
844 N. KING ST, LOCKBOX 18
WILMINGTON, DELAWARE
19801

U.S.M.S.
X-RAY