UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| JIMMIE LEWIS, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>THOMAS L. CARROLL, DR. CANNULLI,)<br>DR. ROGERS, DR. DURST, LT. LARRY )<br>SAVAGE, LT. RALPH HEVERIN, SGT. )<br>GWENDOLYNN EVERETTE, C/O )<br>TELLIFFE, SGT. CAIN, MARY SNIDER, )<br>CHARLES BENSON, C/O BUCKLE )<br>)<br>Defendants. ) | Case No. 06-778 (GMS)<br>JURY TRIAL DEMANDED |

**DEFENDANTS ANTHONY CANNULI, M.D., JOHN DURST, M.D., DALE ROGERS, M.D., AND MARY SNIDER, R.N.'S OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION (D.I. 61)**

Defendants Anthony Cannuli, M.D., John Durst, M.D., Dale Rogers, M.D. and Mary Snider, R.N., (collectively "Answering Defendants[1]") by and through their undersigned counsel of record, hereby respond to Plaintiff's Motion for Preliminary Injunction (D.I. 60) and Amended Motion for Preliminary Injunction and state as follows:

1.     On March 12, 2008, Plaintiff filed a Motion for Preliminary Injunction (the "Motion") (D.I. 60) and an Amended Motion for Preliminary Injunction (the "Amended Motion"). (D.I. 61) On March 27, 2008, the Court ordered this response. (D.I. 62)

---

[1] As stated elsewhere herein, Plaintiff's Motion and Amended Motion raise issues regarding acts and/or omissions by a "Mr. Gibbs" who, upon information and belief, may be a CMS mental health worker. Mr. Gibbs is not a named defendant in the above-captioned action and, prior to the instant Motions, had not been identified in any prior pleading or submission to the Court. As the Court would expect under such circumstances, Mr. Gibbs has never been served with any papers in this proceeding. The undersigned counsel argues herein that the relief Plaintiff seeks against Mr. Gibbs should be denied, but such argument should not be construed as a waiver of any defenses, including but not limited to defenses to service or service of process, that Mr. Gibbs may have should Plaintiff attempt to add Mr. Gibbs as a party to this suit.

2. Neither D.I. 60 nor 61 contains any direct, explicit claims against defendants Durst, Rogers, or Snider. The Motion (D.I. 60) provides, in relevant part: "The plaintiff is denied his medical and mental health treatment. See C.A. Nos. 04-1350, 05-013, 06-778" (D.I. 60 at ¶5; and "Since being returned to the D.C.C., medical and mental health totally ignores the Plaintiff's sick call requests." (*Id.* at ¶ 6) The remaining claims concern alleged acts over which Answering Defendants have no authority or control.

3. The Amended Motion (D.I. 61) provides, in relevant part:

> Since my return to Del. Corr. Center I have been denied mental health intervention. When on 2/26/08 I requested to be placed on the protective custody unit due to having an anxiety related panic attacks because my safety was and or is in jeopardy on the regular S.H.U. security housing units. Apon (sic) requesting mental health intervention and protective custody at 10:00 p.m. the Plaintiff was shackled and handcuffed for twelve hours in the S.H.U. D Unit Conference room placed on Level One Psych close observation by Capt. Burton. But that mourning (sic) of 2/27/08 Dr. A. Cannuli and clinician Mr. Gibbs instructed security to place me back into the cell even though they were in formed by security that Plaintiff was deemed a harmful threat to himself and others.

(D.I. 61 at ¶4)

4. The Amended Motion also alleges that Mr. Gibbs instructed security to place Plaintiff in isolation "in handcuffs and shackles with blackbox for 24 hours." (*Id.* at ¶5) The Amended Motion contains no other allegations against any of the Answering Defendants. Because neither the Motion nor the Amended Motion contains any allegations against Durst, Rogers, or Snider, the relief sought should be denied with respect to those defendants.

5. As stated above, Plaintiff's Motion states "The plaintiff is denied his medical and mental health treatment. See C.A. Nos. 04-1350, 05-013, 06-778." To the extent the Plaintiff seeks an injunction based on the claims asserted in other civil actions, such relief should be sought in those cases, not here.

6. In addition, while the Motion and Amended Motion contain allegations against "Mr. Gibbs", he is not a party to the above-captioned action and has not been served with a summons and complaint, or with notice of the instant Motions. Accordingly, either Mr. Gibbs should be added as a party or a separate action filed against him.

