UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| JIMMIE LEWIS, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>THOMAS L. CARROLL, DR. CANNULLI,)<br>DR. ROGERS, DR. DURST, LT. LARRY )<br>SAVAGE, LT. RALPH HEVERIN, SGT. )<br>GWENDOLYN EVERETTE, C/O )<br>TELLIFFE, SGT. CAIN, MARY SNIDER, )<br>CHARLES BENSON, C/O BUCKLE )<br>)<br>Defendants. ) | Case No. 06-778 (GMS)<br>JURY TRIAL DEMANDED |

--------------------------------------------------------

**DEFENDANTS DR. CANNULI, MARY SNIDER, DR. DURST, AND DR. ROGERS' MOTION FOR SUMMARY JUDGMENT**

Defendants Anthony Cannuli, M.D.[1], Mary Snider, R.N., John Durst, M.D., and Dale Rogers, M.D. (collectively "Moving Defendants") by and through their undersigned counsel, hereby move for entry of judgment in their favor as a matter of law. In support of this Motion, Moving Defendants state as follows:

1.  On December 20, 2006, Plaintiff filed his Complaint (D.I. 2) and Statement of Facts (D.I. 4) against numerous parties, including the Moving Defendants. Specifically, Plaintiff alleged that Dr. Durst and Dr. Rogers were deliberately indifferent to a serious medical condition (Plaintiff's broken finger reported August 21, 2006) (D.I. 4 at ¶¶ IIIA, B) and that Nurse Snider committed civil assault and battery on Plaintiff by administering an injection against his will on September 6, 2006. (D.I. 4 at ¶¶ IB, C) It appears that Plaintiff may also be alleging due process

---

[1] Improperly identified in Plaintiff's pleadings as "Dr. Cannolly." It appears that the Court dismissed the claims against Dr. Cannuli in its Memorandum and Service Order dated April 19, 2007, but also gave instructions for service. (D.I. 11) Nonetheless, in an abundance of caution, counsel here moves for an order addressing potential claims against Dr. Cannuli as well as the other medical defendants.

claims against Dr. Cannuli and Nurse Snider for administration of psychotropic drugs against his will. (*Id.*)

*Factual Allegations*

2.  On August 21, 2006 Plaintiff was seen in the infirmary with complaints that he injured the pinky finger on his left hand while playing basketball. (Exhibit "A", medical records at 1). X-rays were ordered and performed within 24 hours. (*Id.*) The x-ray report indicated a displaced avulsion fracture and subluxation of the corresponding interphalangeal joint with swelling. (*Id.* at 2) The finger was "buddy taped" to the adjoining finger and, on August 29, 2006, one day after the x-ray results were read, a request was written for consultation with an orthopedist. (*Id.* at 3) The Consultation Request noted that the Plaintiff had unilaterally chosen to remove the buddy tape, claiming that it was "inappropriate care." (*Id.*)

3.  On August 30, 2006, Plaintiff was admitted to the infirmary for observation after he attempted to hang himself in his cell. (*Id.* at 1) Plaintiff was maintained at Level I for observation. (*Id.* at 4) Throughout his stay in the infirmary, Plaintiff was non-compliant, refusing medications or accepting them and then flushing them down the toilet, yelling and banging on the door or the window. (*Id.* at 4-9) On September 5, at 0650, Plaintiff was noted to be at his cell door, "yelling out (at) the (corrections officer), agitated (with) (corrections officer) for no reason noted." (*Id.* at 7) On September 6, at 1500, Nurse Snider noted:

> (Inmate) screaming, pounding on door, spitting on glass. Very agitated (sic) (and) unable to talk down. Placed on Level II per Dr. Cannuli. Also (inmate) given Haldol 5mg. IM and Cogentin 1 mg. IM now. (Inmate) placed on Level II and (intramuscular) injection given per orders. Previously (inmate) was screaming threats of throwing feces (at) staff, now quiet. Will continue to observe on Level II.

