IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JIMMIE LEWIS, | ) |
| a/k/a Emmanuel E. Elder, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 06-778-GMS |
| | ) |
| THOMAS L. CARROLL, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM**

### I. INTRODUCTION

The plaintiff, Jimmie Lewis ("Lewis"), who proceeds *pro se*, filed this lawsuit pursuant to

42 U.S.C. § 1983 alleging violations of his constitutional rights and raising supplemental state

claims. At the time he filed the complaint, Lewis was an incarcerated individual within the

Delaware Department of Correction ("DOC"). (D.I. 2, 4.) Lewis is no longer incarcerated and

no longer resides in the State of Delaware. Before the court are the parties' motions for summary

judgment. (D.I. 239, 243, 252.) For the reasons that follow, the court will grant the medical

defendants' motion for summary judgment, will deny Lewis' motion for summary judgment, and

will grant the State defendants' motion for summary judgment.

### II. BACKGROUND

Lewis filed this action raising a number of claims all of which he alleges violated his

constitutional rights. (D.I. 2, 4.) The court dismissed several claims and defendants following

screening of the complaint pursuant to 28 U.S.C. § 1915. Other defendants were dismissed for

Lewis' failure to serve process upon them. Lewis was allowed to proceed with: (1) Eighth

Amendment medical claims against the defendants Warden Thomas L. Carroll ("Carroll"), Dr.

Cannuli ("Dr. Cannuli"), Dr. Durst ("Dr. Durst"), Dr. Rodgers ("Dr. Rodgers"),[1] and Sgt. Cain

("Cain"); (2) First Amendment access to the courts claims against Carroll and Dr. Cannuli; (3)

Eighth Amendment excessive force claims against correctional officer Jelliffe ("Jelliffe")[2], nurse

Mary Snyder ("Snyder"),[3] and Sgt. Gwendolyn Everette ("Everette"); (4) Fourteenth Amendment

due process claims against Dr. Cannuli, Snyder, and Lt. Larry Savage ("Savage"); and (5) a

retaliation claim against correctional officer Buckle ("Buckle").[4] The medical defendants Dr.

Cannuli, Snyder, Dr. Durst, and Dr. Rodgers ("medical defendants"), the State defendants

Carroll, Everette, Jelliffe, Cain, and Savage ("State defendants"), and Lewis move for summary

judgment on the remaining issues, as follows:

## A. Excessive Force, Use of Capstun

Lewis alleges that on November 2, 2005, Everette sprayed capstun into his face without

warning or reason for at least sixty seconds, until the can was empty, following Lewis' repeated

requests to speak to a lieutenant that Everette had ignored. (D.I. 4, VII.)

According to Everette, on the day in question, she was collecting food trays and Lewis

refused to return the tray to her because he was upset over a prison trust account issue. Lewis

asked to speak to a lieutenant, but Everette refused the request because she did not believe it was

warranted. Everette gave Lewis two direct orders to give her his tray and he refused, stating that

---

[1]Misspelled in the complaint and on the court docket as "Dr. Rogers."

[2]Misspelled in the complaint and on the court docket as "Telliffe."

[3]Misspelled in the complaint and on the court docket as "Snider"

[4]Lewis voluntarily dismissed the claims against Buckle on April 4, 2009. (*See* D.I. 138.)

he was going to take the tray and break the glass with it. Everette opened the cell flap and gave Lewis one last order but, instead of handing her the tray, he put his hand through the flap and tried to grab Everette while yelling, "I'm gonna choke you and kick your ass." Everette sprayed Lewis in the face with capstun because of his behavior and informed the staff lieutenant of the incident. Lewis was removed from the cell and seen by medical. (D.I. 254, A1-2.)

Corporal Maans ("Maans") witnessed the incident. He heard Lewis threaten Everette, saw Lewis reach through the flap of the cell door to try to grab at Everette, and heard Lewis threaten to "choke her out." Maans witnessed Everette spray Lewis with two, one second bursts of capstun. (D.I. 254, A6-9.)

According to Lewis, when Everette requested his food tray, he responded by asking to speak to a lieutenant, wherein Everette responded with an obscenity, did not retrieve the tray, and left the unit. Everette returned to Lewis' cell five minutes later, opened the flap, called Lewis over, and gestured for him to come closer. Everette then sprayed capstun into Lewis' face. Lewis states that he did not verbally or physically threaten Everette and did not lunge or try to grab her. Everette sprayed the capstun for at least sixty seconds. Lewis states that he suffered injuries that lasted for several days including burning eyes, burning skin, sore throat, and coughing that lasted for one full week. (D.I. 256, ¶¶ 2-13.)