> *Facts From Mr. Lewis' Medical Records Regarding His Claim That He Received No Mental Or Medical Health Attention Since His Return to DCC from DPC*

7. Plaintiff has been incarcerated since November 17, 2003. (Exhibit "A" at 1) Plaintiff was first admitted to the Delaware Psychiatric Center ("DPC") from May 21, 2004 through June 24, 2004. (*Id.* at 3) "The psychologist evaluated him with no signs of anything bizarre or odd about his behavior that would suggest a psychotic disorder." (*Id.* at 4) Following discharge, Plaintiff returned to DCC, where his behavior over time led to his being returned to DPC on June 7, 2007. (*Id.* at 5) While at DPC the second time, he was diagnosed as "Malingering a Psychotic Disorder, Cannabis Abuse, Full Remission in a Controlled Environment, Antisocial Personality Disorder," and Hypertension. (*Id.* at 6) This diagnosis was reached by Forensic Psychiatrist Andrew W. Donohue, D.O., and concurred in by two other board-certified DPC psychiatrists. (*Id.* at 8-9) In sum, in the opinion of the team of board-certified psychiatrists at DPC, although the Plaintiff threatens suicide, complains of hearing voices, and acts out in strange manners, his acts are the result of an Antisocial Personality Disorder, not psychosis. He uses his behavior to obtain advantages such as better meals, better housing and better treatment. (*Id.* at 1-10) Nonetheless, Plaintiff may still represent a threat to harm himself "as a form of blackmail to keep himself out of the prison system." (Exhibit A at 9-10)

8. Plaintiff was returned to DCC from DPC on December 14, 2007. On his arrival at DCC, he was immediately admitted to the infirmary for examination and observation, in part due to protocol, in part out of caution because his entire chart was not available, and in part because of

3

the recommendations of doctors at DPC. (Exhibit A, 7-10, Exhibit "B", 1-2). Following a physical examination, Plaintiff was found to be "stable from (a) medical standpoint" and was discharged for medical purposes, but remained in the infirmary on Level I observation for psychiatric purposes. (Exhibit B at 2-3)

9.      On December 15, Plaintiff was seen by Dr. Tirimisi who wrote orders to obtain the DPC charts "ASAP" and to continue Level I observation. (*Id.* at 1; Exhibit "D" at 3) In addition, chart checks were ordered and were performed daily. From that point forward, Plaintiff's medical records show daily, if not more frequent, medical attention. His chart is checked daily, and he is observed daily while admitted to the infirmary. (Exhibits B, "C", D) Medical and mental health personnel interact with Plaintiff daily, although he is rarely cooperative. (Exhibit C) His Medication Administration Records ("MAR") show that he is prescribed numerous medications for various ailments, which he sometimes accepts, and sometimes refuses. (Exhibit "E", "F")

10.     Review of the medical records shows Plaintiff received medical treatment for various complaints throughout his stay. For example, following his physical exam on December 17, on December 19, 2007 at 0900 hours, a nurse noted: "(Plaintiff) not talking but showing this nurse (small) cut on the bottom of foot. Feet dry flaky skin. Lotion applied. Bandaid to area cut. Remain on 1 to 1 watch. Officer at door. Alt coping plan continue RX chart prn." (Exhibit B at 4) Orders were then written for an antibiotic cream for the Plaintiff's use for 14 days. (Exhibit D at 4) Later that day, at 1400 hours, a nurse noted: "(Inmate) complaining of left pinky finger swollen from ingrown nail. Dr. "O" ordered soak of (illeg) and betadine. Soaked as ordered. Inmate also given (illeg) cream for foot. Altered mental status. Will monitor level I protocol." (Exhibit B at 4) Although the finger was soaked in the ordered solution, it did not clear up and was given more attention on December 24: Inmate states: "I have a problem with my finger, it

feels like it is going to explode." Noted L 5th finger swollen at tip, reddened & noted skin tight, shiny with lighter area next to finger nail, possible puss under skin. Complains of pain to area. Placed call to Dr. McDonald awaiting call back. Altered skin and tissue integrity." (*Id.* at 5) When a doctor was contacted, orders were given to administer Keflex and to culture any drainage. (Exhibit D at 4) After Plaintiff mentioned that he was allergic to Keflex, the order was changed to Clindamycin and Bacitrin. (*Id.* at 5) Plaintiff refused to allow the nurse to apply pressure to obtain a culture, however, a lab report shows a culture was obtained on December 24 and processed by BioReference Laboratories. (Exhibit B at 6-7) The culture grew out hemolytic strep B, and antibiotics were increased on December 27. (Exhibit D at 5)