(*Id.* at 7)

4.      Dr. Cannuli's note from September 6 provides, in relevant part: "Spoke with (inmate) at length. He cannot contract for his own safety as yet. . . . Definite paranoia . . . Impulsive (and) unpredictable. Manipulative but also mentally ill. . . ." (*Id.* at 8)  Based on his observations, Dr. Cannuli ordered Plaintiff remain in the infirmary for continued observation, and that he be prepared for commitment to the state psychiatric hospital if necessary. (*Id.*)  Later that day, Dr. Cannuli entered a second note in which he stated that he was: "(a)sked by (a corrections officer) to see (inmate) because he was blocking the (cell) camera with tissue. (Inmate) was angry and asking why he wasn't discharged. Told him that he did not contract for his own safety in a.m. and our concern of his recent suicide attempt. . . ." (*Id.* at 9)

5.      When Plaintiff was moved to Level II, the corrections officers were required to go into Plaintiff's cell and remove his clothes so as to reduce his ability to injure himself. When they tried to do so, Plaintiff urinated on his cell door and threatened to throw feces at them. Dr. Cannuli was then called back by the corrections officer, who told him that Plaintiff "had already urinated on (the cell) window and said he was going to throw feces next." (*Id.* at 9)  As a result of Plaintiff's actions and verbal threats to harm others, Dr. Cannuli "spoke with nursing and gave a verbal order for Haldol 5mg (intramuscular) and Cogentin 1 mg (intramuscular). (Inmate's) threat of throwing feces when the corrections officers were going in to take his clothes, etc., is a very serious threat of harm to others, therefore the medication is justified for the protection of staff." (*Id.*)  Based on medical status, Plaintiff was observed at Level II in the infirmary for an additional 48 hours and discharged to the general population at 0940 on September 8, 2006. (*Id.* at 10)  When mental health providers checked up on him later that evening, Plaintiff again expressed suicidal ideation and was readmitted to the infirmary on Level II suicide watch. (*Id.* at 11)

6.      On September 14, 2006, Plaintiff was taken out of the facility to see orthopedic surgeon Dr. DuShuttle. (*Id.* at 12)  The report from that visit provides that the Plaintiff may need to have a "pinning" of the finger, and advises the Plaintiff to return "p.r.n." or as needed. (*Id.* at 12-14)  The report also provides that there is no instability, no neuro or sensory deficit. (*Id.*)  The report further provides that, once Dr. Dushuttle got a look at the x-rays, he recommended surgery to pin the finger. (*Id.* at 14)  That recommendation was made September 18, 2006. (*Id.*)  That same day, Nurse Sherel Ott issued a consultation request to approve Dr. DuShuttle's recommended surgery. (*Id.* at 15) That request was approved by CMS within 24 hours on September 19, 2006 (*Id.*)

7.      An appointment for surgery was scheduled with Dr. DuShuttle and, on October 4, 2006, Plaintiff was taken to Kent General Hospital for the recommended surgical procedure, which he refused (*id.* at 16-19), at which point Dr. DuShuttle refused to treat the Plaintiff any further. (*Id.* at 16)  Although Plaintiff refused to sign the Release of Responsibility form for refusal of consent, it was signed by the two officers who witnessed his refusal. (*Id.* at 18)

*Argument*

    *The Standard for Summary Judgment*

8.      A court shall grant summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue at to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Movants bear the burden of proving that no genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574 586 n. 10 (1986).  Once Movants demonstrate an absence of material fact, the burden shifts to Plaintiff to provide "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

The Court here should view the underlying facts and all reasonable inferences therefrom in the light most favorable to the Plaintiff. *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

9.  The mere existence of some evidence in support of the Plaintiff, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for Plaintiff on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Here, if Plaintiff fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then Movants are entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> *Dr. Cannuli and Nurse Snider are Entitled to Judgment in Their Favor as a Matter of Law*

10. Plaintiff appears to allege civil assault and battery against Nurse Snider for administering against Plaintiff's will the medications ordered by Dr. Cannuli. (D.I. 4, Statement of Facts at IB) Dr. Cannuli gave those orders after Plaintiff urinated on his cell window and threatened to throw feces at the guards who had to try to remove Plaintiff's clothes so that he could not harm himself. (Exhibit A at 8, 9) The order was given for the safety of the guards and of Plaintiff; Nurse Snider merely carried it out.