Lewis received a disciplinary report and during the hearing admitted that he kept his tray because he wanted to speak to the lieutenant and that he was going to bust the tray and break the window. He denied making the statements Everette said he did. Lewis was found guilty. (D.I. 254, A2, A11.)

-3-

## B. Due Process/Disciplinary Hearings

Lewis received sanctions following disciplinary hearings conducted by Savage. Lewis alleges violations of his right to due process when he did not receive written notices of code violations or notices of fact finding, was not allowed to present evidence on his own behalf, not allowed to appeal, and hearings were conducted more than seven days after the disciplinary violation. (D.I. 4, ¶¶ III, XXII.)

The record reflects that on August 30, 2006, Lewis threw his state issued television from the upper tier to the lower tier, shattering it. Lewis was given disciplinary report No. 1027067, and a notice of disciplinary hearing for the incident. Lewis pled not guilty, did not request counsel, but requested the right to confront his accuser and to have witnesses at his hearing. Lewis was present at the September 7, 2006 hearing before hearing officer Savage. Lewis stated that he did not remember the incident. Lewis was found guilty and sanctioned to fifteen days confinement. Lewis did not appeal. (D.I. 254, A25-30.)

On September 5, 2006, Lewis was written up for disorderly and threatening behavior, disrespect, and failing to obey an order, in disciplinary report No. 1027195. Lewis asked to confront his accuser at the hearing, but he did not request counsel or that he be allowed to call any witnesses. During the hearing before hearing officer Savage, Lewis stated that he acted in the manner he had because he "wasn't in the right state of mind." According to Savage, at the hearing, Lewis did not ask to confront his accuser. Lewis was found guilty and indicated that he intended to appeal, but failed to do so by the expiration of the seventy-two hour period provided for filing such appeals. Lewis was sanctioned to thirty days confinement to quarters. According to Savage, on both occasions, Lewis received notice of the code violations, was informed of the

-4-

day and time of his hearing, informed that he could request counsel and witnesses, that he could confront his accuser, and that he could file an appeal. (D.I. 254, A31-41.)

## C. Involuntary Administration of Psychotropic Medication and Excessive Force

Lewis alleges that on September 6, 2006, Dr. Cannuli wrote an order to involuntarily inject Lewis with two separate psychotropic drug cocktails even though there was no evidence of psychosis. Lewis alleges that in preparing to administer the injection, Jelliffe and several other officers tackled him, and Jelliffe abruptly and aggressively twisted his arm and stood on his arm pit and back while shouting obscenities at him. Lewis alleges that, although he informed Snyder that he did not want it, she injected him against his will. Lewis alleges he sustained swelling and bruising to his right arm shoulder blade, swelling and bruising to the right wrist, and swelling and bruising to the two areas where he received the injection. Lewis alleges the actions of the above defendants violated his Eighth and Fourteenth Amendment rights and constituted civil assault and battery. (D.I. 4 ¶ I.)

The record reflects that on August 30, 2006, Lewis was admitted to the infirmary and placed on Level I observation following a suicide attempt. Admitting diagnoses included hypertension (i.e., HTN), schizophrenia, and defiant non-compliant. From September 3 to 6, 2006, Lewis was belligerent, non-compliant with the medical defendants, and verbally abusive to DOC correctional officers, and on two occasions threatened to throw feces on correctional officer Rosalie Vargas ("Vargas"). (D.I. 254 at A35, 58, 60, 67-72.) On September 4, 2006, he complained that if he were sent back to his housing unit, he would commit suicide. (D.I. 241 at 1, 4, 6-11; D.I. 244, ¶ 17; D.I. 254 at A35, 58, 60, 67-72.)

Lewis remained in the infirmary and he spoke to Dr. Cannuli at length on the morning of September 6, 2006. Dr. Cannuli noted that Lewis could not contract for his own safety and ordered continued monitoring of Lewis in the infirmary, with preparations for commitment to the Delaware Psychiatric Center if needed. Lewis states that Dr. Cannuli told him that he was being discharged. At noon, Lewis saw that other inmate patients were being discharged. (D.I. 241 at 12; D.I. 244, ¶¶ 21-22; 254 at A73.)

That day, Lewis was screaming, pounding on the door, spitting on the glass, and very agitated. Medical was unable to talk him down. Lewis covered the surveillance camera lens in his cell with paper. He was ordered by Jelliffe to remove the paper, but refused. Jelliffe asked Dr. Cannuli to speak to Lewis again because he was angry and asking why he had not been discharged. Lewis was told that during the earlier meeting he had not been rational and Lewis became agitated. Dr. Cannuli placed Lewis on Level II observation and left the infirmary. A requirement of Level II observation is removing a patient's clothing and replacing them with a tear-away gown to reduce the patient's ability to harm himself. (D.I. 240, ex. D; D.I. 241 at 7, 11, 13; D.I. 254 at A42-43, 45.)