11.     Plaintiff complained on occasion of dry, cracked skin on his feet. (Exhibit B at 4) In response, medical providers prescribed lotions and creams (Exhibit D at 4) They continued to provide those medications until Plaintiff used them to smear over the lens on the camera in his cell. (*Id.* at 7) These are just a few examples of the medical care that Plaintiff received for physical health issues. In addition to the medical attention for physical complaints, CMS providers also saw Plaintiff on a nearly daily basis for mental health issues. (Exhibit C) Plaintiff was discharged from Mental Health care on January 20, 2008. (Exhibit D at 8)

The Court can see by review of the chart that Plaintiff has been regularly attended and given treatment with respect to both physical and mental health issues.

*Facts From Mr. Lewis' Medical Records Regarding His Claim*
*That His Sick Call Requests Have Been Ignored*

12.     Paragraph 6 of Plaintiff's Motion (D.I. 60) provides: "Since being returned to the D.C.C., medical and mental health totally ignores the Plaintiff's sick call requests." (*Id.*) Exhibit F hereto contains the three Sick Call Requests in his chart. Review of each of them shows that each was received by medical personnel and that each was responded to.

*Facts From Mr. Lewis' Medical Records Regarding His Claim*
*That He Was Inappropriately Sent To Isolation Instead*
*<u>Of The Infirmary On February 27, 2008.</u>*

13.     A progress note written by an RN dated February 26 and timed at 2300 hours provides:

> I was called by (corrections officer) that inmate stated that he wants to kill himself. Upon assessing inmate, he stated to me that he is depressed over so many issues that he does nor want to talk to me about and he is having thoughts of hanging himself. MH supervisor on call was notified. She stated that there is no room available in infirmary for inmate. Inmate will be on Level II in building (illeg) observation room.

(Exhibit B at 11)

14.     A progress note written by another RN dated February 27 and timed at 0300 hours reflects: "Inmate stated that he is having some chest pain. VS 132/70 -88-20, able to lift all upper extremities without any difficulty denies any numbness, no further complaints of (illeg). Inmate was reassessed denies any pain." (*Id.* at 14)  At 1051 hours on February 27, Plaintiff was seen and examined by Dr. Cannuli, who wrote:

> Inmate voiced suicidal ideations last night as was placed in the observation room on his tier. He was going to go to the infirmary. Inmate is a known malingerer – fully assessed at DPC also. He acts out for (secondary) gain. i.e., to get out of his cell, a change of pace at the infirmary. He has been looking forward to level IV and (suicidal ideation) contradicts his future planning. I was not going to send him to the infirmary and he did agree to go back to his cell. After that (correctional officers) reports (sic) he smeared feces in his cell. He is testing limits. He will not go to the infirmary. Security will proceed with a (write up) and likely send him to the hole. Hopefully this will eventually help this behavioral problem/manipulation. Also fully discussed with Mr. Gibbs.

*Id.* at 15

15.     As a result of his examination and observation of Plaintiff, including his extensive history and experience with Plaintiff, as well as the thorough examination and diagnosis performed by DPC, Dr. Cannuli assessed Plaintiff's issues as behavioral, and not caused by mental health deficiencies. (*Id.* at 15-16)  He therefore decided that Plaintiff should not be admitted to the

6

infirmary at that time, at which point it was up to corrections staff to decide how to deal with the plaintiff's decision to smear feces all over his cell, rip the sink out of the wall and smash the glass window in the door. (*Id.* at 15-16)

16. Plaintiff was seen on February 28 at 1500 hours by Dr. Desrosiers, who wrote: Inmate in cuffs post incident yesterday. Cough, yellowish phlegm x 6-7 days. Dry cracking feet, (illeg) athlete's foot. Looks well. No acute distress. . . . Hands: mild soft tissue edema." (*Id.* at 17) Later on the night of February 28, Plaintiff was observed (in isolation) by an RN who wrote: "Seen during PM med pass with no complaints (of nausea), (headache) or loss of appetite. Noticed eating dinner. No vomiting with completion. Respirations even and unlabored. Skin pink warm dry to touch. No acute distress. Making eye to eye contact. No cough noticed." (Exhibit F at 2)