11. Although there does not seem to be a statutory exemption squarely on point, medical professionals are often required to exercise their clinical judgment in a manner which oversteps civil rights when a patient demonstrates that he is a danger to himself or others. For instance, patients with mental illness, or those under the influence of drugs or alcohol, who are brought into emergency rooms by police officers and then become aggressive or violent may be sedated for the safety of the officers, the patient, and medical personnel. Persons who, due to mental health disorders, constitute a threat to themselves or others may be confined against their will for

a period of time to allow some observation or treatment. Similarly, an exemption should exist to permit a nurse to carry out a doctor's orders given to protect the patient, law enforcement officers, and medical personnel, from harm.

12.     The elements of an assault and battery claim are: an "intentional, unpermitted contact upon the person of another which is harmful or offensive." *Brzoska v. Olson,* 668 A.2d 1355, 1360 (Del. 1995) (citing W. Page Keeton, et al., Prosser and Keeton on Torts, §§ 8, 9 (5th ed.1984)). An offensive contact is "one which would offend the ordinary person" and is "unwarranted by the social usages prevalent at the time and place at which it is inflicted." *Brzoska,* 668 A.2d at 1361 (citing Restatement (Second) of Torts § 19 cmt. a (1965)). There is no dispute that Nurse Snider administered the medication pursuant to a physician's orders. The contact here cannot be said to be "offensive" as it was for the safety of Plaintiff and others. In addition, the "ordinary" person standard should not apply to someone who is under observation for mental illness, urinating on windows and threatening to throw feces at those who are charged with protecting his welfare. Nurse Snider is entitled to entry of judgment in her favor.

13.     Although it is not entirely clear, Plaintiff appears also to claim that Dr. Cannuli's order and Nurse Snider's administration of the drugs amounted to a violation of due process. (D.I. 4, Statement of Facts, ¶ IB) In fact, Plaintiff cites the case of *Washington v. Harper*, 494 U.S. 210 221-222 (1995) in support of his allegations in this particular paragraph. (*Id.*) However, *Harper* dealt with the question whether inmates had a constitutionally-protected liberty interest in avoiding the involuntary administration of antipsychotic drugs and, if so, whether a state-crafted policy comported with the requirements of Due Process. *Id.* *Harper* also dealt with another factor that is not present in the instant matter: In *Harper*, the Court was examining the propriety of a policy for the *ongoing, long-term administration* of such drugs as opposed to a one-time

emergency dose. The *Harper* court did not have before it, and did not address, the requirements for a one-time administration of anti-psychotics in an emergent circumstance.

14.    In *Hogan v. Carter*, 58 F.3d 1113 (4th Cir. 1996) the Fourth Circuit Court of Appeals dealt with the specific issue of the propriety of a one-time emergent administration of anti-psychotic drugs against an inmate's will. In that case, inmate Hogan had been diagnosed as having Borderline Personality Disorder with antisocial features, as well as bipolar disorder. (*Id.* at 1114) On the night in question, a nurse at the prison facility contacted Dr. Carter by telephone and informed him that Hogan had been "beating on his cell door" "kicking and banging on [his] door [] with [his] fists" in a manner that suggested he might injure himself, and that he continued to beat and bang on the cell, kicking and cursing staff and others." (*Id.*) After the nurse relayed this information to Dr. Carter, Carter ordered Hogan be restrained and a single dose of Thorazine be administered. (*Id.* at 1115) Discussing and analyzing *Harper*, the *Hogan* court distinguished that ruling and found that where a "licensed psychiatrist who was personally familiar with the inmate's medical history determined, pursuant to and consistent with accepted professional judgment, that it was in [the inmate's] medical interest to receive the one-time dose of Thorazine in order to protect [the inmate] from imminent, self-inflicted harm." (*Id.* at 1117) Similar facts militate for a similar conclusion. Like Dr. Carter, Dr. Cannuli is a licensed psychiatrist who had been treating Plaintiff since he began working at DCC on January 2, 2006 and was therefore familiar with Plaintiff's history. (Exhibit "B", Affidavit of Anthony Cannuli, M.D. at ¶ 1) Like Dr. Carter, Dr. Cannuli received reports from Nurse Snider and corrections officers regarding Plaintiff's actions. (*Id.* at ¶¶ 4, 6-7) Plaintiff here had been placed under observation following a suicide attempt, had been yelling and beating on the cell, had covered the cell camera with tissue paper, urinated on the window and threatened to throw feces at anyone who entered the cell.