Jelliffe asked Lewis to remove his clothing, but he refused. The incident report states that Lewis told Jelliffe that he was going to spread feces on the walls and then he urinated on the floor and walls of his cell. Lewis denies releasing any bodily waste. According to Lewis, once Dr. Cannuli arrived at the infirmary he conferred with Snyder, and Jelliffe, and then Dr. Cannuli advised Lewis that he had ordered a forced injection. Medical records indicate that Dr. Cannuli was advised of Lewis' behavior and verbally ordered Snyder to inject Lewis with Haldol and Cogentin. Dr. Cannuli's note states that Lewis' "threat of throwing feces when the CO's were

-6-

going in to take his clothes etc. is a very serious threat of harm to others, therefore the medication is justified for the protection of staff." In his affidavit, Dr. Cannuli states that he ordered the injections for Lewis' protection and for the protection of the staff, based upon his discussions with the corrections officers, nursing, and his own observations and interactions with Lewis on September 6, 2006. It was a one-time order that Dr. Cannuli believed was in Lewis' best medical interest in order to protect Lewis from harming himself and to allow the guards and/or staff to interact with him under conditions least likely to cause injury to Lewis and/or to staff. Lewis states that Dr. Cannuli did not speak with him prior to ordering the injection. (D.I. D.I. 240, ex. D ¶ 8; D.I. 241 at 7, 11, 13; D.I. 244, ¶¶ 23-24, 26.)

Medical records indicate that Lewis was cuffed, transferred to a cell, given the injection, and stripped. According to Lewis, Jelliffe and several other officers handcuffed him, moved him to an adjoining cell and tackled him to the floor, following by Jelliffe twisting Lewis' arm and standing on his armpit to enable Snyder to administer the injections. Lewis states that he did not fight back to resist the forced injections. According to Jelliffe, Lewis was not "tackled to the floor and handled aggressively or maliciously." Rather, Lewis complied and there was no reason to use force. The incident report does not indicate that force was used. Lewis informed Snyder prior to the administration of the injections that he did not consent. (D.I. 241 at 7, 11; D.I. 244, ¶ 29; D.I. 254, A42-44; D.I. 256, ¶¶ 36-38.)

Lewis remained on observation for forty-eight hours and was discharged. On September 8, 2006, Lewis expressed suicidal ideation and returned to the infirmary for observation. On September 8, 2006, Lewis asked to see a see a nurse because he was going to hurt himself. Lewis spoke with a nurse and was then transferred to the infirmary. (D.I. 241 at A14-15, 59.)

## D. Access to the Courts

Lewis alleges that Carroll violated his right to access to the courts by denying him large envelopes needed to mail a post-conviction appeal. (D.I. 4, ¶ IV.)

Pursuant to DOC Policy 4.0, indigent inmates are provided mail supplies for any legal mail. Indigent inmates are provided up to four extra large (12" x 15") envelopes. These envelopes are generally sufficient for an inmate's legal filings. If additional envelopes are needed for legal documents, an inmate can request them from the law library. The indigent inmate is required to provide evidence that he has a court deadline. If there are no large envelopes available, the indigent inmate is given a sufficient number of smaller envelopes in which to send his legal documents. If an indigent inmate has a court deadline to meet prior to the beginning of the month's distribution day, the inmate can request legal supplies from the law library. (D.I. 254, at A52-56.)

## E. Medical Needs

An x-ray, taken on August 22, 2006, indicated that Lewis had a fractured little finger. Lewis alleges that Dr. Durst confirmed the finger was broken, but left without providing Lewis treatment. Lewis further alleges that Dr. Rodgers was notified of the injury shortly thereafter, but failed to provide him treatment or pain medication. Lewis informed Cain on August 30, 2006, that he needed emergency medical treatment and Cain responded by ordering Lewis to lock in to his assigned cell because Cain viewed the request as a violation of a disciplinary code to lock in. Lewis alleges the injury "persisted" until November 30, 2006. In addition, Lewis alleges that Dr. Rodgers failed to provide treatment for a toenail fungus condition, despite numerous sick call requests beginning on April 7, 2005. Lewis alleges that Dr. Rodgers was made aware of his

-8-

condition, but refused to provide treatment because it was a cosmetic problem and there was nothing she could prescribe.[5] (D.I. 4, ¶¶ III, VI.)