### ARGUMENT

#### *The Legal Standards*

17. "[T]he grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.' " *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989) (quoting *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988)). In ruling on a preliminary injunction, the Court must consider: 1) the likelihood of success on the merits; 2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; 3) the extent to which the defendant will suffer irreparable harm if the requested relief is granted; and 4) the public interest. *See Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995). An injunction should only issue if all four factors favor injunctive relief. *See S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 374 (3d

Cir.1992). Plaintiff does not carry this burden because he cannot establish a likelihood of success on the merits and so the Motion should be denied.

18.     In order to state a claim for a violation of civil rights based on medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). *Estelle* clarified the standards as follows:

> An inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind" . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

*Id.*

19.     In order to show "deliberate indifference," a Plaintiff must demonstrate a sufficiently culpable state of mind on the part of the defendant. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Plaintiff has not met that challenge. Mere allegations of negligence do not meet the *Farmer* standards. *See Estelle*, 429 U.S. at 105-106.    Nor can the claim rest solely on the prisoner's dissatisfaction with the medical care he has received. *Id.* at 107.

*Plaintiff Fails to Show that He is Likely to Prevail on the Merits*

20.     Plaintiff's Motion and Amended Motion appear to set forth three grounds for relief: he has not received any medical or mental health treatment since he returned to DCC from DPC (D.I. 60 at ¶5); since being returned to the D.C.C., medical and mental health totally ignore the Plaintiff's sick call requests (*Id.* at ¶ 6), and Dr. Cannuli and Mr. Gibbs allowed him to be sent to isolation rather than the infirmary. (D.I. 61 at ¶¶4-5) The first two claims are simply untrue by any stretch of the imagination. The medical records clearly show that Plaintiff has received extensive attention; in fact, probably more than most other prisoners. (Exhibits B, C) The three sick call requests that medical has received also show that medical has responded to each one.

(Exhibit F)  There is absolutely no evidence to suggest that Plaintiff would prevail on the merits of the two claims against the medical providers raised in the Motion (D.I. 60), and so those claims should be denied.

21.    The claim raised in the Amended Motion against Dr. Cannuli and Mr. Gibbs provides, in relevant part:

> Since my return to Del. Corr. Center I have been denied mental health intervention.  When on 2/26/08 I requested to be placed on the protective custody unit due to having an anxiety related panic attacks because my safety was and or is in jeopardy on the regular S.H.U. security housing units. Apon (sic) requesting mental health intervention and protective custody at 10:00 p.m. the Plaintiff was shackled and handcuffed for twelve hours in the S.H.U. D Unit Conference room placed on Level One Psych close observation by Capt. Burton.  But that mourning (sic) of 2/27/08 Dr. A. Cannuli and clinician Mr. Gibbs instructed security to place me back into the cell even though they were informed by security that Plaintiff was deemed a harmful threat to himself and others.

(D.I. 61 at ¶4)

Plaintiff next alleges:

> Hours after being placed back into SHU 17, AHC Room, the Plaintiff was escorted to building 20 SHU where Mr. Gibb DCC Mental Health Clinician instructed security to take me to isolation SHU 18 C Unit Lower 5 Cell and placed me in shackles and handcuffed with black box for 24 hours.

(*Id.* at ¶5)

22.    These allegations purport to again form a claim that he has not received any mental health treatment since his return, and to claim that Dr. Cannuli and/or Mr. Gibbs were deliberately indifferent to a serious medical need. As stated above, the medical records put to rest the first claim.  (Exhibit B-F)

In addition, at the time of the incident alleged by Plaintiff, February 27 to 28, 2008, there was no serious medical need.  After the corrections officers put Plaintiff into isolation based on Plaintiff's statements to them, Plaintiff was seen, examined and diagnosed by Dr. Cannuli, a