Unlike Dr. Carter, Dr. Cannuli enjoyed the advantage of being able to personally examine and interact with Plaintiff before ordering the medication in question. (Exhibit A at 8-9, Exhibit B at 3-7)  In addition, here the Plaintiff was deemed a threat to injure not only himself, but other staff as well, thus increasing the justification.  *See Harper, supra*, 494 U.S. at 227 (holding that administration of psychotropic medications against an inmate's will is justified where he poses a threat to himself or others"); *accord*, *Hogan,* 85 F.3d at 1117; *See also Wilson v. Chang*, 955 F.Supp 18, 21 (D.R.I. 1997) ("The rule to be garnered from *Hogan* is that a prison doctor, if he has reasonable grounds to believe that an inmate is a danger to himself or others, utilizing his medical judgment in a medically appropriate manner, may inject the inmate with a sedative to deal with an emergency situation.")

Dr. Cannuli (and therefore Nurse Snider as well) is entitled to judgment in his favor as a matter of law.

### *Plaintiff Cannot Show Dr. Durst or Dr. Rogers were Deliberately Indifferent*

15.    Plaintiff alleges that he received no medical assistance from either Dr. Rogers or Dr. Durst on August 22, 2006.  (D.I. 4, Statement of Facts at ¶ IIIA, B)   However, the medical records show that his finger was x-rayed and the finger was buddy-taped to his other fingers for immobility that same day.  (Exhibit A at 1, 3).  The x-ray report was faxed back to the prison on August 25, 2006, a Friday. (*Id.* at 2) On Monday, August 28, a doctor read the results and ordered the orthopedic consultation on August 29. (*Id.* at 2, 3)  On August 30, Plaintiff was admitted to the infirmary following his suicide attempt. (*Id.* at 1, 4)  Plaintiff remained under observation until he went to see the orthopedic surgeon, Dr. DuShuttle on September 14, who examined the Plaintiff and recommended a surgical process to "pin" the finger. (*Id.* at 12, 13)

8

On October 4, 2006, Plaintiff was taken to the hospital for Dr. Dushuttle to perform the operation, but Plaintiff refused the procedure. (*Id.* at 16-19)

16. In order to state a claim for a violation of civil rights based on medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency.'" *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In order to show "deliberate indifference," a plaintiff must demonstrate an act or omission and a sufficiently culpable state of mind on the part of the defendant. *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994).

17. Here, Plaintiff cannot meet his burden to show that he did not receive adequate medical care. He was seen by a health care provider the day after his injury and was x-rayed and his finger taped the same day. (Exhibit A at 1) When the x-ray reports were received and reviewed, a consultation promptly was scheduled with an orthopedic specialist. (*Id.* at 2, 3) Plaintiff was taken to see the orthopedic specialist within two weeks, and was then scheduled for surgical intervention within an additional two weeks. (*Id.* at 12-15) When Plaintiff was taken to the hospital, however, he refused the procedure. (*Id.* at 16-19)

18. The undisputed facts in the medical records show that Plaintiff was provided adequate medical attention, and that he refused the treatment offered. Dr. Durst and Dr. Rogers are entitled to judgment in their favor as a matter of law.

*Conclusion*

Wherefore, for the foregoing reasons, defendants Dr. Cannuli, Nurse Snider, Dr. Durst and Dr. Rogers respectfully request the entry of judgment in their favor as a matter of law.