The record reflects that Lewis injured his finger playing basketball and was seen by medical on August 21, 2006. An x-ray was ordered and it was performed the next day. The x-ray revealed a displaced avulsion fracture of the left fifth finger. Lewis was treated with "buddy tape" to the hand, but he removed it stating that it was "inappropriate care." Lewis states that the treatment intensified his pain. According to Dr. Durst and Dr. Rodgers, pending an orthopedist's review, the only treatment necessary was to continue to immobilize the finger and provide pain medication, if necessary. Medical submitted an orthopedic consultation request on August 29, 2006, and it was approved on August 31, 2006. (D.I. 241 at 1-7; D.I. 244 ¶¶ 3, 6, 9.)

According to Lewis, he suffered excruciating pain while housed in general population, told Cain and requested medication attention, but Cain refused and locked Lewis in his cell. Lewis states that due to Cain's actions he received no further treatment for several weeks.

---

[5]Neither Dr. Rodgers nor Lewis refer to the toenail fungus condition in their pending motions for summary judgment. The court has scoured the medical records and did not find any indication that, prior to filing a grievance complaining of the failure to treat the nail fungal condition, Lewis submitted a request for medical care. Notably, once the condition was brought to the attention of the medical provider, Lewis was given medication for the condition. (*See* D.I. 9; D.I. 129; D.I. 240, ex. C.) Further, the record does not support a finding that the condition was a serious medical need. *See e.g., Fear v. Diboll Corr. Ctr.*, 582 F. Supp. 2d 841 (E.D. Tex. 2008) (nail fungus condition did not amount to a serious medical need); *Winkleman v. Feinerman,*, Civ. No. 08-369-MJR-PMF, 2010 WL 5479666 (S.D. Ill. Dec. 6, 2010 (the court has some doubts whether nail fungus constitutes a serious medical need). Hence, a reasonable jury could not find for Lewis on the nail fungus medical needs issue. Finally, the court considers the issue waived. The court imposed deadlines for the filing of motions for summary judgment and Lewis filed a motion for summary against the Dr. Rodgers, but failed to raise the nail fungus medical needs issue. (D.I. 175, 243.) Failure to raise an issue in the district court constitutes a waiver of the argument. *See Medical Protective Co. v. Watkins*, 198 F.3d 100, 105 n.3 (3d Cir. 1999) (citing *Brenner v. Local 514, United Bhd. of Carpenters*, 927 F.2d 1283, 1298 (3d Cir. 1991)).

Medical records reflect that Lewis was administered pain medication on August 31, 2006,
September 3, 4, 6, 7, and 8, 2006, but on several occasions refused the medication. (D.I. 241, 5-
7, 15; D.I. 244, ¶¶ 12013; D.I. 256, ¶¶ 21-22.)

Lewis was seen by an orthopedic surgeon on September 14, 2006, who recommended that
Lewis undergo surgery to pin the finger. The recommended surgery was approved and Lewis
presented for his appointment with the orthopedic surgeon on October 4, 2006. Lewis refused
the surgery after arriving at the hospital. Lewis does not explain why he refused the surgery.
Thereafter, the surgeon reported that he would no longer treat Lewis. (D.I. 240, ex. B; 241 at 1-
3, 16-21.)

## III. STANDARD OF REVIEW

A grant of summary judgment is appropriate only where "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of
material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586
n.10 (1986). "When considering whether there exist genuine issues of material fact, the court is
required to examine the evidence of record in the light most favorable to the party opposing
summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v.
Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The "mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly supported motion for summary
judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury
could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). Moreover, "the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks omitted).

All parties move for summary judgment. The rules are no different when there are cross-motions for summary judgment. *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

## IV. DISCUSSION

### A. Eleventh Amendment Immunity

The State defendants move for summary judgment to the extent that Lewis seeks damages against them in their official capacities. Lewis did not respond to the issue.

The Eleventh Amendment guarantees that non-consenting states may not be sued by private individuals in federal court unless Congress abrogates the states' immunity pursuant to a valid exercise of its power. *See Board of Trustees of the Univ. of Al. v. Garrett*, 531 U.S. 356, 363 (2001). State officials acting in their official capacities have the same Eleventh Amendment immunity from damage suits as the state itself. *See Hafer v. Melo*, 502 U.S. 21, 30 (1991). Section 1983 did not abrogate the State of Delaware's Eleventh Amendment immunity and it has not waived it's immunity. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979) (section 1983 was

not intended to abrogate a State's Eleventh Amendment immunity); *Brooks-McCollum v. Delaware*, 213 F. App'x 92, 94 (3d Cir. 2007) (not published) (The State of Delaware has not waived its immunity from suit in federal court). To the extent the State defendants are sued in their official capacities, they are immune from suit. Therefore, the court will grant the State defendants' motion for summary judgment as to this issue.