9

psychiatrist. (Exhibit B at 15-16) In reliance on the diagnosis by three DPC board-certified psychiatrists, his own observations and experience with Plaintiff over the past two years, Dr. Cannuli recognized the Plaintiff's pattern of acting out to obtain more favorable conditions, and told the officers that there was no need to observe Plaintiff. (*Id.*)  In fact, after Dr. Cannuli spoke with Plaintiff, Plaintiff agreed to go back to his cell. (*Id.*)  When Plaintiff returned to his cell, he did not attempt to injure himself.   Instead, he smeared feces around the cell, pulled the sink off the wall and broke the glass window in the cell, for which he was sent to isolation. (*Id.* at 16)  The reason that he was sent to isolation and not to the infirmary was because his act of smearing feces around his cell was behavioral, and manipulative, and not caused by a mental health issue that required treatment. (*Id.* at 15-16)  Among the factors on which Dr. Cannuli based his decision not to send Plaintiff to the infirmary: Plaintiff has been diagnosed as a "malingerer" with "no objective evidence of a psychotic or mood (disorder)" although an "Antisocial Personality (disorder)" has been diagnosed. (Exhibit A, 1-10)  That diagnosis was made by other mental health specialists after more than two months of examination, testing and observation at another institution.

Furthermore, although Plaintiff alleges that Dr. Cannuli and Mr. Gibbs made their decisions and recommendations despite being told by the security officers that Plaintiff was a threat to harm himself (D.I. 61 at ¶4), the decision as to whether an individual truly constitutes a threat to harm himself or another due to a mental health issue belongs to a physician, not a corrections officer.  The corrections officers may observe and report, but it is up to the trained clinician to gather and consider that information and then determine its validity, which is precisely what Dr. Cannuli did.

These Motions are simply another example of Plaintiff's attempts to manipulate the system to suit himself. The Motion and the Amended Motion should be denied because he stands no chance of prevailing on the merits. Plaintiff has received consistent medical and mental health attention since he returned to DCC. As a result, he cannot show deliberate indifference to any serious medical need. *See Clean Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995); *S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 374 (3d Cir.1992).

WHEREFORE, for the foregoing reasons, defendants John Durst, M.D., Anthony Cannuli, M.D., Dale Rodgers, M.D., and Mary Snyder, R.N. respectfully request entry of an Order in the form attached hereto denying Plaintiff's Motion and Amended Motion.

BALICK & BALICK, LLC

/s/ James E. Drnec
James E. Drnec, Esquire (#3789)
711 King Street
Wilmington, Delaware 19801
302.658.4265
Attorneys for Defendants
John Durst, M.D., Anthony Cannuli, M.D., Dale Rodgers, M.D., and Mary Snyder, R.N[2].

Date:   April 4, 2008

---

[2]  And responding for purposes of the instant Motions on behalf of "Mr. Gibbs".

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

JIMMIE LEWIS,                )
                             )   Case No. 06-778 (GMS)
        Plaintiff,           )   JURY TRIAL DEMANDED
    v.                       )
                             )
THOMAS L. CARROLL, DR. CANNULLI,)
DR. ROGERS, DR. DURST, LT. LARRY )
SAVAGE, LT. RALPH HEVERIN, SGT. )
GWENDOLYNN EVERETTE, C/O     )
TELLIFFE, SGT. CAIN, MARY SNIDER, )
CHARLES BENSON, C/O BUCKLE   )
                             )
        Defendants.          )
---------------------------------------------------

# ORDER

AND NOW, this _____ day of _____, 2008, the Court having considered Plaintiff Amended Motion for Preliminary Injunction #2, Pursuant to Federal Rule of Civil Procedure 65, and all opposition thereto, it is hereby ordered that Plaintiff's Motion is DENIED with respect to defendants Dr. Cannuli, Dr. Rogers, Dr. Durst, Mary Snider and Mr. Gibbs..

_____
                J.

**CERTIFICATE OF SERVICE**

I, James Drnec, hereby certify that on the 4th day of April 2008, the foregoing Defendants Anthony Cannuli, M.D., John Durst, M.D., Dale Rodgers, M.D. and Mary Snider, R.N.'s Opposition to Plaintiff's Amended Motion for Preliminary Injunction was filed via CM/ECF and served via First Class Mail upon the following:

> Jimmie Lewis
> SBI#506622
> Delaware Psych Center
> Mitchell Building
> 1901 N. Dupont Hwy
> New Castle, DE 19720
>
> Erika Yvonne Tross, Esquire
> Delaware Department of Justice
> Civil Division
> 820 North French Street
> 6th Floor
> Wilmington, DE 19801

          /s/ James E. Drnec
James E. Drnec, Esquire (#3789)