                                                         BALICK & BALICK, LLC

                                                         /s/ James E. Drnec
                                                    James E. Drnec, Esquire (#3789)
                                                    711 King Street
                                                    Wilmington, Delaware 19801
                                                    302.658.4265
                                                    Attorneys for Defendants
                                                    John Durst, M.D., Anthony Cannulli, M.D., Dale Rodgers,
                                                    M.D., and Mary Snider, R.N.

Date:   April 8, 2008

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JIMMIE LEWIS, | ) | |
| | ) | Case No. 06-778 (GMS) |
| Plaintiff, | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| THOMAS L. CARROLL, DR. CANNULLI, | ) | |
| DR. ROGERS, DR. DURST, LT. LARRY | ) | |
| SAVAGE, LT. RALPH HEVERIN, SGT. | ) | |
| GWENDOLYNN EVERETTE, C/O | ) | |
| TELLIFFE, SGT. CAIN, MARY SNIDER, | ) | |
| CHARLES BENSON, C/O BUCKLE | ) | |
| | ) | |
| Defendants. | ) | |

### AFFIDAVIT OF DR. CANNULI IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| COUNTY OF NEW CASTLE | ) |

I, Anthony Cannuli, M.D., being duly sworn hereby aver as follows:

1. I am over the age of 18 and competent to make this affidavit. I am a licensed, board-certified psychiatrist and have been involved in the care and treatment of Plaintiff since January 2006.

2. Plaintiff attempted suicide by hanging on or about August 30, 2006. As a result, he was admitted to the infirmary for observation and treatment.

3. On September 6, 2006 I spoke with Plaintiff at length. He was unable to contract for his own safety and so I determined it was not in his best interests to allow him to be returned to isolation, a place he stated made him feel "totally overwhelmed". As a result, Plaintiff remained in an observation cell in the infirmary.

4. Later in the afternoon of September 6, 2006, I was contacted by a corrections officer who stated that Plaintiff was covering the lens of the camera in his cell with tissue, making it difficult to observe Plaintiff.

5. In response to the corrections officer's statements I spoke again with Plaintiff, who became very agitated. As a result, I placed Plaintiff on Level II observation. One

requirement of Level II observation is that the patient's clothes must be removed and replaced with a tear away gown to reduce the patient's ability to harm him self.

6. Still later that day, I was again contacted by a corrections officer who told me that the Plaintiff had urinated on his cell window and was threatening to throw feces, making it impossible for anyone to get into Plaintiff's cell to collect his clothes. I also spoke with nursing, who informed me of their observations of Plaintiff, which were consistent with those reported by corrections.

7. Based on my discussions with the corrections officers, with nursing, and on my own observations and interactions with Plaintiff that day, I ordered that Plaintiff be injected with 5 mg of Haldol intramuscularly and with 1 mg of Cogentin intramuscularly for his protection and for the protection of the staff. This was a one-time order intended to allow the guards and/or staff to interact with Plaintiff under conditions least likely to cause injury to Plaintiff and/or to staff.

FURTHER THE AFFIANT SAYETH NOT.

_____
Anthony Cannuli, MD    4-8-08

_____
Witness -- Notary
My commission expires: 8/18/08

**CERTIFICATE OF SERVICE**

I, James Drnec, hereby certify that on the 8th day of April 2008, the foregoing Defendants Dr. Cannuli, Mary Snider, Dr. Durst, and Dr. Rogers' Motion for Summary Judgment was filed via CM/ECF and served via First Class Mail upon the following:

>Jimmie Lewis
>SBI#506622
>Delaware Psych Center
>Mitchell Building
>1901 N. Dupont Hwy
>New Castle, DE 19720
>
>Erika Yvonne Tross, Esquire
>Delaware Department of Justice
>Civil Division
>820 North French Street
>6th Floor
>Wilmington, DE 19801

>/s/ James E. Drnec
>James E. Drnec, Esquire (#3789)