## B. Personal Involvement/Respondeat Superior

Carroll moves for summary judgment on the grounds that he did not personally participate in the alleged constitutional violations and supervisory liability is not viable in a § 1983 claim. Lewis does not oppose the motion for summary judgment as to Carroll, either in the realm of personal involvement and respondeat superior or on the merits of the due process and medical needs claims Lewis raised against Carroll.

As is well established, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

"Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009). In *Iqbal*, the Supreme Court emphasized that "[i]n a § 1983 suit - here masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government

official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S.Ct. at 1949. "Thus, when a plaintiff sues an official under § 1983 for conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well." *Dodds v. Richardson*, 614 F.3d 1185, 1198 (11ᵗʰ Cir. 2010) (quoting *Iqbal* 129 S.Ct. at 1949.) The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue. *Id.*

Under pre-*Iqbal* Third Circuit precedent, "[t]here are two theories of supervisory liability," one under which supervisors can be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm," and another under which they can be liable if they "participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." *Santiago v. Warminster Twp.*, –F.3d–, No. 10-1294, 2010 WL 5071779, at *4 n.5 (3d Cir. Dec. 14, 2010) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (second alteration in original)). "Particularly after *Iqbal*, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue." *Id.* at *5.

The Third Circuit has recognized the potential effect that *Iqbal* might have in altering the standard for supervisory liability in a § 1983 suit but, to date, has declined to decide whether *Iqbal* requires narrowing of the scope of the test. *Santiago*, 2010 WL 6082779 at * 5 n.8; *see, e.g., Bayer v. Monroe County Children and Youth Servs.*, 577 F.3d 186, 190 n.5 (3d Cir. 2009)

-13-

(In light of *Iqbal*, it is uncertain whether proof of personal knowledge, with nothing more, provides a sufficient basis to impose liability upon a supervisory official.). Hence, it appears that, under a supervisory theory of liability, and even in light of *Iqbal*, personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's constitutional right.[6] *Williams v. Lackawanna County Prison*, Civ. No. 07-1137, 2010 WL 1491132, at *5 (M.D. Pa. Apr. 13, 2010).

Facts showing personal involvement of the defendant must be asserted; such assertions may be made through allegations of specific facts showing that a defendant expressly directed the deprivation of a plaintiff's constitutional rights or created such policies where the subordinates had no discretion in applying the policies in a fashion other than the one which actually produced the alleged deprivation; *e.g.*, supervisory liability may attach if the plaintiff asserts facts showing that the supervisor's actions were "the moving force" behind the harm suffered by the plaintiff. *See Sample v. Diecks*, 885 F.2d 1099, 1117-118 (3d Cir. 1989); *see also Iqbal*, 129 S.Ct. at 1949-54; *City of Canton v. Harris*, 489 U.S. 378 (1989); *Heggenmiller v. Edna Mahan Corr. Inst. for Women*, 128 F. App'x 240 (3d Cir. 2005) (not published).

It appears that Lewis named Carroll as a defendant based upon his supervisory position. There is no evidence of record showing Carroll's personal involvement regarding the access to the courts or medical needs issues. Lewis filed a grievance complaining there was delay in filing

---

[6]"'Supervision' entails, among other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance whether through individualized discipline or further rulemaking." *Sample v. Diecks*, 885 F.2d 1099, 1116 (3d Cir. 1989). "For the purpose of defining the standard for liability of a supervisor under § 1983, the characterization of a particular aspect of supervision is unimportant. " *Id.* at 1116-17.

his post-conviction due to actions of the law library clerk. (D.I. 249, grievance No. 75286 dated Sept. 28, 2006.) The grievance makes no mention of Carroll. Nor does the record make mention of Carroll with regard to Lewis' medical needs claims. For the above reasons, the court will grant Carroll's motion for summary judgment on the issue of personal involvement/ respondeat superior.

## C. Exhaustion of Administrative Remedies

Dr. Cannuli and Snyder move for summary judgment on the grounds that, as to the claims raised against them, Lewis has failed to exhaust his administrative remedies. Lewis opposes the motion and argues the medical defendants offer no evidence to demonstrate that a grievance process was available to Lewis or that the prison staff did nothing to thwart's Lewis' ability to avail himself of the grievance process.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle,* 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"). Defendants have the burden of pleading and proving failure to exhaust administrative remedies as an affirmative defense in a § 1983 action. *Ray v. Kertes,* 285 F.3d 287, 295-96 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S.

731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).

"[P]rison grievance procedures supply the yardstick for determining what steps are required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007). A prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA. *Williams,* 482 F.3d at 639; *Spruill v. Gillis,* 372 F.3d 218, 228, 231 (3d Cir. 2004). Perfect overlap between the grievance and a amended complaint is not required by the PLRA as long as there is a shared factual basis between the two. *Woodford,* 548 U.S. at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance"). A futility exception to the PLRA's mandatory exhaustion requirement is completely precluded. *Nyhuis v. Reno,* 204 F.3d 65, 71 (3d Cir. 2000). The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill,* 372 F.3d at 227-28; *Nyhuis,* 204 F.3d at 67. A grievance procedure is not available, even if one exists on paper, if the defendant prison officials somehow prevent a prisoner from using it. *Mitchell v. Horn,* 318 F.3d 523 (3d Cir. 2003). If prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak,* 312 F.3d 109, 112-13 (3d Cir. 2002).

Delaware Department of Correction ("DOC") administrative procedures provide for a multi-tiered grievance and appeal process. (D.I. 135, ex. 4 DOC Policy 4.4 (revised May 15,

1998)).  Medical grievances are first forwarded to the medical services staff who attempt an

informal resolution of the matter.  If this fails, the grievance goes to the Medical Grievance

Committee, which conducts a hearing.  If the matter is still not resolved, the inmate may once

again appeal.  DOC Policy 4.4 (revised May 15, 1998).  With regard to non-medical grievances,

first, the prisoner must file a grievance within seven days with the Inmate Grievance Chair for an

attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Grievance

Resolution Committee for a determination, which is forwarded in turn to the Warden; and third,

the Bureau Grievance Officer conducts the final level of review.  *Id.*

  In the complaint, Lewis states that he fully exhausted his administrative remedies

regarding each of his claims, that he filed a "grievance in accordance to grievance procedure 4.4"

and it was "not grievable."  (D.I. 2.)  In his opposition to summary judgment on this issue, Lewis

relies upon DOC Form 584 which states that disciplinary actions are "non-grievable."[7]  (D.I.

250.)  Lewis argues that the forced injection was a disciplinary action and, therefore, the

grievance process was unavailable to him.

  When Lewis filed his complaint he submitted several grievances, none of which raised

the issue of the forced injections.  In addition, during discovery, the DOC produced copies of all

grievances submitted by Lewis.  Dr. Cannuli and Snyder relied upon those grievances in moving

for summary judgment on the ground that Lewis failed to exhaust his administrative remedies.

Not one grievance is directed to the issue of Dr. Cannuli's order to Snyder to administer the

injections to Lewis or to the access to the courts claim directed against Dr. Cannuli.  Lewis

---

  [7]Lewis' reply brief states that Form 584 is attached as Exhibit B for the court's review.  It
was not.  Exhibits previously filed by Lewis, however, contained the exhibit.

submitted numerous grievances which indicates that he was aware of the grievance system and, indeed, used the grievance system. While he may have believed the issue was non-grievable, the benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. Lewis did not give the system an opportunity to consider his complaint regarding the forced administration of medication. Finally, there is nothing of record to support Lewis' argument that the prison start thwarted his ability to avail the prison grievance process.

A review of the record reveals that Lewis has failed to demonstrate that he has exhausted his claims against Dr. Cannuli and Snyder. Lewis' failure to properly exhaust is fatal to his claims. "[I]t is beyond the power of this court . . . to excuse compliance with the exhaustion requirement." *Nyhuis*, 204 F.3d at 73. Accordingly, the Court will grant Dr. Cannuli's and Snyder's motion for summary judgment as to the claims raised against them on the basis of failure to exhaust administrative remedies.[8]

---

[8]Even if Lewis had exhausted the Eighth and Fourteenth Amendment claims relative to the forced administration of medication, based upon the evidence of record, a reasonable jury could not find in his favor. Lewis cannot survive the medical defendants' motion for summary judgment absent expert testimony that would dispute Dr. Cannuli's affidavit that the treatment Lewis received was medically necessary. *See Aruanno v. Glazman*, 316 F. App'x 194 (3d Cir. 2009) (not published). Finally, Lewis cannot prevail upon the other claims against Snyder and Dr. Cannuli (i.e., excessive force against Snyder and access to the courts against Dr. Cannuli.) Based upon the record, no reasonable jury could find that Snyder used excessive force when she administered the injections. Nor is there any evidence of personal involvement by Dr. Cannuli in Lewis's allegations of denial of access to the courts. Finally, because summary judgment will be granted on the federal claims, the court declines to exercise jurisdiction over Lewis' supplemental state law claims. 28 U.S.C. § 1367; *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003).

-18-

### D. Medical Needs

Lewis, Dr. Rodgers, Dr. Durst, and Cain move for summary judgment on the fractured

finger medical needs claim.[9] Lewis argues that Dr. Rodgers and Dr. Durst identified the severity

of his injury, but ignored his pleas for treatment, and this resulted in no treatment for several

weeks. Dr. Rogers and Dr. Durst argue that Lewis' finger was x-rayed the day after the injury

reported, the finger was immobilized, an orthopedic consult was requested, Lewis received pain

medication but was non-compliant with the immobilization and pain medication, and ultimately

refused surgery. Cain argues that Lewis has not alleged a violation of a constitutional right.

The Eighth Amendment proscription against cruel and unusual punishment requires that

prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97,

103-105 (1976). However, in order to set forth a cognizable claim, an inmate must allege (i) a

serious medical need and (ii) acts or omissions by prison officials that indicate deliberate

indifference to that need. *Estelle v. Gamble*, 429 U.S. at 104; *Rouse v. Plantier*, 182 F.3d 192,

197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a

substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by

"intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-

05.

---

[9]Carroll also moves for summary judgment on the medical needs claim. As discussed
above, the court will grant his motion for summary judge for lack of personal involvement and
because § 1983 liability cannot lie under a respondeat superior theory of recover. Hence, the
court will not address the medical needs issue as alleged against Carroll.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

The evidence of record reflects that Lewis received treatment within a very short time following his injury, albeit not to his liking. Dr. Durst's and Dr. Rodger's unrefuted statements are that the only necessary treatment was immobilization and pain medication pending the orthopedic consultation. Lewis, however, did not agree with the "buddy tape" procedure and removed it. In addition, Lewis was administered pain medication, but on several occasions refused it. Moreover, Lewis was evaluated (in less than a month from the injury), surgery was recommended and approved, but Lewis refused to undergo the procedure. Finally, while Lewis may not have received medical care immediately upon his request to Cain, it is clear from the medical records that Lewis received care and treatment. Upon review of the record, the court finds that there is insufficient evidence to enable a jury to reasonably find for plaintiff on the

-20-

issue of whether defendants were deliberately indifferent to his medical needs. Therefore, the court will grant the motions for summary judgment of Dr. Rodgers, Dr. Durst, and Cain and will deny Lewis' motion for summary judgment as to this issue.

## E. Excessive Force

State defendants Jelliffe and Everette move for summary judgment on the grounds that they acted reasonably when responding to serious threats by Lewis. Lewis argues that Jelliffe's actions were to punish him for engaging in a verbal confrontation and Everette's actions were unjustified and malicious as punishment for perceived insubordination.

The core judicial inquiry when a prisoner alleges that prison officers used excessive force against the prisoner is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *See Wilkins v. Gaddy,* – U.S. –, 130 S.Ct. 1175 (2010); *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). Use of force is actionable under § 1983 when it exceeds "that which is reasonable and necessary under the circumstances." *Davidson v. O'Lone*, 752 F.2d 817, 827 (3d Cir. 1984). The court must determine whether the force was applied in good faith by weighing the following factors: (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, (4) the threat reasonably perceived by the responsible officials, and (5) the efforts made to temper the severity of a forceful response. *Brooks v. Kyler,* 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley,* 475 U.S. at 321).

Prison officials are accorded substantial latitude where prison security and the safety of prisoners and officers is at stake: "The infliction of pain in the course of a prison security

measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). In light of courts' "hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," a prisoner alleging that an officer used excessive force cannot merely question "the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Id.* at 319, 322. Rather, in the prison disturbance context, a plaintiff alleging that an officer used excessive force must establish that the officer acted "maliciously and sadistically to cause harm," causing an injury that was "more than de minimis." *Fuentes v. Wagner,* 206 F.3d 335, 345 (3d Cir.2000) (quoting *Whitley*, 475 U.S. at 320-21).

The Eighth Amendment "does not protect an inmate against an objectively *de minimis* use of force." *Smith v. Mensinger,* 293 F.3d 641, 649 (3d Cir. 2002). Allegations of far more force than Lewis has alleged have been deemed *de minimis* and dismissed. *See, e.g., Reyes v. Chinnici,* 54 F. App'x 44, 48 (3d Cir. 2002) (not published) (where corrections officer punched inmate in the shoulder to avoid being spit on); *Wilson v. Reinhart*, Civ. No. 02-1551-SLR, 2003 WL 21756393 (D. Del. Jul. 29, 2003) (spraying inmate in the face with mace was in proportion to the need to stop plaintiff from causing a disturbance in the prison). *But see Soto v. Dickey,* 744 F.2d 1260, 1270 (7th Cir. 1984) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain."); *Foulk v. Charrier,* 262 F.3d 687, 701-02 (8th Cir. 2001)

(an application of pepper spray when an inmate is being compliant can constitute an Eighth Amendment violation).

Viewing the record in light of these factors, the court finds that Everette did not use excessive force. While Lewis makes a general statement that he "did nothing to verbally or physically threaten" Everette, Lewis does not deny that refused to return his food tray to Everette as required. In addition, Lewis admitted during his disciplinary hearing that he held his tray and said he was going to bust the tray and break the window. While Lewis believes that Everette used capstun to punish him, he provides no evidence in support of his belief. In light of these facts, particularly his threat to break the window, the court finds that the "the need for the application of force" was urgent on account of "the extent of the threat to the safety of staff and inmates" that Lewis' conduct posed. *Kyler*, 204 F.3d at 106 (citation omitted). Based upon the record, a reasonable jury could not find that Everette used excessive force when she used capstun. Therefore, the court will grant Everette's motion for summary judgment on the issue of excessive force.

Similarly, a reasonable jury could not find that Jelliffe used excessive force when he assisted Snyder in administering injections to Lewis. The parties' account of the injection are at odds with one another. Lewis claims he was tackled and held down so that Snyder could administer injections. Jelliffe states Lewis was not tackled and handled aggressively or maliciously, but that Lewis "complied." Lewis also states that he did not fight back to resist the injections. Despite these difference, there is no dispute that the undisputed medical evidence indicates that, at the time, Lewis was a danger to himself and others. Even construing the facts in the light most favorable to Lewis, as the court must, Jelliffe's actions must be afforded

-23-

substantial latitude. At the time, due to Lewis' medical condition, the safety of Lewis and officers was at stake. A reasonable jury could not find, that based on the circumstances, the force used was excessive. Accordingly, the court will grant Jelliffe's motion for summary judgment on the issue of excessive force.

### F. Due Process

The State defendants argue that, because Lewis failed to show that he was deprived of any liberty interest, Savage is entitled to summary judgment on the Fourteenth Amendment due process claim. Lewis responds that he did not receive notice of his disciplinary hearings in clear violation of his constitutional right to due process.

In *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), the Supreme Court held that prisoners must be accorded due process before prison authorities may deprive them of state created liberty interests. A prison disciplinary hearing satisfies the Due Process Clause if the inmate is provided with: (1) written notice of the charges and not less than 24 hours to marshal the facts and prepare a defense for an appearance at the disciplinary hearing; (2) a written statement by the fact finder as to the evidence relied on and the reasons for the disciplinary action; and (3) an opportunity "to call witnesses and present documentary evidence in his defense when to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 563-71; *Griffin v. Spratt*, 969 F.2d 16, 19-20 (3d Cir. 1992). It is axiomatic, however, that to be entitled to procedural due process protections as set forth in *Wolff*, a prisoner must be deprived of a liberty interest. *See Wolff*, 418 U.S. at 557-558.

The Due Process Clause itself confers no liberty interest in freedom from state action taken "within the sentence imposed." *Sandin v. Conner*, 515 U.S. 472, 480 (1995) (quoting

-24-

*Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). More so, state created liberty interests protected by the Due Process Clause are generally limited to restraints on prisoners that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin*, 515 U.S. at 484).

In deciding whether a protected liberty interest exists under *Sandin*, a federal court must consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003) (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)). The Third Circuit has held that an inmate sentenced to an aggregate of 930 days in disciplinary confinement without dayroom or telephone privileges did not constitute an atypical and significant hardship sufficient to trigger a liberty interest under Sandin. *See Young v. Beard*, 227 F. App'x 138 (3d Cir. 2007) (not published).

Here, Lewis was confined to isolation for two relatively short periods of time. In one case, fifteen days, and in another, thirty days. These short sanctions were neither atypical nor significant deprivations that would give rise to a liberty interest under *Sandin*. *See Williams v. Bitner*, 307 F. App'x 609, 610-11 (3d Cir. 2009) (not published). Lewis specifically refers to the lack of proper notice in his opposition to motion for summary judgment on this issue, as well as other alleged procedural defects set forth in the complaint. However, his claims lack legal significance in the absence of any protectable interest. *See Sandin,* 515 U.S. at 487; *Accord Williams v. Bitner*, 307 F. App'x at 611.

For the above reasons, the court will grant Savage's motion for summary judgment on the due process issue.

## V. CONCLUSION

For the above reasons, the court will grant the medical defendants' motion for summary

judgment, deny Lewis' motion for summary judgment, and grant the State defendants' motion for

summary judgment.

An appropriate order will be issued.

_____, 2011
Wilmington, Delaware

CHIEF, UNITED STATES DISTRICT JUDGE